QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* application pending)
Daniel R. Koffmann (California Bar No. 344379)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
alexspiro@quinnemanuel.com
danielkoffmann@quinnemanuel.com

Christopher G. Michel (*pro hac vice* application pending)
Casey J. Adams (*pro hac vice* application pending)
Rachel G. Frank (California Bar No. 330040)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
christophermichel@quinnemanuel.com
caseyadams@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Attorneys for X Corp.,*
*successor in interest to Defendant Twitter, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Twitter, Inc.,<br><br>Defendant. | Case No. 22-3070<br><br>**X CORP.'S MOTION FOR PROTECTIVE ORDER & RELIEF FROM CONSENT ORDER**<br><br>Hearing Date: August 17, 2023<br>Hearing Time: 10:00 AM<br><br>The Hon. Thomas S. Hixson |

## MOTION FOR PROTECTIVE ORDER & RELIEF FROM CONSENT ORDER

PLEASE TAKE NOTICE that on August 17, 2023, at 10:00 AM, or on such other date and time as the Court may order, in Courtroom G of the Phillip Burton Federal Building and United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Thomas S. Hixson, X Corp. successor in interest to Defendant Twitter, Inc., will move the Court for (1) a protective order staying the notice of deposition of Elon Musk, and (2) an order terminating or modifying the consent order in this action or staying enforcement of the consent order.  X Corp. makes this motion pursuant to Rules 26 and 60 of the Federal Rules of Civil Procedure.  The Motion is based on the accompanying memorandum of law, the declaration and exhibits attached to the Motion, the record in this case, and any other matters that the Court may deem appropriate.

## RELIEF REQUESTED

X Corp. requests that the Court enter an order terminating or modifying the Stipulated Order For Civil Penalty, Monetary Judgment, and Injunctive Relief (Dkt. 11) pursuant to Rule 60(b)(5)–(6) of the Federal Rules of Civil Procedure and staying the Notice of Deposition of Elon Musk issued by the Federal Trade Commission ("FTC") pursuant to Rule 26 of the Federal Rules of Civil Procedure.

In the alternative, X Corp. requests that the Court enter an order directing the FTC to provide discovery to X Corp. and staying enforcement of the Stipulated Order For Civil Penalty, Monetary Judgment, and Injunctive Relief and all prospective obligations arising thereunder until that discovery is produced.

## STATEMENT OF ISSUES TO BE DECIDED

Whether prospective application of the Stipulated Order For Civil Penalty, Monetary Judgment, and Injunctive Relief is equitable in light of the FTC's conduct.

Whether the FTC's repudiation of the agreement incorporated into the Stipulated Order For Civil Penalty, Monetary Judgment, and Injunctive Relief warrants termination or modification of the order.

Whether the FTC should be ordered to provide relevant discovery to X Corp., and whether enforcement of the Stipulated Order For Civil Penalty, Monetary Judgment, and Injunctive Relief

and all prospective obligations arising thereunder should be stayed until that discovery is produced.

DATED:    July 13, 2023                      Respectfully submitted,

                                             QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP


                                             */s/ Alex Spiro*
                                             Alex Spiro (*pro hac vice* application pending)
                                             Daniel R. Koffmann (California Bar No. 344379)
                                             51 Madison Ave, 22nd Floor
                                             New York, NY 10010
                                             Telephone:  (212) 849-7000
                                             Facsimile:  (212) 849-7100
                                             alexspiro@quinnemanuel.com
                                             danielkoffmann@quinnemanuel.com


                                             Christopher G. Michel (*pro hac* vice application
                                             pending)
                                             Casey J. Adams (*pro hac vice* application
                                             pending)
                                             Rachel G. Frank (California Bar No. 330040)
                                             1300 I Street NW, Suite 900
                                             Washington, D.C. 20005
                                             Telephone: (202) 538-8000
                                             Facsimile: (202) 538-8100
                                             christophermichel@quinnemanuel.com
                                             caseyadams@quinnemanuel.com
                                             rachelfrank@quinnemanuel.com

                                             *Attorneys for X Corp., successor in interest to*
                                             *Defendant Twitter, Inc.*

# TABLE OF CONTENTS

**Page**

RELIEF REQUESTED ..............................................................................................ii

STATEMENT OF ISSUES TO BE DECIDED..........................................................ii

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND........................................................................................................3

    A.    Twitter's First Consent Order with the FTC ...........................................3

    B.    Twitter's Voluntary Disclosure of Misuse of Data .................................3

    C.    The Consent Order ..................................................................................4

    D.    The FTC's Lack of Interest in Disclosures About Pre-Musk Twitter....................5

    E.    Elon Musk's Acquisition of Twitter........................................................6

    F.    The FTC's Burdensome and Vexatious Enforcement Investigation......................6

    G.    The FTC Chair's and Staff's Repeated Refusal to Meet with Mr. Musk ...............8

    H.    Congressional Leaders' Recognition of the FTC's Overreach .............................8

    I.    The FTC's Attempts to Influence the Independent Program Assessment ..............9

    J.    X Corp.'s Efforts to Avoid Litigation ...................................................11

LEGAL STANDARD ..............................................................................................12

    A.    Motion to Terminate or Stay .................................................................12

    B.    Motion for Protective Order..................................................................12

ARGUMENT ...........................................................................................................13

II.    THE EQUITIES STRONGLY FAVOR TERMINATING OR MODIFYING THE
CONSENT ORDER ................................................................................13

    A.    Continued Enforcement Is Inequitable in Light of the FTC's Improper
Attempts to Influence the Independent Assessment ...........................14

    B.    Allowing the FTC's Investigation and Enforcement to Continue as it Has
Would Be Detrimental to the Public Interest .......................................18

    C.    The FTC's Conduct Has Made Compliance Unworkable ...................19

     D.     At a Minimum, the Court Should Order the FTC To Provide Discovery and Stay Enforcement of the Consent Order ................................................................ 20

III.     The FTC's Bad-Faith Attempt to Influence the Outcome of the Independent Program Assessment Repudiated the Order ..................................................................... 21

IV.     THE COURT SHOULD STAY THE DEPOSITION OF ELON MUSK ....................... 23

CONCLUSION ...................................................................................................................... 25

1

# TABLE OF AUTHORITIES

2
**Page**

3

### Cases

4

*Apple Inc. v. Samsung Elecs. Co.*,
5    282 F.R.D. 259 (N.D. Cal. 2012) ............................................................................. 24

6

*Assoc. of Nat'l Advertisers v. FTC*,
7    627 F.2d 1151 (D.C. Cir. 1979) ........................................................................ 18, 19

*Axon Enter. v. FTC*,
8    986 F.3d 1173 (9th Cir. 2021) .................................................................................. 14

9

*Cinderella Career & Finishing Schs. v. FTC*,
10    425 F.2d 583 (D.C. Cir. 1970) .................................................................................. 18

11   *Coffey v. Braddy*,
     834 F.3d 1184 (11th Cir. 2016) ................................................................................ 12
12

*Doe v. Rector & Visitors of George Mason Univ.*,
13    149 F. Supp. 3d 602 (E.D. Va. 2016) ....................................................................... 19

14

*Est. of Levingston v. Cnty. of Kern*,
15    320 F.R.D. 520 (E.D. Cal. 2017) .............................................................................. 24

16   *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*,
     307 F.3d 1206 (9th Cir. 2002) .................................................................................. 12
17

*Fantasy, Inc. v. Fogerty*,
18    984 F.2d 1524 (9th Cir. 1993) .................................................................................. 21

19   *FTC v. DebitPay, LLC*,
     695 F.3d 938 (9th Cir. 2012) .................................................................................... 21
20

*FTC v. Facebook*,
21    581 F.Supp. 3d 34 (D.D.C. 2022) ............................................................................ 14

22   *FTC v. Hewitt*,
     68 F.4th 461 (9th Cir. 2023) ..................................................................................... 13
23

24   *FTC v. Match Grp.*,
     2023 WL 3181351 (D.D.C. May 1, 2023) ............................................................... 23
25

26   *FTC v. Sysco Corp.*,
     113 F. Supp. 3d 1 (D.D.C. June 23, 2015) ............................................................... 19
27

*In re Google Litig.*,
28    2011 WL 4985279 (N.D. Cal. Oct. 19, 2011) .......................................................... 24

*Grano v. Sodexo Mgmt., Inc.*,
  335 F.R.D. 411 (S.D. Cal. 2020) ........................................................................ 13

*Joe Hand Promotions, Inc. v. Rangee*,
  2013 WL 6859001 (E.D. Cal. Dec. 24, 2013) ..................................................... 21

*Keeling v. Sheet Metal Workers Int'l Ass'n, Loc. Union 162*,
  937 F.2d 408 (9th Cir. 1991) ......................................................................... 21, 22

*King-Seeley Thermos Co. v. Aladdin Indus.*,
  418 F.2d 31 (2d Cir. 1969) ................................................................................. 20

