# EXHIBIT 14

```
 1                    UNITED STATES OF AMERICA
 2             BEFORE THE FEDERAL TRADE COMMISSION
 3
 4    In the Matter of                )
 5    UNITED STATES OF AMERICA,        )
 6    V.                               )  Docket No. C-4316
 7    TWITTER, INC.                    )
 8                                     )
 9         -------------------------)
10
11                              Wednesday, June 21, 2023
12                              Via Zoom videoconference
13
14              The above-entitled matter came on for
15    deposition, pursuant to notice, at 12:30 p.m. Eastern,
16    for the testimony of:
17
18                         DAVID ROQUE
19
20
21
22    Reported by:  DEBORAH WEHR, RPR
23
24
25
```

Roque

USA v. Twitter, Inc.                                            6/21/2023

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:

 4          ANNE COLLESANO, ESQUIRE

 5          REENAH L. KIM, ESQUIRE

 6          ERIK JONES, ESQUIRE

 7          Federal Trade Commission

 8          600 Pennsylvania Avenue, N.W.

 9          Washington, D.C.  20580

10          (202) 326-2272

11          acollesano@ftc.gov

12

13   ON BEHALF OF THE WITNESS:

14          LAURA RIPOSO VANDRUFF, ESQUIRE

15          Kelley, Drye & Warren, LLP

16          3050 K Street, N.W.

17          Washington, D.C.  20007

18          (202) 342-8435

19          lvandruff@kelleydrye.com

20

21

22

23

24

25   (Appearances continued on next page.)
```

3

Roque

USA v. Twitter, Inc.                                          6/21/2023

```
 1    (Appearances continued.)

 2

 3

 4   ON BEHALF OF XCORP:

 5           DANIEL KOFFMANN, ESQUIRE

 6           Quinn Emanuel Urquhart & Sullivan, LLP

 7           51 Madison Avenue

 8           22nd Floor

 9           New York, New York  1010

10           (212) 849-7617

11           danielkoffmann@quinemanuel.com

12

13   ALSO PRESENT:

14           JUSTIN MCCARTY

15           MARC CARLSON

16           ALEX GAYNOR

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

4

Roque

USA v. Twitter, Inc.                                        6/21/2023

```
 1                        I N D E X

 2

 3     EXAMINATION BY                      PAGE

 4     Ms. Collesano                        6

 5     Mr. Koffmann                        195

 6     Ms. VanDruff                        215

 7

 8     EXHIBIT          DESCRIPTION         PAGE

 9     No. 1            12/6/22 e-mail      51

10     No. 2            2/1/23 e-mail       60

11     No. 3            2/6/23 e-mail       66

12     No. 4            2/7/23 e-mail       71

13     No. 5            2/14/23 e-mail      76

14     No. 6            2/14/23 chat        95

15     No. 7            2/21/23 e-mail      105

16     No. 8            2/21/23 e-mail      107

17     No. 9            2/21/23 chat        110

18     No. 10           Resignation letter 124

19     No. 11           Internal memo      130

20     No. 12           11/10/22 e-mail    158

21     No. 13           12/6/22 e-mail     163

22     No. 14           12/22/22 e-mail    166

23     No. 15           1/21/23 chat       173

24     No. 16           11/3/22 e-mail     175
```

```
25     (Exhibits continued on next page.)
```

5

Roque

USA v. Twitter, Inc.                                    6/21/2023

```
 1   (Exhibits continued.)
 2   EXHIBIT          DESCRIPTION              PAGE
 3   No. 17           2/8/23 chat              179
 4   No. 18           2/24/23 e-mail           181
 5   No. 19           1/13/23 e-mail           183
 6   No. 20           3/8/23 letter            185
 7   No. 21           June 2022 memo           189
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

6

Roque

USA v. Twitter, Inc.                                    6/21/2023

```
 1                    P R O C E E D I N G S
 2                    -   -   -   -   -
 3                    STIPULATION:
 4    All counsel present stipulate that the witness shall be
 5            sworn remotely by the court reporter.
 6                    -   -   -   -   -
 7         Whereupon --
 8                    DAVID ROQUE,
 9         a witness, called for examination, having been
10    first duly sworn, was examined and testified as
11    follows:
12                    EXAMINATION
13         BY MS. COLLESANO:
14         Q.  Would you please state your full name for the
15    record.
16         A.  David Roque.
17         Q.  Good morning.  My name is Anne Collesano, and
18    I'm here with my co-counsel Reenah Kim and Erik Jones,
19    as well as technologist Alex Gaynor.  We are conducting
20    this deposition virtually, and we are using Agile Law
21    remote deposition application to share documents and
22    Zoom software for video and audio.  Prior to going on
23    the record, we confirmed with all of the participants
24    here that everyone can hear and see each other, but if
25    at any point anyone has trouble hearing, seeing or
```

Roque

1   accessing the documents we are using, please speak up

2   and we'll address the concerns.

3         Would all other counsel please introduce

4   themselves for the record.

5         MS. VANDRUFF:  This is Laura VanDruff, and I'm

6   appearing for Mr. Roque and Ernst & Young.  I'm joined

7   by in-house counsel Justin McCarty as well as Marc

8   Carlson, who works in the general counsel's office at

9   Ernst & Young.

10         MR. KOFFMANN:  This is Daniel Koffmann from

11   Quinn Emanuel on behalf of XCorp.

12         BY MS. COLLESANO:

13   Q.  Good morning, Mr. Roque.  Do you understand

14   that you were administered an oath by the court

15   reporter and are testifying today under penalty of

16   perjury?

17   A.  Yes.

18   Q.  Do you understand that that oath you took has

19   the same force and effect as if you were providing

20   sworn testimony in a court of law?

21   A.  Yes.

22   Q.  Who is present with you in the room?

23   A.  With me directly is Justin McCarty and Laura

24   VanDruff.

25   Q.  Thank you.  Are you able to communicate with

8

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    anyone in a way that I cannot see or hear?

2        A.   No.

3        Q.   You understand that communicating with anyone

4    in a way that I cannot see or hear while we are on the

5    record in this deposition is inappropriate, correct?

6        A.   Understand, yes.

7        Q.   Do you have any documents, software or

8    applications open on your computer other than Agile Law

9    or Zoom?

10       A.   No.

11       Q.   Do you have a phone with you that's within your

12   reach other than the one you are using for audio?

13       A.   I do.  I can remove it.

14       Q.   As long as you agree not to use it during the

15   deposition.

16       A.   Yeah, I'll just put away right now just to be

17   safe.  It's no longer with me.

18       Q.   Thank you.  Are there any other devices within

19   your reach aside from the phone and the computer?

20       A.   I have an iPad so that I can look at the

21   documents.  Those are the two devices that I have.

22       Q.   You are using the iPad for Agile and the

23   computer for Zoom?

24       A.   That's correct.

25       Q.   Do you have any paper documents in front of

9

Roque

USA v. Twitter, Inc.                                              6/21/2023

 1    you?

 2         A.   I have a copy of the FTC Consent Order.

 3         Q.   Thank you.  Have you ever been deposed before,

 4    Mr. Roque?

 5         A.   I have not.

 6         Q.   Have you ever testified in a trial before?

 7         A.   No, I have not.

 8         Q.   Have you given any testimony under oath before?

 9         A.   I have not.

10         Q.   Since you haven't testified before, I'm just

11    going to go over some ground rules for the deposition.

12    The court reporter is here, and she is writing down

13    everything that we say.  So in order to ensure she is

14    able to get an accurate record of what's being said, I

15    ask that you let me finish my question completely

16    before answering.  Can you do that?

17         A.   I'll do my best, yes.

18         Q.   Please answer every question verbally and

19    audibly rather than gesturing.  Please listen carefully

20    to each question.  If you do not us understand a

21    question, let me know, and I can rephrase it.  If you

22    answer a question, I'll assume that you understood the

23    question.

24         A.   Okay.  Yes.

25         Q.   Your attorney may make objections for the

10

Roque

USA v. Twitter, Inc.                                          6/21/2023

1  record.  After any objection, you can go ahead and
2  answer the question that's pending unless your attorney
3  specifically instructs you not to.
4       A.  Okay.
5       Q.  If you would like to take a break at any time
6  during the deposition, please let me know.  I only ask
7  that if a question is pending, you answer it before we
8  take a break.
9       A.  Okay.
10      Q.  If at any point during your testimony today you
11  need to correct or complete a previous answer, please
12  let me know.  We want a complete and accurate record.
13      A.  Sure.
14      Q.  Do you understand these ground rules?
15      A.  I do.
16      Q.  Do you understand that you are under oath to
17  answer all questions truthfully and accurately?
18      A.  Yes, I do.
19      Q.  Is there any reason you cannot testify
20  truthfully and accurately today?
21      A.  No.
22      Q.  Are you sick?
23      A.  I am not.
24      Q.  Are you taking any medications that may
25  interfere with your ability to testify truthfully and

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    accurately?

2        A.   No.

3        Q.   Do you have any questions before we proceed?

4        A.   I do not.

5        Q.   What did you do to prepare for today's

6    deposition?

7             MS. VANDRUFF:  I would caution the witness to

8    not reveal the contents of any communications with

9    counsel.

10            You may answer the question, Mr. Roque.

11            THE WITNESS:  I had a few, I guess, preparation

12   meetings in anticipation of this just to get familiar

13   with the nature and flow of the discussions and how

14   this day may proceed.

15            BY MS. COLLESANO:

16       Q.   How many meetings did you have?

17       A.   About four, I believe.

18       Q.   Who was present for each meeting?

19       A.   I don't know each meeting, meeting-by-meeting,

20   but at a minimum, it would have been Laura VanDruff,

21   Justin McCarty.

22       Q.   Anyone else?

23       A.   I'm sorry, I don't know Christina's last --

24   there is a colleague that attended some of the meetings

25   from Laura VanDruff's firm.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

12

Roque

USA v. Twitter, Inc.                                    6/21/2023

```
 1        Q.   Anyone else?
 2        A.   And in one meeting I believe Marc Carlson was
 3   also there.
 4        Q.   Who is Marc Carlson?
 5        A.   Marc Carlson is -- works at Ernst & Young as
 6   part of the legal counsel, I understand.
 7        Q.   Anyone else?
 8        A.   Not that I'm aware of or remember.
 9        Q.   How long were the meetings?  How much time
10   overall did you meet with this group of people?
11        A.   They ranged anywhere from an hour to a couple
12   hours.
13        Q.   Did you review documents?
14        A.   Yes, I did.
15        Q.   Do you recall what documents you reviewed?
16        A.   Not off the top of my head, no.  I mean, each
17   one, no.  I can give you an example.  Like the Federal
18   Trade Commission Consent Order itself, I did review.
19        Q.   Anything else you recall?
20        A.   The actual deposition request itself.
21        Q.   Did you review documents related to the
22   readiness assessment or the order assessment?
23        A.   Not since we -- not since we -- I received the
24   preservation order.  I was told not to open and look at
25   any documents.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

13

Roque

USA v. Twitter, Inc.                                      6/21/2023

```
 1        Q.  Did you speak with anyone other than your
 2   attorney and those you met with -- those you have
 3   already told me you've met with about this deposition
 4   today?
 5        A.  No.  I'm sorry, can I clarify that?
 6        Q.  Please.
 7        A.  I did.  There's other people involved from our
 8   executive team.  Like Geoff Beatty, he is the practice
 9   leader for the group.  He is aware that I had been
10   subpoenaed and would be needing to testify.  There is
11   Scott Coolidge, who is also part of the engagement
12   team.  I have talked to him about this engagement or
13   needing to be deposed.  And then there is a few other
14   executives from our professional practice group and our
15   risk management practice within Ernst & Young that are
16   also aware of this proceeding.
17        Q.  Did you discuss what would happen at today's
18   deposition with any of these people?
19        A.  No, I didn't go into any details.  I just made
20   them aware that the deposition request had been
21   provided and that a date was to be determined of when I
22   would need to share what I knew.
23        Q.  You mentioned Mr. Beatty and Mr. Coolidge.  Do
24   you recall the names of others you spoke to?
25        A.  Paul Penler from our professional practice
```

14

Roque

USA v. Twitter, Inc.                                    6/21/2023

1      group.  And then Rebecca Lubens, also from EY legal

2      counsel.

3             Q.  Mr. Roque, where do you currently live?

4             A.  I live in Oakland, California.

5             Q.  Thank you.  I would like to briefly discuss

6      your educational background.  Do you have a high school

7      diploma?

8             A.  I do.

9             Q.  Any further education after high school?

10            A.  Yes.  I graduated from the University of

11     California Los Angeles with a bachelor of science in

12     business and economics.

13            Q.  Any other degrees?

14            A.  No.

15            Q.  Any certifications related to your profession

16     at EY?

17            A.  Yes, I have a CPA license with the State of

18     California.

19            Q.  Anything else?

20            A.  I have a CPA license in other states as well.

21     Do you want all of those?

22            Q.  Sure.

23            A.  Okay.  I have a CPA license in the State of

24     Texas.  I have CPA reciprocity with the State of

25     Washington, the State of Montana.  I have a CPA license

15

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   with the State of Atlanta and a CPA license with the
2   State of Utah as well as Massachusetts.
3        Q.  You said the State of Atlanta.  Do you mean
4   Georgia?
5        A.  I'm sorry, Georgia, yes.
6        Q.  Where are you currently employed, Mr. Roque?
7        A.  At Ernst & Young, LLP.
8        Q.  What is your job title there?
9        A.  It's partner.
10       Q.  What does that mean?
11       A.  I have an ownership interest in the partnership
12   itself.
13       Q.  Are you a full-time employee?
14       A.  I am.
15       Q.  How long have you worked at Ernst & Young?
16       A.  It's coming up on 30 years.  I started
17   October 1, 1991.
18       Q.  I'm impressed you remember the date.
19       A.  It was a big milestone.
20       Q.  Do you currently have any other jobs or
21   employment?
22       A.  No, I don't.
23       Q.  As a partner at EY, what are your job
24   responsibilities?
25       A.  Providing, I guess, service to a host of

16

Roque

USA v. Twitter, Inc.                                     6/21/2023

1  external clients, managing internal team resources at
2  younger levels and executing the firm's strategy.
3      Q.  When you say executing the firm's strategy, who
4  provides that strategy?
5      A.  It comes from our global chairman, then also
6  from -- more specifically from our Americas leadership
7  team.
8      Q.  Who do you report to?
9      A.  I directly report to Hugh Rosengarten.
10     Q.  What is his position?
11     A.  He is the risk leader for the west, which is
12  the region I reside in.
13     Q.  What is included in west?
14     A.  It goes from Alaska down to California, and
15  then it crosses over to Texas, Oklahoma and Rogers,
16  Arkansas.
17     Q.  Does Mr. Rosengarten supervise your work as
18  well?
19     A.  No.
20     Q.  Who supervises your work?
21     A.  Sorry, I'm trying to think of the best way to
22  answer that question.  There's no one that -- there's
23  no one that directly supervises my work.  We have a
24  system of internal quality control, and then on an
25  engagement-by-engagement, we usually have a secondary

17
Roque
USA v. Twitter, Inc.                                    6/21/2023

1    quality control review partner that will provide
2    oversight and sort of an independent assessment of the
3    quality of work performance.
4        Q.  So first the quality control group you
5    mentioned, how does that work?
6        A.  It's established by our firm on a national
7    level, and they will selectively choose engagements
8    throughout the year to perform a series of quality
9    checks for compliance with firm and professional
10   standards.
11       Q.  So the group overall will look into different
12   projects but not every single one?
13       A.  Correct.
14       Q.  And then you also have a quality control person
15   assigned to each project?
16       A.  For the services I provide, yes.
17       Q.  And what does that person do when they are
18   assigned a project that you work on?
19       A.  They provide an independent perspective of the
20   overall engagement conclusions reached.
21       Q.  If they have a different opinion than you, is
22   their opinion what you go forward with or is there a
23   conversation or is it your opinion?
24       A.  No, it's driven by a discussion of the group or
25   the team, and if necessary, we can consult with other

18

Roque

USA v. Twitter, Inc.                                             6/21/2023

1    parties to make sure we reach the right conclusion.

2        Q.   Who was the quality control person assigned to

3    the order assessment?

4        A.   That was Scott Coolidge.

5        Q.   Who was assigned to the readiness assessment?

6        A.   That was also Scott Coolidge.

7        Q.   Prior to your current role as partner at Ernst

8    & Young, have you held other positions there?

9        A.   Yes.  I had the position previous to being a

10   partner was titled senior manager.

11       Q.   How long were you in that role?

12       A.   I believe seven or eight years.

13       Q.   And how long have you been in the partner role?

14       A.   Since 2004.  July 1, 2004.

15       Q.   So about 19 years?

16       A.   Yeah.  Long time.

17       Q.   And prior to senior manager, was there another

18   role you held?

19       A.   The role prior to that within Ernst & Young is

20   a manager role.

21       Q.   How long were you in that role?

22       A.   Two years.

23       Q.   Prior to that did you have a different role?

24       A.   I did.  I had a role called senior.

25       Q.   How long were you in that role?

19

Roque

USA v. Twitter, Inc.                                      6/21/2023

1       A.   Three years.

2       Q.   Anything before that?

3       A.   We have a role called staff, and I was -- we

4  have a staff 1 and a staff 2, and each on of those is

5  one year.

6       Q.   And you did each position?

7       A.   That's correct.

8       Q.   Anything prior to that?

9       A.   No.

10      Q.   Did you work anywhere else before Ernst &

11 Young?

12      A.   I did.  I worked at the student store at UCLA.

13      Q.   While you were in school?

14      A.   Correct.

15      Q.   What is your e-mail address at Ernst & Young?

16      A.   It's my first name, David, dot, last name,

17 R-O-Q-U-E, @ey.com.

18      Q.   How many projects have you worked on at EY

19 related to Twitter?

20      A.   Five.

21      Q.   What were those five projects?

22      A.   Two of them were a system organization control

23 report 2, a SOC 2 report.  One was the readiness

24 assessment.  And the other two were the original or the

25 previous FTC consent order and then the current FTC

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    consent order.

2        Q.   You mentioned systems organization control

3    report.   What does that mean?

4        A.   It's a specific report issued under the AICPA

5    standards that provide organizations the ability to

6    communicate the operation of their processes and

7    controls covering one or more topics, their security,

8    availability, confidentiality, processing integrity

9    and/or privacy.

10       Q.   What is the report used for by Twitter?

11       A.   The report for Twitter is for their

12   advertisers.

13       Q.   For their what?  I'm sorry, I didn't hear that.

14       A.   Their custom audience advertisers.

15       Q.   So what does that mean?

16       A.   If Twitter has an advertiser that uses a custom

17   audience service, they would be entitled to receive the

18   report we issue.

19       Q.   About how things at Twitter work related to

20   things that would impact those advertisers?

21       A.   It's very specific to the custom audience

22   network itself, and it was only on the security

23   standard.

24       Q.   What is a custom audience?

25       A.   It's a service Twitter provides its

21

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    advertisers.  It's a platform that allows an advertiser
2    to come in and place ads in the Twitter services.
3         Q.   Okay.  Thank you.  The five projects that you
4    mentioned, are any of them currently active?
5         A.   No, I don't have any active work with Twitter.
6         Q.   Which of those five projects was the first
7    project you worked on with Twitter?
8         A.   The system organization control report.
9         Q.   When was that?
10        A.   The first time was four years ago.
11        Q.   And the second?
12        A.   Three years ago.
13        Q.   Was there a more recent SOC 2 report being
14   worked on for Twitter?
15        A.   There was.
16        Q.   But you are not working on it?
17        A.   I was not involved in that project, no.
18        Q.   Is that project still active?
19        A.   No, it's not.
20        Q.   No, it's not?  Is that what you said?
21        A.   Sorry if you can't hear me.  No, it's not.
22        Q.   How would you describe the 2022 readiness
23   assessment?
24             MS. VANDRUFF:  Objection.  Vague.
25             You may answer the question.

22

Roque

USA v. Twitter, Inc.                                              6/21/2023

1          THE WITNESS:  The readiness assessment was

2     intended to assess net new controls -- or what we call

3     net new controls that Twitter was implementing or

4     considering implementing relative to the revised order

5     that expanded to include privacy.

6          BY MS. COLLESANO:

7     Q.   What was your role on that project?

8     A.   I was one of the -- I was the engagement

9     partner responsible for the, I guess, engagement

10    itself.

11    Q.   What does that mean to be the engagement

12    partner?

13    A.   When we enter into a statement of work with a

14    client, there is usually one primary partner that is

15    designated with the term "engagement partner" that sort

16    of has overall responsibility for executing the

17    engagement, getting it completed and signing off.

18    Q.   If I describe that assessment as readiness

19    assessment throughout this deposition, does that sound

20    reasonable to you?

21    A.   It does.

22    Q.   What was the 2022 FTC consent order assessment?

23         MS. VANDRUFF:  Objection.  Vague.

24         You can answer the question.

25         THE WITNESS:  I'm sorry, the FTC assessment

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    itself?

2            BY MS. COLLESANO:

3       Q.   The 2022 FTC consent order assessment project

4    with Twitter, how would you describe that?

5            MS. VANDRUFF:  Objection.

6            THE WITNESS:  That was to specifically execute

7    and provide the independent assessor report as required

8    under the order.

9            BY MS. COLLESANO:

10      Q.   If I describe that as the order assessment

11   throughout the deposition, does that sound reasonable

12   to you?

13      A.   It does.  In the context, that will be the

14   current one?

15      Q.   Yes.  So that's what I'm proposing, if I say

16   order assessment, I mean the current order assessment

17   that was terminated in February, unless I specify it's

18   a different one, just for ease of talking about it

19   throughout the deposition.

20      A.   Just to make sure I understand, the one that

21   was reissued in the summer of 2022, that consent order?

22      Q.   Yes, the statement of work that was signed in

23   the summer of 2022.

24      A.   Okay.  Yeah.

25           MS. VANDRUFF:  Counsel, there were two

24

Roque

USA v. Twitter, Inc.                                          6/21/2023

1   statements of work in the summer of 2022.  So you are

2   referencing --

3              MS. COLLESANO:  I'm trying to establish that we

4   can describe -- we said the readiness assessment, we

5   described that that would be the order assessment would

6   be for the statement of work signed in August.  I know

7   the readiness assessment statement of work was signed

8   in July, but I think we can call that the readiness

9   assessment and call the subsequent inquiry the order

10  assessment just for shorthand today rather than saying

11  the 2022 FTC consent order assessment.  That's all I'm

12  asking, if that's all right with Mr. Roque.

13             THE WITNESS:  Yes, that's fine.

14             BY MS. COLLESANO:

15  Q.  What was your role on the order assessment?

16  A.  I was the engagement partner once again.

17  Q.  And how would you describe that role on the

18  order assessment?

19  A.  I was ultimately going to be responsible for

20  issuing the report.

21  Q.  Why did EY terminate the order assessment SOW

22  for Twitter?

23  A.  The firm made a business decision to no longer

24  continue with the work.

25  Q.  What was the reason for that?  What were the

25

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    reasons for that business decision?

2        A.   There was a series of reasons.  There was not

3    one in particular.  It was a combination of various

4    considerations.

5        Q.   What were those considerations?

6        A.   They were -- they included the timing, where we

7    were with the timing of the engagement.  They included

8    the resource availability of the client to support and

9    execute the engagement, the ongoing changes amid the

10   executive management team to be able to represent

11   compliance with the order.

12       Q.   Anything else?

13       A.   I would have to refer back to our resignation

14   memo.

15       Q.   You mentioned timing as one of the reasons.

16   Could you please elaborate on what that means.

17       A.   Yes.  The consent order has a very specific

18   timeline for the end of the assessment period, which

19   was one year after the order was signed.  And then the

20   report needs to be provided within 60 days.  We had not

21   been able to begin or execute any of our field work

22   procedures as of the end of February, and there was

23   concerns whether or not we would actually be able to

24   complete or assess all of the controls that we were

25   going to be required to look at in three months.

26

Roque

USA v. Twitter, Inc.                                          6/21/2023

1        Q.  Why weren't you able to do any of your field
2   work by the end of February?
3        A.  We were informed by the client that they were
4   not ready for us to be onsite.
5        Q.  Had you previously told them you needed to be
6   onsite prior to that time period?
7        A.  Yes, we did.
8        Q.  When did the order assessment SOW contemplate
9   that EY would start its field work?
10       A.  I believe in the statement of work itself,
11  within the timeline section of that statement of work,
12  the original goal was for us to begin and be onsite
13  starting in January of 2023.
14       Q.  That date was agreed to by both Twitter and EY
15  at the time?
16       A.  That is correct.
17       Q.  Do you recall when you first started asking
18  Twitter about the timing of the field work start?
19       A.  Yes.
20       Q.  When was that?
21       A.  It was in December of 2022.
22       Q.  What did you tell them in December of '22?
23       A.  We would like to begin executing our procedures
24  sooner than later, and if possible could we get going
25  in December.

27

Roque

USA v. Twitter, Inc.                                    6/21/2023

1        Q.   What was the response?

2        A.   They were not able to accommodate that request.

3        Q.   Who does that mean they were not able to

4   accommodate the request?

5        A.   They indicated to us they did not have the

6   resources to facilitate us beginning our procedures.

7        Q.   Did they give you an indication of when they

8   thought you would be able to start your procedures?

9        A.   The only time they provided an indication was

10  in February they had proposed we begin our field work

11  procedures March 15th.

12       Q.   From December through February did EY inquire

13  more than once about beginning field work?

14       A.   We did.

15       Q.   About how many times would you estimate?

16       A.   I'm sorry, did you say -- did you give a month

17  or a date?  Could you clarify that again.

18       Q.   About how many times would you estimate you

19  contacted Twitter about starting the field work between

20  December 2022 and February 2023?

21       A.   From December to February, it would be at least

22  weekly.

23       Q.   What was the reply you got from Twitter?

24       A.   They were actively looking to get the resources

25  necessary to accommodate our field work procedures.

28

Roque

USA v. Twitter, Inc.                                            6/21/2023

1    Q.   Was EY ready to begin its procedures?

2    A.   We were.

3    Q.   You also mentioned resource availability of the

4    client as part of the reason behind your decision to

5    terminate.  Would you elaborate on that, please.

6         MS. VANDRUFF:  Objection.  Vague.

7         You may answer the question.

8         THE WITNESS:  Sure.  It was -- there had been

9    just a significant amount of turnover and departure of

10   employees from the company, they were down to a very

11   limited set of individuals that had been identified to

12   facilitate our audit.  And the audit itself can be a

13   very overwhelming exercise, and we weren't sure that

14   they would be able to have the necessary resources for

15   us to execute our procedures.

16        BY MS. COLLESANO:

17   Q.   Did Twitter tell you they didn't have enough

18   resources to exercise those procedures?

19   A.   They said they were short and actively trying

20   to hire some resources to supplement their team.

21   Q.   Did they give you any more details about what

22   they meant by short?

23   A.   They did not.

24   Q.   Did they give you any more details about who

25   they were actively trying to hire?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

29

Roque

USA v. Twitter, Inc.                                      6/21/2023

1        A.   No, they just said they had open positions.

2        Q.   Do you have an idea of how many open positions?

3        A.   I believe there was at least two.

4        Q.   Of these two, do you know what those two

5    positions were?

6        A.   They were specific -- my understanding is they

7    were very specific to, I guess, a role of compliance or

8    internal audit, someone with a control or an audit

9    background.

10       Q.   Would these be high-level employees they were

11   looking to hire?

12       A.   I don't know the level structure of all the

13   different categories of employees.  My understanding is

14   it was supposed to be someone with multiple years of

15   experience with facilitating or conducting audits.

16       Q.   The contacts you were given by Twitter to

17   facilitate the order assessment, did you think that

18   they had the requisite experience to fulfill that

19   position?

20       A.   Is there -- sorry.  Not to be rude, your

21   question was a little vague.  We had multiple contacts

22   provided to us.  So I'm not sure I understand which one

23   you are asking about specifically.

24       Q.   Absolutely.  Can you tell me who your first

25   contact was at Twitter for the order assessment?

30

Roque

USA v. Twitter, Inc.                                           6/21/2023

1      A.   The first primary owner and contact was Damien
2  Kieran.
3      Q.   Can you give me the list of all that you recall
4  who were the primary contact?
5      A.   I can do my best.  After Damien there was the
6  internal audit group, primarily a gentleman by the name
7  of Brett Cohune.  Then there was a gentleman by the
8  name of Jim Baker.  After Jim Baker was Sergio Alonso.
9  Then we were provided with Damien Vogt.  Then after
10  Damien we were provided with Christian Dowell.  And
11  then it was a combination of Christian Dowell and
12  Damien from probably early January until the date we
13  resigned.
14      Q.   When you were working with Damien Kieran, were
15  you getting the information and access that you needed
16  from him?
17          MS. VANDRUFF:  Objection.  Compound.
18          But Mr. Roque, you can answer the question.
19          THE WITNESS:  Yes, we were -- there was no
20  restrictions from Damien in responding to our questions
21  or helping us get information that we requested of him.
22          BY MS. COLLESANO:
23      Q.   How about with Bret Cohune?
24      A.   There was no inability for him to provide
25  information and answer questions or give us access to

31

Roque

USA v. Twitter, Inc.                                           6/21/2023

1   data or people that we were requesting.