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*,
  921 F.2d 1371 (8th Cir. 1990) ............................................................................ 19

*Marshall v. Jerrico, Inc.*,
  446 U.S. 238 (1980) ..................................................................................... 14, 15

*Mehmet v. PayPal, Inc.*,
  2009 WL 921637 (N.D. Cal. Apr. 3, 2009) ........................................................ 24

*Ojo v. Garland*,
  25 F.4th 152 (2d Cir. 2022) .......................................................................... 18, 19

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*,
  13 F.3d 33 (2d Cir. 1993) ................................................................................... 12

*Rufo v. Inmates of the Suffolk Cnty. Jail*,
  502 U.S. 367 (1992) .............................................................................. 12, 14, 20

*S.E.C. v. Wheeling-Pittsburgh Steel Corp.*,
  648 F.2d 118 (3d Cir. 1981) .................................................................. 20, 23, 24

*Schering-Plough Corp. v. FTC*,
  402 F.3d 1056 (11th Cir. 2005) .......................................................................... 19

*Stanley v. Wong*,
  2006 WL 1523128 (E.D. Cal. May 31, 2006) ................................................ 16, 17

*Texaco, Inc. v. FTC*,
  336 F.2d 754 (D.C. Cir. 1964) ............................................................................ 18

*Thompson v. U.S. Dep't of Hous. & Urb. Dev.*,
  404 F.3d 821 (4th Cir. 2005) ......................................................................... 20, 21

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
  2014 WL 939287 (N.D. Cal. Mar. 6, 2014) ........................................................ 24

*In re Twitter, Inc.*,
  Docket No. C-4316 (F.T.C. May 26, 2022) .......................................................... 4

*In the Matter of Twitter, Inc.,*
    Docket No. C-4316 (F.T.C. Mar. 2, 2011) .................................................................. 3, 7

*United Com. Ins. Serv., Inc. v. Paymaster Corp.,*
    962 F.2d 853 (9th Cir. 1992) ................................................................................... 21

*United States v. Arthur Young Co.,*
    465 U.S. 805 (1984) ................................................................................................ 16

*United States v. Baus,*
    834 F.2d 1114 (1st Cir. 1987) ................................................................................. 13

*United States v. Church of Scientology of Cal.,*
    520 F.2d 818 (9th Cir. 1975) ................................................................................... 20

*United States v. Eastman Kodak Co.,*
    63 F.3d 95 (2d Cir. 1995) ........................................................................................ 13

*United States v. Fensterwald,*
    553 F.2d 231 (D.C. Cir. 1977) ................................................................................ 20

*United States v. Foster,*
    128 F.3d 949 (6th Cir. 1997) ................................................................................... 15

*United States v. Lord,*
    711 F.2d 887 (9th Cir. 1983) ................................................................................... 15

*United States v. Lui,*
    2017 WL 3232578 (N.D. Cal. July 31, 2017) .......................................................... 23

*United States v. Powell,*
    379 U.S. 48 (1964) .................................................................................................. 23

*United States v. Sec'y of Hous. & Urban Dev.,*
    239 F.3d 211 (2d Cir. 2001) .................................................................................... 12

*United States v. West. Elec. Co.,*
    46 F.3d 1198 (D.C. Cir. 1995) ................................................................................ 14

*Weiler v. Marcus & Millichap Real Est. Inv. Servs.,*
    22 Cal. App. 5th 970 ............................................................................................... 21

*Whitlock v. Brueggemann,*
    682 F.3d 567 (7th Cir. 2012) ................................................................................... 18

*Winslow v. Smith,*
    696 F.3d 716 (8th Cir. 2012) ............................................................................. 15, 18

*Young v. U.S. ex rel. Vuitton et Fils S.A.,*
    481 U.S. 787 (1987) ................................................................................................ 14

## **Rules & Statutes**

15 U.S.C. § 45 ...................................................................................................... 3, 5, 15

18 U.S.C. § 1512(b)(1) .................................................................................................. 15

ABA Model Rules of Pro. Conduct R. 3.4 ..................................................................... 15

AICPA Code of Conduct R. 0.300.050.02 ..................................................................... 15

AICPA Code of Conduct R. 0.400.49 .............................................................................. 5

AICPA Code of Conduct R. 1.000.020 ...................................................................... 5, 16

AICPA Code of Conduct R. 1.100.010.10 ..................................................................... 17

AICPA Code of Conduct R. 1.100.001 ............................................................................ 5

AICPA Code of Conduct R. 1.210.010.16 ................................................................. 5, 16

California Rules of Professional Conduct Rule 3.4 ........................................................ 15

Civil Local Rule 11-4(a)(1) ........................................................................................... 15

Fed. R. Civ. P. 26 .................................................................................................. ii, 12, 23

Fed. R. Civ. P. 60 ......................................................................... ii, 12, 13, 14, 18 21, 22

## **Additional Authorities**

Brad Dress, *FTC says it's 'tracking the developments at Twitter with deep concern'*, The Hill (Nov. 10, 2022, 1:23 PM) .......................................................... 6

Christine Wilson, *Why I'm Resigning as an FTC Commissioner*, Wall St. J. (Feb. 14, 2023, 12:08 PM) ................................................................................................. 8

Concurring Statement of Comm'r Christine S. Wilson and Comm'r Noah Joshua Phillips, Twitter, Matter No. 2023062 (May 25, 2022) ............................................ 3

*Data Security at Risk:  Testimony From a Twitter Whistleblower Before the S. Comm. on the Judiciary*, 117th Cong. (2022) ......................................................... 5

John N. Tye et al., Protected & Sensitive Whistleblower Disclosure ¶¶ 2(a) (July 6, 2022) ..................................................................................................................... 5

Letter from Hon. Jim Jordan, Chairman, H. Comm. on the Judic. to Lina Khan, Chair, Fed. Trade Comm'n (June 8, 2023) ............................................................. 9

Matthew Cantor, *Twitter office oddities go up for auction – from bird statues to rotisserie ovens*, The Guardian (Dec. 13, 2022, 5:13 PM) .................................. 5, 7

*Oversight of the Federal Trade Commission: Hearing Before the H. Judiciary Comm.*, 118th Congr. (2023)............................................................................... 9

Press Release, Dep't of Justice, Twitter Agrees with DOJ and FTC to Pay $ 150 Million Civil Penalty and to Implement Comprehensive Compliance Program to Resolve Alleged Data Privacy Violations (May 25, 2022)................................................. 22

Rebecca Kern, *Lina Khan to testify for first time before Jim Jordan's Judiciary Committee*, Politico (June 23, 2023, 3:52 PM) ......................................................... 9

Staff of H. Select Comm. on Weaponization, 118th Cong., The Weaponization of the Federal Trade Commission: An Agency's Overreach to Harass Elon Musk's Twitter (Comm. Print 2023) ................................................................................. 8, 23

X Corp., successor in interest to Defendant Twitter, Inc. ("X Corp.," "Twitter," or "the company") respectfully submits this memorandum of law in support of its motion to terminate, modify, or stay enforcement of the consent order in this matter, and for a protective order staying the Notice of Deposition of Elon Musk issued by the Federal Trade Commission ("FTC").

**PRELIMINARY STATEMENT**

This motion asks the Court to rein in an investigation that has spiraled out of control and become tainted by bias, and to terminate a misfit consent order that no longer can serve any proper equitable purpose.  As detailed below, the FTC has engaged in conduct so irregular and improper that Ernst & Young ("EY")—the independent assessor designated under a consent order between Twitter and the FTC to evaluate the company's privacy, data protection, and information security program—"felt as if the FTC was trying to influence the outcome of the engagement before it had started."  Recent sworn testimony details how the FTC, through a series of interactions with EY immediately after Elon Musk acquired Twitter, attempted to co-opt EY's independent assessment in order to generate evidence of "deficiencies in Twitter's privacy and information security program."  These efforts included dictating to EY "very specific types of procedures that they expected" EY to perform and "[conveying] expectations … about what th[e] results should be before [EY] had even begun any procedures."  The FTC was so "adamant" with EY, conveying that "this is absolutely what you will do and this is going to occur, and you'll produce a report at the end of the day" that would be negative about Twitter, that senior EY leaders feared that, if EY resigned as the independent assessor, "[t]he FTC [would] take[] exception to [EY's] withdrawal and create[] 'other' challenges for EY over time."

A private litigant who engaged in such conduct might well be facing charges of witness tampering.  As the Plaintiff in this civil enforcement action, the FTC should not receive preferential treatment.  There simply is no way to square the striking record of bias recounted above—along with other evidence described in this motion—with any semblance of the impartiality, due process, or equitable conduct that the law requires from administrative agencies like the FTC when they act pursuant to court-authorized and -supervised consent orders.  This Court should intervene to stop the FTC's ongoing improper conduct.