2       Q.  Did that change at all after October 27, 2022?

3       A.  No.  We were making requests for information.

4   All the resources we interacted with at the company did

5   their best to provide or follow up to our request as

6   timely as possible when there was -- to have meetings

7   with individuals or review evidence if it existed.

8       Q.  Do you recall when the transition happened from

9   Mr. Cohune to Mr. Baker?

10          MS. VANDRUFF:  Counsel, can you repeat the

11  question, please.

12          BY MS. COLLESANO:

13      Q.  Do you recall when the change happened from

14  Mr. Cohune to Mr. Baker?

15      A.  The -- yes.  It was sort of twofold.  The first

16  one was Mr. Baker was assigned as our primary contact

17  responsible for the program or the privacy and security

18  program that Twitter had.  After Damien resigned, Bret

19  was still working at the company at the time.  And then

20  when Mr. Cohune left around Thanksgiving in November,

21  he officially communicated to Mr. Baker and EY that

22  that's who we should be working with at that time.

23      Q.  Did Mr. Baker provide you with information that

24  you requested?

25      A.  He did not directly.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

                              Roque
USA v. Twitter, Inc.                                    6/21/2023

    1        Q.   What does that mean?
    2        A.   We sent numerous e-mails to him asking to the
    3   meet with him about the order, introduce ourselves and
    4   see if he had any questions about how we could get --
    5   how we could proceed or how it would take place, but he
    6   never responded back to our e-mails.  And I think
    7   within about ten days, he was terminated from the
    8   company.
    9        Q.   How about a Sergio Alonso?
   10        A.   We were informed to work with him after
   11   Mr. Baker's departure, but he left the company or was
   12   terminated within a week after Mr. Baker.
   13        Q.   How about Damien Vogt?
   14        A.   I believe he's still employed with the company.
   15        Q.   Did he provide you with information and access
   16   that you requested?
   17        A.   He did, yes.
   18        Q.   Was he amenable to EY's request to start field
   19   work in January?
   20             MS. VANDRUFF:  Objection.  Vague.
   21             You may answer the question.
   22             THE WITNESS:  He was -- I'm not sure he was
   23   amenable or not amenable to it.  We just said we wanted
   24   to start executing our procedures, and he represented
   25   that they understood that and were working to make it

33

Roque

USA v. Twitter, Inc.                                                6/21/2023

1      happen as quickly as they could.

2             BY MS. COLLESANO:

3         Q.   But he did not provide you access to start your

4      field work at Twitter?

5         A.   That's correct.

6         Q.   Did you make multiple requests to Mr. Vogt as

7      well?

8         A.   We did.

9         Q.   You mentioned turnover and departures as part

10     of the resource availability issues.  Were there any

11     other resource availability issues that contributed to

12     the decision to terminate?

13        A.   Yes.

14        Q.   What were they?

15        A.   Just the amount of change with control owners

16     or controls actually not having a control owner

17     identified.

18        Q.   So when you say the amount of change with

19     control owners, what do you mean by that?

20        A.   The large number of departures that occurred at

21     the company in November and through early December just

22     left holes operationally.

23        Q.   So each control needed to have a control owner,

24     but that control owner was continuing to change; is

25     that what you mean?

34

Roque

USA v. Twitter, Inc.                                              6/21/2023

1        A.   Either the control owner was continuing to
2   change or a new control owner had not yet been
3   identified to replace a control owner that had left.
4        Q.   So in addition to the turnover of control
5   owners, there were also controls that did not have a
6   control owner at all?
7        A.   Yes.
8        Q.   What time period was this happening?
9        A.   It was happening in at least December.  We had
10   made a request to get a list of all of the controls and
11   the control owners themselves, and as of that day we
12   had a preliminary list for a set of controls that
13   showed where the control owners had changed or there
14   was gaps.
15        Q.   When you say controls, just to take a step
16   back, what does that mean?  What is a control?
17        A.   A control, how I interpret the definition of a
18   control is it is intended to address a specific risk.
19   So if you identify a risk, you usually will identify a
20   control to mitigate that risk.
21        Q.   And a privacy and information security program
22   would be made up of numerous controls to address
23   various risks?
24        A.   That's correct.
25        Q.   You said this issue with the control owner

35

Roque

USA v. Twitter, Inc.                                              6/21/2023

1   turnover and lack of control owners began in at least
2   December 2022.  How long did it continue?
3       A.  The next update we received was at the end of
4   January when we were provided with a complete list of
5   all controls and scope that would form the framework of
6   our audit.  And there was still -- we were able to
7   identify revised changes of control owners since
8   December as well as still some controls that did not
9   have a control owner assigned to it.
10      Q.  Can you explain what a control owner is in this
11  context?
12      A.  It would be the individual that's primarily
13  responsible for, I guess, executing the control and
14  make sure it occurs in accordance with the design of
15  that control.
16      Q.  So from at least December 2022 to the end of
17  January 2023, there were a lot of control owner changes
18  and a lot of controls without control owners; is that
19  correct?
20      A.  I'm not sure what your terminology of "a lot"
21  is.  I would just say there was -- we could identify
22  that there were control owners which had changed, and
23  there were certain controls that were listed without a
24  control owner.
25      Q.  How many controls made up -- approximately made

Roque

USA v. Twitter, Inc.                                             6/21/2023

1    up the Twitter privacy and info security program?

2        A.  I don't remember the specific number, but there

3    was north of 350.

4        Q.  And of those approximately 350, how many

5    changed control owners?

6        A.  I don't remember that off the top of my head.

7    I'm sorry.

8        Q.  Do you think it would be more than 100?

9        A.  I don't want to mislead or provide inaccurate.

10   I just don't remember.

11       Q.  Of those, about 350 control owners, how many,

12   approximately, didn't have a control owner?

13       A.  Maybe 10 percent.

14       Q.  Why was the high turnover of control owners or

15   lack of control owners an issue for EY?

16       A.  The amount of turnover of the control owners --

17   sorry.  Usually when you have a new control owner, the

18   owner isn't as familiar with the control as if somebody

19   had been executing that for a period of time.  So it

20   usually requires more effort and back-and-forth in

21   order for the control owner to demonstrate the

22   operation of the control, collect evidence, whatever

23   else comes with those responsibilities.  And so having

24   a lot of, let's say, new people in new roles

25   potentially increased the level of effort.

37
                              Roque
USA v. Twitter, Inc.                              6/21/2023

    1        Q.   Did EY have the resources to increase this
    2    level of effort?
    3        A.   We did.
    4        Q.   Did Twitter?
    5             MS. VANDRUFF:   Objection.   Lacks foundation.
    6             You may answer the question.
    7             THE WITNESS:   I don't know.   I don't know what
    8    they would have -- sorry.   I just don't know if they
    9    had the resources or not.
   10             BY MS. COLLESANO:
   11        Q.   Based on your experience, do you think they had
   12    the resources?
   13             MS. VANDRUFF:   Objection.   Lack of foundation.
   14             You may answer the question.
   15             THE WITNESS:   My personal perspective was, no,
   16    because, as I communicated earlier, they had indicated
   17    they weren't quite ready to support our execution of
   18    the field work because they were resource constrained.
   19             BY MS. COLLESANO:
   20        Q.   Any other resource availability concerns
   21    related to this issue?
   22        A.   I'm not sure I understand the question.
   23        Q.   Sure.   I'll rephrase.   You mentioned resource
   24    availability at Twitter was one of the reasons that EY
   25    decided to terminate.   And we discussed the turnover

38

Roque

USA v. Twitter, Inc.                                          6/21/2023

1   and departures of employees and the change of control
2   owners and lack of control owners.  Were there any
3   other resource availability issues that EY was
4   concerned about?
5        A.   No.  The lack of a designated control owner or
6   resources to facilitate the audit itself was our main
7   concern.
8             MS. VANDRUFF:  Counsel, earlier in Mr. Roque's
9   assessment, he did reference the resignation memo.  So
10  to the extent that you are looking for a comprehensive
11  accounting of Ernst & Young's concerns, I would
12  reference his testimony there.
13            MS. COLLESANO:  Thank you.
14            BY MS. COLLESANO:
15       Q.   You also mentioned executive management changes
16  at Twitter were a reason for the resignation.  Would
17  you please elaborate on that.
18       A.   Yes.  There was just a significant amount of
19  the executives that were originally familiar with the
20  programs that had been implemented had departed, and as
21  new ones were identified, they also were departing.
22  And there was just sort of a constant turnover of those
23  executives starting in early November.
24       Q.   Why was that a concern for EY?
25       A.   One of our required procedures under the

39

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    professional standards is that we need to obtain a
2    representation letter, and usually it is signed by an
3    individual or a group of individuals in a management or
4    executive role that have responsibility for the subject
5    matter we are auditing to be able to convey they have
6    accurately represented and truthfully shared the
7    operation of the program.  And in order to do that, you
8    need to have been involved with the program for a
9    period of time, and we were wondering if the
10   organization would be able to have somebody in a role
11   that could make those type of attestations or
12   representations to us.
13       Q.  When you mentioned the people that left Twitter
14   beginning in early November, who do you mean
15   specifically?
16       A.  So first, in November the main person was
17   Damien.  He was sort of the control owner or -- not the
18   control owner.  The program owner.  And then Bret, as I
19   mentioned earlier, Cohune, left.  So he was the last of
20   the internal audit resources.  So the entire internal
21   audit team had departed by then as well as their
22   compliance functions.
23       Q.  When you say Damien, do you mean Damien Kieran?
24       A.  Yes, I'm sorry.
25       Q.  Were there any other departures that were

40

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    concerning?

2         A.   There was.  There was, I believe, the chief

3    security officer departed.  The head of human resources

4    departed.  Other professionals in the legal group

5    departed.  There was finance people departing.  There

6    was a large host of relatively senior executives across

7    the board leaving the organization.

8         Q.   When you said that you need executives who have

9    been involved for a period of time, what kind of time

10   period are you talking about?

11        A.   There's no specific time period.  It would just

12   be somebody to be able to demonstrate an understanding

13   of the program and have enough knowledge for us, in our

14   professional judgment, to feel comfortable that they

15   sort of understood the breadth of it and what it was

16   entailed to do and how it operated.

17        Q.   And you weren't confident Twitter had that in

18   February 2023?

19        A.   We were -- I wouldn't say we weren't confident.

20   We just said it was a potential risk if and when it

21   came time to issuing our report at the end of May.

22        Q.   Was there any other reasons you recall that EY

23   terminated that we haven't yet discussed?

24        A.   Not off the top of my head, but Ms. VanDruff

25   indicated I think we had them bullet-pointed in our

41
Roque
USA v. Twitter, Inc.                                    6/21/2023

1    resignation memo that was put in our file.

2        Q.  We'll look at that memo soon.

3            MS. VANDRUFF:  Counsel, if you are going to

4    switch to that, maybe this is a good time for us to

5    take a short break.  We are at the one-hour mark.

6            MS. COLLESANO:  Sure.  I wasn't going to look

7    at it right now, but I'm happy to take a break now if

8    Mr. Roque wants a break.

9            MS. VANDRUFF:  Let's do that.  Let's just take

10   five minutes.

11           (A recess was taken.)

12           BY MS. COLLESANO:

13       Q.  Mr. Roque, when did EY first consider

14   terminating its statement of work with Twitter for the

15   FTC order assessment?

16       A.  In early February.

17       Q.  Were there any discussions about it prior that

18   you were aware of?

19       A.  Not -- no, there was no concerted discussions I

20   was aware of prior to then.

21       Q.  When you say no concerted discussions, does

22   that mean there were some discussions?

23       A.  There could have been situations where somebody

24   said, I guess we could always resign, but more of an

25   off-the-cuff statement than not necessarily we are

Roque

USA v. Twitter, Inc.                                    6/21/2023

```
 1   going to resign.
 2       Q.   What prompted EY to consider termination at
 3   that time?
 4            MS. VANDRUFF:  Objection.  Vague as to time.
 5            You may answer the question.
 6            THE WITNESS:  Assuming the time you mean in
 7   February?
 8            BY MS. COLLESANO:
 9       Q.   Yes.
10       A.   It was just a culmination of many of the items
11   that we had been discussing previously.  I mean, when I
12   say "we," on this particular call, such as would we be
13   able to execute the engagement timely?  Would we be
14   able to meet the deadlines and get the body of work
15   done that we wanted to.
16            I apologize.  Now that you have asked that
17   question, there was another item that did resolve
18   itself, but we had outstanding invoices that had not
19   been paid.  So we were continuing to call up and ask
20   about those, and leadership was asking if we had been
21   paid for those balances in February as well.  So there
22   was just several items coming together that as a group
23   we had discussions about.
24       Q.   You mentioned outstanding invoices.  What time
25   period were invoices outstanding from Twitter?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

43

Roque

USA v. Twitter, Inc.                                           6/21/2023

1        A.   We had invoices that were due for payment near
2   the end of December, and those had not been paid as of
3   the end of January, early February.
4        Q.   Do you have any idea of the amounts of money
5   that was due on those invoices?
6        A.   It was about $500,000.
7        Q.   Had EY been following up with Twitter about
8   those payments being due?
9        A.   Yes.
10       Q.   More than once?
11       A.   Weekly.
12       Q.   What was the response from Twitter about the
13   outstanding invoices?
14       A.   They were working on it.
15       Q.   You said the fact that EY wasn't getting paid
16   by Twitter was one of the reasons considered related to
17   termination?
18       A.   It was something we were monitoring.
19       Q.   Who at EY was involved in the discussions about
20   whether to terminate the SOW with Twitter?
21       A.   There was the engagement team.  So myself,
22   Scott Coolidge, Angela Rohan, and then our risk
23   management team, our professional practice group as
24   well as executive leadership, and sorry, various people
25   from legal counsel as well.

44
Roque
USA v. Twitter, Inc.                                                 6/21/2023

1      Q.   Who was on the executive leadership team that
2  discussed it?
3      A.   There would have been Geoff Beatty and Frank
4  Mahoney that I'm aware of.
5      Q.   Who is Frank Mahoney?
6      A.   He is our west region leader for all service
7  lines.  He is also a vice chair of Ernst & Young.
8      Q.   For all service lines, what does that mean?
9      A.   Ernst & Young is primarily made up of four
10 service lines.  We have audit, tax, consulting and
11 transaction advisory services.
12     Q.   How was the decision made?
13          MS. VANDRUFF:   Objection.   Mr. Roque can answer
14 the question to the extent that it doesn't reveal the
15 substance of an attorney-client communication.  And
16 counsel, you may want to rephrase the question to be
17 more granular, because I think, as Mr. Roque has
18 testified, that counsel was present for these meetings.
19          BY MS. COLLESANO:
20     Q.   What was the process around the
21 decisionmaking -- around the decision to terminate?
22     A.   There was a series of meetings held over a
23 period of time where input and facts and circumstances
24 were gathered.  The ultimate decision, I was not a part
25 of that meeting.

45

Roque

USA v. Twitter, Inc.                                            6/21/2023

1      Q.  Do you know who was part of the ultimate
2    decision meeting?
3      A.  I don't.
4      Q.  Who would you expect to have been part of the
5    meeting?
6          MS. VANDRUFF:  Objection.  Calls for
7    speculation.
8          You may answer the question.
9          THE WITNESS:  I honestly don't know, other than
10   Frank.  I'm assuming somebody from other equivalent
11   positions maybe.
12         BY MS. COLLESANO:
13     Q.  You said there were a series of meetings over a
14   period of time.  What period of time are you talking
15   about?
16     A.  Mostly February.  We would, probably on
17   average, have at least a meeting once a week.
18     Q.  When you say a weekly meeting, was it a large
19   meeting involving all the people that you previously
20   described to me as being involved in the discussions?
21     A.  Yes, that's correct.
22     Q.  When was the ultimate decision made?
23     A.  I believe it was February 20th or 21st.
24     Q.  How did you learn that the decision had been
25   made?

46

Roque

USA v. Twitter, Inc.                                             6/21/2023

1          MS. VANDRUFF:  Objection.

2          Mr. Roque, you may answer the question if you

3     know outside of attorney-client communication.  If you

4     don't, then I instruct you not to answer on the basis

5     of attorney-client privilege.

6          THE WITNESS:  I have been instructed not to

7     answer.

8          BY MS. COLLESANO:

9     Q.   So someone informed you the decision was made?

10         MS. VANDRUFF:  I'm sorry, so the question is

11    did someone inform him the decision was made?

12         MS. COLLESANO:  I'm just trying to understand

13    was he e-mailed?  Did someone tell him?  Was -- I'm

14    just trying to understand how he learned that the

15    decision was made since he said he was not in the room

16    when it was made.

17         MS. VANDRUFF:  I'm not trying to obstruct the

18    discovery of facts to which the FTC is entitled, but I

19    also don't want to affect any waiver, of course.  So

20    I'm wondering if this is a subject on which we can

21    submit a writing that doesn't do that, that we can do

22    this carefully, Anne, so that Mr. Roque doesn't wander

23    inadvertently into that.  Could we consider that?

24         MS. COLLESANO:  Why don't we put a pin in it

25    for now and we can discuss it on a break.

47

Roque

USA v. Twitter, Inc.                                              6/21/2023

1           MS. VANDRUFF:  That would be great.

2           BY MS. COLLESANO:

3       Q.  What impact did EY contracts with Musk

4   companies other than Twitter have on the decision to

5   terminate the order assessment statement of work?

6           MS. VANDRUFF:  Objection.  Lack of foundation.

7           You may answer.

8           THE WITNESS:  There was none.

9           BY MS. COLLESANO:

10      Q.  You just said you weren't in all the

11  conversations or the ultimate decision meeting.  How do

12  you know that that was never something that was

13  considered?

14          MR. KOFFMANN:  Objection.  Foundation.

15          MS. VANDRUFF:  Same objection.

16          You may answer the question, if you know,

17  Mr. Roque.  I would also caution you that, again, what

18  you can't do is reveal any attorney-client

19  communications in answering this question.

20          And it might be helpful if the court reporter

21  repeated the question.

22          (The record was read as requested.)

23          MS. VANDRUFF:  Objection to lack of foundation

24  and then instruction to not answer if the basis of your

25  knowledge is an attorney-client communication.

48

Roque

USA v. Twitter, Inc.                                          6/21/2023

```
 1              THE WITNESS:  I'm sorry, can we have a minute?
 2              MS. VANDRUFF:  We certainly can.  We are going
 3    to go off the record for a minute.
 4              (A recess was taken.)
 5              BY MS. COLLESANO:
 6        Q.  Mr. Roque, were you in a position to know
 7    whether Musk company businesses factored into EY's
 8    termination decision?
 9              MR. KOFFMANN:  Objection.  Vague.
10              MS. VANDRUFF:  You may answer the question,
11    Mr. Roque, were you in a position?
12              THE WITNESS:  No, I don't think I was in a
13    position.
14              BY MS. COLLESANO:
15        Q.  Was the potential of a bad report for Twitter
16    discussed in relation to a reason to terminate?
17        A.  No.
18        Q.  Were you in a position to know whether that was
19    discussed by anyone in relation to the termination
20    decision?
21              MS. VANDRUFF:  Objection.  Vague.
22              THE WITNESS:  Can I answer?
23              MS. VANDRUFF:  You may answer.
24              THE WITNESS:  Sorry.  It wasn't.
25              BY MS. COLLESANO:
```

49

Roque

USA v. Twitter, Inc.                                                    6/21/2023

1      Q.   Despite the fact that you weren't in all of the
2    decision-related meetings, you know that this was never
3    discussed?
4           MS. VANDRUFF:   And Mr. Roque, again, I'm
5    instructing that you may answer as to meetings that --
6    of which you have personal knowledge that did not
7    include counsel -- during which there were not
8    attorney-client communications, you may answer the
9    question.
10          THE WITNESS:   I think that the item to
11   appreciate is that we actually hadn't conducted any
12   work with regards to the FTC order itself.  So we
13   weren't really in a position to draw any conclusions,
14   because we had no results.  So I don't think it would
15   have been appropriate to go in assuming we would have
16   had a negative report.  So from my opinion, excluding
17   the conversations with counsel, that was not a factor
18   I'm aware of.
19          BY MS. COLLESANO:
20     Q.   Were you in a position to know whether there
21   was a discussion of the impact this assessment on other
22   potential Twitter business?
23     A.   I was, and I'm not part of the Twitter
24   management team.  I don't know what their decisions
25   might have been.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

50

Roque

USA v. Twitter, Inc.                                              6/21/2023

```
 1        Q.  When you say the Twitter management team, what
 2   do you mean by that?
 3        A.  I was -- if I understood your question
 4   correctly, you were asking if our decisions would have
 5   impacted other Ernst & Young work at Twitter.  That
 6   would be up for them to decide if they wanted to
 7   continue to use Ernst & Young for existing or any other
 8   services.  That's how I was responding to the question.
 9        Q.  When you say you weren't part of the management
10   team that made the decision on the termination, who was
11   in that management team that you are referring to?
12            MS. VANDRUFF:  Objection.  Mischaracterizes
13   testimony.
14            You may answer.
15            THE WITNESS:  I'm sorry, maybe we could ask the
16   question again.  I'm getting confused.  I was
17   responding that I was not part of the Twitter
18   management team.  I may not have understood the
19   question correctly.
20            MS. VANDRUFF:  Counsel, maybe we can back up.
21   You asked a question about whether it would affect
22   Ernst & Young's business with Twitter.  I think
23   Mr. Roque misunderstood that question.  So maybe we can
24   revisit that testimony.
25            BY MS. COLLESANO:
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

51

Roque

USA v. Twitter, Inc.                                                6/21/2023

1          Q.   Was the decision by EY to terminate the SOW
2     with Twitter related at all to the impact it could have
3     on other Twitter business for Ernst & Young?
4               MR. KOFFMANN:  Objection.  Vague and
5     foundation.
6               MS. VANDRUFF:  You can answer the question,
7     Mr. Roque.
8               THE WITNESS:  From my understanding outside of
9     the conversations with legal counsel, no.
10              BY MS. COLLESANO:
11         Q.   Did you personally think that EY should
12    terminate the SOW with Twitter?
13              MS. VANDRUFF:  Objection.
14              You may answer the question to the extent that
15    you understand it.  Go ahead.
16              THE WITNESS:  I personally had not actually
17    made a decision one way or the other.
18              BY MS. COLLESANO:
19         Q.   Mr. Roque, if you have access to the Agile Law
20    platform, I'm going to show you a document.
21         A.   Let me just check.  The iPad had password timed
22    out.  Yep, okay.
23         Q.   I'm marking an exhibit as Exhibit 1.
24              (Roque Deposition Exhibit Number 1 was marked
25    for identification.)

52
Roque

USA v. Twitter, Inc.                                        6/21/2023

     1          BY MS. COLLESANO:
     2     Q.  It's EY_FTC_0006925.  Are you able to see that?
     3     A.  Do I need to click on something right now?  All
     4   I see is sort of like a wooden table picture.  Okay.  I
     5   can see it now, yes.
     6     Q.  Great.  Why don't you take a minute to look at
     7   the document and let me know when you are ready.
     8     A.  Okay.  I have read the e-mail.
     9     Q.  So let's look at page 2.  At the top there is
    10   an e-mail from you to Kailesh Karavadra.  Who is
    11   Kailesh Karavadra?
    12     A.  His name is actually Kailesh.
    13     Q.  Kailesh.  My apologies.
    14     A.  No worries.  He is the global coordinating
    15   service partner for Twitter.
    16     Q.  What does that mean?
    17     A.  Most of our clients will have a term we call
    18   global coordinating service partner.  It is an
    19   individual that is responsible for sort of managing the
    20   overall relationship with a particular organization as
    21   well as sort of bringing the whole suite of services
    22   our firm offers to a client if and when they need them.
    23     Q.  This e-mail is dated December 6, 2022, and you
    24   say, "they are update calls to share what we are seeing
    25   and as a group make a decision if we should continue to

53

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    move forward with the work and issuance of our
2    reports."  What did you mean by this statement?
3          A.  It was just a checkpoint.  I had made a
4    decision that based on all of the activities that were
5    going on from a press standpoint in November, just to
6    update management and explain to them where we were and
7    what was going on so we could decide, you know, if we
8    need to put any incremental risk procedures in place,
9    ask further questions, just, you know, part of our
10   process at Ernst & Young is to consult and try to make
11   group decisions.
12         Q.  You mentioned press statements in November.
13   What kind of press statements were you seeing?
14         A.  I mean, the Elon Musk trying to sneak office
15   building, press statements about whether he was going
16   to be required to buy the company or not, press
17   statements about individuals getting terminated, press
18   statements about the company requiring employees to
19   return back to work, press statements about cafeteria
20   workers suing for getting fired without cause, press
21   statements about people sleeping in the offices.  It's
22   just the host of everything that was going on in
23   November and December.
24         Q.  So these things made you concerned about moving
25   forward with the order assessment?

54

Roque

USA v. Twitter, Inc.                                                6/21/2023

1              MS. VANDRUFF:  Objection.  Leading.

2              You may answer the question.

3              THE WITNESS:  There was just so much activity

4    going on, I thought it warranted providing our

5    executive team with an update.  As you can imagine,

6    there was -- people just said "what's going on out

7    there?  We are seeing all this stuff in the press."

8              BY MS. COLLESANO:

9        Q.  At that time did you think EY shouldn't move

10   forward with the work and the reports?

11             MS. VANDRUFF:  Objection.  Calls for

12   speculation.

13             You may answer the question.

14             THE WITNESS:  I didn't have a conclusion.  That

15   was, I guess, part of the reason for setting up the

16   call, was to elicit feedback from everybody and make

17   sure we were all thinking about this in the right way.

18             BY MS. COLLESANO:

19       Q.  If we turn back to the first page --

20       A.  I'm sorry, the document I'm seeing only has one

21   page.  Oh, yes, I'm sorry.  I didn't realize there was

22   a second page.  So which page would you like me to be

23   on, 1 or 2?

24       Q.  I apologize.  Actually, I have one more

25   question about page 2.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                      6/21/2023

1         A.   Okay.

2         Q.   You say "the issuance of our reports."  Was

3    there more than one Twitter project you were

4    referencing here?

5         A.   Yes, that's correct.  We had the findings or

6    the readiness assessment report, and then the second

7    report would have been the FTC assessor report that

8    would have been issued in July of 2023.

9         Q.   Thank you.  And on the first page Kailesh

10   responds to your e-mail, and at the end of that message

11   he says, Just thought I would share in case we want to

12   hold off on this call until we have new information to

13   help us make the decision.  What did you understand him

14   to mean by that?

15             MS. VANDRUFF:  Objection.  Lack of foundation.

16             You may answer the question, Mr. Roque.

17             THE WITNESS:  I guess I don't want to speak on

18   his behalf.  How I interpreted the message is that did

19   having a meeting for the sake of having a meeting make

20   sense until we had, I guess, more specificity at that

21   time about certain aspects of what was going on with

22   the company.

23             BY MS. COLLESANO:

24        Q.   What decision was he referring to there?

25             MS. VANDRUFF:  Objection.  Lack of foundation.

56

Roque

USA v. Twitter, Inc.                                        6/21/2023

1          You may answer the question, Mr. Roque.
2          THE WITNESS:  I believe it was just how do we
3     want to continue to proceed with supporting the company
4     and our various services.
5          BY MS. COLLESANO:
6     Q.   Your various services to Twitter?
7     A.   Yes.
8     Q.   You said you were referring to the readiness
9     assessment and the order assessment.  Were there any
10    other Twitter projects that Kailesh was managing?
11    A.   Kailesh doesn't directly manage any projects
12    that I'm aware of.  He sort of -- the global
13    coordinating service partner tends to be more of an
14    executive role that oversees everything occurring at
15    the client.  It doesn't necessarily mean that
16    individual is executing engagements specifically
17    himself or herself.
18    Q.   Were you aware of other Twitter work that EY
19    had at that time aside from the readiness assessment
20    and the order assessment?
21    A.   Yes.  I believe there was an outstanding
22    service organization control report engagement, and I
23    believe there was tax services being provided to the
24    client.
25    Q.   Can you repeat that?  What was that?