1    The alarming recent developments in this case occur against the backdrop of a consent order

2    between the FTC and Twitter (now X Corp.) entered more than a decade ago to resolve allegations

3    that Twitter had not adequately safeguarded user information.  In May 2022, the parties replaced

4    that consent order with a new one to resolve allegations that Twitter had used information provided

5    for account authentication to target ads to users, an incident Twitter had self-reported to the FTC.

6    This Court entered that consent order as a judgment over which it retains continuing jurisdiction.

7    Dkt. 11.

8    Shortly thereafter—when Elon Musk acquired Twitter in October 2022—the FTC embarked

9    on a new campaign of unceasing demands, demanding responses to long lists of wide-ranging

10   questions and requiring burdensome document productions.  These demands began during a period

11   of unprecedented change and restructuring at Twitter, and started before Twitter was even required

12   to comply with many of the order's provisions.  Since Mr. Musk acquired Twitter, the FTC has

13   issued 16 demand letters to X Corp., a rate of approximately one letter every other week, a stark

14   contrast to the approximately 28 demand letters the FTC issued in the *decade*-plus period it oversaw

15   Twitter's compliance with the prior consent order.  X Corp. has responded to this avalanche of

16   demands as best it can, responding promptly to FTC inquiries and producing more than 22,000

17   documents to date.  The FTC's overreach has now culminated in a demand to depose Mr. Musk,

18   who is not, and never has been, a party to the Consent Order.

19   The Court should not permit the FTC to continue invoking judicial power to prosecute an

20   investigation so infected by bias that it has lost any plausible connection to lawful purposes.  A

21   consent order is, after all, a matter of equity, and the FTC's recent misconduct is profoundly

22   inequitable.  Accordingly, X Corp. moves to terminate the consent order entered in this case.  Dkt.

23   11.  At a minimum, the Court should order the FTC to provide substantive responses to X Corp.'s

24   requests for information to establish the scope and depth of the FTC's bias and improper interference

25   and stay enforcement of the consent order until that process is complete.  For the same reasons, the

26   Court should issue a protective order indefinitely staying the FTC's notice of deposition of Mr.

27   Musk.

28

# BACKGROUND

### A.      Twitter's First Consent Order with the FTC

Long before Mr. Musk entered the picture, Twitter and the FTC agreed to their first consent order.  Decision & Order, *In the Matter of Twitter, Inc.*, Docket No. C-4316 (F.T.C. Mar. 2, 2011), bit.ly/3JS2P2M (the "2011 Order").  The 2011 Order resulted from an FTC investigation into incidents of unauthorized access to Twitter's systems and resolved charges that Twitter violated the FTC Act, 15 U.S.C. § 45, by misrepresenting the extent to which it protected nonpublic user information from unauthorized access and honored users' privacy choices.  Complaint at 3–5, *In the Matter of Twitter, Inc.*, Docket No. C-4316 (F.T.C. Mar. 2, 2011), bit.ly/3XQlK47. The 2011 Order required Twitter, among other things, to establish a "comprehensive information security program" meeting certain parameters and to obtain biennial assessments of that program by a third-party professional.  2011 Order at 3–4.  Over the next eight years, from 2011 to 2019, Twitter operated under the 2011 Order and completed required assessments while receiving approximately ten demand letters from the FTC. Koffmann Decl. ¶ 4.

### B.      Twitter's Voluntary Disclosure of Misuse of Data

In October 2019, Twitter publicly and voluntarily disclosed that, long before Mr. Musk's acquisition of the company, "some email addresses and phone numbers provided for account security may have been used unintentionally for advertising purposes."  *See* Twitter Support (@TwitterSupport) Twitter (Oct. 8, 2019, 4:02 PM), bit.ly/43i8fel; *see also* Concurring Statement of Comm'r Christine S. Wilson and Comm'r Noah Joshua Phillips, Twitter, Matter No. 2023062 at 6 (May 25, 2022), bit.ly/43h5euU.  The FTC investigated the report, sending approximately 15 demand letters to Twitter over a two-year period.  Koffmann Decl. ¶ 4.  On May 25, 2022, the Department of Justice and the FTC filed a complaint in this Court alleging that Twitter violated the 2011 Order and Section 5 of the FTC Act by misrepresenting the extent to which Twitter maintained and protected the privacy of nonpublic consumer information.  Dkt. 1.  On May 26, 2022, this Court entered a Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief resolving the 2022 complaint.  Dkt. 11.  Twitter consented to the FTC's reopening of the 2011 proceeding and entry of the new consent order attached to the Stipulated Order, which the FTC did on May 26,

2022.   Decision & Order, *In re Twitter, Inc.*, Docket No. C-4316, (F.T.C. May 26, 2022), bit.ly/44IrdvJ.   The stipulated order (the "Consent Order") provides that this Court retains jurisdiction "for purposes of construction, modification, and enforcement."  Consent Order at 4.

### C.   The Consent Order

The Consent Order created a compliance structure tailored to Twitter's operations at that time.  Part V of the Consent Order mandates that Twitter establish and maintain a "comprehensive privacy and information security program" (the "Program") in order to "protect[] the privacy, security, confidentiality, and integrity" of certain user information.  Consent Order at 4.  The Order details the required content of the program, including, for example, the development and evaluation of risk-appropriate safeguards, employee training, and monitoring and reporting of certain security incidents to the FTC.  *See* Consent Order Part V.E–I.  The Order required Twitter to implement the Program by November 22, 2022.  Koffmann Decl. ¶ 6.

Assessment of Twitter's Program by "qualified, objective, independent third-party professionals" forms a core part of the Consent Order.  Consent Order at 8.  As the FTC itself explained in relation to an analogous provision of the 2011 Order:  "The very purpose of a security or privacy order's assessment provision is to ensure that evaluation of a respondent's security or privacy program is truly objective—*i.e.*, unaffected by the interests (or litigation positions) of either the respondent or the FTC."  Ex. 1.  Part VI sets forth detailed requirements for those assessments, which must cover five specific elements:  (1) whether Twitter "has implemented and maintained the Program," (2) "the effectiveness of [Twitter's] implementation and maintenance" of the Program, (3) identification of "any gaps or weaknesses in, or instances of material non-compliance with, the Program[,]" (4) the status of any previously identified gaps or weaknesses, and (5) identification of the evidence the assessor relied upon and an explanation of why that evidence was appropriate and sufficient for its analysis.  Consent Order Part VI.D.  The assessor must sign its work and certify that it "conducted an independent review of the Program and did not rely primarily on assertions or attestations by [Twitter's] management."  *Id.*  The independence of the assessor is paramount.  *Id.*

In July 2022, Twitter executed a Statement of Work ("SOW") with accountancy EY to perform the initial assessment required under Part VI.  EY agreed to perform services in accordance

with the American Institute of Certified Public Accountants' Standards for Consulting Services 100 (the "Professional Standards"). Ex. 2 at 3.  The Professional Standards required EY to "[s]erve the client interest by seeking to accomplish the objectives established by the understanding with the client while maintaining integrity and objectivity."  Ex. 3 at 4.  EY further agreed in the SOW that "EY [would] not: ... Perform any task or service that in EY's judgment may impair EY's independence to provide future services of the Subject Matter under the audit or attestation standards."  Ex. 2 at 3.  Similarly, the Code of Professional Conduct for Certified Public Accounts ("CPAs") requires that when performing professional services, CPAs "shall maintain objectivity and integrity, shall be free of conflicts of interests, and shall not knowingly misrepresent facts or subordinate his or her judgment to others."  Code of Pro. Conduct R. 1.100.001 (Am. Inst. of Certified Pub. Accts. 2020), bit.ly/3NVT7xU ("AICPA Code of Conduct").  That Code defines "adverse interest threat" and "undue influence threat" as categories of "circumstances that could impair independence."  *Id.* Rule 0.400.49.  Undue influence threats include attempts by interested parties "to coerce the [CPA] or exercise excessive influence."  *Id.* R. 1.210.010.16.  CPAs also have an ethical obligation to avoid or resolve "[o]bstacles to following an appropriate course of action due to internal or external pressures."  *Id.* R. 1.000.020.