57

Roque

USA v. Twitter, Inc.                                             6/21/2023

1        A.  There was also some tax services being provided
2    to the client.
3        Q.  Do you know anything about the scope of the tax
4    services that EY was providing to Twitter?
5        A.  I don't.
6            MS. VANDRUFF:  Objection.  Lack of foundation.
7            THE WITNESS:  Sorry, I don't.
8            BY MS. COLLESANO:
9        Q.  If we move to the top of the first page, you
10   respond to Kailesh and say, "Kailesh they are pushing
11   us hard to issue one of our reports this week."  What
12   do you mean by that statement?
13       A.  The company was requesting us to try and
14   finalize our readiness assessment report.
15       Q.  Twitter was asking you to finalize it?
16       A.  That's correct.
17       Q.  Then you mention the meeting is to update
18   Frank.  Do you mean Frank Mahoney?
19       A.  That is correct.
20       Q.  Why would Frank and his team be involved here
21   about whether to issue a report?
22           MS. VANDRUFF:  Objection.  Lack of foundation.
23   Vague.
24           You can answer the question.
25           THE WITNESS:  Just knowing the environment with

58

Roque

USA v. Twitter, Inc.                                            6/21/2023

1    the level of publicity going on with Twitter, there was
2    a general request to make sure people were being
3    updated about where we stood with the services, as I
4    said, outstanding invoice payments and other general
5    information.
6              BY MS. COLLESANO:
7         Q.   Because of all the press reports that you
8    mentioned earlier, EY wanted to have more management
9    oversight of Twitter projects at EY?
10        A.   That's correct.
11        Q.   Had this happened in the past with any other
12   Twitter projects?
13        A.   No.  At least the ones I worked on, I'm not
14   aware of anything.
15        Q.   When you mentioned the unpaid invoices, what
16   projects were those related to?
17        A.   The system organization or the SOC 2 report had
18   an outstanding invoice.  And there was outstanding
19   invoices related to our readiness review work.  And
20   then there was an outstanding invoice related to our
21   efforts to respond to an FTC request for information
22   back in September related to the Mudge event.
23             Our statements of work allowed us to charge the
24   client if we ended up in a situation where we had to
25   respond or spend any efforts for regulatory

59

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    requirements.

2         Q.   Do you know how much -- what the outstanding

3    balance was on the SOC 2 payments?

4         A.   I believe that one was around $50,000.

5         Q.   And the readiness assessment?

6         A.   I believe the remaining balance would have been

7    split about 50/50 between the readiness assessment and

8    the incremental work to respond to the FTC request back

9    in September.

10        Q.   So if -- what was the total for both of them?

11        A.   I would have to go and look at the specific

12   invoice amount.

13        Q.   Do you know if all those invoices were paid in

14   full by Twitter?

15        A.   They were.

16        Q.   Do you know how late they were?

17        A.   They were paid the last week of February or the

18   first week of March of 2023.

19        Q.   Did Frank and his team usually need to approve

20   any report that was issued?

21             MS. VANDRUFF:   Objection.   Lack of foundation.

22             You may answer the question.

23             THE WITNESS:   Frank, no.   It depends -- it

24   would depend on the type of report we are issuing for

25   any client may or may not require various approvals.

60

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          BY MS. COLLESANO:

2     Q.   Was the full payment on these outstanding

3  invoices made after EY decided to terminate?

4     A.   I believe it was.

5     Q.   Was it made after the decision to terminate had

6  been relayed to Twitter?

7     A.   I would have to go back and check the date the

8  payment came in.

9     Q.   I'm going to reveal another document.

10         (Roque Deposition Exhibit Number 2 was marked

11  for identification.)

12         BY MS. COLLESANO:

13     Q.   This is marked EY_FTC_0006959.  If you are able

14  to see that, I'll give you a moment to take a look.

15         MS. VANDRUFF:  Mr. Roque, this also has several

16  pages.

17         THE WITNESS:  Yep, I'm hip to it now.  Okay.

18         BY MS. COLLESANO:

19     Q.   So again, if we can start on the second page,

20  which is the first e-mail in the chain?

21     A.   The one that starts with "Hi, team"?

22     Q.   Lower down, the one February 1st at 2:23 p.m.

23  from Kailesh.  Yes, well, there are two Hi, teams.

24     A.   Sorry.  The one that says "hope you and family

25  are well.  May I suggest"?

61

Roque

USA v. Twitter, Inc.                                                    6/21/2023

1          Q.   Yes.   So Kailesh sent this e-mail to a number
2     of people in the "to" line.   Who is Susan Meyer?
3          A.   Susan Meyer was head of our risk
4     management team.
5          Q.   And Alex Bender?
6          A.   Alex Bender is the center lead for technology.
7     So driving growth in business for that sector in the
8     west.
9          Q.   And Kristin Valente?
10         A.   She is head of sales and marketing, more or
11    less, for the west area.
12         Q.   I think we've already mentioned Frank and Geoff
13    Beatty.   You said that Susan Meyer was the risk
14    management team head.   Is the risk management team an
15    internal-facing team that's responsible for EY's risk
16    or the head of the team that advises clients on risk?
17         A.   No, an internal role.
18         Q.   This e-mail is dated February 1st, and Kailesh
19    says, "may I suggest" -- I'm sorry, the subject is
20    Twitter Client Continuance Discussion.   What does that
21    mean?
22         A.   Our firm has a process that any time there is a
23    significant change in leadership at an executive level
24    or an acquisition that take place, that we are required
25    to re-execute our client acceptance.   Since Twitter was

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    already a client, they called it client continuance.
2    So continue to have our firm's approval that this is an
3    entity we want to continue to do work with.
4         Q.   So it's an internal decision about whether to
5    continue an existing agreement with a client?
6         A.   It's not an existing agreement.  It's more of
7    is this an entity that we want to do business with in
8    general.
9         Q.   All right.  So whether EY wants to continue to
10   do business with Twitter on anything?
11        A.   In the context of the leadership change that
12   took place in November, yes.  We do this for any client
13   that we would provide services to.
14        Q.   What level of change would initiate this client
15   continuance procedure?
16        A.   As I had previously communicated, sorry if it
17   got lost, if there is a significant change in executive
18   leadership at any new or existing clients, our firm's
19   policy is that we re-perform client acceptance.
20        Q.   And client acceptance is a process you do when
21   you are considering any agreement with any company in
22   the first instance?
23        A.   Before we would move into any agreement, you
24   have to complete client continuance.  So is this a
25   client we would even want to do business with to begin

Roque

USA v. Twitter, Inc.                                                    6/21/2023

 1   with.

 2        Q.  Kailesh says, "May I suggest we get on a call

 3   to discuss live our options and summary sometime this

 4   week."  What are the options and summary that he's

 5   referencing?

 6             MS. VANDRUFF:  Objection.  Lack of foundation.

 7             You may answer the question.

 8             THE WITNESS:  My recollection of the discussion

 9   was more he was trying to figure out how to respond to

10   some of the questions that need to be addressed in the

11   client continuance process.

12             BY MS. COLLESANO:

13        Q.  So he wanted information from you about some of

14   the factual information about the client?

15             MS. VANDRUFF:  Mr. Roque, I'm just going to

16   caution you, because I wasn't present at those

17   meetings, but to the extent that any of those meetings

18   involved counsel, I would just caution you not to

19   respond to counsel's questions with any attorney-client

20   communications that may have taken place with

21   Mr. Kailesh.

22             THE WITNESS:  Can I have a clarification there?

23   I lost track of the specific question again.

24             BY MS. COLLESANO:

25        Q.  Sure.  I was just asking what -- Kailesh

64

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    forwarded this e-mail to you or sent this e-mail to

2    you, and I'm asking what he was thinking then when he

3    "said discuss our options and summary."  What are the

4    options and summary he is referring to?

5              MS. VANDRUFF:  Objection.  Calls for

6    speculation.

7              You may answer the question, again, with a

8    caution about attorney-client privilege.

9              THE WITNESS:  I think I heard -- maybe Daniel,

10   did you try to say something as well?

11             MR. KOFFMANN:  I was just joining in your

12   lawyer's objections.

13             THE WITNESS:  Okay.  What Kailesh was trying to

14   understand is what were our options to move forward,

15   because at the time the company was requesting Ernst &

16   Young to assist them with some tax services.  We could

17   not enter into agreement, per our firm policy, to

18   provide them with a statement of work until client

19   continuance had been completed.  So he was trying to

20   make sure he had a clear understanding of our internal

21   processes and sort of what decisions need to be made or

22   how they could be made so we could -- he could move

23   forward with providing Twitter with the statement of

24   work for tax services.

25             BY MS. COLLESANO:

65

Roque

USA v. Twitter, Inc.                                    6/21/2023

1       Q.   So he's trying to see whether EY can get a new
2   agreement with Twitter related to tax services?
3       A.   That's correct.
4       Q.   And did that agreement -- that agreement for
5   tax services ultimately went forward?
6       A.   I know they submitted a statement of work.  I
7   don't know if Ernst & Young was ultimately selected to
8   do that work.
9       Q.   So EY submitted a statement of work to Twitter
10  for the tax services?
11      A.   Yes.
12      Q.   Do you know when that happened?
13      A.   I don't.  The tax stuff is not part of my
14  responsibilities or I'm involved with.  So I just stay
15  out of it.
16      Q.   Based on this e-mail, would it have been after
17  February 1st?
18      A.   Yes.  As I explained, per policy, he wouldn't
19  have been able to provide that statement of work until
20  the client's continuance process was completed.
21      Q.   So your view of this e-mail is that Kailesh is
22  discussing the potential for tax services to be
23  provided to Twitter by EY.  Not relating to the order
24  assessment statement of work?
25           MS. VANDRUFF:  Objection.  Lack of foundation.

66

Roque

USA v. Twitter, Inc.                                      6/21/2023

1          You may answer the question.

2          THE WITNESS:  Yes.  If I'm remembering this

3    call correctly, that was the intent of the call itself.

4    It had nothing to do with the FTC consent order.

5          BY MS. COLLESANO:

6     Q.  I'm going to show you another document.

7          (Roque Deposition Exhibit Number 3 was marked

8    for identification.)

9          BY MS. COLLESANO:

10    Q.  This is marked EY_FTC_0002620.  I'll give you a

11   moment to take a look at it.

12    A.  I see it has two pages.  Just confirming when I

13   flip to page 2, I don't see any information on there.

14   There's just sort of the end of the message says "learn

15   more" and "meeting options", underlined; is that

16   correct?

17    Q.  Yes, that's what I see as well.

18    A.  Okay.  Yes, I have looked at the e-mail.

19    Q.  So this is a calendar invite that you sent to

20   Brian Lynch and Paul Penler on February 6, 2023; is

21   that correct?

22    A.  That is correct.

23    Q.  Who is Brian Lynch?

24    A.  I don't know his title off the top of my head,

25   but he works with our independence team.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

67

Roque

USA v. Twitter, Inc.                                        6/21/2023

1      Q.   What is the independence team?
2      A.   It's a group of internal individuals that help
3   make sure our firm is managing all the requirements
4   from independence that we need to comply with from SEC
5   and other professional standards.
6      Q.   Who is Paul Penler?
7      A.   Paul Penler is from our professional practice
8   group.   It's also another internal group that's
9   responsible for interpreting and helping teams
10  adequately follow professional standards.
11     Q.   So the notes in this meeting invite are talking
12  again about client continuance, and you say, "Frank
13  Mahoney requested that I research if there is anything
14  from a management integrity and ethics standpoint
15  relative to our professional obligations that would
16  prevent EY from continuing its current FTC consent
17  order engagement."   What did you mean when you wrote
18  that?
19     A.   During one of our calls, as we were going
20  through client continuance, Frank asked that question,
21  and I was just following up on his request.
22     Q.   What does management integrity refer to?
23     A.   It's a defined term in the professional
24  standards, do we have any questions about the integrity
25  of management itself.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

68

Roque

USA v. Twitter, Inc.                                    6/21/2023

1      Q.  At the company that you would be working with?

2      A.  Correct.

3      Q.  I'm sorry, were you going to say something

4  else?  Did I interrupt you?

5      A.  No, you didn't.  I apologize if I answered too

6  quickly.

7      Q.  And what about ethics in this context, is that

8  a defined term as well?

9      A.  It is.  If you look at the professional

10  standards, one of the requirements is that we need to

11  assess in the integrity of management or at least make

12  a determination if there's anything that we've seen or

13  become aware of that would cause us to question the

14  integrity of management and then from that make a

15  determination if, you know, there are services that

16  should or should not be provided or maybe we need to

17  adjust our procedures for incremental risk.  It just

18  depends on the team, the engagement and what we are

19  intending to do.

20      Q.  So in this instance, how did you research these

21  two issues?

22      A.  We had a discussion with Brian on the call.

23      Q.  Do you recall what happened on that call?  What

24  did Brian tell you?

25      A.  Yes.  He replied back that he was not aware of

69

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    anything specifically within the standards themselves
2    as part of client continuance that would have an
3    impact.
4        Q.  So he thought it was okay to continue with
5    Twitter as a client?
6            MS. VANDRUFF:  Objection.  Lack of foundation.
7            You may answer the question.
8            THE WITNESS:  He didn't -- he actually didn't
9    draw a conclusion if we could move forward with Twitter
10   as a client.  All he just said was there is nothing
11   specific within the standards that he was aware of
12   based on the question Frank had asked us to follow up
13   with him.  So that's -- we were able to take that back
14   to Frank and say we did what you asked us to do, and
15   there was nothing specifically in the standard that was
16   on that topic.
17           BY MS. COLLESANO:
18       Q.  So in his view there was nothing preventing EY
19   from continuing to have Twitter as a client?
20       A.  Not for that specific item.
21           MS. VANDRUFF:  Anne, can I ask to pause for one
22   moment.  I apologize.  It's unrelated.
23           (Pause in the proceedings.)
24           (The record was read as requested.)
25           BY MS. COLLESANO:

70

Roque

USA v. Twitter, Inc.                                          6/21/2023

1      Q.  So your answer to the last question, you are
2  just saying this wasn't a reason to no longer have
3  Twitter as a client, but potentially there were other
4  reasons?
5      A.  That's correct.
6      Q.  What were those other potential reasons?
7      A.  In the client continuance process itself, it
8  asks a whole series of various questions.  Any of those
9  questions could trigger a reason not to accept a
10  client.
11      Q.  So you are saying Brian Lynch could only speak
12  to the management integrity and ethics piece of that
13  longer client continuance discussion?
14      A.  Correct.  We were following up, as I said
15  earlier, on a very specific request for Frank to just
16  check this one item, and that's all we were doing.
17      Q.  Why did you think Frank wanted you to check
18  this item?
19          MS. VANDRUFF:  Objection.  Lacks foundation.
20          You can answer the question.
21          THE WITNESS:  I'm not sure I know why he asked
22  for this to be checked.  He asked for it, so I did it.
23          BY MS. COLLESANO:
24      Q.  When you say the client continuance procedures
25  involves a whole list of items to consider and that the

71

Roque

USA v. Twitter, Inc.                                            6/21/2023

1    ethics and management integrity were just one part, can
2    you recall any of the other items?
3        A.  I would have to go and open the client
4    continuance process.  I haven't had to do that in a
5    while.  One item I know that occurs is we do a full
6    background check on all the executives.  So you could
7    have results that come back from the background check
8    that says, hey, one of the executives was a previous
9    felon.  That would be a piece of information we would
10   use in drawing a conclusion is this a client we want to
11   have.  It, in and of itself, is not a yes-or-no factor.
12   It's not black and white.
13       Q.  Do you recall any other items?
14       A.  I would have to go and pull up the checklist
15   and look at all of them.
16       Q.  Was the background check done here on the
17   management executives?
18       A.  It was.
19       Q.  Was there anything concerning?
20       A.  I was not copied on the results of that it.  I
21   don't know what was in it.
22       Q.  I'm going to reveal another document.  This is
23   EY_FTC_0006962.  If you want to take a moment to review
24   the document.
25           (Roque Deposition Exhibit Number 4 was marked

72

Roque

USA v. Twitter, Inc.                                          6/21/2023

 1    for identification.)

 2           MR. KOFFMANN:  Counsel, looks like the exhibit

 3    stamp is covering up part of the e-mail.  So you might

 4    just want to move that to the top.

 5           MS. COLLESANO:  I apologize.  Is that better?

 6           MR. KOFFMANN:  Yes.

 7           MS. VANDRUFF:  Thank you, Dan.  Thanks, Anne.

 8           THE WITNESS:  Okay.

 9           BY MS. COLLESANO:

10      Q.  So let's look at the bottom of page 1.  There

11    is an e-mail from you to several people on February 6,

12    2023, at 9:00 p.m.  Who is Bridget Neill?

13      A.  She is part of our internal communications

14    team.

15      Q.  What does that team do?

16      A.  They manage external communications on behalf

17    of Ernst & Young.

18      Q.  How about Shauna Steele, who is that?

19      A.  I'm not familiar with her.  I don't know.  I

20    assume it's somebody that works on Bridget's team.

21      Q.  You say in your e-mail that Paul Penler

22    suggested you reach out to them about services to the

23    FTC if our consent order issued to Twitter.  You say,

24    "We wanted to obtain your thoughts as we work with area

25    leadership in executing this engagement and implement

73

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    any additional risk mitigation consideration as
2    appropriate."  What did you mean there?
3         A.   That the intent was, as I have shared
4    previously, we try not to operate in a vacuum, and so
5    we leverage all the resources we have within the firm.
6    As part of the communications team, that group is a
7    little bit more well versed in sort of, I don't know,
8    what's transpiring and the different political views
9    that are taking place, what are the trends and thoughts
10   that are occurring, and knowing the publicity that was
11   surrounding Twitter and what this scope of service was,
12   we were just saying, hey, as we start executing this
13   opportunity, is there additional things or procedures
14   that we should be doing to make sure that we're
15   adequately performing services in the best way we can.
16        Q.   What advice did they provide you?
17        A.   I don't know that they gave any advice that I
18   remember that resulted in any incremental procedure
19   that we were going to the execute.
20        Q.   When you say "implement any additional risk
21   mitigation consideration," what did you mean by that?
22        A.   As I was just sharing, it would be is there an
23   extra set of procedures we need to execute on the
24   engagement?  Do I need to perhaps include an extra
25   representation in our management representation letter

74

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    we would have had management sign?  Should I be asking

2    for meetings in a different way?  It could entail a

3    hole host of potential options.

4        Q.  I guess I'm just confused why the external

5    communications team would provide risk mitigation

6    consideration.  I'm just not understanding that.

7            MS. VANDRUFF:  Is there a question, counsel?

8            BY MS. COLLESANO:

9        Q.  Why would the external communications team be

10   providing risk mitigation consideration?

11           MS. VANDRUFF:  Can you answer the question?

12           THE WITNESS:  Yeah, I mean, it is an unusual

13   group, but this was an unusual examination that was

14   involved at a level of media attention that we don't

15   usually have with many of our clients.  So it was, for

16   what they do from an external communications

17   standpoint, was there anything that we should be

18   considering the way we operate this engagement?  Was

19   there a risk that we, as a team, had not considered

20   that they might have a perspective, putting a different

21   lens on it.

22           BY MS. COLLESANO:

23       Q.  Thank you.  You also end up adding John

24   Hallmark to this e-mail chain.  Who is John Hallmark?

25       A.  He works with Bridget.  I think she was not --

75

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    if I remember correctly, she was not sure she would be
2    able to attend, and if he could attend in her place.
3         Q.   I'm going to show you another document.
4              MS. VANDRUFF:  Anne, if this is a good place,
5    maybe we could take a short break for lunch.
6              (Discussion off the record.)
7              (Whereupon, at 2:58 p.m., Eastern, a lunch
8    recess was taken.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

76

Roque

USA v. Twitter, Inc.                                          6/21/2023

```
 1                    AFTERNOON SESSION
 2                              (3:36 p.m.)
 3           BY MS. COLLESANO:
 4           Q.  I'm going to reveal another document.
 5           (Roque Deposition Exhibit Number 5 was marked
 6      for identification.)
 7           Q.  This is EY_FTC_0002730.
 8           A.  Yep, it's up.
 9           Q.  So take a look and let me know when you are
10      ready.
11           A.  I'm all set.
12           Q.  Great.  So this is an e-mail from you to Paul
13      Penler on February 14th at -- February 14, 2023; is
14      that correct?
15           A.  I think so.  The date is a little -- there it
16      is.  Yes, I can see the date now.
17           Q.  It's labeled Options -- the subject line is
18      Options.  Who asked you to lay out these options?
19           MS. VANDRUFF:  Objection.  Lack of foundation.
20           You may answer the question.
21           THE WITNESS:  There was just -- the options
22      were asked to be laid out by the group based on the
23      discussions we were having in -- starting in February,
24      about where we were and just thinking through, I guess,
25      pros and cons.
```

77

Roque

USA v. Twitter, Inc.                                      6/21/2023

1              BY MS. COLLESANO:

2         Q.  You say that this is a feeble attempt.  What do

3    you mean by that?

4         A.  Oh, I just quickly jotted it down to get

5    something back and moving on for people to start giving

6    perspective on.  So all told, maybe not my best work

7    ever produced.

8         Q.  Did you have an opinion on which option was

9    best here?

10        A.  I didn't.  As I said, there's pros and cons of

11   each.

12        Q.  So it says Option I - we do not issue the

13   report.  And you say at number 2, "EY does not believe

14   Twitter is currently ready for EY to come onsite and

15   begin its field work procedures.  We simply cannot do

16   the work."  What did you mean there?

17             MS. VANDRUFF:  Objection.  The document speaks

18   for itself.

19             You may answer the question.

20             THE WITNESS:  Just as I have shared with you

21   previously, in February we had concerns of whether or

22   not we could execute the work, and Twitter had been

23   letting us know that they were not ready for us to come

24   onsite.

25             BY MS. COLLESANO:

78

Roque

USA v. Twitter, Inc.                                          6/21/2023

1          Q.   So Twitter's lack of preparedness was
2     preventing EY from doing its assessment?
3          A.   I don't know if they were prepared or not.  I
4     don't think they had -- my understanding was they
5     didn't have adequate resources to facilitate the audit.
6          Q.   And that lack of resources was preventing you
7     from doing your assessment, correct?
8               MS. VANDRUFF:  Objection.  Mischaracterizes
9     testimony.
10              You may answer the question.
11              THE WITNESS:  It was a potential inhibitor for
12    us to be able to do our work efficiently.
13              BY MS. COLLESANO:
14         Q.   Or to do the work at all, correct?
15         A.   That could have been a possibility, but since
16    we didn't really begin, I don't know.
17         Q.   Number 3 you say, "Twitter has indicated they
18    cannot accommodate EY to begin its procedures until
19    mid-March.  It is unlikely EY will be able to complete
20    the scope of work by the end of May."  What did you
21    mean?
22              MS. VANDRUFF:  Objection.  The document speaks
23    for itself.
24              You can answer the question.
25              THE WITNESS:  Exactly as written, the day we

Roque

USA v. Twitter, Inc.                                              6/21/2023

```
 1   were told we were aiming for to come onsite, based on
 2   Twitter, was March 15th.  And in that time frame, there
 3   was -- based on my experience, there was a question of
 4   whether we would be able to complete the totality of
 5   the work in two and a half months.
 6             BY MS. COLLESANO:
 7        Q.  So Twitter was preventing you from completing
 8   the assessment by the order deadline?
 9        A.  It was a consideration.  Since we didn't
10   execute the work, I don't know if it would have been
11   achievable or not.  The results would have occurred if
12   we moved forward, but it was just an item we were
13   evaluating.
14        Q.  At number 4 you say, "Twitter appears to be
15   resource constrained."  What did you mean by that?
16             MS. VANDRUFF:  Objection.
17             THE WITNESS:  From our conversation, our weekly
18   conversations, my understanding is they appeared to be
19   resource constrained.
20             BY MS. COLLESANO:
21        Q.  Lack of money?  Lack of people?  Lack of --
22   what was lacking?
23        A.  Sorry, resources specifically to people.
24        Q.  Number 5 says, "Based on information provided
25   to date, the report is likely to have numerous
```

80

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    findings."  What does it mean to have numerous

2    findings?

3        A.  There was a possibility of control gaps or

4    controls not operating.

5        Q.  Why would that be a consideration to not issue

6    the report?

7            MS. VANDRUFF:  Objection.  Lack of foundation.

8            You can answer.

9            THE WITNESS:  I don't think it was -- I see how

10   you are tying it together.  I don't know that it was a

11   consideration not to issue the report.  It was just a

12   potential factor.  At some point, if there was too many

13   findings, sort of like is there value in issuing the

14   report.

15           BY MS. COLLESANO:

16       Q.  You are saying if you thought there would be a

17   lot of gaps in the report, there wouldn't be any merit

18   in completing the assessment and issuing the report?

19           MS. VANDRUFF:  Objection.  Mischaracterizes

20   testimony.

21           You may answer the question.

22           THE WITNESS:  The question -- well, we didn't

23   do any of the work.  So all of this is premised on

24   what-if scenarios.  And at some point, in the

25   worst-case scenario, we were finding a lot of issues,

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

81

Roque

USA v. Twitter, Inc.                                                6/21/2023

```
 1    it would be do we stop and have a group discussion with
 2    the client that says how would you like us to continue?
 3    How much time and energy and resources do you want to
 4    spend with us and internally to continue to come up
 5    with the totality of all the results?  Or are we at a
 6    point where there's a potential outcome known earlier
 7    than later?
 8              BY MS. COLLESANO:
 9         Q.  Is that the type of conversation you have with
10    the client if it looks like there are going to be a lot
11    of findings in a report?
12         A.  We can have those conversations.
13         Q.  I know you say that this is a what-if scenario
14    because you hadn't started the order assessment work.
15    But you had done a lot of work on the order -- on the
16    readiness assessment, correct?
17              MS. VANDRUFF:  Objection.  Vague.
18              You may answer the question.
19              THE WITNESS:  I guess I'm not sure I know what
20    your threshold is for a lot of work.  We executed --
21              BY MS. COLLESANO:
22         Q.  I'm sorry.  Go ahead.
23         A.  We executed some procedures.
24         Q.  Had you examined the majority of the controls?
25         A.  No.
```

82

Roque

USA v. Twitter, Inc.                                          6/21/2023

1          MS. VANDRUFF:  Objection.  Vague.

2          THE WITNESS:  Sorry.  No, we only assessed a

3    subset of the controls for the readiness review.

4          BY MS. COLLESANO:

5    Q.  Was it more than half of the controls?

6    A.  I would have to get the breakdown.  I don't

7    believe it was more than half.  We were only primarily

8    focused on the privacy controls.

9    Q.  You say that this is just a what-if scenario,

10   but this says based on information provided to date,

11   it's likely to have numerous findings.  Then what

12   information were you basing this on?

13   A.  The risk and control matrix that the client

14   finally provided on January 31st that indicated there

15   were still controls that didn't have control owners

16   assigned.

17   Q.  And that information led you to believe there

18   would be other issues as well?

19         MS. VANDRUFF:  Objection.  Leading.

20         You may answer the question.

21         THE WITNESS:  It was just a factor for

22   consideration.  Usually when you have a new control

23   owner, based on my experience, providing similar

24   services, there is a higher likelihood of findings to

25   occur.

83

Roque

USA v. Twitter, Inc.                                    6/21/2023

1              BY MS. COLLESANO:

2         Q.   What do you mean by findings?

3         A.   I would treat -- the control wasn't designed

4    correctly.  The control wasn't operating as it was

5    intended.  There wasn't evidence captured to determine

6    that the procedures had actually been executed based on

7    the control.  Those are all the findings or exceptions.

8         Q.   So a finding would indicate that something was

9    not operating properly?

10        A.   Usually, yes.

11        Q.   Then you also mentioned exceptions.  What does

12   that mean in relation to a finding?  What is the

13   difference?

14        A.   I'm using them interchangeably.

15        Q.   So an exception or a finding could be the same

16   thing?

17        A.   Correct.

18        Q.   Based on the information you had at that point,

19   what did you believe the scale of the control gaps was?

20             MS. VANDRUFF:  Objection.  Vague.

21             You may answer the question.

22             THE WITNESS:  We didn't do any work, so I

23   didn't have any findings at that point.