### D.   The FTC's Lack of Interest in Disclosures About Pre-Musk Twitter

In the five months between the signing of the Consent Order on May 25, 2022 and Mr. Musk's acquisition of Twitter, Inc. on October 27, 2022, the FTC sent Twitter only three demand letters.  Koffmann Decl. ¶ 5.  All of these related to allegations that Peiter "Mudge" Zatko, a former high-ranking Twitter security professional, made in a July 6, 2022, whistleblower complaint to the FTC and other agencies, as well as in testimony before the Senate Judiciary committee on September 13, 2022.  *Id.*; *Data Security at Risk: Testimony From a Twitter Whistleblower Before the S. Comm. on the Judiciary*, 117th Cong. (2022), bit.ly/3OaRa1G.  The complaint made a series of explosive claims about Twitter, including that it had committed "[e]xtensive, repeated, uninterrupted violations of the Federal Trade Commission Act by making false and misleading statements to users and the FTC about, *inter alia*, the Twitter platform's security, privacy and integrity."  John N. Tye et al., Protected & Sensitive Whistleblower Disclosure ¶¶ 2(a) (July 6, 2022), bit.ly/3OdyQoU

("Zatko Disclosure").  Mr. Zatko specifically alleged that, as of January 2022, "Twitter remained out of compliance in multiple respects with the 2011 FTC Consent Order" and "was not on track to ever achieve compliance for [] important items, especially in the area of information security."  *Id.* ¶ 75.  Despite those allegations relating directly to the FTC and the Consent Order, the FTC waited until August 31, 2022—nearly two months after Mr. Zatko made his confidential disclosure directly alleging that Twitter had misled the FTC and was endangering the privacy and security of its users— to send its first demand letter on the subject.  *See* Ex. 4.

### E.    Elon Musk's Acquisition of Twitter

On April 25, 2022, Mr. Musk signed an agreement with Twitter to acquire the company and take it private, effective October 27, 2022.  Koffmann Decl. ¶ 3.  As Twitter later explained to the FTC during the post-acquisition period, "Twitter [was] undergoing a fundamental transformation" that involved, among other things, "a substantial overhaul of its organizational structure, budgeting, revenue-generation priorities, and other fundamental aspects of the business."  Ex. 5.  As part of Mr. Musk's new plan for the company, Twitter, Inc. was merged into X. Corp., with X Corp. as the surviving entity, on March 15, 2023.  Ex. 6.

### F.    The FTC's Burdensome and Vexatious Enforcement Investigation

Mr. Musk's acquisition of Twitter produced a sudden and drastic change in the tone and intensity of the FTC's investigation into the company.  Two weeks after the acquisition, an FTC spokesperson told media outlets that the agency was "tracking recent developments at Twitter with deep concern."  Brad Dress, *FTC says it's 'tracking the developments at Twitter with deep concern'*, The Hill (Nov. 10, 2022, 1:23 PM), bit.ly/3PYGkxj.  The FTC took the unusual step of publicly confirming the existence of an investigation and threatening a CEO in his second week on the job: "No CEO or company is above the law, and companies must follow our consent decrees.  Our revised consent order gives us new tools to ensure compliance, and we are prepared to use them."  *Id.*  That same day, the FTC issued two demand letters seeking information about workforce reductions and Twitter Blue, a recently announced subscription service.  *See* Exs. 7 (Twitter Blue), 8 (workforce reduction).  The FTC claimed it sent these letters out of concern that "staff reductions impair Twitter's ability to protect consumer's information and comply with the [Consent Order],"

1    Ex. 8, but the demands arrived more than a week *before* the November 22, 2022 deadline for Twitter

2    to have its Program in place under Part V of the Consent Order.  *See* Koffmann Decl. ¶ 6.

3            From that date until the present, the FTC has pummeled X Corp. with burdensome demand

4    letters and requests for depositions.  X Corp. has made every effort to comply promptly and

5    completely with the FTC's more than 200 demands for information and documents, and has

6    produced more than 22,000 documents.  Koffmann Decl. ¶ 7.  But the FTC has continued to ratchet

7    up scrutiny, issuing new demand letters and insisting on further document productions at a rate of

8    nearly one new demand letter every two weeks.  *Id.*.  Some of these requests have, at best, tenuous

9    connections to the privacy and security of user data or X Corp.'s compliance with the Consent Order,

10   and many are seemingly issued in response to whatever negative news happens to be published

11   about Twitter that day.  *Compare* Matthew Cantor, *Twitter office oddities go up for auction – from*

12   *bird statues to rotisserie ovens*, The Guardian (Dec. 13, 2022, 5:13 PM) (reporting that Twitter

13   planned to auction "surplus corporate office assets" including items ranging from "bizarre decor to

14   high-end cooking equipment"), bit.ly/3XNR43i *with* Ex. 9 (demanding, in a letter sent that same

15   day, that Twitter "[s]tate whether, as part of its ... cost-cutting measures, Twitter is also selling its

16   office equipment").  Another request sought "*all* communications" sent by *any* Twitter employee

17   "relating to Elon Musk" in *any* way, along with *every* communication sent to or from Mr. Musk

18   since he had acquired control of Twitter.  Ex. 10 (emphases added).

19           The FTC has also deposed five former Twitter employees and David Roque from EY,

20   totaling more than 1,200 pages of transcript.  Koffmann Decl. ¶¶ 8–9.  On December 7, 2022, less

21   than a month after it issued its first post-acquisition demand letters, the FTC noticed the deposition

22   of Mr. Musk on February 3, 2023, at 9:30 am at the offices of the FTC in San Francisco, California.

23   Ex. 11.[1]   The FTC stated that it was issuing the notice "[p]ursuant to Part XIII.A. of the

24   Commission's May 26, 2022, Decision and Order in *In the Matter of Twitter, Inc.*, Docket No. C-

25   4316."  *Id.*  X Corp. learned on June 23, 2023, that Mr. Musk's deposition had been rescheduled for

26

27   _____

28   [1]   The FTC issued a corrected notice the following day.

July 25, 2023.  Ex. 12.  Notably, the FTC has never sought to depose *any* current X Corp. employee other than Mr. Musk himself.  Koffmann Decl. ¶ 10.

### G.    The FTC Chair's and Staff's Repeated Refusal to Meet with Mr. Musk

The FTC's unusually combative posture toward Mr. Musk and "Twitter 2.0" came as a surprise.  In order to gain a better understanding of the FTC's concerns, and how Twitter could demonstrate its commitment to user privacy, data protection, and information security, Mr. Musk made several requests to FTC Chair Lina Khan for a meeting.  Koffmann Decl. ¶ 11.  These included at least three requests conveyed from Twitter's counsel to FTC staff throughout November and December 2022, as well as at least one voicemail left on his behalf with the Chair's office.  *Id.*.  On January 27, 2023, Chair Khan finally responded but did not agree to a meeting—even in principle.  Ex. 13.  Instead, she stated that she would "*consider* scheduling a meeting with Musk," but only after "Twitter [had] fully complied with all FTC requests," which at that time totaled well over 100.  *Id.*  Ultimately, Mr. Musk was able to secure a meeting with former Commissioner Christine Wilson—ten days *after* she publicly announced her intention to resign from the FTC in an op-ed titled, "Why I'm Resigning as an FTC Commissioner: Lina Khan's disregard for the rule of law and due process make it impossible for me to continue serving."  Christine Wilson, *Why I'm Resigning as an FTC Commissioner*, Wall St. J. (Feb. 14, 2023, 12:08 PM), bit.ly/3NN5RXm; Koffmann Decl. ¶ 12.

### H.    Congressional Leaders' Recognition of the FTC's Overreach

Outside observers took the concerning turns in the FTC's investigation seriously.  On March 7, 2023, a U.S. House of Representatives subcommittee released an Interim Staff Report titled "The Weaponization of the Federal Trade Commission: An Agency's Overreach to Harass Elon Musk's Twitter."  Staff of H. Select Comm. on Weaponization, 118th Cong. (Comm. Print 2023), bit.ly/3PRoc8k ("House Report").  The House Report concluded that many of the FTC's "demands [to X Corp.] have no basis in the FTC's statutory mission and appear to be the result of partisan pressure to target Twitter and silence Musk."  *Id.* at 1.  Specifically, the report found that "the FTC is currently imposing some demands on Twitter that have no rational basis in user privacy."  *Id.* at 3.

On June 8, 2023, the House Judiciary Committee Chair wrote to Chair Khan informing her that "[t]he Committee's oversight has uncovered information suggesting that the FTC took action against Twitter in May 2022 as a result of Elon Musk's anticipated acquisition of the company." Letter from Hon. Jim Jordan, Chairman, H. Comm. on the Judic. to Lina Khan, Chair, Fed. Trade Comm'n (June 8, 2023), bit.ly/44jZIc9.  Specifically, "[a] close examination of the information provided suggests that there is an unjustified approximate one-year gap in the FTC's actions with respect to Twitter.  A reasonable conclusion is that neither you nor Acting Chair Slaughter seriously planned to take action against Twitter until political pressure arose given Musk's impending acquisition.  The FTC's decision to enter the May 2022 Order after Musk's acquisition became apparent gave the FTC the power to then harass Twitter under cover of the May 2022 Order."  *Id.* at 3.  He also noted that "[t]he Committee remains concerned with the decision-making and internal controls that allowed for many specific demands in the FTC's investigation to be sent to Twitter." *Id.* at 4.  Judiciary Committee oversight of the FTC's investigation is ongoing, and Chair Khan is scheduled to testify before the committee on July 13, 2023.  Rebecca Kern, *Lina Khan to testify for first time before Jim Jordan's Judiciary Committee*, Politico (June 23, 2023, 3:52 PM), bit.ly/44jxpeb; *see Oversight of the Federal Trade Commission: Hearing Before the H. Judiciary Comm.*, 118th Congr. (2023), https://bit.ly/43ldSbN.