24             BY MS. COLLESANO:

25        Q.   I understand there weren't findings, but the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

84

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   lack of control -- the control gaps that you mentioned
2   earlier, what were they of the scale of?
3           MS. VANDRUFF:  Objection.  Vague.  And lack of
4   foundation.
5           You may answer the question.
6           THE WITNESS:  My explanation earlier wasn't
7   specific to Twitter.  You were asking a broad question
8   about what, like, a control gap could be or what an
9   exception was or what a finding was.  I was providing a
10  general overview of what that might entail in any
11  client environment.
12          BY MS. COLLESANO:
13  Q.  Okay.  Number 6 says, "If we do resign, will
14  need to develop communication message to Twitter."
15  What does that mean?
16  A.  We would need to inform them that we were
17  resigning.
18  Q.  And what is a communication message, in your
19  view?
20  A.  It would be putting in writing based on our
21  contractual obligation to inform them that we were
22  terminating the agreement.
23  Q.  Anything else?
24  A.  No.
25  Q.  For Option I - Risks, you say, "Although there

85

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   is an impact to potential business, impact to
2   reputation risk is preserved."  What does that mean?
3          MS. VANDRUFF:  Objection.  Lack of foundation.
4   The document speaks for itself.
5          You may answer the question.
6          THE WITNESS:  It was intended to say there is a
7   risk if we resign.  It may not sit well with Twitter,
8   and they would make a business decision to potentially
9   not use Ernst & Young for other services.
10         BY MS. COLLESANO:
11   Q.  What about impact to reputation risk is
12   preserved, what does that mean?
13         MS. VANDRUFF:  Objection.
14         You can answer.
15         THE WITNESS:  If we don't do the work, there is
16   a potential for less impact for Ernst & Young to be
17   associated with the report.
18         BY MS. COLLESANO:
19   Q.  You are saying it would be better for Ernst &
20   Young to not be associated with a report about Twitter?
21   A.  I didn't say that.  I said there was a
22   possibility that there would be less publicity
23   associated if we didn't ever issue a report.
24   Q.  Option II is we issue the report.  And you say
25   at number 3, "EY will prepare a new SOW to further

86

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    manage risk with incremental fees for work."  What does
2    that mean?
3          MS. VANDRUFF:  Objection.  The document speaks
4    for itself.
5          You may answer the question.
6          THE WITNESS:  As part of the process moving
7    forward with this work we were going to enter into a
8    new statement of work, because for all practical
9    purposes, the statement of work we had entered into was
10   with an organization that was different at the time.
11   The executive management team that entered into the
12   statement of work with us had all resigned, as we have
13   discussed.  We performed client continuance procedures.
14   We finally got a control scope set January 31st that
15   was very different.  If we needed to move forward with
16   supplementing our team with additional resources
17   because of delays in timing, those are all variables
18   that would warrant a change in the scope of our
19   original statement of work.
20         BY MS. COLLESANO:
21   Q.  Had you talked to Twitter at this point about
22   potentially having a revised statement of work?
23   A.  We had.
24   Q.  What was the reaction?
25   A.  They simply said they understood.

87

Roque

USA v. Twitter, Inc.                                    6/21/2023

1      Q.   Did you take that to mean they would agree to a
2   new statement or work or not?
3      A.   I took it to mean they were most likely going
4   to agree to a new statement of work.
5      Q.   And that there would be -- this says
6   incremental fees.  So there would be additional fees
7   for work provided under the revised statement of work?
8      A.   Most likely, yes.
9      Q.   Number 4 says, "EY will execute aggressing
10  testing following our methodology and report all
11  findings."  What do you consider aggressive testing to
12  be?
13     A.   We would, at a minimum, test -- so for a
14  transactional type of testing, at a minimum, we'd
15  follow our methodology of 25 items.  We might make a
16  decision, based on the amount of change in the
17  environment, that we would increase that to say on
18  average a sample size of 40 instead of 25.
19     Q.   So you would look at additional items for each
20  control in the testing process?
21     A.   Possibly.  Since we didn't move forward with
22  the engagement, we never got to that point of making a
23  determination of sample sizes.
24     Q.   You say report all findings.  Wouldn't you
25  always report all findings?

88

Roque

USA v. Twitter, Inc.                                          6/21/2023

1        A.   Yes.

2        Q.   So why is that specifically noted here?

3        A.   That's just what I wrote at the time.  There

4    was -- we were going to do all of our testing and we

5    were going to report all findings.

6        Q.   Number 5 says, "Assuming the EY report has

7    findings or significant findings should have less

8    impact to firm after issuance."  What is the difference

9    between findings and significant findings?

10       A.   This varies, the findings, in maybe the breadth

11   of a particular finding could impact.  And then so not

12   all findings are equal.  Some are very straightforward.

13   Some are more significant.

14       Q.   Could you give an example of what a potential

15   finding versus a significant finding would be?

16       A.   A finding might be there was a request for a

17   new user to be added to a system, and it appears it

18   wasn't documented or the approval to get the access

19   wasn't documented.  A more significant finding would be

20   using the example of 40 new user access requests and

21   all 40 didn't have approvals for access.

22       Q.   So it could be severity or scale of an issue

23   could determine whether something was a finding or a

24   significant finding?

25       A.   Yes.

89

Roque

USA v. Twitter, Inc.                                                6/21/2023

1      Q.  You say this should have less impact to firm
2  after issuance.  What does that mean?
3      A.  If the report included a substantial amount of
4  findings, whatever substantial turned out to be,
5  because that could be interpreted differently by every
6  individual, it would be harder for an unknown entity,
7  not having any context of this report, to turn around
8  and say Ernst & Young didn't do a good job because look
9  at all the findings.
10     Q.  Then 6, "EY will further supplement its team
11  and procedures with security and technical resources."
12  What additional supplements were you contemplating?
13     A.  There were specific procedures based on the
14  call with the FTC in December that they wanted us to
15  look at.  And so those became very technical, and we
16  would supplement the team as necessary to make sure we
17  addressed all those increments or requests.
18     Q.  Certain kinds of testing you mean?
19     A.  Correct.
20     Q.  It says Option II - Risks, number 1, "The FTC
21  uses the EY report as evidence against Twitter and
22  impacts potential business."  What did you think the
23  impact of potential business would be?
24     A.  As I expressed earlier, Twitter might be upset
25  with the results, and they could say we don't

90

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    appreciate the results from Ernst & Young and we are no
2    longer doing business with you.  But that's likely with
3    any report we issue for any client.
4        Q.  Number 2 you say, "Negative press from Twitter
5    if a negative report is issued."  What do you mean by a
6    negative report?
7        A.  If the report has less than an unqualified
8    opinion, that would be considered a negative report.
9        Q.  What does less than an unqualified opinion
10   mean?
11       A.  So in order to provide this service, Ernst &
12   Young has made a decision that our reports will be
13   produced under the AICPA attestation standards.
14   There's a level of assurance and an opinion that goes
15   with that.  In the accounting world, and I'm sorry if
16   any of this doesn't make sense and you need me to
17   clarify, there is different levels of assurance for
18   different types of reports.  So you could have an
19   unqualified opinion, although it sounds contrary,
20   meaning everything is good and clean; we didn't really
21   have any problems.  You can have a qualified opinion.
22   And then there's a host of other types of opinions as
23   well that are usually less favorable to a client.
24       Q.  Is the unqualified opinion that is less
25   favorable to a client?

Roque

USA v. Twitter, Inc.                                                    6/21/2023

```
 1        A.   No.  The unqualified opinion is the most
 2    favorable to a client.  It's contrary.  It sounds like
 3    it's not good because of the "un," but unqualified
 4    basically says, for the most part, you have either a
 5    completely clean report or you had a clean report that
 6    generally everything was operating well.
 7        Q.   Unqualified like no caveats, everything is
 8    good?
 9        A.   Correct.
10        Q.   And then negative press from Twitter, were you
11    concerned that they would say negative things about EY?
12        A.   Potentially.
13        Q.   Number 3 says, "Report leaks and is made
14    publicly available, EY a 'negative' report is
15    misunderstood."  And negative is in quotes.  What does
16    that mean?
17             MS. VANDRUFF:  Objection.  Vague.
18             You may answer the question.
19             THE WITNESS:  If the results -- if we had done
20    the work and the results had -- I'll just go back to
21    our previous conversation, a significant amount of
22    findings, that would be potentially considered a
23    negative report.  And people don't always understand --
24    or the work we perform is often misconstrued and not
25    understood, and so it could be misinterpreted in the
```

92

Roque

USA v. Twitter, Inc.                                              6/21/2023

1      press.

2               BY MS. COLLESANO:

3          Q.   How is it generally misunderstood?   What was

4      the concern here?

5               MS. VANDRUFF:   Objection.   Compound.

6               You may answer the question.

7               THE WITNESS:   It just depends on who is using

8      the report, but my personal experience is that there's

9      an expectation or understanding gap between the

10     professional standards and what people believe the

11     auditors are supposed to do.

12              BY MS. COLLESANO:

13         Q.   Can you elaborate on what you mean by that?

14         A.   Yes.   In which part?

15         Q.   The gap between understanding of what the

16     auditors do and what they are supposed to do.

17         A.   Sure, I'll give you an example.   My mom thinks

18     I do tax work because I work at Ernst & Young.   And I

19     keep telling her I don't do tax work, but her

20     understanding and expectation is I do tax work because

21     I work at Ernst & Young.   There's a misunderstanding

22     fundamentally of what I do and how I do it even with my

23     mom.

24         Q.   So you are concerned about a public

25     misunderstanding of what the report says even though

93

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    it's done in accordance with accepted principles in
2    your field?
3        A.  Correct.
4        Q.  Number 4 says, "An incident or event occurs and
5    EY 'missed' something in its procedures."  What does
6    that mean?
7            MS. VANDRUFF:  Objection.  The document speaks
8    for itself.
9            You may answer the question.
10           THE WITNESS:  You can do all the right
11   procedures and you can do all the best things and you
12   can think you've covered everything, but there is a
13   possibility you missed something.  And if we miss
14   something, intentionally or unintentionally, and it
15   came to light later, there's bound to be questions
16   like, How was this missed?
17           BY MS. COLLESANO:
18       Q.  How would you intentionally miss something?
19       A.  Sorry, bad choice of words.  We unintentionally
20   miss something.
21       Q.  So these risks listed in Option II, there are
22   five of them, and they all -- why do they all relate to
23   a negative report for Twitter?
24           MS. VANDRUFF:  Objection.  Mischaracterizes the
25   testimony.

94

Roque

USA v. Twitter, Inc.                                        6/21/2023

1          You may answer the question.

2          THE WITNESS:  I don't think that's how I would

3     read them or that was the intent.  For example, number

4     3 is more of a negative item for EY and has not really

5     anything to do with Twitter.

6          BY MS. COLLESANO:

7     Q.   There are all discussed in the context of a

8     negative report.  Is there a reason for that?

9     A.   No.  It just -- I mean, as I said, in this

10    whole thing, there's pros and cons.  I mean, you could

11    have an unqualified report, which could be a good

12    report, but it still may have negative consequences.

13    Q.   Is it fair that the issuance of a negative

14    report was a concern for EY?

15         MS. VANDRUFF:  Objection.  Leading.

16         You may answer the question.

17         THE WITNESS:  No.  I mean, me personally, my

18    obligation with my CPA license is to conduct the audit

19    and report the results based on the procedures that I

20    performed.  I would never go into an engagement with a

21    preconceived notion that my goal is to only produce a

22    good report.  A report is intended to be issued based

23    on the results.  That's foundational to the way the

24    profession operates from an integrity and objectivity

25    standpoint.

95

Roque

USA v. Twitter, Inc.                                          6/21/2023

1          BY MS. COLLESANO:

2      Q.  I'm not saying you would go in there trying to

3  have a certain agenda with how to issue a report.  I'm

4  asking whether these risk factors indicate that at this

5  time EY was concerned about the likelihood of there

6  being a negative report if EY completed this

7  engagement.

8      A.  It was one of many considerations.  A negative

9  report is -- has the potential to have a positive and

10  negative outcomes, just as a positive report has a

11  potential to have positive and negative outcomes.

12      Q.  I'm going to show you another document that's

13  marked EY_FTC_0006971.

14          (Roque Deposition Exhibit Number 6 was marked

15  for identification.)

16          BY MS. COLLESANO:

17      Q.  Let me know if you can see it and then take a

18  moment to review.

19      A.  Yes, I'm just looking at it right now.

20      Q.  Great.

21      A.  Okay.

22      Q.  This is a chat between you and Paul Penler on

23  February 14, 2023; is that correct?

24      A.  Yes.

25      Q.  On the second page of the document, the first

96

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    page with the chat messages, the third message from the
2    top, Mr. Penler says, We will have significant issues
3    by resigning.  What does he mean here?
4             MS. VANDRUFF:  Objection.  Lack of foundation.
5             You may answer the question.
6             THE WITNESS:  By resigning probably both
7    Twitter and the FTC would not be happy with Ernst &
8    Young.
9             BY MS. COLLESANO:
10        Q.  If EY resigned from the order assessment?
11        A.  Correct.
12        Q.  So you think he means the significant issues
13   are the FTC and Twitter being unhappy with EY?
14        A.  Based on reading this e-mail, that's how I
15   would read it, yes.
16        Q.  Anything else you think he meant by it?
17            MS. VANDRUFF:  Objection.  Lack of foundation.
18            You may answer the question.
19            THE WITNESS:  I don't know -- no, that's all I
20   would interpret by it.
21            BY MS. COLLESANO:
22        Q.  Then it looks like you are talking about a
23   document that refers to options, and you say, "to [sic]
24   many cooks in the kitchen but hear you."  What did you
25   mean by this?

97

Roque

USA v. Twitter, Inc.                                          6/21/2023

1          MS. VANDRUFF:  Could you give me the time

2     stamp, Anne?

3          MS. COLLESANO:  Sure.  It's 11:22 p.m.  It's

4     actually the second 11:22 p.m.

5          MS. VANDRUFF:  Thank you.  I'm sorry, the

6     question was what?

7          MS. COLLESANO:  What did Mr. Roque mean by this

8     statement?

9          MS. VANDRUFF:  You may answer the question,

10     Mr. Roque.

11          THE WITNESS:  There was a lot of people with

12     varying opinions going through the exercise of whether

13     we would potentially resign or not, and if we did

14     resign, what might we need to do differently than we

15     were already planning for.

16          BY MS. COLLESANO:

17     Q.  Were there people that wanted to resign and

18     people who wanted to stay?  Did they fall into two

19     different groups?

20     A.  I wouldn't say there was different groups.  And

21     I would -- it was more of a let's get all the ideas and

22     perspectives.  And people shared ideas, and those were

23     evaluated pros and cons.

24     Q.  I'm sorry, I think group was the wrong word.

25     I'm just curious whether there were some people that

98

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    thought going forward and doing the work was the right

2    decision and some people thought that EY should resign.

3    Is that fair?

4            MS. VANDRUFF:  Anne, I'm going to instruct the

5    witness not to answer because those were conversations

6    that were -- that he's already testified included

7    counsel.  And so on the basis of privilege, I'm

8    instructing Mr. Roque not to answer that question.

9            BY MS. COLLESANO:

10   Q.  Did every -- go ahead.  I'm sorry.

11   A.  I was just going to say for the reporter, I

12   have been instructed not to respond to that question.

13   Q.  Did every conversation you had about the

14   potential to terminate the SOW involve an attorney?

15   A.  To the best of my recollection, yes.

16   Q.  Is Mr. Penler an attorney?

17   A.  He is not.

18   Q.  So maybe there were some conversations

19   informally where not -- that did not involve an

20   attorney and considered this decision?

21           MS. VANDRUFF:  Objection.  Leading.

22           You may answer the question.

23           THE WITNESS:  Yeah.  Potentially, yes.  There

24   was a lot of stuff going on at the time.

25           BY MS. COLLESANO:

99

Roque

USA v. Twitter, Inc.                                    6/21/2023

1      Q.   In informal conversations like this, did you
2   hear from people who thought termination was the right
3   idea?
4           MS. VANDRUFF:   Anne, if you want to ask him
5   about communications outside of any communications with
6   counsel, I'll let him answer that question, but I need
7   it to be more specific.
8           BY MS. COLLESANO:
9      Q.   Did you have any communications, excluding
10  communications you had involving counsel, did you have
11  communications about whether it was the right decision
12  to resign or not?
13          MS. VANDRUFF:   Mr. Penler, if you can answer
14  that question without revealing the communications that
15  involved attorneys of Ernst & Young, you may answer the
16  question.   Otherwise, I am instructing you to not
17  answer the question.
18          THE WITNESS:   Mr. Roque.
19          MS. VANDRUFF:   I'm so sorry, Mr. Roque.   If you
20  can answer the question without revealing the contents
21  of communications with Ernst & Young attorneys.   Do you
22  need the court reporter to read it back for you?
23          THE WITNESS:   No, I'm just trying to make sure
24  I can think through if there were conversations where
25  legal counsel was not present.   I don't think there was

Roque

```
 1    any -- I think the conversations about that you asked,
 2    legal counsel was always involved.
 3              BY MS. COLLESANO:
 4         Q.  So the next message, the first at 11:27 p.m.,
 5    Paul Penler says, "Kalesh [sic] special!"  What did you
 6    understand Mr. Penler to mean here by that statement?
 7              MS. VANDRUFF:  Objection.  Lack of foundation.
 8              You may answer.
 9              THE WITNESS:  It was a derogatory comment
10    towards Kailesh.
11              BY MS. COLLESANO:
12         Q.  What did it mean?
13              MS. VANDRUFF:  Objection.  Lack of foundation.
14              You may answer.
15              THE WITNESS:  Kailesh is a unique individual.
16              BY MS. COLLESANO:
17         Q.  Is the reference to his uniqueness?
18         A.  Correct.
19         Q.  Farther down at 11:39 p.m., you write, "I think
20    I am to the point where I just need this to end if it
21    can."  What did you mean?
22         A.  I needed a final decision, are we going to do
23    this work or not.
24         Q.  You are not indicating you wanted the order
25    assessment to end?  You just wanted a decision about
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    whether it would or not?

2         A.  Yes, I just needed to know if I could move

3    forward or -- not if.  Are we moving forward to execute

4    this work or are we not.

5         Q.  What was happening in this interim period where

6    EY had expected to be performing this assessment of

7    Twitter but delays were preventing it from beginning

8    the work?  What were the team members doing instead?

9    Was their time filled with other projects?

10        A.  A combination.  Some team members were rolled

11   off and working on other projects.  Some team members

12   were filling their time in trying to move this

13   engagement forward.  We were trying to get what we call

14   our PBC, prepared-by-client, or client assistance list

15   pulled together.  That would be used to facilitate

16   interviews and discussions as part of our walk-through

17   procedures, setting up timelines, creating the

18   engagement file, you know, if we were going to move

19   forward with the work.  So there's some internal

20   administrative stuff that needs to happen before we can

21   actually begin the field work.

22        Q.  If the assessment was going to move forward,

23   did EY have the people available to come back on and

24   work on the project?

25        A.  Yes.  And as in the previous message, we had

Roque

USA v. Twitter, Inc.                                              6/21/2023

1      already been informing area management that we were

2      going to need to have all hands on deck and supplement

3      it with specialty resources where needed.

4           Q.  So you were preparing to move forward in case

5      that was the decision?

6           A.  Yep, absolutely.

7           Q.  On the last message on the bottom of the page

8      it says, "Do we need to address the requested new SOC

9      work?"  What is Mr. Penler referring to here?

10               MS. VANDRUFF:  Objection.  Lack of foundation.

11               You may answer.

12               THE WITNESS:  In January, end of January,

13     Twitter approached us and asked if we could move

14     forward in preparing a new statement of work to issue a

15     new SOC report.

16               BY MS. COLLESANO:

17          Q.  What happened with that request?

18          A.  We never heard back from the company.  We

19     followed up once and then never heard back from our

20     follow-up.  And then we resigned and everything

21     stopped.

22          Q.  You told Twitter you were no longer interested

23     in submitting a statement of work for that project?

24               MS. VANDRUFF:  Objection.  Leading.

25               You may answer the question.

103

Roque

USA v. Twitter, Inc.                                        6/21/2023

 1          THE WITNESS:  We didn't communicate anything
 2     with them one way or the other.
 3          BY MS. COLLESANO:
 4          Q.  Well, you say you resigned.  What does that
 5     mean, then?
 6          A.  We resigned from the FTC consent order
 7     engagement.
 8          Q.  You resigned from the FTC's consent order
 9     engagement, so that meant what, that that wouldn't
10     happen, the SOC work?
11          A.  We just never heard back from anybody after
12     that with their interest to provide them with a
13     statement of work.
14          Q.  Okay.  So you are saying you terminated and
15     then Twitter never contacted you about it again?
16          A.  Correct.
17          Q.  On the first message on the next page, you say,
18     "no we just say we are not doing that as well."  What
19     does that mean?
20          MS. VANDRUFF:  Objection.  It speaks for
21     itself.
22          You may answer the question.
23          THE WITNESS:  If we had resigned from the FTC
24     work, then we probably would tell Twitter, no, we
25     weren't going to do the SOC report either.

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          BY MS. COLLESANO:

2          Q.  Is there a reason you couldn't do the SOC

3     report?

4          A.  There wasn't a reason.  It was more of an

5     efficiency aspect.

6          Q.  What does that mean?

7          A.  The SOC report had some similar controls or

8     controls that were covered under the FTC report, and so

9     we would be able to test them and leverage the work and

10    conduct our interviews sort of jointly for both levels

11    of work.  But if we weren't doing the FTC work, then,

12    you know, there wouldn't be a benefit to the company to

13    do that.  So I would tell them it's probably not

14    efficient for us to be the ones to do that since you

15    could take from anybody.

16         Q.  There's discussion in the last statement at the

17    bottom about an exit plan.  What did you plan to be an

18    exit plan?

19              MS. VANDRUFF:  Objection.  Vague.

20              You may answer the question.

21              THE WITNESS:  If we decided to terminate the

22    agreement.

23              BY MS. COLLESANO:

24         Q.  If you decided to terminate the agreement, what

25    would your exit plan be?

Roque

USA v. Twitter, Inc.                                      6/21/2023

```
1        A.  I was being cute at the end of a very long
2   conversation.  Basically my exit plan would be I would
3   just give them the giant foam finger and be like, I'm
4   done with all of this.
5        Q.  I understand that.  I'm just asking would EY
6   have an actual exit plan?  What does that mean?
7        A.  Yes --
8        Q.  A resignation or something else?
9        A.  Yes, it goes back to one of the items from the
10  previous e-mails where you specifically highlighted we
11  would need to prepare a resignation communication for
12  Twitter.
13       Q.  So that's all an exit plan would entail, just
14  written communication to Twitter saying that you were
15  resigning?
16       A.  Correct.
17           (Roque Deposition Exhibit Number 7 was marked
18  for identification.)
19           BY MS. COLLESANO:
20       Q.  I'm going to show you another document marked
21  EY_FTC_0007423.  Are you able to see that?
22       A.  Yes.
23       Q.  Do you need a minute to review?
24       A.  It's just the one sentence, correct?
25       Q.  Yes.
```

Roque

USA v. Twitter, Inc.                                                          6/21/2023

1          A.   No, I read it.

2          Q.   So this is an e-mail from you to Paul Penler on

3     February 21, 2023, with the subject line Urgent; is

4     that correct?

5          A.   Correct.

6          Q.   And it appears to have an attachment, Twitter

7     Talking Points (resign).docx; is that right?

8          A.   Yes.

9          Q.   Did you create this Twitter talking points

10    document?

11         A.   I did.  I was the originator of it.

12         Q.   Who were the talking points for?

13         A.   Myself.

14         Q.   For what purpose?

15         A.   To communicate to Twitter that we would be

16    resigning from the engagement.

17         Q.   Why did you send the document to Paul Penler?

18         A.   He is from our professional practice group.

19    He's had a lot more experience with situations of this

20    nature.  As I have shared before, we try not to execute

21    and operate individually.  We always consult, and I

22    always think more of user considerations are better.

23    So I value Paul's opinion and asked him to take a look

24    at it and give me his thoughts.

25         Q.   Were these talking points based on your own

```
 1   perspective?
 2        A.   Yes, I had originally framed the message.
 3        Q.   What were the talking points?
 4        A.   I believe they are the same talking points that
 5   we put in the resignation memo and then as well as the
 6   memo that I know we provided to Twitter on what we
 7   actually sent to Twitter in writing for our
 8   resignation.
 9             (Roque Deposition Exhibit Number 8 was marked
10   for identification.)
11             BY MS. COLLESANO:
12        Q.   Showing you another document, EY_FTC_0002778.
13   Let me know when you've had a chance to take a look at
14   it.
15        A.   Okay.
16        Q.   This is a message from Paul Penler to you and
17   others on February 21, 2023; is that correct?
18        A.   Correct.
19        Q.   And Mr. Penler indicates he had a conversation
20   with Brian Lynch and is conveying some key information
21   about that; is that right?
22        A.   Yes.  That's what I interpret it.
23        Q.   And he says in the first bullet, "Generally
24   audit and attest work is not viewed as causing any
25   independence threats - so the possible issue I raised
```

Roque

USA v. Twitter, Inc.                                      6/21/2023

1    is likely not a significant concern."  What did he mean
2    by that?
3              MS. VANDRUFF:  Objection.  Lack of foundation.
4              You may answer the question.
5              THE WITNESS:  I can't remember, to be honest.
6              BY MS. COLLESANO:
7        Q.  Is he indicating this potential issue he was
8    raising was not a concern?
9        A.  That's how I interpret it, but I can't remember
10   what the original issue was.
11       Q.  The second bullet talks about there not being a
12   specific prohibition against being an expert witness.
13   Did you expect EY to be an expert witness in relation
14   to this consent order assessment?
15             MS. VANDRUFF:  Objection.  That calls for a
16   legal conclusion.
17             You may answer the question.
18             THE WITNESS:  I have no idea, actually.  I
19   didn't understand what the nuance of that meant, and so
20   it didn't sound like any of this was gong to be
21   impactful for where we were in the process.  So I read
22   the e-mail, saw the outcome was, for the most part,
23   ignore everything that we talked about earlier.
24             BY MS. COLLESANO:
25       Q.  Okay.  So these points that Mr. Penler had

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    raised, they weren't actually concerns.  That was your
2    read of the message?
3            MS. VANDRUFF:  Objection.  Leading.  Lack of
4    foundation.
5            You may answer the question.
6            THE WITNESS:  I believe that was the intent
7    based on his comment "I was barking up the wrong tree."
8            BY MS. COLLESANO:
9        Q.  What did you understand that to mean?
10       A.  He had at some point expressed a concern, but
11   it turned out to be not a valid concern.
12       Q.  He says at the end of that sentence, "but we
13   have more cannon fodder related to perceived
14   independence risks."  What did you understand that to
15   mean?
16           MS. VANDRUFF:  Objection.  Lack of foundation.
17           You may answer the question.
18           Mr. Roque is reading the document.  Do you want
19   to direct him to where that is?
20           MS. COLLESANO:  At the end of the sentence he
21   just referenced, the paragraph begins, "Bottom line,"
22   and I'm directing him to the end of that sentence, "but
23   we have more cannon fodder related to perceived
24   independence risks."
25           THE WITNESS:  I actually don't know what he was

110

Roque

USA v. Twitter, Inc.                                                    6/21/2023