## I.   The FTC's Attempts to Influence the Independent Program Assessment

X Corp. recently learned that the FTC's harassment campaign was even more extreme and far-reaching than it had imagined.  On June 21, 2023, the FTC deposed David Roque, the engagement partner for EY's independent assessment of Twitter's Program. Ex. 14.  Mr. Roque's testimony and the documents introduced at his deposition raised serious concerns about the way the FTC has conducted its investigation.  For example, Mr. Roque testified that the FTC's conduct made him "fe[el] as if the FTC was trying to influence the outcome of the engagement before it had started." *Id.* at 120:20–22.  He testified:

> [EY's] obligation under our contract is to go in and do the independent assessor report and then report the facts based on the results. In some of the discussions that we were having with the FTC, expectations were being conveyed about what those results should be before we had even begun any procedures, and I was concerned that

1    there was this adversarial situation occurring where you had two
     competing parties that, stepping back, both had a desire for a certain
2    outcome to occur that may not have always been aligned.

3    *Id.* at 122:4-14.  "[T]he way the conversations with the FTC were transpiring" was so startling and

4    unusual that Mr. Roque worried that the FTC posed "an adverse threat [to EY]," meaning that the

5    FTC constituted "somebody outside of the arrangement [EY] had with Twitter trying to influence

6    the outcome of [EY's] results."  *Id.* at 120:23–121:2.

7            When the FTC attorney deposing Mr. Roque asked him to confirm that "no one from the

8    FTC directed you to reach a particular conclusion about Twitter's program," he explained that, to

9    the contrary, "[t]here w[ere] suggestions of what they would expect the outcome to be."  *Id.* at

10   122:20–24.  Mr. Roque testified that the "outcome" he perceived the FTC expected was that EY

11   "would conclude that there were deficiencies in Twitter's privacy and information security

12   program."  *Id.* at 120:20–22, 200:19–201:3.

13           Mr. Roque also detailed the heavy-handed manner in which the FTC sought to ensure EY

14   would generate evidence damaging to Twitter.  He testified that the FTC communicated to EY "that

15   Ernst & Young, under all circumstances, will be conducting and issuing a report on behalf of the

16   FTC order.  So it was sort of like it was very adamant about this is absolutely what you will do and

17   this is going to occur, and you'll produce a report at the end of the day."  *Id.* at 200:2–8.  Mr. Roque

18   felt this adamance was "surprising" given that the FTC could not know what would "transpire[] over

19   the next six to seven months before that report was due."  *Id.* at 200:9–12.  The FTC also told Mr.

20   Roque that the "FTC would be surprised if there [were] areas on our report that didn't have findings

21   based on information the FTC was already aware of," and that if EY "didn't have findings in those

22   areas" then it "should expect the FTC would follow up very significantly to understand why we

23   didn't have similar conclusions."  *Id.* at 124:14–21.

24           Mr. Roque also testified that at a meeting in January 2023, the FTC gave EY "a list of

25   specific[] . . . types of procedures they were expecting us to execute" and "provid[ed] areas that

26   they were expecting us to look at" in connection with its "independent" assessment under the

27   Consent Order.  *Id.* at 201:11–15.  "It was almost as if [they] were giving us components of our

28   audit program to execute."  *Id.* at 203:17–21.  Mr. Roque explained that this level of "third party"

1    involvement in an independent testing engagement was "unusual," especially since EY conceived

2    of its auditing role as limited to "look[ing] at the processes and controls" that make up the required

3    elements of the Program and how they operate, "[n]ot going into some of the one-offs, very specific

4    details [FTC staff] were asking us about." *Id.* at 203:13–204:25.

5         Contemporaneous communications within EY corroborate Mr. Roque's testimony.   For

6    example, Mr. Roque and his EY colleagues were concerned that, by "pressuring [EY] to reach a

7    specific outcome," the FTC's conduct had created an "[u]ndue influence threat" that interfered with

8    EY's "ab[ility] to be objective." Ex. 15 at 1; *see also* Ex. 16 at 3 (discussing how the FTC's conduct

9    jeopardized EY's ability to "act with objectivity").   Other internal EY communications show that

10   Mr. Roque perceived a risk that, if EY resigned as Twitter's independent assessor, "[t]he FTC [will]

11   take[] exception to our withdrawal and create[] 'other' challenges for EY over time." Ex. 17 at 1.

12        **J.       X Corp.'s Efforts to Avoid Litigation**

13        X Corp.'s attempts to resolve its dispute with the FTC without burdening the Court have

14   served only to compound its concerns about the FTC's bias and partiality.  Following the deposition

15   of Mr. Roque, the company sought information and documents from the FTC regarding its contacts

16   with EY, the company that succeeded EY as Twitter's independent assessor, and another company

17   that Twitter considered but did not select to succeed EY.  Ex. 18.  In its July 6, 2023 response, the

18   FTC stonewalled and refused to provide any information, much less evidence that would dispel the

19   inescapable conclusion that it has prejudged its investigation of X Corp. and Mr. Musk.  Ex. 19.

20   Instead, the FTC's letter spent pages laying out an argument that Mr. Roque's testimony could

21   establish a violation of Part VII of the Consent Order before asserting that the agency "hold[s] no

22   preconceived notions for the outcome of this investigation. . . .   Over the past several years, we

23   investigated numerous privacy and data security issues at [pre-Musk] Twitter that did not result in

24   enforcement action."  *Id.* at 5.  In response to X Corp.'s follow-up letter, the FTC asserted that its

25   "rights to seek information and obtain discovery are not reciprocal" and threatened to treat failure

26   to comply with its demands as violations of the Consent Order.  Ex. 20.

27        This motion followed.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## LEGAL STANDARD

### A.     Motion to Terminate or Stay

A district court has inherent authority to terminate or modify a consent order.  *See Rufo v. Inmates of the Suffolk Cnty. Jail*, 502 U.S. 367, 381 n.6 (1992).  "[A] district court may modify or terminate a consent decree, subject to abuse-of-discretion review, if changed circumstances have caused compliance with the decree to become substantially more onerous, have rendered the decree impracticable, or have caused its continued enforcement to be inimical to the public interest." *Coffey v. Braddy*, 834 F.3d 1184, 1193 (11th Cir. 2016); *see also Rufo*, 502 U.S. at 381.[2]  "[A]ny showing of a significant change in factual conditions or law would justify a modification of a decree[.]" *Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 13 F.3d 33, 37 (2d Cir. 1993) (applying a "flexible standard").  "[A] court of equity [is entitled] to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached." *Id.* at 39; *see also* Fed. R. Civ. P. 60(b) (a "court may relieve a party or its legal representative from a final judgment . . .  [if] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable"); *United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 216–17 (2d Cir. 2001) (documenting the "significant relaxation of the restrictions imposed on District Courts seeking to modify consent decrees").

### B.     Motion for Protective Order

Rule 26(c)(1)(D) provides that the Court may issue a protective order "for good cause" to "forbid[] inquiry into certain matters, or limit[] the scope of disclosure or discovery to certain matters."  Fed. R. Civ. P. 26(c)(1)(D).  A party moving for a protective order meets its burden of demonstrating "good cause" by showing that "specific prejudice or harm will result if no protective order is granted." *Phillips ex rel. Ests. of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002).  The Court has "wide discretion to determine what constitutes a showing of good

---

[2]   Unless otherwise indicated, this brief omits internal quotation marks, citations, alterations, and omissions from legal citations.

1    cause and to fashion a protective order that provides the appropriate degree of protection." *Grano*

2    *v. Sodexo Mgmt., Inc.*, 335 F.R.D. 411, 414 (S.D. Cal. 2020).

3                                        **ARGUMENT**

4            When a "settlement agreement is made, as here, under the eyes of the court, it is a most

5    solemn undertaking, requiring the lawyers, as officers of the court, to make every effort to carry it

6    through to a successful conclusion." *United States v. Baus*, 834 F.2d 1114, 1124 (1st Cir. 1987).

7    The FTC has breached that "solemn obligation" through its efforts to manufacture support for its

8    predetermined conclusion that Mr. Musk's X Corp. has violated the Consent Order.  Those efforts—

9    particularly the FTC's attempts to dictate and influence the content, procedures, and outcome of an

10   assessment this Court's order requires to be "objective" and "independent"—have irrevocably

11   tainted its enforcement efforts and undermined the purposes the Consent Order was crafted to serve.

12   *Id.*; Consent Order Part VI.A.  The Court should prevent further abuses by terminating or modifying

13   the Consent Order.  At a minimum, the Court should order the FTC to respond to X Corp.'s

14   reasonable requests for information so that it can assess the extent of the agency's misconduct and

15   necessary remedies, while staying all enforcement of the Consent Order (including the deposition

16   of Mr. Musk) until that process is complete.