```
 1    referring to.
 2              BY MS. COLLESANO:
 3         Q.  I'm going to show you another document.
 4              (Roque Deposition Exhibit Number 9 was marked
 5    for identification.)
 6              BY MS. COLLESANO:
 7         Q.  This is EY_FTC_0006979.  Let me know when you
 8    have had a chance to take a look.
 9         A.  Okay.
10         Q.  So this is a chat conversation between you and
11    Mr. Penler on February 21, 2023; is that correct?
12         A.  That is correct.
13         Q.  On this second page, the second message from
14    the top Mr. Penler says, "I don't think it changes the
15    talking points.  I through [sic] a hail mary on my
16    e-mail and Brian ruled not caught."  What did you
17    understand that to mean?
18              MS. VANDRUFF:  Objection.  Lack of foundation.
19              You may answer the question.
20              THE WITNESS:  Can you give me just a minute.
21              MS. VANDRUFF:  I'm sorry, Mr. Roque, are you
22    evaluating another document?
23              THE WITNESS:  I am.  I'm going back to look at
24    Document 008.
25              MS. VANDRUFF:  Ms. Collesano has not asked you
```

111

Roque

USA v. Twitter, Inc.                                          6/21/2023

 1   to do that.  So I think --

 2            THE WITNESS:  Am I not allowed to do that?

 3            MS. VANDRUFF:  Well, if she asks you to, you

 4   may, but for now she is asked you to look at Exhibit 9.

 5   So looking at Exhibit 9, if you can answer the

 6   question, please do that.

 7            THE WITNESS:  I would like to answer the

 8   question, but I'm trying to make sure I'm factually

 9   correct, and I want to go look at Document 8.

10            MS. VANDRUFF:  I think you can let

11   Ms. Collesano know that.

12            THE WITNESS:  Can I go back and check

13   Document 8 before I answer the question you asked?

14            BY MS. COLLESANO:

15       Q.  Of course.

16       A.  Sorry.

17            MS. VANDRUFF:  So for the record, the witness

18   is reviewing what counsel for the FTC has marked as

19   Exhibit 8 in answering the pending question.

20            THE WITNESS:  So to answer your question, I

21   believe this was a follow-up from the earlier exchange,

22   Document 8 we went through, where Paul was indicating

23   that he had asked a series of questions to Brian Lynch,

24   and Brian came back and said, no.  And so Paul was

25   making reference that he had thrown out an idea, but it

Roque

USA v. Twitter, Inc.                                      6/21/2023

1    wasn't caught, meaning it wasn't correct or it wasn't
2    valid.
3              BY MS. COLLESANO:
4        Q.  So his idea was that there were these
5    independence concerns that Mr. Lynch might think were
6    issues that could support the EY decision to terminate?
7              MS. VANDRUFF:  Objection.  Lack of
8    foundation -- excuse me.  Objection.  Lack of
9    foundation.  Leading.
10             You may answer the question.
11             THE WITNESS:  I think you have -- sorry if I
12   misunderstood you.  I think you have it backwards.
13   Paul had a thought that could be something, and so he
14   went to check on it with Brian.  Brian said, no, I
15   don't think that's correct.
16             BY MS. COLLESANO:
17       Q.  So when he says Hail Mary, it's not that he
18   wanted his idea to work?
19             MS. VANDRUFF:  I'm sorry, is there a pending
20   question, counsel?
21             BY MS. COLLESANO:
22       Q.  When he references Hail Mary, is he indicating
23   that he wanted his idea to work?
24             MS. VANDRUFF:  Objection.  Lack of foundation.
25             You may answer the question.

Roque
USA v. Twitter, Inc.                                      6/21/2023

1          THE WITNESS:  I don't remember what his mindset
2     was when he wrote that.
3          BY MS. COLLESANO:
4     Q.  You respond, No worries.  There is not good
5     outcome from this anyway.  What are you saying there?
6     A.  I was basically saying at this point, whether
7     we resigned or we executed the engagement, it didn't
8     seem like either one was going to be a good outcome
9     possibly.
10    Q.  Why did you think that?
11    A.  Because I wasn't sure we would be able to
12    complete the examination work timely.  And obviously,
13    resigning was going to create a whole set of problems
14    with people being upset that we had resigned.
15    Q.  The next sentence from Paul Penler says, "I
16    assume Rebecca knows she can't tell FTC we are
17    resigning or talk about how we can [sic] to that
18    conclusion."  What was Mr. Penler telling you here?
19         MS. VANDRUFF:  Objection -- go ahead.  Can you
20    finish the question.
21         BY MS. COLLESANO:
22    Q.  Excuse me.  I was going to say why was he
23    saying Rebecca couldn't tell the FTC?
24         MS. VANDRUFF:  Objection.  Compound.  Lack of
25    foundation.

114

Roque

USA v. Twitter, Inc.                                            6/21/2023

1          You may answer the question.

2          THE WITNESS:  All of this -- can we have a

3     minute?

4          MS. VANDRUFF:  Sure, we can confer.  We are

5     going to go off the record.

6          (A recess was taken.)

7          (The record was read as requested.)

8          MS. VANDRUFF:  Counsel, I'm going to instruct

9     Mr. Roque that he may not answer that question if it

10    reveals the contents of communications between

11    Mr. Roque and counsel.  He may otherwise answer the

12    question.  Mr. Roque?

13         THE WITNESS:  I don't think I can answer that

14    question based on conversations with counsel.

15         BY MS. COLLESANO:

16    Q.  You say later at 5:16 p.m., it looks like it's

17    the third message at 5:16 p.m., "I am not sure how that

18    works in this situation when the client has told us we

19    can talk to the FTC."  Are you pointing out that you

20    don't agree with Mr. Penler's statement that EY

21    couldn't share the termination with the FTC?

22         MS. VANDRUFF:  Objection.  The document speaks

23    for itself.  And I'm going to instruct Mr. Roque that

24    he may not answer the question if it reveals the

25    content of attorney-client communications.

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          Mr. Roque, you may answer the question if it

2     does not reveal the content of confidential

3     attorney-client communications.

4          THE WITNESS:  A component of my reply to that

5     question was since Paul had not been part of the

6     day-to-day engagement, I was just making sure he had an

7     appreciation that Twitter had provided to us in writing

8     we were allowed to talk to the FTC if and when we felt

9     it was appropriate or they reached out to us with

10    questions.  We didn't always need to inform Twitter or

11    have Twitter present.  They gave us that latitude.

12    That's what I was trying to make sure he understood.

13         BY MS. COLLESANO:

14    Q.   On the same page at 5:18 Mr. Penler says, "Do

15    we have a game plan if the FTC extends the deadline?"

16    What does that mean?

17         MS. VANDRUFF:  Objection.  Lack of foundation.

18         You may answer the question.

19         THE WITNESS:  I think I need to step out again.

20         MS. VANDRUFF:  We'll go off the record.

21         (A recess was taken.)

22         (The record was read as requested.)

23         MS. VANDRUFF:  There's an objection that that

24    lacks of foundation.

25         And Mr. Roque, you can answer the question to

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    the extent it doesn't implicate any confidential

2    communications with regards to attorney-client

3    communication.

4           THE WITNESS:  In our efforts to try to conduct

5    this examination and get it done on time, a question

6    was raised does Twitter have the ability to go back to

7    the FTC and ask for the deadline of when the report was

8    supposed to be issued to be pushed out.  That's what

9    his question was for.

10          BY MS. COLLESANO:

11     Q.  Why would you need a game plan if the FTC

12   accepted a push of the deadline?

13     A.  Just making sure we had adequate resources to

14   continue to execute our resources and teams were booked

15   with a certain time component where it was scheduled to

16   end.  And then those resources probably were already

17   deployed on other engagements, such as making sure we

18   could facilitate that if the timing changed.

19     Q.  Was part of the concern that EY didn't want to

20   do the work even if the deadline was pushed out?

21          MS. VANDRUFF:  Objection.  Mischaracterizes

22   testimony.

23          You may answer the question.

24          THE WITNESS:  No.  It was just a question of

25   another what-if scenario.

1          BY MS. COLLESANO:

2      Q.   On the next page, at 5:19 p.m., you say, No

3   idea.  I can ask Frank on the call I have with him at 4

4   today but he does not want to do the work, so a

5   deadline change or not I am not sure it is going to

6   change anything for EY."  What did you mean there?

7          MS. VANDRUFF:  Objection.  The document speaks

8   for itself.

9          You may answer the question.

10         THE WITNESS:  I was just indicating that I had

11  a follow-up call with Frank later that afternoon to

12  check in on where the firm was in its decisionmaking.

13         BY MS. COLLESANO:

14     Q.   Farther down at 8:11 p.m. you say, "Where is

15  the best place to confirm independence considerations

16  for attest engagement."  What did you mean there?

17         MS. VANDRUFF:  Objection.  The document speaks

18  for itself.

19         You may answer the question.

20         THE WITNESS:  I was just trying to double check

21  I had all my facts straight, and I was asking Paul if

22  he could help me navigate our internal tool that has

23  all the standards listed so I could do the proper

24  research.  Being from professional practice, he just

25  knows that stuff inside and out, and I was trying to

118

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    help him direct me exactly where would be the best
2    sections to review the standards themselves.
3           BY MS. COLLESANO:
4       Q.  You are trying to find the policy within EY
5    related to independence considerations?
6       A.  No.  I was trying to find the professional
7    guidance from the AICPA standards about independence
8    considerations.
9       Q.  Farther down -- why were you looking for that
10   independence considerations guidance at that time?
11      A.  Just to make sure we had everything accurately
12   reflected.  Just so we didn't run afoul of anything.
13      Q.  What do you mean?
14      A.   In order to issue an attestation report, the
15   firm issuing those reports needs to be independent, and
16   I just was -- I forget exactly what prompted the
17   question, but I was just trying to do my due diligence
18   to make sure there wasn't something that we needed to
19   consider, a document.
20      Q.  A little farther down in the document at
21   8:24 p.m. you say, By the way or BTW, do you think this
22   could work for Twitter, and you quote language about an
23   adverse interest threat.  What were you trying to say
24   here?
25          MS. VANDRUFF:  Objection.  Vague.  Lack of

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    foundation.

2              You may answer the question.

3              THE WITNESS:  Can I have a minute?

4              MS. VANDRUFF:  We need to go off the record?

5              THE WITNESS:  Yes.

6              MS. VANDRUFF:  We are going to go off the

7    record.

8              (A recess was taken.)

9              THE WITNESS:  So the question about --

10             MS. VANDRUFF:  Why don't we have the court

11   reporter read it back, please.

12             MS. COLLESANO:  I'm happy to have the question

13   read back.  I'm just a little surprised that we keep

14   taking breaks while --

15             MS. VANDRUFF:  I'm going to ask that we take a

16   break, and I have instructed after every question.  And

17   so but we are going to take a break after this question

18   also.  Take a break so that Mr. Roque has a mental

19   break.  We have been going now for an hour and a half,

20   and so there have been a number of issues here that

21   have implicated meetings between Ernst & Young counsel

22   and Mr. Roque, and so we have consulted with him on our

23   breaks about that.  And that is Mr. Roque's right, of

24   course.

25             MS. COLLESANO:  Happy to take a break when you

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   are ready.  I was pointing out the questions are

2   pending.  If you are saying these are all

3   attorney-client privileged matters, I understand that,

4   and I appreciate that clarification.

5        MS. VANDRUFF:  Happy to.  Ms. Wehr, if you will

6   read the question back to Mr. Roque.

7        (The record was read as requested.)

8        MS. VANDRUFF:  And my instruction was that this

9   was vague and lacks foundation.

10        Mr. Roque, you can answer the question.

11        THE WITNESS:  As we were moving forward with

12   this engagement, we had ongoing discussions with the

13   FTC.  And during those discussions, the FTC kept

14   expressing their opinion more and more adamantly about

15   the extent of procedures Ernst & Young would need to

16   perform based on their expectations.  And there was

17   also expectations around the results they would expect

18   us to find based on the information Twitter had already

19   provided to the FTC and the FTC had reviewed.

20        I raised a personal concern that I felt as if

21   the FTC was trying to influence the outcome of the

22   engagement before it had started, and I was trying to

23   make sure that the way the conversations with the FTC

24   were transpiring we didn't have an adverse threat from

25   an independent interest.  In other words, was there

Roque

1   somebody outside of the arrangement we had with Twitter
2   trying to influence the outcome of our results.
3            BY MS. COLLESANO:
4       Q.  In the conversations that you had with the FTC,
5   was the focus on getting appropriate information to
6   make sure that the program mandated under the order was
7   operating effectively?
8       A.  Yes.
9            MS. COLLESANO:  Ms. VanDruff, I'm finished with
10  this exhibit if you want to take that break now.
11           MS. VANDRUFF:  I do.  If you don't have
12  follow-up questions about Exhibit 9, that would be
13  helpful.  Thank you.
14           MS. COLLESANO:  How long would you like?
15           MS. VANDRUFF:  Five minutes would be helpful.
16           MR. KOFFMANN:  Can we make it ten minutes, if
17  you don't mind.
18           MS. COLLESANO:  Sure.
19           (A recess was taken.)
20           BY MS. COLLESANO:
21      Q.  I was trying to get you a break, I'm sorry if
22  we went a little long.  You can just stop me.  I'm
23  happy to take breaks when you guys need them.
24           Just going back to Exhibit 9, on the third page
25  near the bottom at 8:28 p.m., you say, "I was thinking

Roque

USA v. Twitter, Inc.                                         6/21/2023

1    EY interests are not aligned with Twitter anymore
2    because of the FTC."  What did you mean by that?
3         A.  Before the break, I was just personally getting
4    concerned that our obligation under our contract is to
5    go in and do the independent assessor report and then
6    report the facts based on the results.  In some of the
7    discussions that we were having with the FTC,
8    expectations were being conveyed about what those
9    results should be before we had even begun any
10   procedures, and I was concerned that there was this
11   adversarial situation occurring where you had two
12   competing parties that, stepping back, both had a
13   desire for a certain outcome to occur that may not have
14   always been aligned.
15        Q.  It seems to implicate that at least at one
16   point you thought EY's interests were aligned with
17   Twitter.
18        A.  No.  That was not the intent to say I had an
19   allegiance or alignment with any entity.
20        Q.  To be clear, no one from the FTC directed you
21   to reach a particular conclusion about Twitter's
22   program, correct?
23        A.  There was suggestions of what they would expect
24   the outcome to be.
25        Q.  Did the FTC convey concerns about the level of

123

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    change at Twitter and things that had been revealed

2    through the press that --

3        A.   The -- sorry, you instructed me not to talk

4    over you.  I apologize.

5            MS. VANDRUFF:  Anne, I apologize.  Would you

6    like to restate your question?

7            MS. COLLESANO:  If Mr. Roque had something to

8    say, I'm happy to let him make his statement.

9            THE WITNESS:  No, just finish your question so

10   I can make sure I answer it correctly.

11           MS. COLLESANO:  Deborah, can you read back what

12   I said, please.

13           (The record was read as requested.)

14           BY MS. COLLESANO:

15       Q.   That were developing and that the FTC would

16   want to make sure EY examined in its assessment of

17   Twitter's program?

18       A.   Yes.

19       Q.   I believe you testified earlier that you were

20   also reading news reports in November of 2022 and had

21   concerns as well; is that correct?

22           MS. VANDRUFF:  Objection.  Mischaracterizes

23   prior testimony.

24           You may answer the question.

25           THE WITNESS:  I don't know that I had concerns.

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   There was just a lot going on that we were trying to
2   figure out what was fact from fiction.
3           BY MS. COLLESANO:
4       Q.  And a lot of these changes -- a lot of these
5   changes created more work for EY in the assessment,
6   correct?  More that needed to be reviewed?
7       A.  I don't know for sure since we didn't do the
8   work.  The amount of change did require more work in
9   just trying to understand the impact of that change.
10      Q.  No one from the FTC actually told you what EY's
11  report should say in its conclusions, correct?
12          MS. VANDRUFF:  Objection.  Leading.
13          You may answer the question.
14          THE WITNESS:  There was a conversation where it
15  was conveyed that the FTC would be surprised if there
16  was areas on our report that didn't have findings based
17  on information the FTC was already aware of, and if
18  Ernst & Young didn't have findings in those areas, we
19  should expect the FTC would follow up very
20  significantly to understand why we didn't have similar
21  conclusions.
22          BY MS. COLLESANO:
23      Q.  I'm going to show you another document.
24          (Roque Deposition Exhibit Number 10 was marked
25  for identification.)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          BY MS. COLLESANO:

2      Q.   Let me know when you have had a chance to take

3   a look.

4      A.   Yes, I looked at it.

5      Q.   This document is marked EY_FTC_0003024.

6   Mr. Roque, can you tell me what this document is?

7      A.   This is our formal communication to Twitter of

8   our resignation for the FTC engagement.

9      Q.   And it's dated February 27th.  I believe you

10  mean 2023.  Not '2?

11     A.   Yes, that is an error.

12     Q.   But you testified earlier that EY made the

13  decision to resign on February 20th; is that right?

14     A.   It was earlier in that week.  I forget the

15  exact date.

16     Q.   If the decision was made a week earlier, why

17  did EY wait until the 27th to inform Twitter of its

18  decision?

19     A.   We had a certain process that we wanted to

20  follow from a communications standpoint and took a few

21  days to get all the necessary parties to, for example,

22  review this particular communication before it was sent

23  to Twitter.

24     Q.   EY had different teams to review what was being

25  said before it was communicated?

126

Roque

USA v. Twitter, Inc.                                        6/21/2023

1          A.  Not different teams.  Different individuals.
2    So for example, our risk management team.
3          Q.  Anyone else?
4          A.  Professional practice, legal counsel.  Whoever
5    decided they thought they wanted to give input or
6    review it before it went out, they were involved in the
7    process.
8          Q.  To review your talking points or to review the
9    content of this letter?
10         A.  Both.
11         Q.  How did you tell Twitter that you were
12   resigning?
13         A.  By video call.
14         Q.  Who was in the meeting?
15         A.  It was myself, Christian Dowell and Rebecca
16   Lubens, as far as I remember.
17         Q.  What did you tell them?  What did you tell
18   Mr. Dowell?
19         A.  I communicated our resignation points.
20         Q.  Resignation points that are where?
21         A.  I would have to figure out where they are in
22   what we submitted, but I know we provided a summary of
23   our talking points for the resignation videoconference.
24   And I just read from that.
25         Q.  You provided a summary of your talking points

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    to Mr. Dowell just verbally or are you saying you
2    provided the document?
3         A.  I had a document that I read from and verbally
4    communicated to Mr. Dowell.  My talking points were not
5    sent to him.
6         Q.  And what do you recall about what you said to
7    him, what the points were?
8         A.  It was very short.  Basically we decided to
9    resign from the FTC engagement.
10        Q.  Did he ask why?
11        A.  He did, and we just said we made a business
12   decision.
13        Q.  Did you provide any further context for him?
14        A.  We didn't.  The conversation was probably less
15   than 10 minutes.
16        Q.  What was Mr. Dowell's reaction to your
17   statement?
18        A.  He was surprised.
19        Q.  Did he have any -- how did he express that to
20   you?
21        A.  Something similar to the lines of, like, I'm
22   surprised.  I wasn't expecting this.  I understand.
23   Thank you.
24        Q.  What else happened in the meeting?
25        A.  That was it.  We had the resignation, and as I

128

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    say, the call lasted less than 10 minutes.

2           I'm sorry, I can clarify.  We also did, at the

3    end of the call, offer to obviously help in

4    transitioning or providing assistance as they sought a

5    new assessor.  We could do what we could where it made

6    sense to support that process as best we could.  So

7    that was also discussed in that call.

8       Q.  Did Mr. Dowell seem receptive to that offer?

9       A.  He did.

10      Q.  So the letter itself mentions that you had a

11   meeting on February 27th and then said that the

12   agreement would be terminated pursuant to paragraph 33

13   of the services agreement.  Do you recall what that

14   paragraph allowed for?

15      A.  Yeah.  Yes, it's in the -- the services

16   agreement is what we refer to as sort of our master

17   service agreement.  It's the agreement that we have

18   with Twitter as a company, and then individual

19   statements of work for particular services that are

20   more specific with scope and timing are executed under

21   that.  In the service agreement, paragraph 33 is a

22   termination clause.  It gives both parties the right to

23   terminate immediately or in writing with 30 days

24   notice.

25      Q.  What is the difference between the 30 days and

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    the immediate notice?

2          MS. VANDRUFF:  Objection.  Calls for a legal

3    conclusion.

4          You may answer the question.

5          THE WITNESS:  It's just two different options

6    to terminate the agreement.  My personal view is they

7    both result in the same outcome.

8          BY MS. COLLESANO:

9      Q.  And you terminated immediately, so it was

10   effective that day?

11     A.  Correct.

12     Q.  In the last a sentence of the letter you write,

13   "For the avoidance of doubt, this termination relates

14   only to the Services described in the August 24, 2022

15   SOW;" is that correct?

16     A.  Yes.

17     Q.  Why were only those services terminated?  Did

18   you have other active services for Twitter?

19         MS. VANDRUFF:  Objection.  Compound.

20         You can answer the question.

21         THE WITNESS:  Yes.  I believe, as we discussed,

22   there was ongoing tax services with Twitter.

23         BY MS. COLLESANO:

24     Q.  So had EY gotten those tax services by this

25   time?

130

Roque

USA v. Twitter, Inc.                                          6/21/2023

1          A.   There was ongoing tax services that EY has
2     provided, is my understanding, to Twitter over the
3     years.  Then what we were talking about earlier is
4     there was a new set of services as well that were
5     incremental.
6          Q.   I'm going to show you another document.
7               (Roque Deposition Exhibit Number 11 marked for
8     identification.)
9               BY MS. COLLESANO:
10         Q.   This is marked EY_FTC_000057.  Let me know when
11    you have had a chance to review it.
12         A.   Okay.  I'm looking at it now.  Okay.
13         Q.   Did you draft this document?
14         A.   I did.
15         Q.   Did anyone assist you in drafting the document?
16         A.   Yes, several parties did.
17         Q.   Who were they?
18         A.   This would go back to your previous question of
19    the timeline.  So after I initially created this, I had
20    the independent quality review partner, Scott Coolidge,
21    also take a look at it to get his feedback.  We had
22    risk management review it to see if they had any
23    comments or feedback.  Professional practice or as
24    mentioned earlier, Paul Penler specifically, reviewed
25    it to give comments.  Legal counsel reviewed it.  I

Roque

USA v. Twitter, Inc.                                        6/21/2023

1   can't remember if Geoff Beatty or Frank specifically
2   reviewed it as well.  Frank Mahoney.
3       Q.  Do you recall when you drafted it?  I believe
4   this is undated.
5       A.  It probably would have been the beginning of
6   that week after the decision was made.  And this was
7   then leveraged as part of our engagement archiving
8   process.  So it would have been leveraged from the
9   initial resignation communications and then rounded out
10  before we archived our file.
11      Q.  When you say leveraged from, what do you mean?
12      A.  Just the facts.  The initial body of this was
13  probably written during the week of the resignation.
14  After we resigned, we then needed to archive our
15  engagements in accordance with firm policy.  This
16  document was specifically put in to give a broader set
17  of context for everybody that hadn't necessarily been
18  involved in all the discussions if they came along and
19  independently looked at the file.
20      Q.  In the first paragraph you describe that this
21  is "in order to have a record of our minimal engagement
22  activities."  What were the minimal activities that EY
23  has done for this assessment?
24      A.  We had had -- we created an original statement
25  of work.  We had completed client acceptance -- not

132

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    client acceptance, engagement acceptance procedures

2    specific to this engagement.  We had had some initial

3    discussions with management in preparation to begin our

4    planning.

5        Q.  Anything else?

6        A.  No, that was about it.  I think the file only

7    contains about 13 documents.

8        Q.  And the engagement acceptance procedures, those

9    would be done before you signed the statement of work?

10       A.  That's correct.

11       Q.  So if you go a little farther down this page,

12   there's a section entitled Original Plan, and you say

13   that "we planned to begin our procedures in January

14   2023."  What do you mean by procedures?

15       A.  Those were documented in the statement of work

16   in our timeline.  We had originally expected to sort of

17   be in the field and starting to execute our design

18   procedures with control owners in January.

19       Q.  When you say be in the field, what do you mean

20   by that?

21       A.  Sorry.  Audit term.  Actually conducting direct

22   interviews, interacting with client contacts, the

23   control owners themselves.  Historically field work

24   meant we would go into the field, like on the client's

25   site, and do our actual physical work.  Obviously, with

133

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    COVID that moved to more of a remote model.

2        Q.  Were there aspects of the field work that still

3    needed to be done in person or could it all be done

4    remotely?

5        A.  I think it could be done remotely.  Our goal,

6    though, was to go onsite and do as many procedures as

7    possible directly at the Twitter offices, as that was

8    the company's policy, for everybody to be returning

9    back to the office.

10       Q.  So that was the plan here, that you would

11   prefer to be in-person onsite?

12       A.  Where possible.

13       Q.  You also said "execute design procedures."

14   What does that mean?

15       A.  The design procedures are the initial set of

16   procedures where we try to obtain or confirm our

17   understanding of the design of the control and how it

18   operates.  So we usually do a transactional test of

19   one.

20       Q.  So the plan in the statement of work was to go

21   in January 2023, but that didn't happen, correct?

22       A.  Yes.

23       Q.  Had you begun any of the field work procedures?

24       A.  No.

25       Q.  The next sentence says that we initiated

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   planning for the engagement in October 2022.  What does
2   that mean, initiating planning?
3       A.  We had our signed statement of work.  We were
4   trying to get a complete list of the controls
5   framework.  We would be trying to build out our client
6   assistance or prepared-by-client list to send ahead of
7   time so they could start gathering the evidence to set
8   up the meetings.  We have a set of internal documents
9   such as a planning memo that provides an overview of
10  the scope of the engagement.  Those are considered our
11  planning activities.
12      Q.  And that PBC reference, that's a list of items
13  that you need the company to provide to you for your
14  work?
15      A.  Correct.
16      Q.  If you turn to the next page, the first
17  sentence states that on October 27, 2022, Elon Musk
18  acquired Twitter.  When did you become aware of the
19  Musk acquisition?
20      A.  I had been following it through the news
21  articles.  I knew he had made an intent to purchase the
22  organization, saw that the Court required him to follow
23  through on that interest to purchase and then saw the
24  transaction was actually finalized.
25      Q.  Did anyone at Twitter convey the information to

135

Roque

USA v. Twitter, Inc.                                                6/21/2023

1    you?

2         A.   No.   Sorry.   People were talking about there

3    was the intent for him to buy the company, but the

4    actual acquisition, I believe, I saw first or heard

5    about first through the press.

6         Q.   Did the acquisition impact your work with

7    Twitter?

8         A.   Yes.

9              MS. VANDRUFF:   Objection.   Vague.

10             BY MS. COLLESANO:

11        Q.   How?

12        A.   It just made it very difficult to regularly

13   interact and find key contacts with Twitter personnel

14   that were involved or responsible for this engagement.

15        Q.   You mentioned significant voluntary departures.

16   What do you mean by significant?

17        A.   My view of significant would be more than

18   probably 20 to 40 people.   So for example, in the end

19   of February -- sorry, the end of November when the

20   mandate to return to the office was required, I think

21   they had several hundred people opt not to return.   To

22   me, for a one-day event, that's pretty significant for

23   that many people to depart an organization.

24        Q.   You also mentioned the departure of two

25   individuals for whom we previously obtained management

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                      6/21/2023

1    representation.  Who were you referring to there?

2        A.  Damien Kieran previously provided the

3    management representation.  And I would have to go

4    back.  I can't remember the second signature.

5        Q.  Was it potentially Lea Kissner?

6        A.  I would have to go back.  That would have been

7    the 2020 year engagement.  So almost two and a half

8    years ago.

9        Q.  This also states Twitter terminated numerous

10   individuals who were control owners as well as internal

11   audit managers.  Do you have an idea of how many people

12   you are referring to here?

13       MS. VANDRUFF:  Objection.  Lack of foundation.

14       You may answer the question.

15       THE WITNESS:  Yes, it would be everybody in

16   internal audit.  It would be some of our historical

17   security and privacy contacts that we would interact

18   with in doing our readiness review.  It would be key

19   executives, such as Jim Baker, who supposedly replaced

20   Damien Kieran and then was also terminated.  It was

21   sort of ongoing, I guess.

22       BY MS. COLLESANO:

23       Q.  It says you made multiple requests for key

24   documents like a final control list or organization

25   chart.

137

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          A.   That's correct.

2          Q.   Did you receive an organization chart?

3          A.   We never received a final organization chart.

4          Q.   It says that, As a result, our planning

5     procedures and scoping of the engagement halted for a

6     period of time.  What was that period of time?

7          A.   Basically from November to the day of

8     resignation.

9          Q.   I think we've already talked about Mr. Baker

10    and Mr. Alonso.  A little farther down you write, "The

11    response we received on December 1, 2022, indicated

12    that a majority of the controls had new owners while

13    other controls did not have current owners or were not

14    operating as intended."  Is that correct?

15         A.   I'm sorry, I'm trying to find the specific

16    paragraph.  Are we still on page 2?

17         Q.   It's the last sentence of the fourth paragraph

18    on page 2.

19         A.   Got it.  Yes, okay.  I'm sorry.

20         Q.   I was asking if that was what you wrote here.

21    What did this statement mean for the order assessment?

22         A.   If we had decided to move forward with issuing

23    our findings and recommendations report, we were trying

24    to get a sense of the relevance of the -- and how

25    accurate the information in that report still was.  We

138

Roque

USA v. Twitter, Inc.                                                    6/21/2023

1    had asked management to provide us a current list of
2    all the controls reviewed in the readiness assessment
3    to understand the amount of change that had occurred
4    since our procedures were conducted.  On December 1st,
5    they actually provided a response to our request, which
6    included all of the controls that we had previously
7    looked at in September and October with the control
8    owners and whether there had been changes.
9         Q.  If the program was supposed to be in place on
10   November 22nd, and on December 1st Twitter is telling
11   you there were lots of new owners and lots of controls
12   not operating as intended, did that indicate anything
13   to you about the likely implementation of the program?
14        MS. VANDRUFF:  Objection.  Lack of foundation.
15   Calls for expert testimony.
16        You can answer the question.
17        THE WITNESS:  It did raise a question about
18   what the potential outcome could be.
19        BY MS. COLLESANO:
20        Q.  What do you mean by that?
21        MS. VANDRUFF:  Same objection.
22        You may answer.
23        THE WITNESS:  It just was a data point of
24   reference that there was potentially the impact of
25   aspects of the program not working, but I had no

Roque

USA v. Twitter, Inc.                                          6/21/2023