17   **II.     THE EQUITIES STRONGLY FAVOR TERMINATING OR MODIFYING THE
             CONSENT ORDER**

18

19           The Court should terminate or modify the Consent Order pursuant to Rule 60(b)(5) of the

20   Federal Rules of Civil Procedure because "applying it prospectively is no longer equitable" in light

     of the FTC's abusive investigation conduct.  The Consent Order has prospective effect under Rule

21   60(b)(5) because it involves the Court in "supervision of changing conduct or conditions." 

22   *FTC v. Hewitt*, 68 F.4th 461, 467 (9th Cir. 2023).  "*Rufo* teaches that the power of a court to modify

23   or terminate a consent decree is, at bottom, guided by equitable considerations." *United States v.*

24   *Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995).  A party may seek to modify or terminate a

25   consent order by demonstrating "a significant change in circumstances." *Id. Rufo* further provides

26   "a number of situations that may constitute a showing of changed circumstances, including: where

27   changed factual conditions make compliance with the decree 'substantially more onerous'; where

28

the decree proves unworkable because of unforeseen obstacles; or where enforcement of the decree would be detrimental to the public interest." *Id.* at 101 n.3; *see also United States v. West. Elec. Co.*, 46 F.3d 1198, 1208 (D.C. Cir. 1995) (affirming modification where a change in circumstances "rendered the decree substantially more onerous.").

Here, the FTC radically shifted its enforcement strategy after Mr. Musk acquired Twitter, imposing new and burdensome demands and treating the Consent Order as license for invasive scrutiny of any move X Corp. makes, no matter how remote from the data privacy and security concerns that ground both the FTC's statutory jurisdiction and the Court's Order.  The FTC's approach is increasingly unmoored for its proper authority and manifestly unworkable for X Corp. The agency's ongoing overreach raises serious concerns about due process and prosecutorial misconduct, as well as the fairness of, and public confidence in, agency investigations and proceedings.  The FTC's newly adopted enforcement regime constitutes a "changed circumstance" rendering continued enforcement of the Consent Order "no longer equitable." *Rufo*, 502 U.S. at 383; Fed. R. Civ. P. 60(b)(5).  The Court should terminate or modify the Consent Order.

## A. Continued Enforcement Is Inequitable in Light of the FTC's Improper Attempts to Influence the Independent Assessment

The FTC's improper attempts to manufacture evidence unfavorable to X Corp. that it could later portray as "objective and independent" trample on bedrock principles of basic fairness and due process.  The FTC wields "tremendous enforcement power," and due process imposes guardrails on that authority when an agency seeks to investigate and charge civil law violations.  *Axon Enter. v. FTC*, 986 F.3d 1173, 1173 (9th Cir. 2021), *aff'd and rev'd in part*, 143 S. Ct. 890 (2023).  In those cases, the agency is akin to a prosecutor, and prosecutors violate due process when they are "subject to influences that undermine confidence that a prosecution can be conducted in disinterested fashion." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810–11 (1987); *FTC v. Facebook*, 581 F.Supp. 3d 34, 63–64 (D.D.C. 2022) (holding that when the FTC acts in the nature of a prosecutor, courts can look to standards for prosecutorial conduct as guides).  Investigators and prosecutors "too must serve the public interest," and their actions are "not immunized from judicial scrutiny." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249 (1980).  That scrutiny is appropriate where

"the enforcement decisions of an administrator [are] motivated by improper factors or [are] otherwise contrary to law."  *Id.* at 249.

There can be no legitimate dispute that manufacturing evidence and improperly influencing witness testimony constitute misconduct in both the civil and criminal contexts.  Federal law makes it a felony to "engage[] in misleading conduct toward another person, with intent to ... influence, delay, or prevent the testimony of any person in an official proceeding."  18 U.S.C. § 1512(b)(1). Rule 3.4 of the California Rules of Professional Conduct (applicable to practice in this district pursuant to Civil Local Rule 11-4(a)(1)) provides that a lawyer shall not "unlawfully obstruct another party's access to evidence" or "falsify evidence [or] counsel or assist a witness to testify falsely[.]"  Cal. Rules of Pro. Conduct R. 3.4(a-c), bit.ly/3rupFXT.  This rule is identical to Rule 3.4 of the American Bar Association ("ABA")'s Model Rule 3.4, which, as the ABA explains in an official Comment, is intended to protect "[f]air competition in the adversary system" from parties "improperly influencing witnesses."  Model Rules of Pro. Conduct R. 3.4 cmt. (Am. Bar Ass'n 2018), bit.ly/3rwRSxe.  And in the criminal context, "government conduct which amounts to substantial interference with a witness' free and unhampered determination to testify will violate due process."  *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997); *see also United States v. Lord*, 711 F.2d 887, 891 (9th Cir. 1983) (finding plausible claim that prosecutorial misconduct "distort[ed] the judicial fact-finding process" where "prosecutor told [witness] that whether he would be prosecuted depended on his testimony" and remanding for further clarification).  Similarly, prosecutors and investigators may not manufacture evidence by "systematically coach[ing] witnesses into providing false testimony . . . in line with the narrative of the [government's] theory." *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012).

Here, the FTC improperly attempted to influence the content and outcome of an assessment that the Consent Order, this Court's Order, X Corp.'s contract with EY, and the professional and ethical obligations applying to EY's work all required to be objective and independent.  The FTC *itself* told Twitter that "[t]he very purpose of a security or privacy order's assessment provision is to ensure that evaluation of a respondent's security or privacy program is *truly objective—i.e.*, unaffected by the interests (or litigation positions) of either the respondent *or the FTC*."  Ex. 1

(emphasis added). "The principle of objectivity imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest." AICPA Code of Conduct R. 0.300.050.02, bit.ly/3NVT7xU. The Supreme Court likewise has recognized the importance of the "public watchdog function" provided by independent auditors, who act as "disinterested analyst[s] charged with public obligations." *United States v. Arthur Young Co.*, 465 U.S. 805, 817 (1984).

But Mr. Roque testified that the FTC's conduct made him "fe[el] as if the FTC was trying to influence the outcome of the engagement before it had started." Ex. 14 at 120:20–22. "In some of the discussions … with the FTC, expectations were being conveyed about what those results should be before we had even begun any procedures." *Id.* at 122:3–10. According to Mr. Roque, he felt that the FTC was attempting to "influence" EY to reach the conclusion that "there were deficiencies in Twitter's privacy and information security program." *Id*. at 120:20–22, 200:19–201:3. He was so concerned by the FTC's communications that he and his colleagues discussed whether the agency threatened to become an "adverse threat" to EY's independence or a party "outside of the arrangement we had with Twitter trying to influence the outcome of our results." *Id.* at 120:20–121:2.

The choice of words is meaningful—Mr. Roque was worried that the FTC was making itself an adverse or undue influence threat to EY's contractual, ethical, and professional obligations. *See* AICPA Code of Conduct R. 1.210.010.16 (defining undue influence threat to include attempts by "interested parties to coerce the [CPA] or exercise excessive influence"); *see also id.* R. 1.000.020 (providing that CPAs have an ethical obligation to avoid or resolve "[o]bstacles to following an appropriate course of action due to internal or external pressures"). And by communicating that the FTC would be "surprised" and "follow up very significantly [with EY]" if the assessment did not include negative findings in certain areas, the FTC raised the specter that it would "create[] 'other' challenges for EY over time" if EY failed to complete its audit or the results came out the wrong way. Ex. 14 at 124:14–21; Ex. 17 at 1. "A lawyer commits misconduct ... when that lawyer knows, or should know, that the lawyer is encouraging a witness to place his or her own interests, problems concerns, fear, biases, and the like ahead of telling the truth. This is the essence of 'improper influence' or 'undue influence[.]'" *Stanley v. Wong*, 2006 WL 1523128, at *8 (E.D. Cal. May 31,

2006).  The same principle applies to the ethical and professional conduct of CPAs: the fear of adverse consequences for EY constitutes an "adverse interest threat" because it could compromise EY's independence and objectivity.  AICPA Code of Conduct R. 1.100.010.10, bit.ly/3NVT7xU.

Nor did the FTC stop at applying pressure for its favored outcome:  it also attempted to dictate the content and procedures of EY's assessment.  Mr. Roque testified that "[i]t was almost as if [FTC staff] were giving us components of our audit program to execute." Ex. 14 at 203:17–21. He explained that this level of "third party" involvement in an independent testing engagement was "unusual," especially because EY's role was to "look at the processes and controls" that make up the required elements of the Program and how they operate, "[n]ot [to] go[] into some of the one-offs, very specific details [FTC staff] were asking us about." *Id.* at 203:13–204:25.