```
 1   evidence to support that.  It was just an assumption.
 2           BY MS. COLLESANO:
 3       Q.  Until you would be able to go in and examine
 4   the procedures?
 5       A.  Correct.
 6       Q.  Next paragraph -- I'm sorry, two paragraphs,
 7   the last paragraph on the page says on December 22nd
 8   you arranged a broader meeting with the new Twitter
 9   privacy and security program owners, and at the end of
10   the paragraph, it talks about some of the things you
11   discussed.  One of the things was "our proposed timing
12   for our procedures."  What was communicated about the
13   timing of EY's procedures?
14       A.  We had communicated in the statement of work
15   our procedures were scheduled to begin in January, but
16   we were obviously trying to look at accelerating or
17   doing as much as possible sooner than later so we could
18   understand what was really happening with the impact
19   for all this change.
20       Q.  So from your perspective, you needed to
21   potentially get in earlier to address unanticipated
22   changes because of the acquisition?
23           MS. VANDRUFF:  Objection.  Leading.
24           You may answer the question.
25           THE WITNESS:  Yes.  And in a conversation in
```

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    early December with the FTC, they also made the request
2    of us to see what we could do to start executing any
3    procedures sooner than later, and so we said we'll go
4    and ask.  So we started asking in December if we could
5    start doing more work or any work sooner than later.
6              BY MS. COLLESANO:
7         Q.  And Twitter said no?
8         A.  Twitter didn't really give an answer for most
9    of December because we didn't have -- we couldn't track
10   down anybody that was responsible for the program to
11   facilitate that.
12        Q.  You also then said "outstanding client
13   requests."  What outstanding client requests were
14   pending?
15        A.  It was the items that were listed here.
16   Primarily what we needed is a complete risk and control
17   matrix that would then facilitate our ability to scope
18   the body of work and know how to make our request list
19   as well as design our procedures to do our testing.
20        Q.  Sounds like the risk and control matrix was a
21   prerequisite for doing the assessment; is that right?
22        A.  Yes, that would be foundational for us to
23   really plan and execute the audit.
24        Q.  Do you recall receiving the final risk and
25   control matrix?

141

Roque

USA v. Twitter, Inc.                                          6/21/2023

1      A.  We did.  We received it on January 31st.

2      Q.  You also mention the payment of outstanding

3  invoices.  What were you referring to here?

4      A.  As we shared earlier or one of your earlier

5  questions, we had invoices that became due in December,

6  and we made inquiries about where those stood and when

7  they might be paid.

8      Q.  And then you mentioned the challenges we were

9  experiencing with control turnover.  What was control

10  owner turnover, what challenges were you experiencing?

11      A.  Just who the new control owners were, did we

12  have the right control owner.  As I shared previously,

13  there were some controls where there was not a control

14  owner identified.  So we were just struggling to know

15  where to begin.

16      Q.  On the next page in the third paragraph that

17  begins, "On January 31, 2023," you write that Twitter

18  said the redesign of the organization structure was

19  still in process.  What does that mean?

20      A.  That was in reference to their organizational

21  chart.  They were still redesigning or mapping out

22  their organizational chart.  It hadn't been finalized.

23      Q.  Did the -- go ahead.

24      A.  I'm sorry.  I think somebody just moved in the

25  room and made a background noise.

142

Roque

USA v. Twitter, Inc.                                          6/21/2023

1        Q.   Did the fact that the organizational structure
2   was still being developed have any impact on the risk
3   and control matrix?
4        A.   It was a component of it.  So the
5   organizational chart helps us understand the structure,
6   where segregation of duties may or may not exist, who
7   reports to who.  So it's a component of looking --
8   having that is a component of the risk and control
9   matrix and trying to look at them together.  The
10  organizational chart would have also been beneficial
11  for us to try to consolidate or plan our procedures.
12  Some controls might have the same control owner.  So if
13  we knew the structure, we could say, okay, here is the
14  group of people or the individual that we need to talk
15  to and try to plan and book our time so we are as
16  efficient as possible to get as much accomplished with
17  each meeting we had.
18       Q.   So even though you had the updated risk and
19  control matrix, the lack of organizational chart could
20  still slow down your planning procedures related to it?
21       A.   That's correct.
22       Q.   In the fifth paragraph down, you write, In
23  early February, Twitter told us it would likely not be
24  ready for us to initiate field work until mid-March.
25  Did they explain why?

143

Roque

USA v. Twitter, Inc.                                     6/21/2023

1        A.   They just said they didn't have the resources
2   available to do the audit.   And that was one of the
3   discussions I had where they said they were actively
4   trying to hire at least two open positions and hoped to
5   have had them fulfilled and then would be able to have
6   more resources to address our requests, I guess.
7        Q.   So you told Twitter that the revised time frame
8   would increase the risk of not completing the
9   assessment by the June 2023 deadline; is that correct?
10       A.   Yes.
11       Q.   What was their reaction to that statement?
12            MS. VANDRUFF:   Objection.   Lack of foundation.
13            You may answer the question.
14            THE WITNESS:   Their response was we'll all make
15   an effort to get started as soon as possible and get as
16   much done as we can by the deadline.
17            BY MS. COLLESANO:
18       Q.   Did you make Twitter aware of the expanded
19   scope of work given the changes that had taken place at
20   Twitter?
21       A.   Yes.
22       Q.   In the next paragraph you say that as of
23   February 27, 2023, EY had not conducted any interviews
24   of Twitter control owners since October 2022 or
25   completed planning or executed any assessment

144

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   procedures.  Why couldn't the Twitter control owners be
2   interviewed?
3           MS. VANDRUFF:  Objection.  Lack of foundation.
4           You may answer the question.
5           THE WITNESS:  The company didn't facilitate us
6   having those interviews.
7           BY MS. COLLESANO:
8       Q.  Was that the same situation for the completion
9   of planning and the execution of assessment procedures?
10          MS. VANDRUFF:  Objection.  Compound.  Vague.
11          You may answer the question.
12          THE WITNESS:  It was an extension of not having
13  the necessary information to complete our planning.
14  For example, the risk and control matrix, we didn't
15  receive that until January 31st.
16          BY MS. COLLESANO:
17      Q.  When you say complete planning, what would that
18  encompass, the completion of planning?
19      A.  The overall time memo, the timeline, some
20  preliminary work we do around, you know, like assessing
21  the risk and control matrix.  A different item we had
22  been asking for was management's annual risk assessment
23  that needed to be conducted in conjunction with the
24  order so we could start reviewing that.  Some of those
25  items were required for us to finalize our planning.

Roque

USA v. Twitter, Inc.                                           6/21/2023

1          Q.   In the order assessment SOW, when did it state

2     that planning would be completed?

3          A.   I don't believe the statement of work

4     specifically had a timeline component for the category

5     of planning, just that we would do our work from

6     January until, I forget the back end date.

7          Q.   When would you have expected the planning to be

8     done for an assessment like this?

9          A.   The general expectation is it would be done

10    before we begin field work.

11         Q.   The next paragraph is under a heading called

12    Internal Discussion.

13         A.   Yep.

14         Q.   And it says that "the engagement team consulted

15    with executive management to keep leadership informed

16    of the team's progress on the assessment and consider

17    potential risk to our engagement preconditions

18    resulting from the dynamic nature of the company.

19    During these meetings EY evaluated numerous factors,

20    including, but not limited to."  I would like to go

21    through each bullet and have you tell me what is meant

22    by that.  The first --

23         A.   Okay.

24         Q.   "How the departure of Twitter employees

25    responsible for the compliance programs, control

146

Roque

USA v. Twitter, Inc.                                    6/21/2023

1  ownership and control operation could impact EY's

2  ability to complete its procedures," what did you mean

3  here?

4      A.  The amount of change to personnel in the

5  organization potentially may cause delays resulting

6  from our inability to either talk to control owners or

7  obtain evidence from the control owners timely.

8      Q.  How about the "whether appropriate control

9  owners would be in place at the time of control

10  testing," what does that mean?

11      A.  We would -- whether or not each control, by the

12  time we began our field work procedures, would actually

13  have a control owner assigned and would that control

14  owner actually have executed the control for a period

15  of time to be able to talk to it and walk us through an

16  example and ultimately support our testing.

17      Q.  How much -- is there a general practice of how

18  long a control owner would need to be able to be up to

19  speed on their control?

20          MS. VANDRUFF:  Objection.  Asked and answered.

21          You may answer the question.

22          THE WITNESS:  I would expect a control owner

23  usually to be in place and executing the control for at

24  least a month, but it would depend on the nature and

25  the type of the control itself.

147

Roque

USA v. Twitter, Inc.                                              6/21/2023

1              BY MS. COLLESANO:

2         Q.   The third bullet mentions whether the FTC or

3    Twitter could use EY's report for purposes for which it

4    is not intended.  What does that mean?  What could they

5    potentially use it for?

6         A.   The report that we intended to issue under the

7    attest standards was designed to be provided to

8    Twitter, and Twitter could then, in turn, provide that

9    report to the FTC.  So those are the two intended

10   users.  But there was concern that maybe the report

11   would be shared inappropriately with other parties and

12   be used for unintended purposes.

13        Q.   What kind of parties were you concerned about?

14        A.   The press, other regulators.

15        Q.   You mention the availability of employees with

16   appropriate subject matter competence to provide

17   written management representations to EY.  When EY

18   terminated, did you believe Twitter had these people in

19   place?

20        A.   It was to be determined.

21        Q.   Did you see evidence that they had the people

22   in place?

23        A.   I don't know because we didn't execute any of

24   the procedures.  I couldn't talk to any of the control

25   owners.  And really the only individual we had operated

Roque

USA v. Twitter, Inc.                                          6/21/2023

1   with from sort of an executive standpoint was Christian

2   Dowell.

3       Q.  The next bullet is about adequate resources,

4   which we discussed.  Did you have anything else to add?

5       A.  I don't think so, but if you have questions,

6   please ask.

7       Q.  The first bullet on the next page says,

8   "whether management would have a basis to provide

9   written representations and would have an adequate

10  basis for their assertions."  Is this different from

11  the employee representation?

12      A.  Correct.  The management representation is a

13  very specific document that's required under the

14  professional standard where key executives are usually

15  responsible for signing that.  So as we discussed in

16  the previous FTC examination, we had at least Damien

17  sign.  He was the overall head and individual

18  responsible for the program.  He was running the

19  program for a number of years, and we interacted with

20  him regularly.  So there was just a potential question

21  of what would it look like when it came time to get

22  that representation at the end of the engagement.

23      Q.  At the time you terminated, who would you have

24  expected to make a management representation?

25              MS. VANDRUFF:  Objection.  Lack of foundation.

149

Roque

USA v. Twitter, Inc.                                              6/21/2023

1          You may answer the question.

2          THE WITNESS:  At a minimum, at that time, at

3    least Christian Dowell, if not others.

4          BY MS. COLLESANO:

5      Q.  Can you think of anyone else specifically that

6    it would be or just Christian?

7          MS. VANDRUFF:  Objection.  Lack of foundation.

8          You may answer the question.

9          THE WITNESS:  Potentially somebody from legal

10   counsel, potentially somebody that had more direct

11   responsibility for the overall spend of the privacy

12   controls.  Perhaps somebody from the security

13   organization like a chief security information officer.

14   Some or all of those individuals probably would have

15   been asked to sign the representation letter.

16         BY MS. COLLESANO:

17     Q.  Do you know whether Twitter had those people in

18   place at the time you terminated?

19     A.  I don't know if they had designated individuals

20   for all those roles.

21     Q.  The next bullet talks about organizational

22   changes, which you've also discussed.  And then you

23   mention the delay to the project timeline requested by

24   Twitter.  Was the delay requested or was it simply a

25   new timeline because you couldn't do anything without

150
Roque
USA v. Twitter, Inc.                                                6/21/2023

1    Twitter's assistance?
2        A.  We couldn't do much without Twitter's
3    assistance.  As I shared, they proposed mid March to be
4    in working, but there was also the possibility, I
5    guess, that they might move it to April 1st.  We just
6    didn't know.
7        Q.  If they had come back and said "we want to move
8    it to April 1st," could you have done anything about
9    it?
10           MS. VANDRUFF:  Objection.  Lack of foundation.
11           You may answer the question.
12           THE WITNESS:  I'm not sure I understand what
13   you are asking for.  Could we have done anything
14   without it, are you talking from a resource standpoint?
15   Are you -- I mean, it's sort of a future event that
16   didn't happen.  So I'm trying to make sure I do my best
17   to respond to what you are looking for.
18           BY MS. COLLESANO:
19       Q.  Did you have a way to make Twitter let the
20   field work start earlier?
21       A.  Other than asking and continuing to ask for us
22   to begin our work, we didn't have much influence.  I
23   didn't know the control owners.  They didn't know who
24   we were necessarily.  I didn't have their e-mails.  I
25   don't know it would be appropriate for me to change the

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    protocol we had set up with how we were going to

2    communicate and operate with them and start reaching

3    out to these individuals arbitrarily on our own.

4         Q.  In the SOW with Twitter, had they previously

5    agreed to start the work in January 2023?

6              MS. VANDRUFF:  Objection.  Asked and answered.

7              You may answer the question.

8              THE WITNESS:  Based on them signing the

9    agreement, I would say yes.

10             BY MS. COLLESANO:

11        Q.  In the next the section you talk about EY

12   executive management making the decision to resign.

13   Who would be included in that description?

14        A.  All I know is for sure Frank Mahoney.

15        Q.  Do you think he was the ultimate decisionmaker

16   or were others involved?

17             MS. VANDRUFF:  Objection.  Lack of foundation.

18             You may answer the question.

19             THE WITNESS:  I don't know.  I wasn't involved

20   in the conversations or had a list of people he talked

21   to in trying to eventually come back with a decision.

22             BY MS. COLLESANO:

23        Q.  Without revealing any privileged information,

24   can you explain how you were informed that the

25   termination decision had been made?

Roque

USA v. Twitter, Inc.                                          6/21/2023

1          MS. VANDRUFF:  Anne, I appreciate your caution,
2     but I'm going to instruct Mr. Roque that he can only
3     answer your question if you are able to do that without
4     revealing any communication that is confidential
5     between attorneys and Ernst & Young employees.
6          THE WITNESS:  If I can, that was -- I was
7     informed by videoconference.
8          BY MS. COLLESANO:
9     Q.   By the team that made the decision?
10    A.   Not the team.  By Frank.
11         MS. VANDRUFF:  Anne, I'm just going to ask that
12    we take a short break to confer on this.  I'm going to
13    go off the record.
14         (A recess was taken.)
15         (The record was read as requested.)
16         MS. VANDRUFF:  Thank you, Ms. Wehr.
17         BY MS. COLLESANO:
18    Q.   In the second paragraph after the resignation
19    conclusion section, you stated that EY determined to
20    resign because the engagement preconditions had changed
21    so significantly between the time of the engagement and
22    Ernst's decision to terminate that the team did not
23    believe any longer that it could perform the engagement
24    in accordance with the professional obligations.  Why
25    wasn't EY able to do so?

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          MS. VANDRUFF:  Objection.  Vague.
2          You may answer the question.
3          THE WITNESS:  It was a culmination of the
4    factors outlined above.  We ultimately didn't think we
5    were going to be able to execute this engagement on
6    time.  And there had been a significant change with the
7    executive management, and we would have still had to
8    renegotiate a new statement of work, and that might
9    have also been further delays.
10         BY MS. COLLESANO:
11    Q.  Aside from the delay piece, how is the delay
12   piece related to fulfilling professional obligations?
13    A.  I shouldn't be executing an engagement without
14   a signed statement of work.  So we had a professional
15   obligation not usually to conduct those procedures,
16   especially for a new testing engagement or a financial
17   audit without a signed statement of work.
18    Q.  And the signed statement of work from August of
19   2022 was not sufficient?
20    A.  No.  There had been so much change, we felt it
21   needed to be renegotiated.
22    Q.  Was Twitter willing to renegotiate it?
23         MS. VANDRUFF:  Objection.  Lack of foundation.
24         You may answer the question.
25         THE WITNESS:  I believe they were.  As we

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

154

Roque

USA v. Twitter, Inc.                                     6/21/2023

1    discussed earlier, I had communicated we were working

2    on a revised statement of work, and they said they

3    understood.

4            BY MS. COLLESANO:

5        Q.  Had you shared a revised statement of work with

6    them?

7        A.  We didn't.  We resigned before that got framed.

8        Q.  The increased scope of work that you

9    anticipated as a result of changes in circumstances,

10   when do you think you would have needed to start your

11   procedures to meet the deadline?

12           MS. VANDRUFF:  Objection.  Lack of foundation.

13           You may answer the question.

14           THE WITNESS:  Probably early February.

15           BY MS. COLLESANO:

16       Q.  At the latest?

17       A.  At the latest, but that's not to say it

18   couldn't get done.

19       Q.  I know we've talked a little bit about the

20   basic phases of work for the order assessment, but can

21   you just give me a quick overview of the different

22   parts?

23           MS. VANDRUFF:  Is there a question, counsel?

24           BY MS. COLLESANO:

25       Q.  Can you give me an overview of the different

Roque

USA v. Twitter, Inc.                                             6/21/2023

1    parts of the phases of work in the order assessment?

2        A.   Yes.  And I'm sorry, are you going to have me

3    look at a document any time soon on the tool?

4        Q.   Not right now.

5        A.   Okay.  I just need to switch glasses.  It's

6    hard for me.  Sorry.

7             So usually we have our -- before we start any

8    engagement, following from policy, we would usually

9    complete a series of internal procedures first.  Some

10   of them we've talked about.  Some of them may or may

11   not need to be done each and every time, but there's

12   usually at least engagement acceptance.  We have a

13   review process before accepting new work to make sure

14   we have adequate resources, for example, to execute

15   that work.  We have a very technical skills assess to

16   do the work.  So there's like an upfront pre-engagement

17   phase.

18            Then we usually have the statement of work

19   component where we are negotiating finalizing scope,

20   timing with the client, get their agreement and our

21   understanding of the engagement is correct.

22            Once that gets signed, we enter into what we

23   call the planning phase.  Then, as we've discussed,

24   that usually entails helping the team get up to speed.

25   It might be something as simple as getting client

156

Roque

USA v. Twitter, Inc.                                              6/21/2023

1   laptops, getting badged so we can get onsite and do
2   procedures if we are going onsite, writing our planning
3   memos, finalizing the budget, setting up engagement
4   codes.
5           Then after that we usually, depending on the
6   engagement, the length of time or the nature of it,
7   we'll usually do what we call a design phase where we
8   confirm our understanding of the controls and their
9   operations.  And that allows us to then say, okay,
10  based on the nature of the control, how do I design my
11  testing procedures to test that control based on our
12  sampling methodology.
13          Then we usually have the actual execution and
14  testing phase, and then we have sort of our wrap-up and
15  report issuance phase where we produce the deliverables
16  to the client if there's any that were contracted for.
17          And after that we archive the engagement, which
18  means we basically create a finalized version of
19  everything we've produced, and it goes off into records
20  storage.
21      Q.  That's been helpful.  I appreciate it.  Aside
22  from, I think, you started with the internal procedure,
23  which I assume EY handles itself and doesn't involve
24  the potential client; is that right?
25      A.  Yes, for the most part.  There might be a

Roque

USA v. Twitter, Inc.                                          6/21/2023

1  question or two we ask the client, but generally it's
2  all Ernst & Young.
3      Q.  And then you work on that statement of work
4  internally, and then that needs to be finalized with
5  the client?
6      A.  Correct.
7      Q.  And then the next four phases you mentioned,
8  planning design, execution/testing and report/wrap-up,
9  do each of those components involve information and
10  assistance from the client to be executed?
11      A.  They do.
12      Q.  Did you get the information and access you
13  needed from Twitter to complete your planning
14  procedures?
15      A.  They were very receptive to giving access.  As
16  we've discussed there was a couple of key items we were
17  looking for, like the annual risk assessment, the
18  organizational chart, the risk and control matrix.
19  Some of those were provided to us but pretty late from
20  when we originally were hoping to receive them.
21      Q.  Did you reach the design phase at all?
22      A.  We didn't.
23      Q.  I assume each phase builds on the prior one, so
24  you couldn't do the design without the finalization of
25  the planning process; is that fair?

158

Roque

USA v. Twitter, Inc.                                        6/21/2023

1          A.   Yes.

2          Q.   So since you couldn't do planning or design,

3     you couldn't do execution and testing either; is that

4     right?

5          A.   That's correct.

6          Q.   And then you obviously couldn't write up a

7     report and share the results, correct?

8          A.   Yes.

9          Q.   I'm going to show you another document now.

10         (Roque Deposition Exhibit Number 12 was marked

11    for identification.)

12         BY MS. COLLESANO:

13         Q.   This is EY_FTC_0005309.  Let me know when you

14    have had a chance to take a look.

15         A.   Okay.

16         Q.   So this is a meeting invite that was sent to

17    you in November 2022, and in some of the information

18    that's conveyed with that meeting invite, there are

19    three bullets.  The first states, in part, that Bret

20    Cohune cautioned that if anyone at Twitter signs it,

21    the SOC 2 report, it would be fraudulent.  Were you

22    aware of that caution at the time?

23         MS. VANDRUFF:  Objection.  Vague.

24         You may answer the question.

25         THE WITNESS:  I became aware of it in -- upon

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

159

Roque

USA v. Twitter, Inc.                                                   6/21/2023

1   receiving this e-mail.

2          BY MS. COLLESANO:

3      Q.  Were you concerned about this statement?

4      A.  Sure, at face value, yes.

5      Q.  Why?

6      A.  I have a client contact using the word

7   "fraudulent."

8      Q.  Did you think that was an implication for the

9   order assessment work?

10         MS. VANDRUFF:  Objection.  Lack of foundation.

11         You may answer the question.

12         THE WITNESS:  I wasn't sure.  It was to be

13  determined.

14         BY MS. COLLESANO:

15     Q.  The second bullet says "the remaining teams

16  will not be working on FTC matters anymore."  Do you

17  know what that means?

18     A.  Yes.  Bret was not happy with the direction of

19  what was taking place at the company.  And after Damien

20  Kieran resigned, he had instructed his team that he did

21  not feel comfortable that anybody from internal audit

22  should be supporting the FTC engagement anymore, and he

23  just was letting us know that that's not what EY's team

24  would be doing.

25     Q.  What is the role of internal audit?

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          MS. VANDRUFF:  I'm sorry.  Objection.  Lack of
2     foundation.
3          You may answer the question, Mr. Roque.
4          THE WITNESS:  I'm going to be very specific.
5     Different organizations can decide how they want to use
6     their internal audit function in many different ways.
7     For our engagement, internal audit was helping to
8     facilitate the actual the execution of our audits.
9          BY MS. COLLESANO:
10         Q.  At the time you terminated, was the internal
11    audit team still active at Twitter?
12         A.  No.  They had -- Bret was the last one, and he
13    resigned in November, and that was the last member of
14    the internal audit group.
15         Q.  Do you know what happened to the rest of the
16    internal audit group aside from Bret?
17         A.  They were either terminated or resigned prior
18    to the work-from-the-office order.
19         Q.  Do you know if people were hired to create --
20    to recreate an internal audit team at Twitter?
21         MS. VANDRUFF:  Objection.  Lack of foundation.
22         You may answer the question.
23         THE WITNESS:  Up to the point of resignation,
24    I'm not sure I remember any discussions of whether the
25    company had made a decision to rebuild that group or

161

Roque

USA v. Twitter, Inc.                                                  6/21/2023

1    not.

2          BY MS. COLLESANO:

3          Q.   The bullet says "the remaining teams will not

4    be working on FTC matters anymore."  Do you know what

5    other teams this is referring to aside from internal

6    audit?

7          A.   I don't.  I wasn't on the call, and this was

8    conveyed through a different person.  So I'm not sure

9    how she may have interpreted it.

10         Q.   So you are saying you didn't join this meeting?

11         A.   I may have joined the meeting, but I believe

12   this was an e-mail communicated to a group of EY

13   individuals based on a conversation Ryan had with Bret.

14   So this was Ryan's summary of her discussions with

15   Bret.  I don't know how she -- if she interpreted them

16   all correctly or the word choices she used.

17         Q.   Sure.  I understand this is a meeting invite.

18   I'm asking do you recall if you joined the actual

19   meeting to discuss these items?

20         A.   I'm assuming I did, yes.

21         Q.   Do you remember anything that was said in the

22   meeting about the remaining teams referenced here?

23         A.   I don't.  The main people we were interacting

24   with was internal audit.  I'm sure there's people from

25   the privacy or security teams that were in place, but I

162

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    don't know if they were specifically instructed or they
2    made their own decisions not to participate.
3        Q.   The second bullet goes on to say, "if EY
4    chooses to issue its FAR report, it would need to go
5    directly to Elon or his attorney."  What FAR report is
6    being referenced here?
7        A.   That's an acronym for findings and
8    recommendations that goes back to, I think, at the
9    beginning of our call we decided to call it the
10   readiness review or readiness assessment.  It's one and
11   the same.
12       Q.   So this refers to the readiness assessment?
13       A.   Correct.
14       Q.   You mentioned that this was based on a call
15   that Ryan had with Bret Cohune.  Who is Ryan
16   Walkenhorst?
17       A.   Ryan Walkenhorst was, at the time of this, I
18   believe she was a senior on the engagement in providing
19   the readiness review work.
20       Q.   Was she also going to work on the order
21   enforcement project?
22       A.   She was.
23       Q.   Do you recall anything else about this meeting
24   and what was discussed?
25       A.   I don't.  The only other item I assume was

Roque

1    discussed was based on bullet point 3, Bret

2    communicating the company's policy to halt the payment

3    of all invoices.

4        Q.  At this point had you been experiencing delays

5    in invoice payments yet?

6        A.  We had not.  Our invoices were not past due at

7    the time of this e-mail.

8        Q.  I'm going to show you another document.

9            (Roque Deposition Exhibit Number 13 was marked

10   for identification.)

11           MS. VANDRUFF:  Can we just take a short break.

12           (A recess was taken.)

13           BY MS. COLLESANO:

14       Q.  So just before the break, I revealed

15   Exhibit 13.  Mr. Roque, are you able to see that and

16   take a look?

17       A.  Yeah, I just opened it.

18       Q.  So this is an e-mail that you sent.  The first

19   e-mail at the bottom of the first page indicates that,

20   in case you have not already seen, our new key contact

21   that privacy and security roll up to was fired today.

22   Is that correct?

23       A.  Yes, it is.

24       Q.  Is this how you learned that Jim Baker was no

25   longer at Twitter?

164

Roque

USA v. Twitter, Inc.                                    6/21/2023

1        A.   That's correct.

2        Q.   Did Twitter inform you about the situation?

3        A.   They did not.

4        Q.   Did you reach out to Twitter to ask about the

5    situation?

6        A.   We, at the time, knowing we still had another

7    person we were working with, Sergio, we had reached out

8    to him to ask what was going on, and so that was after

9    we came to learn Mr. Baker had been terminated.

10       Q.   Did he confirm that was the situation?  Did

11   Mr. Alonso confirm that was the situation at Twitter

12   with Mr. Baker?

13       A.   I don't believe he actually ever responded

14   because he himself left within four or five days after

15   Mr. Baker's termination.

16       Q.   When did you get a new contact aside from

17   Mr. Baker and Mr. Alonso?

18       A.   I think at the end of November, early December,

19   the other Damien, Damien Vogt, was identified that we

20   should start interacting with him about the FTC consent

21   order work.

22       Q.   Just to be clear, your e-mail is dated

23   December 6th.  How long after this do you think you

24   were informed of Mr. Vogt's position as your client

25   contact?

Roque

USA v. Twitter, Inc.                                         6/21/2023

1        A.  I don't know.  My understanding, the e-mail is
2   obviously factually correct.  I remember end of
3   November, early December we were given Damien as sort
4   of our day-to-day person to interact with as well.
5        Q.  Your subject line here is, "More Twitter Fun."
6   What previous fun led this to be titled More Twittner
7   Fun?
8             MS. VANDRUFF:  Objection.  Lack of foundation.
9             You may answer the question.
10            THE WITNESS:  It was more sarcasm, meaning we
11  had been constantly seeing stories about terminations
12  at the organization, key people we have been working
13  with leaving.  So it was just sort of a tongue-in-cheek
14  of here we go again.
15            BY MS. COLLESANO:
16       Q.  The e-mail at the top of the page, it's again
17  from you, and the last sentence says, "With the holiday
18  quickly approaching and people continuing to disappear,
19  I'm not optimistic we would be able to do much before
20  the next year."  What did you mean by disappearing from
21  Twitter?
22       A.  The amount of terminations and resignations.
23  During the month of November, it just seemed like
24  people were disappearing left and right.
25       Q.  I'm going to show you another document as

166

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    Exhibit 14.  This is EY_FTC_0001940.

2            (Roque Deposition Exhibit Number 14 was marked

3    for identification.)

4            BY MS. COLLESANO:

5    Q.  Feel free to take a look at the document, but

6    I'll only have a couple questions about this.

7            MS. VANDRUFF:  I don't think it's been

8    published yet.

9            THE WITNESS:  Yeah, the document hasn't come

10   through.  There it is.  Okay.

11           BY MS. COLLESANO:

12   Q.  So the first page, this is a looks to be a

13   meeting recap of a meeting between EY and Twitter on

14   December 22, 2022; is that correct?

15   A.  That is correct.

16   Q.  And who is Casey Kalra who sent this e-mail?

17   A.  She was a senior working with Ryan on the

18   readiness work and was going to be part of the team to

19   do the FTC consent order.

20   Q.  When you say a senior or she is in line with

21   seniors, what does this mean?

22   A.  Earlier when we went through the levels or

23   maybe when you were asking about my levels of

24   responsibility, we have roles of staff.  We have staff

25   1, staff 2, then we have a senior title, then we have a

167

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    manager title, senior manager title and ultimately a
2    partner or principal title.  So they were both in the
3    ranks of seniors.  Seniors can operate between three to
4    five years, usually, of time experience.
5         Q.  So it's based on the level of experience they
6    have, the title?
7         A.  Correct.  It's more geared towards time served
8    at Ernst & Young or previous experience.  They'll get
9    assigned a certain level within the organization.
10        Q.  And the work they would be doing across the
11   board would be working on assessments of companies or
12   other types of work?
13        A.  I'm sorry, could you maybe ask your question in
14   a different way?  I want to make sure I respond
15   correctly.
16        Q.  I hear you describing your their as based on
17   the amount of time they've spent at EY.  I'm just
18   curious what kind of experience they have in those
19   roles.  What type of work do they do?
20        A.  Assuming the individual had started, let's say,
21   day one out of school with Ernst & Young, then they
22   usually will have been on a series of clients building
23   their skill set to provide this type of service.  So
24   they would participate in client meetings, they would
25   learn how to lead walk-through discussions, review work

168

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   papers, execute testing procedures.  It just depends on
2   their level within the senior ranks and the client
3   situation.
4        Q.  So the EY attendees are listed here.  It looks
5   like you attended this meeting; is that correct?
6        A.  Yes.
7        Q.  Actually, if you look at the bottom of the
8   document, the fourth bullet from the bottom --
9            MS. VANDRUFF:  On page 1 or page 2?
10           MS. COLLESANO:  On page 1.
11           MS. VANDRUFF:  Thank you.
12           THE WITNESS:  The paragraph starting, "EY
13   explained there has been a bunch of change"?
14           BY MS. COLLESANO:
15       Q.  Yes.
16       A.  Okay.
17       Q.  So as you said, EY explained there had been a
18   bunch of change, and later in the paragraph, "we asked
19   for update related to those 85 percent of controls that
20   had all changed."  Is she indicating that 85 percent of
21   Twitter's controls had changed since you worked on the
22   readiness assessment?
23           MS. VANDRUFF:  Objection.  Lack of foundation.
24           You may answer the question.
25           THE WITNESS:  My interpretation of that was she

169
Roque
USA v. Twitter, Inc.                                                     6/21/2023

1    was making a broad statement.  The change in controls
2    could have encompassed -- the control itself did
3    change.  Maybe a new control was added.  An existing
4    control could have been deprecated.  The control that
5    could have had a change in the control owner.  So
6    there's a variety of items that could have impacted a
7    control, meaning there was a change to it in some way.
8            BY MS. COLLESANO:
9        Q.  And 85 percent of Twitter's controls had some
10   type of change like you have described since the
11   readiness assessment was completed or almost completed
12           MS. VANDRUFF:  Objection.  Mischaracterizes
13   testimony.
14           You may answer the question.
15           THE WITNESS:  Only the controls that we
16   assessed as part of the readiness.  So as we discussed
17   earlier, not all of the Twitter controls in their
18   program were looked at then.  So what we have referred
19   to as the net new controls, those were what changed and
20   were current in our system in October.
21           BY MS. COLLESANO:
22       Q.  Two bullets down says, "Primarily, we need to
23   understand controls of old order versus new order.
24   David is saying we're pretty blind right now."  What
25   does that mean?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                        6/21/2023

1          MS. VANDRUFF:  Objection.  Lack of foundation.

2          You may answer the question.

3          THE WITNESS:  Just there had been so much

4     change to the organization, we didn't know anymore,

5     based on the work we had done in October, how accurate

6     that still was.  So how many -- were the controls still

7     the same controls.  We were basically starting over

8     from scratch again.  And blind meaning like we just had

9     no insight or understanding of what the current

10    environment was operating under.

11         BY MS. COLLESANO:

12    Q.  On the first bullet on the next page, the

13    second sentence says, "if they're too new, we can't get

14    evidence for walk-through or testing."  How much time

15    does a control need to be in effect to be able to test

16    it?

17         MS. VANDRUFF:  Objection.  Asked and answered.

18    Vague.

19         You may answer the question.

20         THE WITNESS:  It depends on the control itself.

21         BY MS. COLLESANO:

22    Q.  Can you give me an example?

23    A.  Sure.  If you have, let's say, a password

24    control that says my password needs to be eight

25    characters long, that's usually an inherent system

171

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    functionality.  You can go into the system as of a
2    point in time and say does that control exist?  It's
3    point in time.  It doesn't really offer -- it will
4    operate through a series of other controls to support
5    it operating correctly, but it's a point in time
6    control usually when we look at it.
7         If there is like a quarterly review control of
8    looking at users that are appropriate to an application
9    or a system, I would need at least three months to have
10   gone by for them to execute a quarterly control.
11        Q.  Thank you.  The last bullet on this page says,
12   "if they say it is all working, then we want to test
13   that and go to the FTC and say that they are
14   misrepresenting themselves."  What does that mean?
15        MS. VANDRUFF:  Objection.  Lack of foundation.
16        You may answer.
17        THE WITNESS:  I don't know.  Sorry, I'm reading
18   it to myself.  I think there was a question of what --
19   so in the order, there is the requirement after
20   240 days where the company needed to provide
21   representations based on the order of the overall
22   control framework.  So I think that's what I would
23   interpret it.
24        In January, the bullet there, it says in
25   January that Twitter was going to need to represent the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

172

Roque

USA v. Twitter, Inc.                                            6/21/2023

1    order to the FTC.  I'm not sure why she would put the
2    second part in there because we didn't really have any
3    evidence to conclude, based on what we had done to
4    date, whether there was any misrepresentations or not.
5            BY MS. COLLESANO:
6        Q.  And you mean the compliance report that was
7    required under the order to be submitted to the FTC?
8        A.  Correct.
9        Q.  Did you ever receive a copy of that compliance
10   report from Twitter?
11       A.  We did.
12       Q.  Did you review it?
13       A.  I did.
14       Q.  Did you have any thoughts about it?
15           MS. VANDRUFF:  Objection.  Vague.
16           You may answer.
17           THE WITNESS:  They said they had the program in
18   place and it was operating and ready to go.  So...
19           BY MS. COLLESANO:
20       Q.  Did you think that was accurate?
21       A.  I didn't have any evidence to tell me that it
22   wasn't.
23       Q.  I'm going to show you another document.  Before
24   I do that, with reference to the January compliance
25   report, EY had no basis to validate the accuracy of

173

Roque

USA v. Twitter, Inc.                                              6/21/2023

1   what Twitter had written in that report, correct?
2          MS. VANDRUFF:  Objection.  Leading.
3          You may answer.
4          THE WITNESS:  Yes.
5          BY MS. COLLESANO:
6      Q.  Yes, that's correct?
7      A.  Yes, that's correct.
8          MS. VANDRUFF:  Objection.
9          (Roque Deposition Exhibit Number 15 was marked
10   for identification.)
11         BY MS. COLLESANO:
12     Q.  Showing you a new document marked as
13   Exhibit 15.  It's EY_FTC_0007225.  Let me know when you
14   have had a chance to take a look.
15         MS. VANDRUFF:  It hasn't been published yet.
16         THE WITNESS:  I have it.  You need to scroll
17   down.
18         MS. VANDRUFF:  I apologize.  Thank you.
19         THE WITNESS:  Okay.
20         BY MS. COLLESANO:
21     Q.  Who is Yvette Yeo?  Sorry if I'm mispronouncing
22   her name.
23     A.  No, that's correct.  She is a senior manager I
24   work with and was a senior manager for the FTC
25   engagement.

Roque

USA v. Twitter, Inc.                                          6/21/2023

1      Q.  At 10:44 p.m. on January 31, 2023, she writes
2  in a chat to you, "it's almost like, if we can't finish
3  testing all controls because of the delay, we will just
4  need to fail and qualify them."  What does that mean?
5          MS. VANDRUFF:  Objection.  Lack of foundation.
6          You may answer.
7          THE WITNESS:  I think she was trying to
8  understand if we couldn't execute on the work.  So
9  there was either if we couldn't get the evidence or we
10  ran out of time to test certain controls, what was
11  going to be the approach or how would we document the
12  results of that.  And it would just be that we would
13  either say -- I don't think we would have said they
14  failed.  We would have probably had some more general
15  language about we are not able to test the operating
16  effectiveness.
17          BY MS. COLLESANO:
18      Q.  And then so you wouldn't say failed.  You would
19  say something like that and then qualify them?  Can you
20  explain what that means?
21          MS. VANDRUFF:  Objection.  Compound.  Leading.
22  Lack of foundation.
23          You may answer the question.
24          THE WITNESS:  I qualified those facts in one of
25  our earlier discussions.  It's a very specific term in

175

Roque

USA v. Twitter, Inc.                                              6/21/2023

1   the audit language around the attestation standard.  So

2   you can have a qualified report.  I think she was using

3   it broadly to convey if we had a large body of controls

4   we couldn't test, would it possibly result in a

5   qualification to the report.

6          BY MS. COLLESANO:

7      Q.  Can you remind me what that would mean, a

8   qualification to the whole report?

9      A.  It's language that says here is what we did,

10  but there's certain things we couldn't do.  So there's

11  a qualification to our opinion or the results of the

12  examination itself.

13     Q.  Can you have qualifications -- can you have

14  general qualifications as well as qualifications for an

15  individual control or do they not work that way?

16     A.  They can.  Sorry, I didn't mean to cut you off.

17  The standards do allow for qualifications broadly or on

18  a per-control area basis.

19     Q.  I'm going to show you another document.

20         (Roque Deposition Exhibit Number 16 was marked

21  for identification.)

22         BY MS. COLLESANO:

23     Q.  This is Exhibit 16, EY_FTC_0006560.  Let me

24  know when you have had a chance to look at it.

25     A.  Okay.

Roque

USA v. Twitter, Inc.                                      6/21/2023

1      Q.   This is an e-mail from Christina Cavalli to
2  you.  Who is Christina Cavalli?
3      A.   She is an internal finance person who helps
4  with our budgeting and engagement economics.
5      Q.   She references an ETC.  Was that?
6      A.   An estimate to complete.
7      Q.   What does that mean?
8      A.   So Ernst & Young's internal system for
9  projects, we are required to do periodic updates on the
10  status of the projects, anticipating the estimated
11  level of effort to complete the engagement.  And so you
12  make adjustments sort of as you go periodically
13  throughout the engagement.  We made an adjustment and
14  had to process an ETC, and that ETC was resulting in an
15  incremental effort that we were not anticipating -- we
16  had originally anticipated went we set up the
17  engagement code, and we were going to have to write
18  that off, meaning we would take a loss against it.
19      Q.   Why would you take a loss against it?
20      A.   Because there was going to be more hours
21  expected to be incurred than we had planned for.  So
22  meaning, so if we had an engagement and we thought it
23  would take 100 hours, and after the first week we
24  said -- we charged 20 of those hours and said, no, we
25  are now going to take 120 hours, we would run the ETC,

Roque

USA v. Twitter, Inc.                                             6/21/2023

1    and the ETC would say, okay, based on when you
2    originally set this up, something has changed.  There's
3    more hours being incurred.  You are going to have -- we
4    are not going to be able to potentially collect for all
5    that.  So we need to write it off sooner than later.
6         Q.  So this was written off from the readiness
7    assessment because of the hours that you had calculated
8    that would have been spent?
9              MS. VANDRUFF:  Objection.  Leading.  Lack of
10   foundation.
11             You may answer the question.
12             THE WITNESS:  That's correct.
13             BY MS. COLLESANO:
14        Q.  So if that's just standard that everything --
15   is that the only reason for a write-off?
16        A.  No.  I'm not sure -- so maybe to clarify a
17   point earlier, the ETCs are what we anticipate to
18   complete the engagement.  So something could change.  I
19   could run another ETC where I've had more efficiencies
20   than I was expecting.  So an ETC doesn't always result
21   in a write-off.  I can have a write-up as well.  So now
22   this engagement is working out better than I
23   anticipated; here is what I'm now expecting to collect.
24   So it's more of our firm's ability to accurately
25   reflect the revenue that's being generated on a

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    particular project through the lifetime of the project.
2        Q.  Did this write-off just have to do with EY's
3    procedures or did it have anything to do with Twitter
4    specifically?
5           MS. VANDRUFF:  Objection.  Vague.
6           You may answer.
7           THE WITNESS:  I don't know.  As I said, it's a
8    point in time during the entire engagement.  So it will
9    fluctuate up and down.  I don't know the analysis that
10   drove this particular estimate where it was going to
11   take more time.  It could have been items from Twitter.
12   It could have been inefficiencies from Ernst & Young.
13   It could have been due to a change in resource
14   allocation.  Each resource has different costing
15   associated with it.  So we might have needed to swap
16   somebody after somebody had left the firm, and the new
17   resource we replaced had a higher cost, which would
18   have impacted what we expected to originally recover.
19   So there's a host of things that could be contributing
20   to write-ups or write-downs.
21          BY MS. COLLESANO:
22       Q.  Do you know what was contributing to this
23   write-off?
24          MS. VANDRUFF:  Objection.  Asked and answered.
25          You may answer.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

179

Roque

USA v. Twitter, Inc.                                            6/21/2023

1           THE WITNESS:  As I said, I would have to dig

2    into the analysis back in -- when was this?  Back in

3    November.

4           BY MS. COLLESANO:

5      Q.  What is a WIP?

6      A.  It stands for WIP.  And it's just another Ernst

7    & Young acronym that stands for work in progress.

8      Q.  What is it?  It stands for work in progress,

9    but what does that mean?  Is it a document that you

10   have or is it just a term you use to describe --

11     A.  It's a lazy term that more or less means the

12   same thing as the ETC.  So we used to say you need to

13   go and do -- look at the work in progress and make sure

14   it's still reflective of where we are.  When we got a

15   new accounting system, they changed it to you now need

16   to process ETCs, but some of us that are older in the

17   firm continue to use the legacy terminology.

18     Q.  I'll show you another document.

19          (Roque Deposition Exhibit Number 17 was marked

20   for identification.)

21          BY MS. COLLESANO:

22     Q.  This is Exhibit 17, and it's EY_FTC_0002662.

23   Let me know when you have had a chance to take a look

24   at it.

25     A.  Okay.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

180
Roque
USA v. Twitter, Inc.                                    6/21/2023

1          Q.   So Mr. Rosengarten asked have you received any
2     payments from Twitter, and you say "of course not"; is
3     that correct?
4          A.   Yep.
5          Q.   Is that "of course not" because you had been
6     experiencing delays for a while in the payment of
7     invoices?
8               MS. VANDRUFF:  Objection.  Leading.  Lack of
9     foundation.
10              You may answer the question.
11              THE WITNESS:  Yes.
12              BY MS. COLLESANO:
13         Q.   Then Mr. Rosengarten asked about "do they have
14    a deadline before we highlight the resources are no
15    longer available."  What does that mean?
16              MS. VANDRUFF:  Objection.  Lack of foundation.
17              You may answer the question.
18              THE WITNESS:  He was asking if there was a date
19    where we would maybe say the resources allocated to
20    this project are no longer available.
21              BY MS. COLLESANO:
22         Q.   Meaning the EY resources?
23         A.   That's correct.
24         Q.   Then you say "they are starting planning.
25    Frank gave a general okay to start but we have told

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    them we will not perform an [sic] field work until they

2    pay."  Is that correct?

3         A.  That is correct.

4         Q.  So was Twitter's failure to pay impacting EY's

5    ability to perform its work?

6              MS. VANDRUFF:  Objection.  Asked and answered.

7              You may answer the question.

8              THE WITNESS:  No.  We were executing our

9    planning.  We were still meeting with them regularly.

10   We were holding status meetings trying to get the

11   engagement going.  It just sort of put a stake in the

12   ground that said if we got to the point where we were

13   supposed to be executing our field work procedures and

14   still hadn't been paid, we would -- we would probably

15   say we are not going to do that at this time until

16   payment came through.

17             BY MS. COLLESANO:

18        Q.  I'll show you another document.

19             (Roque Deposition Exhibit Number 18 was marked

20   for identification.)

21             BY MS. COLLESANO:

22        Q.  This is Exhibit 18, EY_FTC_0002802.  Let me

23   know when you have had a chance to look at that.

24        A.  Okay.

25        Q.  So the e-mail on the bottom of the first page,

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                          6/21/2023

1   this is slightly later than the last document we looked

2   at.  It's February 23, 2023, and you write that you

3   have checked and double checked the payment system and

4   you have not received payments from Twitter.  Is that

5   correct?

6        A.  Yes.

7        Q.  And you say later, "Therefore, we will not be

8   attending the status meeting today.  We need to stop

9   incurring time if payment will ultimately not arrive."

10  Is that correct?

11       A.  Yes.

12       Q.  So at a certain point, you stopped attending

13  meetings?

14            MS. VANDRUFF:  Objection.  Leading.  Lack of

15  foundation.

16            You may answer the question.

17            THE WITNESS:  Yes, we started to -- I don't

18  know if -- where you are -- I'm not sure I see status

19  meeting.

20            BY MS. COLLESANO:

21       Q.  The last -- second-to-last line.

22       A.  Yeah.  We were just starting to -- it was

23  getting closer to start executing our field work

24  procedures, and so we were starting to enact what we

25  had communicated we were intending to do of not being

183

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    able to move forward until payment had been received.

2        Q.  Did these payment issues contribute to EY's

3    decision to terminate?

4            MS. VANDRUFF:  Objection.  Asked and answered.

5            You may answer.

6            THE WITNESS:  No.

7            BY MS. COLLESANO:

8        Q.  Do you know if payment issues were discussed by

9    the team making the decision about the termination?

10       A.  I don't know.

11           (Roque Deposition Exhibit Number 19 was marked

12   for identification.)

13           BY MS. COLLESANO:

14       Q.  I'm going to show you another document.  This

15   is Exhibit 19, EY_FTC_0005482.  Let me know when you

16   have had a chance to look at it.

17       A.  Okay.  Yes.

18       Q.  Who is Casey Kalra?

19           MS. VANDRUFF:  Objection.  Asked and answered.

20           Go ahead.

21           THE WITNESS:  It's the same individual we

22   talked about earlier when you had questions about the

23   seniors.  She was working with Ryan on the readiness

24   assessment and was going to be part of the consent

25   order.

184

Roque

USA v. Twitter, Inc.                                          6/21/2023

1           BY MS. COLLESANO:

2      Q.   Who is Bailey Walker?

3      A.   She is a staff-level person.  So underneath the

4  lowest level we have, they're going to be doing the

5  day-to-day or documentation and gathering of evidence

6  to facilitate some of the walk-throughs.

7      Q.   And Nicole Tran?

8      A.   Another staff resource.

9      Q.   So Ryan Walkenhorst has sent this, what appears

10 to be a calendar invite, on January 13, 2023.  But in

11 the message she writes, "RIP, hopefully we can all work

12 together on another consent order soon."  What does

13 that mean?

14          MS. VANDRUFF:  Objection.  Lack of foundation.

15          You may answer the question.

16          THE WITNESS:  There was a component of our

17 privacy team that specializes in privacy that they

18 needed to get reassigned because there was no work for

19 them to continue.  So earlier you asked the question

20 about what happened to our team members.  Some of the

21 younger ones were redeployed.  So back in January,

22 there was one or two members from the privacy group

23 that got rolled on to another project, and I think she

24 assumed at that point this engagement was not going to

25 happen.  And so she was just saying, I think, she

185

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    enjoyed working with me and hoped we had the
2    opportunity to be on a project again at some other
3    point in time.
4              BY MS. COLLESANO:
5        Q.  I'm going to show you another document.
6              (Roque Deposition Exhibit Number 20 was marked
7    for identification.)
8              BY MS. COLLESANO:
9        Q.  This is Exhibit 20, EY_FTC_0003184.  Let me
10   know when you have had a chance to look at it.
11       A.  I'm familiar with it, yes.
12       Q.  So what is this document?
13       A.  This is a document that is basically asking for
14   the company, and in this case, Protiviti, to sort of, I
15   guess, waive considerations to talk to Ernst & Young.
16   So earlier in the day I had communicated when we had
17   resigned, there was also the component where we had
18   offered to help facilitate a transition or do what we
19   could to make all this as easy as possible for Twitter
20   with our resignation.  And so they, obviously, needed
21   to go out and find a new assessor.  Protiviti was one
22   of the assessors that they were looking at, but
23   Protiviti wanted to talk to Ernst & Young directly
24   about why we resigned.  And so in the accounting
25   profession, we have a certain series of protocols that

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    in order to have those types of discussions, the
2    requesting firm usually needs to sign that, hey, we are
3    going to talk to you but don't hold it against us.  And
4    so this document was prepared to then be signed by
5    Twitter and Protiviti before we had the call with them.
6        Q.  Protiviti was the one that made the request to
7    speak with you?
8        A.  That's correct.
9        Q.  Did you meet with them personally?
10       A.  I talked to them through a videoconference.  I
11   didn't meet them in person.
12       Q.  I apologize.  I mean, were you one of the
13   people that spoke with them?
14       A.  Yes.
15       Q.  Who else was in the meeting from EY?
16       A.  Rebecca Lubens.
17       Q.  Anyone else?
18       A.  EY, no, I think it was just the two of us.
19       Q.  Was Twitter part of the meeting?
20       A.  They were.
21       Q.  Who from Twitter was there?
22       A.  I remember Christian Dowell.  I'm not sure if I
23   recall who else may have been there.
24       Q.  Do you recall what was discussed?
25       A.  Yes.  I mean, legal counsel was in this call.

Roque

USA v. Twitter, Inc.                                    6/21/2023

1          MS. VANDRUFF:  Is there a question, Anne?

2          THE WITNESS:  She asked me what was discussed

3    on the call.

4          MS. VANDRUFF:  She asked you -- I don't believe

5    that was the question.

6          THE WITNESS:  I'm sorry.  I should just shut

7    up.

8          BY MS. COLLESANO:

9     Q.   What was discussed on the call?

10         MS. VANDRUFF:  Answer the question.  You may

11   answer the question.

12         THE WITNESS:  They just were asking questions

13   about why we resigned and what led us to that

14   conclusion.

15         BY MS. COLLESANO:

16    Q.   What did you tell them?

17    A.   We reiterated the same statement that we've

18   provided to Twitter as part of the resignation.

19    Q.   How many times did you speak with Protiviti?

20    A.   Just that once.

21    Q.   Do you know whether Protiviti became the new

22   assessor for Twitter?

23    A.   Our understanding from the company is that, no,

24   they were not selected as the new assessor.

25    Q.   Was that conveyed to you on the call that you

188

Roque

USA v. Twitter, Inc.                                     6/21/2023

1    had with them?

2         A.   No.

3         Q.   How was that conveyed to you?

4         A.   It was conveyed in a follow-up request to speak

5    with a different party that they were intending to

6    select for the new assessor role.

7         Q.   What party was that?

8         A.   I forget the security firm out of Chicago I

9    believe they ultimately selected and is doing the

10   assessment right now.

11        Q.   So you had a meeting with that firm as well?

12        A.   We actually didn't have a meeting with them,

13   but we conducted a similar exercise where that firm

14   specifically asked for copies of some of our reports.

15   And so because the reports were intended only for

16   Twitter, they needed our approval to be able to turn

17   those over.

18        Q.   So you met with Protiviti but not this other

19   firm that asked for documents?

20        A.   Correct.

21        Q.   And then after this firm made a request for

22   documents, you checked with Twitter about whether you

23   could provide them?

24        A.   No, Twitter asked us.  Our statement of work

25   says they specifically have to get approval from us to

189

Roque

USA v. Twitter, Inc.                                        6/21/2023

1    provide certain documents.

2         Q.   Okay.   So Twitter basically informed you who

3    the new assessor was by making this request?

4         A.   Correct.

5         Q.   Did you provide the information to the new

6    firm?

7         A.   We did after they signed a similar letter.

8         Q.   Is there a reason you spoke to Protiviti but

9    didn't have a meeting with the other firm?

10        A.   No.   Protiviti asked for the meeting.   The

11   other firm, as far as I know, never asked.

12        Q.   I'm going to show you another document.   This

13   is 0000810.

14             (Roque Deposition Exhibit Number 21 was marked

15   for identification.)

16             BY MS. COLLESANO:

17        Q.   Exhibit 21, EY_FTC_0000810.   Let me know when

18   you have had a chance to take a look at it.

19        A.   Yes, okay.

20        Q.   Have you seen this document before?

21        A.   Yes, I prepared it.

22        Q.   What is this document?

23        A.   It is a risk assessment memo that we decided we

24   needed to create based on the nature of this

25   engagement.

Roque

USA v. Twitter, Inc.                                      6/21/2023

1       Q.   How do you prepare this type of memo?

2            MS. VANDRUFF:  Objection.  Vague.

3            THE WITNESS:  I'm not sure I know how to answer

4       based on that question.  Could you maybe ask it a

5       different way or be a little bit more specific?

6            BY MS. COLLESANO:

7       Q.   What process did you take to prepare this

8       document?

9            MS. VANDRUFF:  Same objection.

10           You may answer the question.

11           THE WITNESS:  When we've talked earlier about

12      our engagement acceptance process, there's a series of

13      questions that need to get asked, and depending on how

14      those questions are answered, it drives sort of a risk

15      factor associated with a particular engagement.

16           This engagement, because it was an FTC consent

17      order, it had some potential publicity around it,

18      drove -- said this was a higher risk engagement, and so

19      we decided to write this engagement to explain what was

20      driving those risks and how we were intending to

21      execute our engagement to address and mitigate them.

22           BY MS. COLLESANO:

23      Q.   This is dated June 2022.  So this is reflective

24      of your assessment as of that time?

25      A.   Correct.

Roque

USA v. Twitter, Inc.                                    6/21/2023

1      Q.   Was this document ever updated later?

2      A.   It was not.

3      Q.   How do you determine what level of risk you put

4  in for each risk factor?

5      A.   Just professional judgment, experience from

6  executing third-party attestation engagements.

7      Q.   Did anyone work with you on this document?

8      A.   Scott Coolidge did.  He helped me craft it.  He

9  has had experience in providing assessor reports for

10  other FTC engagements.  So he helped provide a lens

11  based on that experience.

12      Q.   On page 3 there's a risk factor number 2 titled

13  Deficiencies in the Twitter Security and Privacy

14  Programs.  Why would this be a risk if there are

15  deficiencies in the program?

16      A.   We didn't know if there was deficiencies.  The

17  risk was there could be deficiencies, and there was

18  just what risk is -- what happens if there's

19  deficiencies in the program is sort of the intent of

20  what the risk was.

21      Q.   So I guess, once engaged, you have a category

22  here for level of risk, and one is engagement risk.

23  What does engagement risk mean?

24      A.   Leading to the actual engagement itself, so

25  executing the FTC consent order.

Roque

USA v. Twitter, Inc.                                          6/21/2023

1     Q.   The risk to EY in executing the consent order?

2     A.   No, risks associated with trying to execute the

3     engagement itself for that particular project.

4     Q.   What about firm reputational risk, what does

5     that mean?

6     A.   If there was an outcome or consequences that we

7     were not anticipating in executing this engagement,

8     potentially for that risk what could be the impact to

9     the firm.

10    Q.   How is this factor -- why does this have a high

11    risk factor?

12         MS. VANDRUFF:  Objection.  Vague.

13         You may answer the question.

14         THE WITNESS:  If the report we had issued ended

15    up not -- sorry, had been other than unqualified, that

16    probably would not have been the outcome Twitter was

17    hoping for.  And so as I said, I mean, things get

18    leaked or shared inappropriately, and as I shared

19    earlier before, the people that may obtain access to

20    the report that never should have had it could

21    misinterpret it or use it inappropriately, and that can

22    create inaccurate press coverage for Ernst & Young

23    related to the service.

24         BY MS. COLLESANO:

25    Q.   It looks like you also have categories for

193

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    potential mitigating steps and actions to mitigate a

2    risk factor; is that correct?

3        A.  Yes.

4        Q.  So the fact that you moved forward with this

5    statement of work would indicate that EY considered the

6    risks that are laid out here and thought the potential

7    mitigations were reasonable enough to let you go

8    forward with the engagement?

9            MS. VANDRUFF:  Objection.  Leading.

10           You may answer the question.

11           THE WITNESS:  That's correct.

12           MS. COLLESANO:  Anne, it's been about an hour.

13   Can we take a quick break.

14           (A recess was taken.)

15           BY MS. COLLESANO:

16       Q.  Mr. Roque, your counsel said you had a

17   clarification you would like to make.  Please go ahead.

18       A.  That's correct.  It was pertaining to the

19   question you asked about the reports that had been

20   requested by the -- my understanding is the current

21   assessor.  And two aspects.  One is I said we provided

22   those to them.  I don't think that was correct.  We

23   gave the authority for Twitter to provide the

24   documents.

25           The second item is I just had a brain freeze,

194

Roque

USA v. Twitter, Inc.                                            6/21/2023

1    and what the assessor asked for was a copy of our SOC
2    report as well as a copy of our findings for any of the
3    readiness assessment report.  We agreed that they could
4    have the SOC report, but we did not let Twitter or we
5    instructed Twitter not to provide the findings report
6    to the new assessor.
7         Q.   Thank you for that clarification.
8         A.   Sure.  I apologize.  I'm embarrassed.
9         Q.   No problem at all.
10             Earlier today you described the various
11   resource constraints that Twitter faced post
12   acquisition.  In your experience, do you have an
13   opinion as to how those resource constraints would
14   affect Twitter's program?
15             MS. VANDRUFF:  Objection.  Incomplete
16   hypothetical.
17             You may answer the question.
18             THE WITNESS:  I just think there would have
19   been a larger burden on a smaller number of people to
20   execute the same control structure.
21             BY MS. COLLESANO:
22        Q.   What would the impact of that be?
23        A.   The potential impact is just assumptions.  I
24   don't know for sure.  It could be people making
25   mistakes because they are more tired and trying to get

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    more stuff done in a day.  Errors or mistakes could

2    occur because they are now operating or performing a

3    function that they are not as familiar with.  It can

4    compound the problem because they are getting worked so

5    hard they decide this isn't the environment they want

6    to be in anymore, and so they could potentially leave,

7    which would compound the problem potentially further.

8    So there's some thoughts of what I could see could

9    happen.

10          MS. COLLESANO:  Thank you, Mr. Roque.  I

11   appreciate your answers today.  Those are all the

12   questions I have at this time.

13          MS. VANDRUFF:  I have just a quick follow-on,

14   if I may.

15          MR. KOFFMANN:  Let me just, sorry, counsel, I

16   also have some questions.  So I don't know if you

17   prefer to do your follow-up now or to wait until after

18   my questions.  Whatever you prefer.

19          MS. VANDRUFF:  No, I would prefer to do that

20   after yours, Mr. Koffmann.

21                    EXAMINATION

22          BY MR. KOFFMANN:

23   Q.  Mr. Roque, hopefully just a few minutes of

24   questions.  I know it's been a long day for you.

25          Just to be clear, you understand that the oath

Roque

USA v. Twitter, Inc.                                        6/21/2023