The extent of the FTC's overreach can be seen in EY's internal communications as it considered resigning as the independent assessor.  At the same time that EY was "concern[ed]" that the FTC constituted an "[u]ndue influence threat" because it is "pressuring us to reach a specific outcome and therefore we may not be able to [be] objective," Ex. 15, senior EY leaders perceived the risk that, if they were to resign, "[t]he FTC [will] take[] exception to our withdrawal and create[] 'other' challenges for EY over time."  Ex. 17.

This record shows how the FTC attempted to bully EY into acting as an arm of its enforcement staff digging up dirt on X Corp., rather than an objective, independent, third-party auditor bound by its own contractual, ethical, and professional obligations of independence and objectivity.  This is extraordinary misconduct.  It is bad enough that the FTC acts as both the prosecutor and judge in its administrative-adjudication role; it is even worse for the FTC to try to coopt the witnesses too.  Communications from Mr. Roque establish that EY was clear-eyed about the "risk" that the FTC's actions could lead "EY [to be] viewed as [an] extension of the FTC" if EY were to issue a negative report.  Ex. 17.  "[G]overnment officials must recognize their status as having the potential to influence witnesses" and "[a] government lawyer affiliated with law enforcement has the same potential to influence." *Stanley*, 2006 WL 1523128, at *7.  To be sure, X Corp. is not arguing that the FTC was powerless to seek information from X Corp., conduct its own investigations, make determinations outside of the independent assessment, or scrutinize or

disagree with EY's ultimate findings.  The FTC could (and did) issue demand letters under Part XIII of the Consent Order.  *See supra* at 6–8.  The FTC could (and did) issue subpoenas and seek deposition testimony from Twitter employees and third parties.  *Id.*  Those tools are more than sufficient to allow the FTC to obtain the evidence it needs to measure X Corp.'s compliance.  If the FTC were to come to a different conclusion from EY on some aspect of X Corp.'s compliance, it could argue that its own findings should be credited over EY's analysis.

What the FTC *could not* do is attempt to manufacture its own evidence by improperly influencing the content and outcome of an investigation that the Consent Order entered by this Court requires to be objective and independent.  In the criminal context, a "prosecutor who manufactures evidence when acting in an investigatory role can cause a due process violation."  *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *see also Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012).  So too here.  The FTC's efforts to trample the professional, contractual, and ethical obligations of EY in an attempt to engineer the outcome of an "independent" assessment has infected the FTC's investigation with unfairness.  Continued enforcement of the Consent Order in these circumstances is inequitable under Rule 60(b)(5).

**B.**    **Allowing the FTC's Investigation and Enforcement to Continue as it Has Would Be Detrimental to the Public Interest**

The FTC's conduct in this case is inconsistent with the requirement that administrative processes "be attended, not only with every element of fairness but with the very appearance of complete fairness."  *Cinderella Career & Finishing Schs. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970).  An agency's "reputation for objectivity and impartiality is opened to challenge" where its conduct signals to disinterested observers that it has "in some measure decided in advance that [a defendant] ha[s] violated" the law."  *Texaco, Inc. v. FTC*, 336 F.2d 754, 760 (D.C. Cir. 1964), *vacated and remanded on other grounds*, 381 U.S. 739 (1965).  Accordingly, decision-makers violate due process when they approach a case with an "unalterably closed mind on matters critical to the disposition of the proceeding."  *Assoc. of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979).  The public has a strong interest in "fairness and adherence to the law in agency proceedings," which "facilitate[s] public confidence in the outcome of such proceedings."  *Ojo v.*

*Garland*, 25 F.4th 152, 174 (2d Cir. 2022).  "The appearance of bias or partiality erodes public trust in the integrity of government institutions."  *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 620 n.19 (E.D. Va. 2016).  For that reason, even "the appearance of having prejudged" the issues can raise serious questions about the fairness and impartiality of an agency's conduct.  *Assoc. of Nat'l Advertisers*, 627 F.2d at 1171.

In this investigation, it "seem[s] as though the Commission clearly made its decision" that, under Mr. Musk, X Corp. has violated the Consent Order and FTC Act "before it considered any contrary conclusion."  *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1066 (11th Cir. 2005).  The bias and prejudgment inherent in the FTC's approach to investigating Mr. Musk and X Corp. is so apparent that—even before Mr. Roque's deposition—it spurred a congressional subcommittee to produce a report detailing such evidence and to call the FTC Chair to account for the agency's actions at an oversight hearing.  *See supra* at 8–9.  Permitting the FTC to forge ahead towards its predetermined outcome would undermine faith in the agency's impartiality, the fairness of its proceedings, and the legitimacy of its decisions across the board.  That harms the public interest.  *See Ojo*, 25 F.4th at 174.  That is particularly so given the public's strong interest in the effective discharge of the FTC's statutory responsibilities.  *See, e.g.*, *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 86–87 (D.D.C. June 23, 2015) (recognizing the "public interest in effectively enforcing antitrust laws.").

### C.   The FTC's Conduct Has Made Compliance Unworkable

The FTC's irregular conduct, and the inferences that follow from that conduct, demonstrate that no matter what X Corp. does to demonstrate its compliance with the Consent Order, the FTC will not be satisfied.  "A court has a strong interest in not involving itself, along with the prestige of the law, in an ongoing equitable decree which is [] manifestly unworkable."  *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990).  The FTC's conduct under the auspices of the Consent Order threatens to invite more governmental abuse moving forward.  As the FTC has understood the Consent Order and its ability to issue demand letters thereunder, it has assumed powers it would not otherwise have and used those powers inequitably.  The FTC's remarkable overreach, evidenced by, among other things, its effort to tamper with an

independent assessment, demonstrates that nothing X Corp. and Mr. Musk do will satisfy the FTC. While the company has expended *thousands* of hours by its own personnel and external legal counsel to respond to hundreds of demands for information and documents, Koffmann Decl. ¶ 13, the evidence that arose at Mr. Roque's deposition makes clear that those efforts were in vain, because the FTC's mind was made up long before.  There can be no reasonable argument that X Corp. can comply with the Consent Order when the evidence is so clear that FTC's conclusion is prebaked.  *See Rufo*, 502 U.S. at 384 ("Modification is [] appropriate when a decree proves to be unworkable because of unforeseen obstacles."); *King-Seeley Thermos Co. v. Aladdin Indus.*, 418 F.2d 31, 35 (2d Cir. 1969) (considering whether "modification was necessary to achieve the results intended, even though this would take the form of reducing the restrictions imposed"); *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 829 (4th Cir. 2005) (modification warranted where "exceptional magnitude" of government's conduct was unanticipated).

### D.    At a Minimum, the Court Should Order the FTC to Provide Discovery and Stay Enforcement of the Consent Order

The current record of inequitable conduct by the FTC is more than enough to justify termination or modification of the Consent Order.  But if the Court is not prepared to take those steps on the current record, it should authorize X Corp. to obtain discovery from the FTC based on the "meaningful evidence" of "abus[e] of the judicial process" supporting this motion.  *S.E.C. v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 128 (3d Cir. 1981) (remanding claim of agency abuse of process with instructions that "respondents should be entitled to discovery procedures" in further proceedings).  X Corp. attempted to gather such information to assess the extent of the FTC's inequitable conduct from the agency without judicial involvement.  Ex. 18.  The FTC refused.  Exs. 19, 20.  The Court need not, and should not, allow the agency to have both the first and last word on allegations of its own wrongdoing.  *Wheeling-Pittsburgh* at 128–29; *United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977) (per curiam) (authorizing discovery where IRS engaged in "extraordinarily harassing investigation"); *United States v. Church of Scientology of Cal.*, 520 F.2d 818, 825 (9th Cir. 1975) ("allegations of bad faith harassment by the [IRS], though thin, raised sufficient doubt about the [IRS]'s purposes" to justify discovery including "cross-

examination of the summoning agent"). The Court should stay enforcement of the Consent Order—including X Corp.'s obligations to respond to demand letters and produce witnesses for deposition—until the FTC has provided discovery necessary for a complete factual record of the FTC's conduct and necessary remedies.

## III. THE FTC'S BAD-FAITH ATTEMPT TO INFLUENCE THE OUTCOME OF THE INDEPENDENT PROGRAM ASSESSMENT REPUDIATED THE ORDER

Separately, the FTC's bad-faith effort to influence the outcome of EY's audit is an exceptional circumstance warranting relief from the Consent Order. "Repudiation of a settlement agreement that terminated litigation pending before a court constitutes an extraordinary circumstance" justifying vacatur. *Keeling v. Sheet Metal Workers Int'l Ass'n, Loc. Union 162*, 937 F.2d 408, 410–11 (9th Cir. 1991). This holds true where, as here, the government is the party at fault. *See, e.g.*, *Thompson*, 404 F.3d at 824 (Department of Housing and Urban Development's actions or failure to act constitute a "factual" change warranting modification of consent decree). The FTC's exceptional interference irremediably tainted the independent assessment, thereby frustrating the purpose of the Consent Order. Relief on grounds of repudiation is justified where the repudiation "amount[s] to" such "a complete frustration of the settlement agreement[.]" *Joe Hand Promotions, Inc. v. Rangee*, 2013 WL 6859001, at *3 (E.D. Cal. Dec. 24, 2013).