```
 1   that you took earlier today still applies even though
 2   I'm asking questions now and the FTC is not?
 3        A.  Yes.
 4        Q.  And you understand that the oath that you took
 5   today is the same one that would apply if you were
 6   testifying in court?
 7        A.  Yes.
 8        Q.  And it's also the same oath that would apply if
 9   you were testifying before the Federal Trade Commission
10   itself.  Do you understand that?
11        A.  Yes, I do.
12        Q.  Okay.  And just as with counsel for the FTC, if
13   there's anything in my questions that is unclear or
14   doesn't make sense to you, just let me know.  If you
15   don't tell me that you don't understand the question,
16   I'm going to assume that you do understand the
17   question.  Is that fair?
18        A.  That's fair.
19        Q.  Okay.  Mr. Roque, you testified earlier today
20   about some interactions you had with the FTC that gave
21   you the impression that the FTC was expecting a certain
22   outcome in the assessment that Ernst & Young was
23   conducting relative to Twitter's compliance with the
24   consent order.  Do you recall that topic of testimony
25   from earlier today?
```

197

Roque

USA v. Twitter, Inc.                                        6/21/2023

1       A.  I do.

2           MS. COLLESANO:  Objection.  Mischaracterizes

3    the testimony.

4           BY MR. KOFFMANN:

5       Q.  Mr. Roque, was there a particular meeting that

6    you had with representatives from the FTC that gave you

7    that impression?

8       A.  Yes, there was.

9       Q.  Can you tell me when that meeting occurred?

10      A.  I believe there was discussion on an initial

11   meeting we had in December, early December with the

12   FTC, and then a secondary meeting that -- I can't

13   remember the timing.  It may have been end of January.

14      Q.  And that's December 2022?

15      A.  Yes, I apologize, December 2022.

16      Q.  And so just focusing on that December 2022

17   meeting, do you recall who attended that meeting?

18      A.  I don't.  I would have to going back and look

19   at the calendar invite.  It was the first time I had

20   talked to that group of individuals from the FTC.  I

21   know Reenah was there just because she did -- led most

22   of the discussion, and at the time, her -- there was a

23   gentleman, I believe it was her boss, but I can't

24   remember his name.  And then there was maybe two or

25   three other people from the FTC at that meeting.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                    6/21/2023