On a Rule 60(b) motion, "[t]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally," even when the underlying cause of action is federal. *United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992); *see also FTC v. DebitPay, LLC*, 695 F.3d 938, 943 (9th Cir. 2012). Under California law, "[a] material breach is one that 'is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the undertaking.'" *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1530 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994). And "[b]asic contract law dictates that 'hindrance of the other party's performance operates to excuse that party's nonperformance.'" *Weiler v. Marcus & Millichap Real Est. Inv. Servs.*, 22 Cal. App. 5th 970. 978 (Ct. App. 2018).

The purpose of the Consent Order, and therefore the Court's Order entering it as a judgment,

was to allow Twitter to resolve FTC charges by paying a $150 million civil penalty and "implement[ing] robust compliance measures to protect users' data privacy." Press Release, Dep't of Justice, Twitter Agrees with DOJ and FTC to Pay $ 150 Million Civil Penalty and to Implement Comprehensive Compliance Program to Resolve Alleged Data Privacy Violations (May 25, 2022), bit.ly/46D90l8. Assessment by "qualified, objective, independent third-party professionals" was foundational to the compliance scheme agreed by the parties because it protected the interests of both the FTC (by giving it access to objective, unimpeachable evidence to use in an enforcement proceeding) and Twitter (by ensuring its compliance was tested by an objective outsider rather than solely by attorneys for the agency responsible for bringing enforcement actions). Consent Order Part VI.A. In other words, "[t]he very purpose of a security or privacy order's assessment provision is to ensure that evaluation of a respondent's security or privacy program is truly objective—*i.e.*, unaffected by the interests (or litigation positions) of either the respondent or the FTC." Ex. 1. Part VI also ensured that Twitter and the FTC were on the same page about *how* compliance would be measured, by requiring assessors to independently analyze a static set of five Program elements. Consent Order Part VI.D.

The FTC's conduct fatally undermines both of these negotiated protections by compromising the independence and objectivity of the assessment. The "occurrence" of an objective, independent audit was a "basic assumption on which the contract was made," which the FTC prevented by its interference. Restatement (Second) of Contracts § 265 (describing the doctrine of discharge by supervening frustration). Instead of the objective, independent assessment that both parties could rely on, as contemplated in the Consent Order, the FTC attempted to secure a report that bore the label "independent" but was in reality guided by the desires and influence of the very agency planning to use it as evidence in an enforcement action.

The FTC's inequitable effort to secure a negative outcome of an "independent" assessment of Twitter's Program completely frustrates the purpose of the Court's order—an "extraordinary circumstance" justifying relief under Rule 60(b)(6). *See Keeling*, 937 F.2d at 410–11 ("[r]epudiation" or "complete frustration" of a settlement is an extraordinary circumstance justifying relief under Rule 60(b)(6)).

1   IV.   **THE COURT SHOULD STAY THE DEPOSITION OF ELON MUSK**

2           The record in this case makes clear that the FTC's desire to depose Mr. Musk derives from

3   the same bad faith and improper conduct that has characterized its investigation to date.  "[A] court

4   may not permit its process to be abused" by enforcing administrative demands "issued for an

5   improper purpose, such as to harass [the recipient] or put pressure on him ... or for any other purpose

6   reflecting on the good faith of the particular investigation."  *United States v. Powell*, 379 U.S. 48,

7   58 (1964).  Bad faith can take a number of forms, including "improper influence and abdication of

8   the agency's objective responsibilities."  *Wheeling-Pittsburgh*, 648 F.2d at 126 (remanding for

9   discovery on abuse-of-process claim where appellant alleged a "politically powerful third party

10  influenced the SEC to bring an action that it ordinarily would not pursue").  "[T]he dispositive

11  question in each case is whether the [agency] is pursuing the authorized purposes in good faith."

12  *United States v. Lui*, 2017 WL 3232578, at *8 (N.D. Cal. July 31, 2017).

13          The timeline of FTC action compels the conclusion that its quest to depose Mr. Musk is

14  baseless, politically motivated, and made in bad faith.  Only after Mr. Musk acquired Twitter in late

15  2022 did the FTC embark on a rapid-fire campaign of endless discovery requests.  *See supra* at 6–

16  11; House Report at 1, bit.ly/3PRoc8k.  And the FTC issued a Notice of Deposition for Mr. Musk

17  himself less than a *month* into that campaign, before the agency could even have digested the

18  information and materials the company was providing.  *See supra* at 6–11.  Before Mr. Musk

19  acquired Twitter, the FTC took months to follow up on the Zatko complaint, which involved *direct*

20  *allegations* of statutory and regulatory violations that Mr. Zatko claimed put user data at risk.  *See*

21  *supra* at 5–6.  In light of the FTC's overreach and Mr. Musk's merely high-level supervisory role

22  with respect to the Program, a reasonable observer easily can conclude that the FTC has no

23  legitimate basis for deposing Mr. Musk.  The same principles forbidding abuse of process in

24  administrative investigations, *see FTC v. Match Grp.*, 2023 WL 3181351 at *17 (D.D.C. May 1,

25  2023), apply with equal force to a Court's protective order under Rule 26(c)(1), which protects a

26  party or person from "annoyance, embarrassment, oppression, or undue burden or expense."  The

27  Court should quash or stay the Notice of Deposition of Mr. Musk through a Rule 26 protective order.

28  In the alternative, the Court should stay the deposition until the FTC responds to the company's

1   reasonable requests for documents and information.  *See Wheeling-Pittsburgh*, 648 F.2d at 128.

2        The Court should stay the deposition for the additional reason that deposing Mr. Musk at

3   this time violates the so-called Apex Doctrine.  Because depositions of high-level executives

4   "create[] a tremendous potential for abuse or harassment," courts will "generally refuse to allow the

5   immediate deposition of 'apex deponents,' before the depositions of lower level employees with

6   more intimate knowledge of the case." *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D.

7   Cal. 2012); *Mehmet v. PayPal, Inc.*, 2009 WL 921637, at *2 (N.D. Cal. Apr. 3, 2009) (granting

8   protective order barring depositions of PayPal's President, General Counsel, and CFO).  "In

9   determining whether to allow an apex deposition, courts consider (1) whether the deponent has

10   unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party

11   seeking the deposition has exhausted other less intrusive discovery methods." *Apple*, 282 F.R.D. at

12   263.  "[A] purpose to harass or annoy may be inferred where there is no showing the high-ranking

13   official has relevant and personal knowledge about the facts at issue." *Est. of Levingston v. Cnty.*

14   *of Kern*, 320 F.R.D. 520, 526 (E.D. Cal. 2017).

15        Mr. Musk is the majority owner of X Corp., an executive of the company, the Chief

16   Technical Officer, and the former CEO. Koffmann Decl. ¶ 14.  He would also be the very first

17   current employee of X Corp. deposed by the FTC in this investigation.  The FTC noticed Mr. Musk's

18   deposition less than a month after issuing its first post-acquisition demand letters.  *See supra* at 6–

19   11.  The FTC has not shown that he possesses any "unique and first-hand," non-repetitive knowledge

20   pertaining to X Corp.'s compliance with the Consent Order, which is the issue in dispute.  The

21   FTC's attempt to depose Mr. Musk before anyone else at the company "shed[s] considerable light"

22   on its true purpose: an improper effort to harass and annoy Mr. Musk himself.  *In re Transpacific*

23   *Passenger Air Transp. Antitrust Litig.*, 2014 WL 939287, at *5 (N.D. Cal. Mar. 6, 2014).  The Court

24   should quash or stay the notice of deposition on this basis alone.  *See id.*; *In re Google Litig.*, 2011

25   WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011) (barring the deposition of Google's President).

26

27

28

## **CONCLUSION**

For the foregoing reasons, the Court should (1) terminate the Consent Order or issue an order staying enforcement of the Consent Order, and (2) issue a protective order staying the notice of deposition issued to Elon Musk by the FTC.  At a minimum, the Court should order the FTC to provide discovery to X Corp. and stay all enforcement of the Consent Order—including X Corp.'s obligations to respond to demand letters and produce witnesses for deposition—until the FTC has provided the discovery necessary to develop a complete factual record of the FTC's conduct and any necessary remedies.

DATED:    July 13, 2023               Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Alex Spiro*
Alex Spiro (*pro hac vice* application pending)
Daniel R. Koffmann (California Bar No. 344379)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
alexspiro@quinnemanuel.com
danielkoffmann@quinnemanuel.com

Christopher G. Michel (*pro hac vice* application pending)
Casey J. Adams (*pro hac vice* application pending)
Rachel G. Frank (California Bar No. 330040)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
christophermichel@quinnemanuel.com
caseyadams@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Attorneys for X Corp., successor in interest to Defendant Twitter, Inc.*