```
 1        Q.  You said that Ms. Kim did most of the talking.
 2   Did her -- the person you perceived to be her boss, did
 3   he speak as well?
 4        A.  He did.  He was engaged in part of the
 5   conversations.
 6        Q.  Did anybody else from the FTC make any comments
 7   that affected the impression that you received that the
 8   FTC had an expectation about what the outcome of your
 9   assessment would be or was it just Ms. Kim and her
10   boss?
11            MS. COLLESANO:  Objection.  Mischaracterizes
12   prior testimony.
13            MS. VANDRUFF:  You can answer.
14            THE WITNESS:  Okay.  I don't remember any of
15   the other individuals asking any significant questions.
16   They were mostly very tactical in nature if they did
17   ask a question.
18            BY MR. KOFFMANN:
19        Q.  Is it possible that Ms. Kim's boss, whom you
20   referred to, is James Kohm?
21        A.  I don't want to speculate.  I would have to go
22   and look at the invite and double check exactly who it
23   was.
24        Q.  Okay.  And what was it that representatives
25   from the FTC said in that meeting that gave you the
```

Roque

1    impression that you characterized earlier about their

2    expectation about the outcome of the order assessment

3    that Ernst & Young was conducting?

4            MS. COLLESANO:  Objection.  Mischaracterizes

5    prior testimony.

6            THE WITNESS:  The meeting in December was --

7    the meeting in December was more, from my recollection,

8    interesting in the standpoint of we were -- the FTC had

9    reached out.  They had wanted to talk to Ernst & Young

10   directly and see what information we knew about the

11   amount of change that was taking place in Twitter

12   during the month of November after the acquisition and

13   what we were seeing, with the assumption that we were

14   already on the ground and onsite and sort of executing

15   work.

16           As part of that, we informed them that we

17   hadn't actually executed any procedures.  We were

18   having some challenges in tracking down key contacts.

19   The information that we were getting was primarily

20   based from articles in the press, and you know, we were

21   trying to figure out what to do.  And I believe a

22   question was asked "what do you mean trying to decide

23   what to do?"  And we said, "well, we are trying to

24   consider everything from when can we start field work?

25   Where does this reside?  Are they going to fire us?"  I

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    mean, we just didn't know.

2            And one of the comments at that point was made

3    that Ernst & Young, under all circumstances, will be

4    conducting and issuing a report on behalf of the FTC

5    order.  So it was sort of like it was very adamant

6    about this is absolutely what you will do and this is

7    going to occur, and you'll produce a report at the end

8    of the day.

9            So for me, that was a bit surprising to be so

10   adamant about that not knowing what could have

11   transpired over the next six to seven months before

12   that report was due.

13           BY MR. KOFFMANN:

14   Q.  Just to be clear, I believe you testified

15   earlier, but correct me if this is not your testimony

16   or if this is not an accurate description of the sense

17   that you got based on your interactions with the FTC

18   but that you had the impression, based on your

19   conversations with the FTC, that the FTC expected that

20   the report that Ernst & Young would issue would

21   conclude or would have findings or, in other words,

22   would conclude that there were deficiencies in

23   Twitter's privacy and information security program?

24           MS. VANDRUFF:  Objection.  Misstates prior

25   testimony.

Roque

USA v. Twitter, Inc.                                        6/21/2023

1          You may answer the question.

2          MS. COLLESANO:  Objection.  Vague.

3          THE WITNESS:  You are correct.  I apologize.  I

4    stopped to see if you had questions and I didn't

5    finish.  Your broader question of what happened, there

6    was sort of two meetings.  That was the first one in

7    December, which was sort of expectations were

8    definitely set from that meeting.

9          And then I forget the second meeting we had in

10   January where they were asking about the extent of our

11   procedures and the results.  And at that meeting, I

12   believe, they started providing areas that they were

13   expecting us to look at.  They had given us a list of

14   specificity of the types of procedures they were

15   expecting us to execute, and they also said -- that was

16   the meeting where it was communicated that they would

17   expect Ernst & Young to have findings or exceptions or

18   negative results in certain areas based on what they

19   already understood from an operational standpoint,

20   based on information Twitter had provided, and that if

21   we ended up producing a report that didn't have

22   findings in those areas, that they would be surprised,

23   and they would be definitely following up with us to

24   understand why we didn't -- why we reached the

25   conclusions we did if they were sort of not reflecting

Roque
USA v. Twitter, Inc.                                                6/21/2023

```
 1    gaps in the controls.
 2          BY MR. KOFFMANN:
 3    Q.   So the expectation that the FTC conveyed about
 4    the results of the assessment and what would happen if
 5    Ernst & Young concluded its work without making
 6    findings or exceptions, that was communicated not at
 7    the initial meeting in December, but only at the
 8    subsequent meeting; is that correct?
 9    A.   That's correct.
10    Q.   So let's go back to the December meeting.
11    During that meeting, what was conveyed to you was that
12    the FTC had a definite expectation that Ernst & Young
13    would issue a report; is that correct?
14    A.   That's correct.
15    Q.   And I believe you said before that you found
16    that surprising; is that right?
17    A.   Surprising from the standpoint of there was so
18    much change going on, there was press communications
19    about the company going through and firing a variety of
20    providers on a variety of fronts, that there was -- I
21    don't think it was unreasonable for somebody to come
22    along and say "we are not going to use Ernst & Young
23    for this; fire them and go get somebody else."  It was
24    just speculation, I guess, but the FTC was very adamant
25    that it would be Ernst & Young.  And I sort of stepped
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

203

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    back and said "a lot is going on; who knows."  I didn't
2    say that to them.  That was sort of what I thought.
3         Q.  Did the possibility that Ernst & Young would
4    not complete the assessment come up at that December
5    meeting?
6         A.  No, I don't believe it did.
7         Q.  Okay.  Anything else that happened in that
8    December meeting that gave you the impression that the
9    FTC had expectations about what Ernst & Young would
10   conclude in its order assessment engagement?
11        A.  Not on a conclusion standpoint in the December
12   the meeting.
13        Q.  Did anything else happen at the December
14   meeting that you would characterize as unusual?
15           MS. VANDRUFF:  Objection.  Vague.
16           You may answer.
17           THE WITNESS:  For me, yes.  There was a level
18   of specificity on the execution of very specific types
19   of procedures that they expected to be performed.  It
20   was almost as if they were giving us components of our
21   audit program to execute.
22           BY MR. KOFFMANN:
23        Q.  And why was that unusual?
24        A.  Because I usually wouldn't have a third
25   party -- well, having a third party is an unusual

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    situation in general for providing a test report.  But

2    if a third party usually wants a specific procedure

3    performed, then that type of engagement usually would

4    not be a testing engagement.  We would call it agreed

5    upon procedures, where all the parties involved in

6    getting the report would agree on the specific

7    procedures to be executed so that they all agree that

8    they would be done for the particular needs and wants

9    of the users of the report.

10          The other component of that was a little

11   unusual -- the other component of that report was that

12   the -- our approach is you look at the processes and

13   controls.  So we say, "okay, how does security operate?

14   How does the user administration process manage?  How

15   are changes developed and pushed to production?"  And

16   we look at the controls in those.

17          The requests we were looking at were very

18   specific of, you know, going across the entire service

19   to execute certain commands to make sure certain

20   settings were existing or not, for example.  And as

21   auditors, they are not specifically required or there's

22   a need to based on a perceived risk, we, once again,

23   audit for the processes and controls that mitigate the

24   general risks.  Not going into some of the one-offs,

25   very specific details they were asking us about.

Roque

USA v. Twitter, Inc.                                      6/21/2023

1      Q.  Okay.

2      A.  Sorry if that was confusing.

3      Q.  No, no, it's helpful.  Let's move to the second

4  meeting that you referred to before that I believe you

5  said your best recollection is that it occurred

6  sometime in January of 2023.  Do you have --

7      A.  That's correct.

8      Q.  Do you have in mind the meeting that I'm

9  referring to?

10     A.  I believe so, yes.

11     Q.  And it was during that meeting that

12  representatives from the FTC expressed that they

13  believed Ernst & Young's assessment would lead to

14  findings or exceptions about Twitter's compliance with

15  the consent order?

16         MS. COLLESANO:  Objection.  Mischaracterizes

17  prior testimony.

18         MS. VANDRUFF:  Same objection.

19         You may answer the question, Mr. Roque.

20         THE WITNESS:  That was my personal opinion when

21  I walked away from the meeting.

22         BY MR. KOFFMANN:

23     Q.  Who was at that meeting?

24     A.  I know I was at the meeting, and I believe

25  Rebecca Lubens, our internal counsel, EY counsel was on

Roque

USA v. Twitter, Inc.                                    6/21/2023

1    the call with the FTC.

2         Q.   And do you recall who from the FTC attended?

3         A.   I would have to go back and look again.

4         Q.   Was Ms. Kim in that meeting?

5         A.   I believe she was.

6         Q.   Was the same person who you characterized

7    earlier as her boss in that meeting?

8         A.   No, I don't believe the gentleman joined that

9    meeting.

10        Q.   Okay.  Do you recall how many people from the

11   FTC attended?

12        A.   This was a smaller group.  I think it was two

13   or three.  I just remember a second gentleman only

14   because he had recently joined the FTC and had

15   communicated on introductions he had only been there a

16   week.

17        Q.   And what did the representatives from the FTC

18   say that gave you the impression that they expected

19   that there would be findings in Ernst & Young's report?

20        A.   It was along the lines of there's certain areas

21   that I took away that they believe were already not

22   working correctly and that they wanted to -- or so they

23   had an expectation up front that those areas would be

24   the ones that we would also have similar findings if we

25   conducted the procedures.

207

Roque

USA v. Twitter, Inc.                                    6/21/2023

1       Q.   Anything else that occurred during that meeting
2   that gave you the impression that the FTC expected that
3   there would be findings in Ernst & Young's report?
4       A.   No.
5       Q.   Is there anything, aside from what occurred
6   during the two meetings that we've just discussed, that
7   gave you the impression that the FTC expected there
8   would be findings in Ernst & Young's report?
9       A.   No.  It was primarily that January meeting.
10      Q.   Do you know whether any other Ernst & Young
11  representative met with the FTC regarding Ernst &
12  Young's order assessment engagement?
13      A.   I know Rebecca Lubens occasionally had
14  conversations with them to provide them sort of updates
15  of what was transpiring.
16      Q.   And without revealing the substance of any
17  communications that you had with Ms. Lubens, did she
18  report to you afterwards about those meetings?
19          MS. VANDRUFF:  So just I'm going to caution
20  Mr. Roque that that is a yes-or-no question, that you
21  can answer with a yes or a no.
22          THE WITNESS:  Yes.
23          BY MR. KOFFMANN:
24      Q.   And again, yes or no, did those reports include
25  purely statements that the FTC representatives had made

Roque

USA v. Twitter, Inc.                                      6/21/2023

1   during those meetings without her analysis or

2   impressions of the meaning of those statements?

3            MS. VANDRUFF:  Counsel, any communication from

4   Ms. Lubens to Mr. Roque, I don't know that he's in a

5   position to know whether they include her analysis or

6   otherwise, so I'm going to instruct him not to answer

7   that question on the basis of attorney-client

8   privilege.

9            MR. KOFFMANN:  Okay.  I don't think that that's

10  the law.  We don't have to debate that now.  But I do

11  think for purposes of the record, that I'm entitled to

12  ask a few more questions that will be yes or no, and

13  you'll give whatever instructions you deem appropriate.

14           MS. VANDRUFF:  Okay.

15           BY MR. KOFFMANN:

16      Q.  Mr. Roque, is it true that you are not in a

17  position to evaluate whether Ms. Lubens reported to you

18  statements that FTC representatives had made to her

19  without her impressions or opinions about those

20  statements?

21           MS. VANDRUFF:  You can answer yes or no.

22           THE WITNESS:  I'm sorry, you were being so

23  careful to ask the question, I'm not sure I --

24           BY MR. KOFFMANN:

25      Q.  It's a complicated question.  So I apologize

Roque

USA v. Twitter, Inc.                                    6/21/2023

1   for that.  Let me see if I can make it a little bit

2   simpler.

3        I asked you a question a minute ago, and your

4   counsel instructed you not to answer.  And as I

5   understand the basis for her instruction was that you

6   were not in a position to know whether what Ms. Lubens

7   was telling you about her communications with the FTC

8   included her thoughts and opinions about those

9   interactions or if she was just reporting to you "this

10  is what they told me."

11       So my question to you, is that true?  Are you

12  able to distinguish between whether Ms. Lubens was just

13  telling you "I spoke to the FTC today and they said X,

14  Y and Z" as opposed to a report to you that

15  incorporated her thoughts and impressions about her

16  interactions with the FTC?

17       MS. VANDRUFF:  And Dan, I'm just going to

18  object again that I think you are asking Mr. Roque to

19  read Rebecca's mind, and that isn't fair to Mr. Roque.

20  But if he's able to answer the question, I'll allow him

21  to.

22       And if you want the court reporter to read back

23  what Mr. Koffmann just said, she can do that.

24       THE WITNESS:  I don't think I can answer that

25  question.

210

Roque

USA v. Twitter, Inc.                                    6/21/2023

    1          BY MR. KOFFMANN:
    2     Q.   Okay.  Do you have any reason to believe
    3   that -- well, let me move to a different topic, which
    4   is as part of your 30 years working at Ernst & Young,
    5   30-plus years, has part of your practice been to
    6   interact with government regulators?
    7     A.   Yes.
    8     Q.   Is that something that you do on a weekly
    9   basis?
   10     A.   No.
   11     Q.   On a yearly basis?
   12     A.   Yes.
   13     Q.   How many engagements -- if you had to estimate,
   14   how many engagements have you been involved in that
   15   have involved interactions with government regulators?
   16     A.   Approximately 20.
   17     Q.   In any of those prior approximately 20
   18   engagements, have your interactions with the regulator
   19   given you the impression that the regulator had
   20   expectations that Ernst & Young would have findings or
   21   exceptions in a report that Ernst & Young would issue?
   22     A.   No, but I feel obligated to clarify most of
   23   those regulatory interactions would be with the PCOB.
   24   And so those type of interactions are very different
   25   from this particular engagement.

211
Roque
USA v. Twitter, Inc.                                          6/21/2023

1       Q.  Are there any engagements that you personally
2   have been involved in that you would characterize as
3   similar to the Twitter order assessment engagement?
4       A.  No.
5       Q.  When the FTC conveyed to you their expectation
6   that there would be findings in Ernst & Young's report,
7   did you discuss that with any of your colleagues at
8   Ernst & Young or at any other firm?
9           MS. COLLESANO:  Objection.  Mischaracterizes
10  prior testimony.
11          MS. VANDRUFF:  You may answer.
12          THE WITNESS:  Yes.
13          BY MR. KOFFMANN:
14      Q.  In my next question I don't want you to tell me
15  about communications you had with attorneys for Ernst &
16  Young.  So with the exception of any attorneys for
17  Ernst & Young, did you discuss with anybody else
18  whether they had experience or been involved in an
19  engagement where a government regulator expressed their
20  expectation that an auditor or an accounting firm or an
21  assessor would have findings or exceptions in a report
22  that they would be issuing?
23          MS. VANDRUFF:  Mr. Roque, I caution you that in
24  responding to counsel's question that you not provide
25  any information that involves communication with an

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Roque

USA v. Twitter, Inc.                                      6/21/2023

```
 1   attorney for Ernst & Young.
 2           THE WITNESS:  I'll clarify if I understood the
 3   question correctly, Mr. Koffmann, you said excluding
 4   conversations with legal.  So there was no other
 5   communications that I had with other individuals that
 6   were not legal counsel around this area.
 7           BY MR. KOFFMANN:
 8      Q.   So the only communications that you had about
 9   the FTC's expectation that Ernst & Young's report would
10   have findings or exceptions, those were only with
11   attorneys for Ernst & Young?
12      A.   That's correct.
13      Q.   And then I just want to make sure I have the
14   chronology right on the week before Ernst & Young
15   communicated to Twitter that it was resigning.  That
16   occurred on February 27th; is that correct?
17      A.   The actual communication to Twitter, yes.
18      Q.   And the decision had been made on either the
19   20th or the 21st?
20      A.   That's correct.
21           MS. VANDRUFF:  Objection.  Misstates prior
22   testimony.
23           THE WITNESS:  Yes, it was made earlier in that
24   week.
25           BY MR. KOFFMANN:
```

213

Roque

USA v. Twitter, Inc.                                              6/21/2023

1      Q.  Do you recall when earlier in that week?

2      A.  A few days prior.

3      Q.  At the time that Ernst & Young decided it would

4  be terminating Twitter, were there still outstanding

5  invoices?

6      A.  I don't know.  I would have to go and pull the

7  records of when the payments were received.

8      Q.  Let's take a look at Exhibit 18.

9      A.  Is this coming through the same tool?

10     Q.  Yes.  So this is the exhibit that counsel for

11 the FTC marked as Exhibit 18 and has a Bates label

12 EY_FTC_0002802.  It's an e-mail from Yvette Yeo on

13 February 24, 2023, to David Roque, copying Ryan

14 Walkenhorst.

15     A.  Yes.

16     Q.  Do you have that in front of you?

17     A.  I do.

18     Q.  And we looked at this before obviously.  Does

19 this refresh your recollection -- well, withdrawn.

20          As of February 24th, had Ernst & Young been

21 paid by Twitter or were there still outstanding

22 invoices?

23     A.  Based on the message, I believe the invoices

24 for our system were still showing as outstanding.

25     Q.  Do you know whether the decision to terminate

Roque

USA v. Twitter, Inc.                                          6/21/2023

1    Twitter had been made prior to this e-mail?

2        A.  I believe yes.

3        Q.  Did Ernst & Young receive payment for

4    outstanding invoices after this e-mail but prior to

5    your conversation with Christian Dowell in which you

6    informed him that Ernst & Young was resigning?

7            MS. VANDRUFF:  Objection.  Asked and answered.

8            You may answer the question.

9            THE WITNESS:  I would have to go back and look

10   at the day the payments were posted.

11           BY MR. KOFFMANN:

12       Q.  Did you communicate to Mr. Dowell that Ernst &

13   Young was resigning before you were informed that Ernst

14   & Young had been paid its outstanding invoices?

15           MS. VANDRUFF:  Objection.  Asked and answered.

16           You may answer the question.

17           THE WITNESS:  I don't, no.  Sorry.  Not I don't

18   know.  Just no.

19           BY MR. KOFFMANN:

20       Q.  So you did not inform Mr. Dowell that Ernst &

21   Young was resigning until after you had been informed

22   that Ernst & Young had been paid?

23       A.  No, that's not correct.

24           MS. COLLESANO:  Mischaracterizes testimony.

25           MR. KOFFMANN:  I was not characterizing his

215

Roque

USA v. Twitter, Inc.                                              6/21/2023

1    testimony.  I was asking a question.

2            BY MR. KOFFMANN:

3        Q.  Please continue, Mr. Roque.

4        A.  We had set up a meeting with Christian Dowell

5    on the 27th to communicate our resignation.  On the day

6    of that meeting, I had no idea whether or not the

7    payments had been received or not.

8            MR. KOFFMANN:  Understood.  That's all I have.

9    Thank you, Mr. Roque.

10           MS. VANDRUFF:  I would like to take a short

11   break.

12           (A recess was taken.)

13                       EXAMINATION

14           BY MS. VANDRUFF:

15       Q.  Mr. Roque, I would like to ask you about the

16   document that Ms. Collesano marked as Exhibit 7, which

17   was Bates labeled EY_FTC_0007423.  Can you take a

18   moment to review that.

19       A.  Yes, I have it open.

20       Q.  And do you remember addressing this document

21   with counsel for the FTC?

22       A.  Yes, I do.

23       Q.  And attached to your e-mail to Mr. Penler were

24   talking points that, as you described for counsel for

25   the FTC, you had drafted; is that correct?

Roque

USA v. Twitter, Inc.                                              6/21/2023

1        A.   Yes, I believe so.

2        Q.   Did you consult with counsel for Ernst & Young

3   in drafting those talking points?

4        A.   Yes.

5        Q.   Was counsel for Ernst & Young with whom you

6   consulted Ms. Lubens?

7        A.   Yes.

8        Q.   And was the purpose of consulting with

9   Ms. Lubens for seeking her advice?

10       A.   Yes.

11            MS. VANDRUFF:   I have no further questions.

12            MS. COLLESANO:   Thanks, Mr. Roque.   I don't

13   have any further questions right now.   We really

14   appreciate your time testifying today.

15            (Reading and signature not waived.)

16            (Whereupon, the proceedings at 8:22 p.m.,

17   Eastern, were concluded.)

18

19

20

21

22

23

24

25

217

Roque

USA v. Twitter, Inc.                                                    6/21/2023

```
 1      C E R T I F I C A T I O N   O F   R E P O R T E R
 2           DOCKET/FILE NUMBER: C4316
 3           CASE TITLE:  USA V. TWITTER, INC.
 4           DATE:  JUNE 21, 2023
 5
 6           I HEREBY CERTIFY that the transcript
 7      contained herein is a full and accurate transcript of
 8      the notes taken by me at the hearing on the above cause
 9      before the FEDERAL TRADE COMMISSION to the best of my
10      knowledge and belief.
11
12                          DATED:  6/26/23
13
14
15                          DEBORAH WEHR, RPR
16
17
18
19
20
21
22
23
24
25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

218

Roque

USA v. Twitter, Inc.                                    6/21/2023

```
 1                   CERTIFICATE OF DEPONENT
 2           I hereby certify that I have read and
 3      examined the foregoing transcript, and the same is a
 4      true and accurate record of the testimony given by me.
 5           Any additions or corrections that I feel are
 6      necessary, I will attach on a separate sheet of paper
 7      to the original transcript.
 8
 9                         _____
10                         DAVID ROQUE
11           I hereby certify that the individual
12      representing himself/herself to be the above-named
13      individual, appeared before me this
14      _____ day of _____, 2023, and
15      executed the above certificate in my presence.
16
17           _____
18      NOTARY PUBLIC IN AND FOR
19           _____
20      MY COMMISSION EXPIRES:
21           _____
22
23
24
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

219

Roque

USA v. Twitter, Inc.                                         6/21/2023

```
 1    WITNESS:  DAVID ROQUE
 2    DATE:  JUNE 21, 2023
 3    CASE:  USA V. TWITTER, INC.
 4
 5          Please note any errors and the corrections
 6    thereof on this errata sheet.  Do not write on the
 7    transcript.  The Rules require a reason for any change
 8    or correction.  It may be general, such as "To correct
 9    stenographic error," or "To clarify the record," or "To
10    conform with the facts."
11    PAGE LINE        CORRECTION        REASON FOR CHANGE
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```