BRIAN M. BOYNTON, Principal Deputy Assistant Attorney General
ARUN G. RAO, Deputy Assistant Attorney General
AMANDA N. LISKAMM, Director
LISA K. HSIAO, Assistant Director
HILARY K. PERKINS, Assistant Director
SCOTT P. KENNEDY, Trial Attorney (DCBN 1658085)
ZACHARY L. COWAN, Trial Attorney (NCBN 53432)

> U.S. Department of Justice
> Civil Division
> Consumer Protection Branch
> 450 5th Street NW, Suite 6400-S
> Washington, DC 20530
> Telephone: (202) 305-1837
> Scott.P.Kennedy@usdoj.gov
> Zachary.L.Cowan@usdoj.gov

ISMAIL J. RAMSEY, United States Attorney (CABN 154284)
MICHELLE LO, Chief, Civil Division (NYBN 4325163)
SHARANYA MOHAN, Assistant United States Attorney (NYBN 5027768)
EMMET P. ONG, Assistant United States Attorney (NYBN 4581369)

> Northern District of California
> 450 Golden Gate Avenue
> San Francisco, California 94102
> Telephone: (415) 436-7198
> sharanya.mohan@usdoj.gov
> emmet.ong@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TWITTER, INC., a corporation,<br><br>Defendant. | Case No. 3:22-cv-3070-TSH<br><br>**OPPOSITION TO X CORP.'S MOTION FOR PROTECTIVE ORDER & RELIEF FROM CONSENT ORDER**<br><br>Hearing Date: November 16, 2023<br>Hearing Time: 11:00 AM<br><br>The Hon. Thomas S. Hixson |

1

**TABLE OF CONTENTS**

2

INTRODUCTION ........................................................................................................................ 1

3

STATEMENT OF THE ISSUES TO BE DECIDED .............................................................. 3

4

BACKGROUND ...................................................................................................................... 3

5

I.   Procedural Background ...................................................................................................... 3

6

   A.  The 2011 Administrative Order ................................................................................. 3

7

   B.  The 2022 Administrative Order And Stipulated Order ............................................ 4

8

II.  FTC Staff's Compliance Monitoring Efforts ................................................................... 5

9

   A.  X Corp.'s Numerous Layoffs, Terminations, And Resignations ........................... 5

10

   B.  Musk's Conduct ........................................................................................................ 7

11

   C.  Resignation Of X Corp.'s Assessor ......................................................................... 9

12

ARGUMENT ......................................................................................................................... 11

13

I.   X Corp.'s Prospective Obligations Cannot Be Terminated Under Rule 60(b) Because They Flow

14

   From The FTC's Administrative Order And Not The Court's Stipulated Order ............... 11

15

II.  X Corp.'s Allegations Also Fail To Meet The Standards for Relief Under Rule 60(b) .................. 13

16

   A.  X Corp. Has Not Met The Standard For Modification Or Termination Under Rule

17

      60(b)(5) ................................................................................................................... 13

18

     1.  X Corp. Has Not Shown That A Significant Change Warrants Modification ...................... 14

19

     2.  X Corp. Has Not Shown That Compliance With The Decree Is More Onerous,

20

       Unworkable, Or Detrimental To The Public Interest ........................................................ 19

21

     3.  X Corp. Has Not Shown That Its Proposed Modification Is Suitably Tailored .................... 20

22

     4.  X Corp.'s Alternative Request For Discovery Is Meritless. ............................................ 21

23

   B.  X Corp. Is Not Entitled To Relief Under Rule 60(b)(6) ............................................ 22

24

III. X Corp. Is Not Entitled To A Protective Order To Prevent Musk From Testifying .................... 23

25

CONCLUSION ...................................................................................................................... 25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Cases:**

3   *Apple Inc. v. Samsung Elecs. Co., Ltd,*

4       82 F.R.D. 259 (N.D. Cal. 2012) .............................................................................24-25

5   *Atl. Ref. Co. v. FTC,*

6       381 U.S. 357 (1965) .................................................................................................. 13

7   *Axon Enter., Inc. v FTC,*

8       143 S. Ct. 890 (2023)................................................................................................ 13

9   *Banister v. Davis,*

10      140 S. Ct. 1698 (2020)............................................................................................. 12

11  *Bldg. & Const. Trades Council of Philadelphia & Vicinity, AFL-CIO v. NLRB,*

12      64 F.3d 880 (3d Cir. 1995)....................................................................................... 19

13  *Civ. Investigative Demands Dated June 30, 2022, to Amazon.com, Inc. & Certain Current  .&*

14      *Former Amazon Emps.*, No. 212-3050, 2022 WL 4483142 (FTC Sept. 21, 2022) .........24

15  *Cobell v. Norton,*

16      237 F. Supp. 2d 71 (D.D.C. 2003) ......................................................................17-18

17  *Delay v. Gordon,*

18       475 F.3d 1039 (9th Cir. 2007)................................................................................. 12

19  *Deuss v. Siso*, No. 14-cv-00710-YGR (JSC),

20      2014 WL 4275715 (N.D. Cal. Aug. 29, 2014)............................................................22

21  *Elmo Co. v. FTC,*

22      389 F.2d 550 (D.C. Cir. 1967) ................................................................................. 12

23  *FTC v. Bisaro,*

24      757 F. Supp. 2d 1 (D.D.C. 2010) ..............................................................................24

25  *FTC v. Invention Submission Corp.,*

26      965 F.2d 1086 (D.C. Cir. 1992) ................................................................................24

27  *FTC v. Rockefeller,*

28      591 F.2d 182 (2d Cir. 1979)......................................................................................15

*Genuine Parts Co. v. FTC*,

    445 F.2d 1382 (5th Cir. 1971) ......................................................................22

*Hermetic Order of Golden Dawn, Inc. v. Griffin*,

    No. 08-16904, 400 Fed. App'x. 166 (9th Cir. 2010) (unpublished) ...............22

*Horne v. Flores*,

    557 U.S. 433 (2009) .......................................................................................20

*Joe Hand Promotions, Inc. v. Rangee*,

    No. 2:13-cv-00939, 2013 WL 6859001 (E.D. Cal. Dec. 24, 2013) (unpublished) ......22-23

*Keeling v. Sheet Metal Workers Int'l Ass'n, Local Union 162*,

    937 F.2d 408 (9th Cir. 1991) ....................................................................22-23

*Mohr v. FTC*,

    272 F.2d 401 (9th Cir. 1959) .........................................................................13

*Moon v. GMAC Mortgage Corp.*,

    08-cv-969, 2008 WL 4741492 (W.D. Wash. Oct. 24, 2008) ..........................19

*NLRB v. Harris Teeter Supermarkets*,

    215 F.3d 32 (D.C. Cir. 2000) .........................................................................20

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*,

    13 F.3d 33 (2d Cir. 1993) ..............................................................................21

*Rettinger v. FTC*,

    392 F.2d 454 (2d Cir. 1968) ..........................................................................13

*Rufo v. Inmates of Suffolk Cnty. Jail*,

    502 U.S. 367 (1992) ................................................................................. 13, 18

*Sawka v. Healtheast, Inc.*,

    989 F.2d 138 (3d. Cir. 1993) .........................................................................23

*SEC v. Coldicutt*,

    258 F.3d 939 (9th Cir. 2001) .........................................................................20

*SEC v. McGoff*,

    647 F.2d 185 (D.C. Cir. 1981) ......................................................................22

*SEC v. Musk,*

    No. 22-1291, 2023 WL 3451402 (2d Cir. 2023) (unpublished) ......................14-15, 20-21

*SEC v. Musk,*

    No. 18-cv-8865, 2022 WL 1239252 (S.D.N.Y. Apr. 27, 2022) ................................ 15, 18

*Stewart v. General Motors Corp.,*

    756 F.2d 1285 (7th Cir. 1983) ...................................................................................21

*T.Y. v. Bd. of Cnty. Comm'rs of Cnty. of Shawne*e,

    912 F. Supp. 1424 (D. Kan. 1996) .............................................................................17

*United States v. Alpine Land & Reservoir Co.,*

    984 F.2d 1047 (9th Cir. 1993) ...................................................................................22

*United States v. Apple Inc.,*

    787 F.3d 131 (2d Cir. 2015) ......................................................................................17

*United States v. Asarco Inc.,*

    430 F.3d 972 (9th Cir. 2005) ...................................................................12-13, 18-21

*United States v. Church of Scientology of California,*

    520 F.2d 818 (9th Cir. 1975) ....................................................................................22

*United States v. City of Albuquerque,*

    1:14-cv-1025, 2017 WL 5508519 (D.N.M. Nov. 16, 2017) ..........................................17

*United States v. Eastman Kodak Co.,*

    63 F.3d 95 (2d Cir. 1995) ....................................................................................21, 23

*United States v. Fensterwald,*

    553 F.2d 231 (D.C. Cir. 1977) ..................................................................................22

*United States v. Gallegos-Curiel,*

    681 F.2d 1164 (9th Cir. 1982) ...................................................................................15

*United States v. Louisiana-Pac. Corp.,*

    754 F.2d 1445 (9th Cir. 1985) ...................................................................................13

*United States v. Louisiana-Pac. Corp.,*

    967 F.2d 1372 (9th Cir. 1992) ...................................................................................13

*United States v. Swift & Co.*,
  189 F. Supp. 885 (N.D. Ill. 1960)....................................................................................19

*United States v. Turner*,
  No. 3:13-cv-1827, 2022 WL 1570741 (S.D. Cal. May 17, 2022)....................................21

*W. Watersheds Project v. Bennett*,
  No. 04-cv-181, 2008 WL 2003114............................................................................21, 23

*X Corp. v. Ernst & Young, LLP*,
  No. 1:23-mc-82 (D.D.C. Aug. 25, 2023).....................................................................21-22

**Statutes, Rules, and Regulations:**

Federal Rules of Civil Procedure
  Fed. R. Civ. P. 26(d)..................................................................................................22
  Fed. R. Civ. P. 26(f)...................................................................................................21
  Fed. R. Civ. P. 60(b)...........................................................................................*passim*
  Fed. R. Civ. P. 60(b)(5).......................................................................................*passim*
  Fed. R. Civ. P. 60(b)(6).......................................................................................*passim*

Federal Trade Commission Act
  15 U.S.C. § 45(a).................................................................................................3, 12
  15 U.S.C. § 45(b) ............................................................................................4, 12-13
  15 U.S.C. § 45(c).....................................................................................................13
  15 U.S.C. § 45(*l*) ......................................................................................................4
  15 U.S.C. § 49..........................................................................................................21

**Other Authorities:**

B. Lee, Fake Eli Lilly Twitter Account Claims Insulin Is Free, Stock Falls 4.37%
  (Nov. 12, 2022), *Forbes*, https://perma.cc/CJB3-E2TG......................................................9

F. Siddiqui, Twitter Brings Elon Musk's Genius Reputation Crashing Down to Earth
  (Dec. 24, 2022), *The Washington Post*, https://perma.cc/7HLF-ELH9 .............................7

M. Toh & J. Liu, Elon Musk Says He's Cut About 80% of Twitter's Staff
  (Apr. 12, 2023), *CNN Business*, https://perma.cc/UB6E-K4XM.....................................14

**INTRODUCTION**

After agreeing last year to settle charges that it once again misled consumers about the privacy and security of their information, X Corp. (formerly Twitter, Inc.)[1] now seeks to jettison that agreement and limit further scrutiny of its data practices. X Corp.'s motion is meritless and should be denied.

In 2011, the Federal Trade Commission ("FTC" or "Commission") accused X Corp. of deceptively misrepresenting its data privacy and security practices to users. X Corp. agreed to resolve those allegations through an FTC administrative order ("2011 Administrative Order"), which barred it from making similar misrepresentations in the future. In 2022, the FTC referred this lawsuit for civil penalties and injunctive relief to the U.S. Department of Justice, alleging X Corp. had again misrepresented its data practices, violating the 2011 Administrative Order. The parties resolved these new allegations through a Stipulated Order by which X Corp. agreed to pay a $150 million civil penalty and consented to modifying the 2011 Administrative Order. After the Court entered the Stipulated Order, the Commission modified the administrative order to reflect the terms to which X Corp. consented ("2022 Administrative Order").

The 2022 Administrative Order was designed to ensure X Corp. protects its users' privacy and secures their data. For example, the order requires X Corp. to implement and maintain a privacy and data security program. It also requires the company to provide information about its compliance to the FTC upon request. In seeking "relief" from these obligations, X Corp. does not argue that the safeguards to which it consented have become unnecessary or unworkable. Rather, it complains the FTC asked too many questions after Elon Musk acquired the company. But the FTC asked questions because of sudden, radical changes at the company: within weeks of the acquisition, half of X Corp.'s employees were terminated or resigned, including key executives in privacy, data security, and compliance roles. At Musk's urging, the company hastily released a new version of a product that it abruptly pulled back within days of its release. And numerous reports detailed alarming site outages, product malfunctions, and issues with data access controls. The FTC had every reason to seek information about whether these developments signaled a lapse in X Corp.'s compliance. X Corp.'s motion does not credibly argue otherwise; in fact, it largely fails to acknowledge the circumstances that catalyzed the FTC's requests.

---

[1] The name of the company was changed in April 2023. For ease of reference, this Opposition uses the name "X Corp." to refer to the company both before and after the name change.

Instead, the company's motion rests on hyperbolic allegations of "witness tampering" and an investigation "tainted by bias." It supports these accusations by mischaracterizing cherry-picked excerpts from the deposition of a partner at Ernst & Young ("EY"), the firm X Corp. initially retained to assess its privacy and data security program pursuant to the 2022 Administrative Order. Yet X Corp. fails to mention that EY chose to terminate its engagement in February 2023 due to the extensive departures within, and a lack of support from, X Corp. Nor does X Corp. acknowledge that it has since retained a new independent assessor, which renders immaterial the company's allegations regarding EY, since EY never produced a report of X Corp.'s program or submitted one to the FTC.

X Corp.'s motion now seeks to use Federal Rule of Civil Procedure 60(b) to discard the entire framework to which it agreed in 2022. This drastic remedy must be denied for multiple reasons. *First*, as a threshold matter, the requested relief—termination of this Court's Stipulated Order—would have no effect on the company's ongoing obligations under the FTC's separate 2022 Administrative Order. And even if the Court construed the motion as a request to terminate the FTC's administrative order, the Court would lack authority to grant it because X Corp. did not first seek that relief from the Commission itself.

*Second*, even if the compliance obligations to which X Corp. objects were part of the Stipulated Order, relief would be unwarranted because the company's motion does not meet the standard for modification of a judicial decree under Rule 60(b)(5). The company has not identified a change in circumstances that renders the order's safeguards unworkable or contrary to the public interest. Nor has X Corp. offered any argument that its sole proposed modification—outright termination—is suitably tailored to address its complaints. The company also fails to identify extraordinary circumstances warranting relief under Rule 60(b)(6) because, even if true, X Corp.'s accusations fall far short of showing complete frustration of the parties' settlement agreement. The Court should likewise reject X Corp.'s attempt to interfere in the FTC's investigation through premature discovery.

*Finally*, X Corp. is not entitled to a protective order staying the deposition of Musk. Contrary to X Corp.'s assertions, Musk has unique, first-hand knowledge about the current state and direction of the company's data practices and efforts to comply with the 2022 Administrative Order.

For these reasons, X Corp.'s Motion for Protective Order and Relief from Consent Order, ECF No. 17, should be denied.

**STATEMENT OF THE ISSUES TO BE DECIDED**

1.     Whether Rule 60(b) authorizes the district court to terminate obligations imposed by the FTC via a valid FTC administrative order, contrary to Congress's express statutory determination that the Commission shall decide whether to terminate an FTC administrative order in the first instance.

2.     Whether a judicial decree should be terminated under Rule 60(b)(5) where the movant has neither shown a significant change in circumstances rendering compliance more onerous, unworkable, or against the public interest, nor that termination is tailored to address the movant's complaints.

3.     Whether a settlement should be set aside under Rule 60(b)(6) where the movant has not shown a complete frustration of the parties' agreement.

4.     Whether this Court should grant a protective order staying the deposition of a corporate executive who has first-hand knowledge of his company's compliance with an FTC administrative order.

**BACKGROUND**

**I.     <u>Procedural Background</u>**

The instant motion arises out of binding agreements that X Corp. made with the FTC, in 2011 and again in 2022, to resolve charges that X Corp. deceptively misrepresented the extent to which it protected the data of its users. The first resulted in the 2011 Administrative Order, and the second in this Court's Stipulated Order and the 2022 Administrative Order. The FTC's current investigation into X Corp. is occurring pursuant to the agency's compliance monitoring authority under the 2022 Administrative Order.

**A.     The 2011 Administrative Order**

X Corp. operates a social media network that is used by hundreds of millions of users around the world. In 2011, the Commission issued an administrative complaint alleging X Corp. was engaging in deceptive practices that violated the FTC Act, 15 U.S.C. § 45(a). *See* 2011 Complaint, ECF No. 1-2 at 6.[2] The heart of that deception was X Corp.'s statements to those users about its data security practices. *Id.* Specifically, the complaint alleged that X Corp. misled its users by claiming it had adopted appropriate measures to protect their nonpublic information and honor their privacy choices, when in fact X Corp. had failed to do so. *Id.* at 4-6. Multiple intruders exploited these lapses to access users' information. *Id.*

---

[2] Except where otherwise noted, in all quotations, emphases have been added, and internal alteration marks, citations, and footnotes have been omitted.

1    X Corp. settled those allegations in 2011 by agreeing to an administrative cease-and-desist order,

2    15 U.S.C. § 45(b). *See* 2011 Administrative Order, ECF No. 1-1. Among other things, that order prohibited

3    X Corp. from misrepresenting the extent to which it maintained and protected the confidentiality, security,

4    privacy, or integrity of nonpublic consumer information. *Id.* at 3. It also required X Corp. to establish and

5    maintain a comprehensive data security program to protect users' nonpublic information, and to obtain

6    periodic third-party assessments of that program. *Id.* at 4-5.

7         **B.**     **The 2022 Administrative Order And Stipulated Order**

8         In 2022, the Commission referred a new complaint against X Corp. to the U.S. Department of

9    Justice, alleging that the company had engaged in multiple violations of the 2011 Administrative Order

10    and the FTC Act by again misrepresenting its measures to protect the privacy and security of nonpublic

11    consumer information. *See* 2022 Complaint, ECF No. 1. Specifically, the complaint alleged X Corp. told

12    users it was collecting their telephone numbers and email addresses to enable certain security features,

13    when in fact that information was also used to target users with advertisements. *Id.* at 14-18. Moreover,

14    certain international privacy standards prohibit companies from processing users' personal information in

15    a manner incompatible with the stated purposes for which it was collected. The complaint alleged that X

16    Corp. claimed to adhere to those standards, but its practices plainly violated them. *See id.*

17         The Department of Justice accepted the Commission's referral and filed this lawsuit for civil

18    penalties and injunctive relief under the FTC Act. X Corp. agreed to resolve the allegations against it

19    according to the terms set forth in the Stipulated Order. *See* Stipulated Order, ECF No. 11. As part of that

20    settlement, X Corp. agreed to pay a $150 million civil penalty under 15 U.S.C. § 45(*l*). *Id.* The company

21    also consented to reopening the Commission's administrative proceeding against X Corp. and modifying

22    the FTC's 2011 Administrative Order, as set forth in an attachment to the Stipulated Order. *Id.*

23         The Court entered the Stipulated Order on May 26, 2022. *See id.* Shortly thereafter, the

24    Commission exercised its statutory authority to reopen and modify the 2011 Administrative Order on the

25    terms to which X Corp. had agreed by signing the Stipulated Order. *See* Modification Order, Ex. A; *see*

26    *also* 15 U.S.C. § 45(b). X Corp. did not object to the reopening or modification.

27         The 2022 Administrative Order expanded the safeguards required by the 2011 Administrative

28    Order. Among other things, the modified administrative order imposed more robust requirements for X

Corp. to implement and maintain a comprehensive privacy and data security program. *See* 2022 Administrative Order, Ex. B at 4-8. The program provisions required X Corp. to conduct risk assessments of any new or modified product, service, or practice, and implement appropriate safeguards to mitigate identified risks prior to launch. *Id.* at 5-7. They also required X Corp. to maintain access controls for databases storing consumer information, as well as for systems and software that either provided access to users' accounts or contained information enabling access to the company's systems. *Id.* at 7. Additionally, X Corp. was required to obtain periodic assessments of its privacy and data security program from a third-party professional who would assess the effectiveness of X Corp.'s program and identify any gaps or weaknesses. *Id.* at 8-9. Finally, X Corp. agreed to provide information, produce records, and appear for depositions at the FTC's request for compliance-monitoring purposes. *Id.* at 13.

## II.    FTC Staff's Compliance Monitoring Efforts

On October 27, 2022, Elon Musk acquired X Corp. *See* X Corp. Ltr. to FTC (Dec. 14, 2022), Def. Ex. 5 at 1. In the company's own words, what followed was a "fundamental transformation," including "a significant reduction in headcount" and "a substantial overhaul of its organizational structure, budgeting, revenue-generation priorities, and other fundamental aspects of the business." *Id.*

Given these developments—many of which were reported publicly, *see, e.g.,* FTC Ltr. to X Corp. (Nov. 10, 2022), Def. Ex. 7 at 1—the FTC exercised its discovery rights under the 2022 Administrative Order, requesting records and other information to determine whether X Corp. was properly protecting user data during this transformation. Also, the FTC deposed five former X Corp. employees, including a former Chief Privacy Officer, Chief Information Security Officer, Director of Threat Management and Operations, Director of Security Engineering, and a senior privacy engineering manager. The information obtained revealed a chaotic environment at the company that raised serious questions about whether and how Musk and other leaders were ensuring X Corp.'s compliance with the 2022 Administrative Order.

### A.    X Corp.'s Numerous Layoffs, Terminations, And Resignations

According to X Corp., from October 27 to December 14, 2022, Musk directed at least five rounds of terminations, layoffs, or other reductions in X Corp.'s workforce. *See* Def. Ex. 5 at 10. The initial layoffs occurred on November 4, 2022, reducing the company's workforce by about 50%. *See* Deposition of Seth Wilson ("Wilson Tr."), Ex. C at 132:15-133:22. Then, in mid-November, Musk rescinded the

company's remote work policy and demanded that every employee confirm in writing that they wanted to opt into the "hardcore" version of "Twitter 2.0." *Id.* at 33:13-35:16. Employees who failed to reply were deemed to have "opted out." *Id.* at 34:20-35:16. Musk's ultimatum prompted numerous employees to leave X Corp. *See* Deposition of Andrew Sayler ("Sayler Tr."), Ex. D at 63:1-16. These reductions affected the teams charged with protecting user data. *See* Deposition of Damien Kieran ("Kieran Tr."), Ex. E at 35:4-13. For example, nearly half of the security, governance, risk, and compliance team left the company. *See id.* at 75:6-77:2; Deposition of Lea Kissner ("Kissner Tr."), Ex. F at 101:17-21.

Within days of the initial layoffs, three key data privacy and security executives all resigned: Chief Privacy Officer Damien Kieran, Chief Information Security Officer Lea Kissner, and Chief Compliance Officer Marianne Fogarty. *See* Kieran Tr. at 87:13-88:5. These three had been the sole remaining members of the company's Data Governance Committee, which was tasked with interpreting and modifying data policies and practices to ensure X Corp. complied with the 2022 Administrative Order. *See* Def. Ex. 5 at 24-25; Kieran Tr. at 89:15-23, 93:20-94:23, 104:22-105:12, 138:24-139:19.



At a deposition, Kissner testified that decisions by Musk and others—including layoffs and other "cost-cutting pressure and decisions"—impaired X Corp.'s ability to "put technical restrictions and controls in place . . . around the company's use of contact data to make sure that it was being used . . . for the purpose that the particular contact data was collected." Kissner Tr. at 80:5-81:3, 84:15-85:16, 113:21-114:10. Notably, the misuse of contact data had been a basis for the government's 2022 lawsuit. *See supra* pp. 4-5. Kissner also testified that X Corp. was impaired from completing improvements in its data management, access, and deletion practices. *See* Kissner Tr. 80:5-84:8, 87:3-25, 91:3-13, 130:8-21, 237:4-

239:9. And Kissner testified that certain programmatic protections relating to product launch reviews, data access controls, and other ongoing security controls were effectively dismantled. *See id.* at 115:14-116:10.

Finally, Kissner testified that, due to the mass employee exodus, about half of the controls in X Corp.'s information security program did not have a designated "owner" responsible for their operation. *Id.* at 104:21-105:18. Similarly, at his deposition, Kieran testified that the firings and layoffs meant no one was responsible for about 37% of X Corp.'s privacy program controls. *See* Kieran Tr. at 85:17-86:7.

## B.   Musk's Conduct

After the acquisition, Musk became X Corp.'s Chief Executive Officer as well as its sole director, President, Treasurer, and Secretary. Def. Ex. 5 at 2, 9. Musk also personally assumed supervisory authority over X Corp.'s privacy and information security program under the 2022 Administrative Order. *Id.* at 9. During his deposition, former Director of Threat Management and Operations Seth Wilson described a meeting with Musk and others on or about November 10, 2022, concerning possible security incidents and compliance with the 2022 Administrative Order. *See* Wilson Tr. at 74:14-24. Wilson testified he was concerned about compliance since X Corp. had lost both its Chief Information Security Officer and Chief Privacy Officer, and thus sought clarity from Musk on the "escalation point" for incidents. *Id.* at 72:10-23, 77:12-24. At this meeting, Musk gave assurances that he was "the single person responsible" and that liability "falls on him." *Id.* at 75:20-76:7. In terms of reporting security incidents, Musk told Wilson, "just go straight to me." *Id.* at 76:8-15. Elsewhere, Musk's conduct reflected a similar understanding of his active oversight responsibilities over X Corp. For example, Musk instructed engineers and others to "send a weekly update of everything [that they] were working on." *Id.* at 120:23-122:4.

Former X Corp. employees testified about several concerning incidents involving Musk. For example, in early December 2022, Musk reportedly directed staff to grant an outside third-party journalist "full access to everything at Twitter. . . . No limits at all."[3] *See* Sayler Tr. at 216:19-217:10; Wilson Tr. at 60:22-61:11. Consistent with Musk's direction, the journalist was initially assigned a company laptop and internal account, with the intent that they be given "elevated privileges beyond just what a[n] average employee might have." Wilson Tr. at 61:21-63:3; *see* Sayler Tr. at 216:19-218:17. But, concerned such

---

[3] F. Siddiqui, Twitter Brings Elon Musk's Genius Reputation Crashing Down to Earth (Dec. 24, 2022), *The Washington Post*, https://perma.cc/7HLF-ELH9.

1    an arrangement could expose nonpublic user information in potential violation of the 2022 Administrative

2    Order, longtime information security employees intervened and implemented safeguards to mitigate the

3    risks. *See* Sayler Tr. at 216:19-217:10; Wilson Tr. 63:23-64:3. Ultimately, the journalist did not receive

4    "direct access" to X Corp. systems, but instead "was working with some other individuals within [the

5    company] who were potentially accessing such services on [their] behalf." Sayler Tr. at 218:10-17.

6          Wilson also received a screenshot of "a text message from Elon" directing that an executive

7    assistant was to receive access to certain systems "immediately, and anybody standing in the way [was]

8    to be fired." Wilson Tr. at 64:4-65:10. Wilson thought the access was inconsistent with the assistant's

9    position. *Id.* at 66:16-22. To him, this "raised some concerns" that employees would "get pressure from

10    an access standpoint to do things" and "be given access" to systems that "weren't commensurate with

11    their job responsibility." *Id.* at 64:4-65:10. Former Director of Security Engineering Andrew Sayler

12    similarly testified he had "ongoing questions about Elon's commitment to the overall security and privacy

13    of the organization" because "the manner in which Elon was requesting us to grant access to third parties

14    that had not undergone our regular vetting process struck" Sayler as "having some degree of disregard for

15    the overall sensitivity and security at that level of access." Sayler Tr. at 264:22-265:24.

16          Also in December 2022, Musk directed that X Corp. servers be moved from one data center to

17    another. Wilson Tr. at 152:8-21, 153:22-154:16. X Corp. policy was that "data cannot leave the data center

18    unless it's been wiped." *Id.* at 152:8-153:12. But because employees only had "a matter of days and weeks,

19    not, like months or quarters" to conduct the move, they did not have "enough time to put together a process

20    that [] would be in compliance with [their] own policies." *Id.* In fact, the relocated servers were not only

21    unwiped, but they also contained ████████████████████████████████

22    ████████████████████████████████████████████

23          In another example, Musk insisted on launching the new Twitter Blue user verification service on

24    an accelerated basis, despite staffing limitations. According to Kissner, Musk insisted the service "ha[d]

25    to launch right now," even though X Corp. was "so reduced in size that [teams were] struggling to keep

26    the service up." Kissner Tr. 130:22-132:12. Kieran recalled Twitter Blue was implemented so quickly

27    that, "to ensure the speed that the product and engineering team was trying to work at," the security and

28    privacy review was not conducted in accordance with the company's process for software development.

1    *See* Kieran Tr. at 146:13-21. Sayler described how some of the security team's recommendations went

2    unheeded, including measures for mitigating the risk that people would purchase verification to

3    impersonate other accounts. Sayler Tr. at 155:13-156:3. These concerns were well-founded: Twitter Blue

4    was suspended the day after it was launched, after reports of fake accounts and impersonations. *See id.*[4]

5           **C.    Resignation Of X Corp.'s Assessor**

6          X Corp. retained EY to conduct the third-party assessment required by the 2022 Administrative

7    Order. *See* Deposition of David Roque ("Roque Tr."), Def. Ex. 14 at 19:18-20:1, 23:3-8, 24:15-20. The

8    administrative order required the initial third-party assessment to be completed by July 25, 2023. *See* 2022

9    Administrative Order at 8-9. But on February 27, 2023, EY informed X Corp. it was terminating its

10   engagement as the company's assessor before this work was completed. After EY resigned, X Corp.

11   selected another assessor to take its place. *See* Roque Tr. at 187:21-189:11.

12         During a deposition, EY partner David Roque testified that EY chose to resign because of concerns

13   "with the timing of the engagement . . .[,] the resource availability of the client to support and execute the

14   engagement, [and] the ongoing changes amid the executive management team to be able to represent

15   compliance with the order." *Id.* at 24:21-25:11. Because the "order has a very specific timeline for the end

16   of the assessment period," EY and X Corp. had agreed that EY would "be onsite starting in January of

17   2023." *Id.* at 25:15-25, 26:8-13. However, when EY reached out in December 2022, they were informed

18   that X Corp. "did not have the resources to facilitate [EY] beginning [its] procedures." *Id.* at 26:17-27:6.

19   At least weekly thereafter, EY followed up on its request, but X Corp. continued pleading insufficient

20   resources. *Id.* at 27:18-25. Finally, in February 2023, X Corp. proposed that EY begin field work

21   procedures on March 15, 2023. *Id.* at 27:7-11. EY was concerned, however, that this truncated period was

22   insufficient to "actually . . . complete or assess all of the controls that [it was] going to be required to look

23   at" under the 2022 Administrative Order. *Id.* at 25:15-25.

24         Moreover, Roque explained that the "significant amount of turnover and departure of employees

25   from the company" meant that there was "a very limited set of individuals that had been identified to

26   facilitate [EY's] audit." *Id.* at 28:3-15. Indeed, EY's primary X Corp. contact changed six times in two

27

28       [4] *See also, e.g.,* B. Lee, Fake Eli Lilly Twitter Account Claims Insulin Is Free, Stock Falls 4.37%
(Nov. 12, 2022), *Forbes*, https://perma.cc/CJB3-E2TG.

months, including a two-week period in late 2022 when EY was redirected to three different people in rapid succession. *See id.* at 29:5-32:16. Moreover, "[t]he large number of departures that occurred at [X Corp.] in November and through early December just left holes operationally," including in terms of who could serve as the designated "owners" responsible for the various controls that made up the company's privacy and information security program. *Id.* at 33:9-34:24. These holes remained apparent to EY from information that X Corp. provided in December 2022 and January 2023. *Id.* at 34:25-35:9.

Finally, Roque testified there was "constant turnover" in "the executives that were . . . familiar with the [privacy and information security] programs that had been implemented." *Id.* at 38:15-23. As part of its assessment, EY "need[ed] to obtain a representation letter" from an X Corp. manager or executive who could "convey they have accurately represented and truthfully shared the operation of the program." *Id.* at 38:24-39:12. But by February 2023, EY was "wondering if [X Corp.] would be able to have somebody in a role that could make those types of attestations or representations to us." *Id*

Roque also testified about two meetings he recalled having with FTC staff in connection with the assessment. *See id.* at 198:24-199:12. In a December 2022 meeting, consistent with the FTC's decision to approve EY as the assessor, FTC staff conveyed its expectation that EY would issue an assessment report by the deadline required under the 2022 Administrative Order. Roque thought this was "[s]urprising from the standpoint of there was so much change going on," and X Corp. was "firing a variety of providers on a variety of fronts." *Id.* at 202:15-203:6. Roque did not otherwise understand the FTC to be conveying other expectations from "a conclusion standpoint" at that meeting. *Id.* at 203:7-12. Consistent with EY's duty to identify and report on gaps and weaknesses in X Corp.'s program, and not to rely primarily on X Corp.'s assertions or attestations for its findings, *see* 2022 Administrative Order at 8-9, Roque stated that the FTC requested "specific types of procedures that they expected to be performed." *Id.* at 203:13-21; *see* 2022 Administrative Order at 9 (explaining the assessor must identify specific evidence examined to make its determinations—such as documents reviewed, sampling and testing performed, and interviews conducted—and explain why such evidence is appropriate and sufficient to justify the assessor's findings).

FTC staff met again with EY in January 2023 after learning of numerous troubling developments at the company, including the persistence of numerous gaps in the ownership of controls that made up X Corp.'s privacy and data security program. *See supra* p. 7. During that meeting, Roque had the impression

that the FTC expected the assessment to identify issues with X Corp.'s program. Roque Tr. at 200:14-202:1. According to Roque, FTC staff indicated that, if there were not "negative results in certain areas based on what they already understood from an operational standpoint, based on information [X Corp.] had provided, . . . they would be surprised, and they would be definitely following up with [EY] to understand why [EY] . . . reached the conclusions [it] did if they were sort of not reflecting gaps in the controls." *Id.*; *see id.* at 124:10-21 (similar). During that meeting, FTC staff also gave a list of "the types of procedures they were expecting [EY] to execute" as part of the assessment. *Id.* at 200:14-202:1.

While Roque thought some of FTC staff's expectations regarding the assessment were unusual, he noted that the conversations were all "focus[ed] on getting appropriate information to make sure the program mandated under the order was operating effectively." *Id.* at 121:4-8. He also acknowledged he had never been involved in an assessment that was "similar to the [X Corp.] order assessment engagement." *Id.* at 211:1-4. And he noted he had relatively limited experience working with government regulators. *See id.* at 210:2-25. Roque did *not* indicate that the meetings with FTC staff led EY to resign. *See generally id.* at 118:20-124:21, 196:19-212:12. To the contrary, Roque testified that EY's reasons for resigning were memorialized in an internal memorandum, *see id.* at 40:22-41:1, which ███████████ ████████████████████████████████

Shortly after Roque's deposition, X Corp. filed this motion, seeking to terminate or modify the Stipulated Order and prevent FTC staff from deposing Musk.

**ARGUMENT**

X Corp.'s motion should be denied for multiple reasons. *First*, terminating the Stipulated Order would have no effect on X Corp.'s discovery and assessment obligations because those obligations flow from the 2022 Administrative Order, which is not properly before the Court. *Second*, X Corp. has failed to satisfy the standards for relief under Federal Rule of Civil Procedure 60(b)(5) and (6). *Finally*, X Corp. is not entitled to a protective order against the deposition of Musk, who has first-hand knowledge of conduct that is the subject of the FTC's investigation.

**I.** **X Corp.'s Prospective Obligations Cannot Be Terminated Under Rule 60(b) Because They Flow From The FTC's Administrative Order And Not The Court's Stipulated Order**

Hoping to limit the FTC's investigation into alarming developments related to its data privacy and

security practices, X Corp. "requests that the Court enter an order terminating or modifying the *Stipulated Order*" under Federal Rule of Civil Procedure 60(b). Def. Mem. at ii. But the assessment and discovery requests X Corp. complains about flow from the Commission's *2022 Administrative Order*, which is distinct from this Court's Stipulated Order. *See* Def. Mem. at 3-4 (recognizing the Commission entered the 2022 Administrative Order after the Court entered the Stipulated Order). Thus, terminating or modifying the Stipulated Order would have no effect on the assessment and discovery obligations to which X Corp. now objects. This alone is a sufficient basis to deny X Corp.'s motion. *See United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (explaining that a proposed modification must be "suitably tailored to resolve the problems created by the changed factual . . . conditions"); *see also infra* pp. 20-21.

Moreover, to the extent X Corp. is seeking modification or termination of the 2022 Administrative Order, a district court lacks the statutory authority to grant such relief. The FTC Act provides that such requests must be filed with the Commission in the first instance, not with a district court through a Rule 60(b) motion. Rule 60(b) "regulates the procedures by which a party may obtain relief from a final judgment." *Delay v. Gordon*, 475 F.3d 1039, 1044 (9th Cir. 2007). The rule codified various writs allowing litigants to seek relief from *court* orders. *See Banister v. Davis*, 140 S. Ct. 1698, 1709 (2020). But Rule 60(b) says nothing about modifying or terminating the FTC's *administrative* orders. For good reason: the FTC Act instead sets forth the standards and procedures for reevaluating administrative orders.

Under the FTC Act, Congress charged the Commission with protecting the public from "unfair or deceptive acts or practices in or affecting commerce," and it empowered the agency to issue administrative orders commanding corporations to "cease and desist from using" such acts or practices. 15 U.S.C. § 45(a), (b). Congress also understood that the public interest may change over time, and an administrative order may also need to change. *See Elmo Co. v. FTC*, 389 F.2d 550, 552 (D.C. Cir. 1967). To that end, the FTC Act provides that "the Commission may at any time . . . reopen and alter, modify, or set aside, in whole or in part," an administrative order if it finds that "conditions of fact or of law have so changed as to require such action or if the public interest shall so require." 15 U.S.C. § 45(b). Moreover, the subject of an order may "file[] a request with the Commission" seeking relief from an administrative order, which must "make[] a satisfactory showing that changed conditions of law or fact require such order to be altered, modified, or set aside." *Id.* Only after the Commission has an opportunity to consider such a request may

the subject seek appropriate judicial review. *See id.* § 45(b), (c); *United States v. Louisiana-Pac. Corp.*, 754 F.2d 1445, 1450 (9th Cir. 1985) (directing that the *Commission* shall make "specific findings" on whether to reopen and modify an administrative order); *see also United States v. Louisiana-Pac. Corp.*, 967 F.2d 1372, 1377 (9th Cir. 1992) (limiting judicial review of the Commission's decision "not to modify" an administrative order to whether that determination "was arbitrary and capricious"); *Rettinger v. FTC*, 392 F.2d 454, 457 (2d Cir. 1968) (holding that the Commission's modification of an administrative order is a "necessary prerequisite to [judicial] review" under the FTC Act).

Through the FTC Act, Congress thus determined that the Commission should decide "in the first instance" whether and when to "reopen and modify its orders." *Atl. Ref. Co. v. FTC*, 381 U.S. 357, 377 (1965); *see Mohr v. FTC*, 272 F.2d 401, 406 (9th Cir. 1959) (explaining the "Commission [is] entitled to change its mind . . . as to the kind of a cease and desist order which [is] necessary to protect the public interest"); *see also Axon Enter., Inc. v FTC*, 143 S. Ct. 890, 898 (2023) (noting the FTC Act "provide[s] for review of a *final* Commission decision"). X Corp. has filed no request with the Commission seeking relief from the 2022 Administrative Order. Having failed to pursue this administrative prerequisite, X Corp. cannot use Rule 60(b) to circumvent the review process that Congress established.

In sum, X Corp. did not—and, at this time, cannot—seek judicial relief from the 2022 Administrative Order. Therefore, X Corp.'s request to modify or terminate should be denied.

## II.   X Corp.'s Allegations Also Fail To Meet The Standards for Relief Under Rule 60(b)

Even if the compliance reporting obligations of which X Corp. complains were part of the Court's Stipulated Order, its request for relief still would not satisfy the relevant standards under Rule 60(b).

### A.   X Corp. Has Not Met The Standard For Modification Or Termination Under Rule 60(b)(5)

To obtain modification of a judicial consent decree under Rule 60(b)(5)—which permits relief from a judgment if its prospective application "is no longer equitable"—X Corp. "must satisfy the initial burden of showing a significant change either in factual conditions or in the law warranting modification of the decree." *Asarco Inc.*, 430 F.3d at 979 (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). And because X Corp. "cites significantly changed factual conditions," it must "additionally show that the changed conditions make compliance with the consent decree more onerous, unworkable,

or detrimental to the public interest." *Id*. Finally, the Court "must then determine whether [X Corp.'s] proposed modification is suitably tailored to resolve the problems created by the changed factual . . . conditions." *Id*. X Corp.'s request fails on all three fronts.

### 1. X Corp. Has Not Shown That A Significant Change Warrants Modification

X Corp. contends the FTC's alleged "harassment campaign" against it "constitutes a 'changed circumstance' rendering continued enforcement" of the Court's Stipulated Order inequitable. Def. Mem. at 9, 14. Specifically, the company claims the FTC "impos[ed] new and burdensome [discovery] demands" and made "improper attempts to influence [EY's] independent assessment," *id.* at 14, and that those actions demonstrate "bias and prejudgment," *id.* at 18. This argument fails for multiple reasons.

*First*, X Corp. has offered "no evidence to support [its] contention that the [FTC] has used the consent decree to conduct bad-faith, harassing investigations" that would warrant modification. *SEC v. Musk*, No. 22-1291, 2023 WL 3451402, at *2 (2d Cir. 2023) (unpublished).[5] Rather, the actions of which X Corp. complains were all taken to "investigate [X Corp.'s] compliance with the decree, as provided for in the parties' agreement." *Id.*

By claiming that the FTC's investigation "has lost any plausible connection to lawful purposes," Def. Mem. at 2, X Corp. ignores the obvious: under the 2022 Administrative Order, the FTC had ample authority to investigate X Corp.'s compliance, and the "fundamental transformation" within X Corp. gave it every reason to do so. To name just a few such reasons: shortly after the Musk acquisition, X Corp. laid off or fired at least half of its workforce, *supra* p. 5, and by April 2023 the company had reportedly lost about 80% of its workforce through subsequent rounds of terminations and resignations.[6] This exodus significantly impacted X Corp.'s privacy, data security, governance, risk, and compliance functions. *Supra* p. 6. Key compliance officers resigned—including the company's entire Data Governance Committee—

---

[5] In 2022, Musk offered very similar arguments in support of a motion to modify or terminate a consent decree entered into with the Securities and Exchange Commission in the U.S. District Court for the Southern District of New York. The district court rejected that motion—and the Second Circuit affirmed that judgment—for many of the same reasons articulated in this opposition. *See Musk*, 2023 WL 3451402, at *1-3.

[6] *See* M. Toh & J. Liu, *Elon Musk Says He's Cut About 80% of Twitter's Staff* (Apr. 12, 2023), *CNN Business*, https://perma.cc/UB6E-K4XM.

and the company's former Chief Information Security Officer issued dire warnings about X Corp.'s data security and privacy practices under new leadership. *Id.* X Corp.'s independent assessor, EY, abruptly resigned due to a perceived lack of timely support from, and dramatic changes within, X Corp. *See supra* pp. 9-10. And sworn testimony demonstrates that Musk had at least once ordered employees to provide an outside journalist with full access to X Corp. systems that could expose nonpublic user data, and did so without regard for the company's existing order-mandated safeguards. *See supra* pp. 7-8. "It is unsurprising that," under these circumstances, the FTC "would have some questions." *SEC v. Musk*, No. 18-cv-8865, 2022 WL 1239252, *9 (S.D.N.Y. Apr. 27, 2022), *aff'd sub nom. Musk*, 2023 WL 3451402.[7]

While X Corp. claims "the only possible purpose" of the FTC's post-acquisition investigation has been to harass, it "reach[es] this conclusion . . . by concentrating only on" the fact that the agency's demands post-date Musk's acquisition while omitting why the FTC took the actions it did. *FTC v. Rockefeller*, 591 F.2d 182, 189 (2d Cir. 1979) (upholding enforcement of FTC subpoenas because they flowed "reasonably and logically" from lawful investigatory goals). X Corp.'s argument "embod[ies] the post hoc ergo propter hoc fallacy." *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1168 (9th Cir. 1982) (recognizing that "vindictiveness cannot be inferred simply because" the government's actions followed some "act by the defendant."). The company's contention that the FTC "misused" the 2022 Administrative Order to "launch endless, boundless investigations" motivated by "bias" and "a desire to harass" is therefore "meritless." *Musk*, 2022 WL 1239252, at *4, 7.

X Corp.'s allegation of "witness tampering," Def. Mem. at 1, likewise has no merit. Even taking its cherry-picked quotations from Roque's testimony in isolation, *see id.* at 9-11, 16-17, the company has offered no evidence to support its accusation that the FTC "engage[d] in misleading conduct toward" EY, that it "falsif[ied] evidence," or that it "interfere[d] with [EY's] free and unhampered determination to testify," *id.* at 15. And while X Corp.'s motion recites professional standards for certified public accountants, *id.* at 16, it offers no evidence that the FTC pressured EY to breach those standards, nor that

---

[7]   Accordingly, the Court should be skeptical of how X Corp. characterizes the FTC's investigational demands. For example, X Corp. complains that a request regarding the sale of "office equipment" had no rational connection to "privacy and security of user data." Def. Mem. at 7. But X Corp. omits that this request was tailored to whether and how computing equipment was "sanitized clean of its [private user] data," reflecting a concern about unauthorized access and disclosure. Def. Ex. 9 at 5.

the agency "bull[ied]" EY in any way, *id.* at 17. Nor has the company even explained how it will be harmed by the FTC's communications with EY, given that X Corp. replaced EY with a new independent assessor after EY resigned due to X Corp.'s conduct, *see supra* p. 9.

Instead, X Corp. offers hyperbolic rhetoric about benign communications. For example, X Corp. mischaracterizes a December 2022 meeting as a "heavy-handed" effort by the FTC "to ensure EY would generate evidence damaging Twitter." Def. Mem. at 10 (discussing Roque Tr. at 200:2-12, 124:14-21). But Roque testified that, in that meeting, FTC staff simply communicated an expectation that EY would issue an assessment (indeed, it had previously approved EY to do just that), without conveying other expectations from "a conclusion standpoint." *See* Roque Tr. at 200:2-12, 203:7-12.

X Corp. also makes much (Def. Mem. at 9, 16) of a January 2023 meeting in which FTC staff allegedly stated that, if EY's assessment lacked "negative results in certain areas . . . based on information [X Corp.] had provided, . . . they would be surprised, and they would be definitely following up with [EY] to understand," *id.* at 200:14-202:1. But X Corp. ignores that this exchange was informed by alarming developments from the company that had been surfacing on a near-weekly basis since the acquisition, *see supra* pp. 5-9, and that FTC staff were entitled to "convey concerns about the level of change at" X Corp. and "make sure that EY examined [those developments] in its assessment of [X Corp.'s] program," Roque Tr. at 122:25-123:18 (confirming Roque's understanding that these were the FTC's aims).

As for Roque's comment that he was "trying to make sure . . . we didn't have an adverse threat from an independent interest . . . trying to influence the outcome," *id.* at 120:24-121:2, he went on to explain that, more broadly, he was "concerned that there was this adversarial situation occurring where you had *two competing parties* that, stepping back, *both* had a desire for a certain outcome that may not have always been aligned," *id.* at 121:21-122:14; *see also id.* at 89:20-90:3 (expressing a concern that X Corp. "might be upset with the results" if EY generated an unfavorable report). This adversarial dynamic was unremarkable: after all, the 2022 Administrative Order was part of a settlement that resolved an *adversarial proceeding*. Consequently, if EY had discovered problems in X Corp.'s data privacy and security program, the FTC naturally would have had an interest in learning more and seeing such issues documented in the assessor's report, whereas X Corp. might have preferred for those problems to remain hidden. And while Roque was concerned about the involvement of "somebody outside of the arrangement

1   we had with [X Corp.]," *id.* at 121:1, he cautioned that he had only interacted with government regulators

2   in contexts "very different from this particular engagement," *id.* at 210:1-25, and he noted that having a

3   third party involved at all was "unusual" for him, *id.* at 203:24-204:25. X Corp. thus creates an illusion of

4   impropriety only by depriving the testimony of its essential context.[8]

5        X Corp. cites no authority, nor any provision in the 2022 Administrative Order, that precluded

6   FTC staff from conveying their views and expectations to Roque as outlined above. Rather, because the

7   parties had not "negotiated" any "condition[s]" on communications with the independent assessor in their

8   agreement, it is unsurprising that FTC staff sought to raise questions with EY concerning X Corp.'s

9   compliance. *T.Y. v. Bd. of Cnty. Comm'rs of Cnty. of Shawnee*, 912 F. Supp. 1424, 1427 (D. Kan. 1996)

10  (holding that attempt to forbid *ex parte* communications with independent monitor to "[e]nsure [the

11  monitor's] impartiality" was inconsistent with the parties' consent decree, which contained no such

12  prohibition); *see also* Roque Tr. at 114:16-115:12 (noting X Corp. had informed EY that it had "latitude"

13  to "talk to the FTC" without "hav[ing] [X Corp.] present"). Indeed, courts are reticent even to *disqualify*

14  a monitor—let alone terminate a consent decree—based on communications that allegedly threatened the

15  monitor's impartiality. *See United States v. City of Albuquerque*, 1:14-cv-1025, 2017 WL 5508519, *5-6

16  (D.N.M. Nov. 16, 2017) (rejecting defendant's "dumbfound[ing]" argument that federal agency's

17  communications undermined monitor's impartiality because "the parties [had] not prohibited" such

18  communications); *Cobell v. Norton*, 237 F. Supp. 2d 71, 81-82 (D.D.C. 2003) (noting that a compliance

19  monitor's need for *ex parte* communications with the parties "cannot rationally be disputed" and "has

20  been explicitly recognized by virtually all circuits" (collecting cases)); *United States v. Apple Inc.*, 787

21  F.3d 131, 138-39 (2d Cir. 2015) (upholding denial of request to disqualify even where the monitor took

22  the "remarkable" step of "litigat[ing] on the side of a party"). Thus, X Corp.'s argument that the parties'

23

24  ───────────────────

25        [8] X Corp. also mischaracterizes an email in which Roque considered whether the FTC might
     "create 'other' challenges for EY over time," Def. Mem. 11 (citing Def. Ex. 17 at 1). X Corp. combines
26  this quotation with its own narration to hint at a coercive threat tied to a specific conclusion. *See* Def.
     Mem. 1, 16. But Roque's email ███████████████████████████████████████████████
27  ███████████████████████████ Def. Ex. 17 at 1. And X Corp. omits that, ████████████████████
     ███████████████████████████████████████████████████████████████████████████ *Id.*
28  Nor does X Corp. acknowledge the broader concern within EY that "*both* [X Corp.] *and* the FTC would
     not be happy with [EY]" if the firm withdrew. Roque Tr. at 95:25-96:7.

1    agreement should be terminated due to alleged "witness tampering" is factually and legally baseless.

2        *Second,* even if X Corp. had established a significant change in circumstances, it would not warrant

3    relief because "modification should [ordinarily] not be granted where [the movant] relies upon events that

4    actually were anticipated" by the parties. *Rufo*, 502 U.S. at 385. Courts look "within [the] four corners"

5    of the decree to ascertain the parties' expectations. *Asarco*, 430 F.3d at 980. Here, the circumstances to

6    which X Corp. now objects flow from the parties' agreement.

7        To begin, X Corp. agreed to the investigation of which it now complains. The company

8    characterizes FTC's investigative demands as a "changed circumstance," Def. Mem. 14, but "the plain

9    terms of the [2022 Administrative Order] reveal the parties' expectation that" such demands "might occur

10   during the lifetime of" its enforcement. *Asarco*, 430 F.3d at 982. The 2022 Administrative Order expressly

11   authorized the FTC to pursue discovery "without further leave of court," and to pursue "all other lawful

12   means" to investigate compliance. 2022 Administrative Order § XIII; *see also Asarco*, 430 F.3d at 982

13   (noting a reservation of the government's "rights to take any and all response actions authorized by law"

14   evidenced parties' anticipation that the government might take such action). X Corp. consented to these

15   terms as part of the settlement, so it "could hardly have thought that at the time [it] entered into [that

16   settlement] that [it] would have been immune from [FTC compliance] investigations." *Musk*, 2022 WL

17   1239252, at *8. It is therefore "particularly ironic" that X Corp. now expresses surprise at one. *Id.*

18       Moreover, FTC staff's alleged communications with the independent assessor were in line with

19   what the parties contemplated. The 2022 Administrative Order contains no "commitment . . . that would

20   prohibit the [FTC] from" communicating its views to the assessor. *Asarco*, 430 F.3d at 989. The absence

21   of such a prohibition is significant, as X Corp. "had ample opportunity to propose incorporation in the

22   decree of any protection it may have felt necessary, and to object to procedures it deemed contrary to its

23   understanding of the decree's terms." *Id.*; *see also T.Y.*, *City of Albuquerque*, and *Cobell*, discussed *supra*

24   p. 17. X Corp. now complains that the FTC violated the agreement by sharing its concerns and

25   expectations with EY, *see supra* pp. 10-11, even though nothing prohibited the agency from doing so.

26   This Court should decline X Corp.'s invitation to read new proscriptions into the decree.

27       *Third,* X Corp. also fully expected the perceived "bias," Def. Mem. at 18-19, that it now alleges.

28   The 2022 Administrative Order's requirement for an "objective, independent *third-party*" assessment

1    reveals that neither party considered the other to be an objective, independent observer. 2022

2    Administrative Order § VI. Again, the 2022 Administrative Order resolved the parties' *adversarial*

3    proceeding. It should come as no surprise, then, that the FTC might take actions and make statements with

4    which X Corp. disagrees. If allegations of bias sufficed under Rule 60(b)(5), no consent decree—and no

5    third-party monitorship—would be safe.

6         Because the circumstances cited by X Corp. were anticipated, to obtain modification, it must

7    "satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable

8    effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Asarco*,

9    430 F.3d at 984. X Corp. has not even attempted to meet that burden, so its motion should be denied.

10        **2.    X Corp. Has Not Shown That Compliance With The Decree Is More Onerous,**

11             **Unworkable, Or Detrimental To The Public Interest**

12        X Corp.'s argument fails for yet another reason: even if the 2022 Administrative Order's

13   prospective requirements were part of the Stipulated Order (they are not), and even if the Court were to

14   accept the company's misleading factual narrative (it should not), X Corp. has not shown that those facts

15   make compliance *with the order's requirements* "more onerous, unworkable, or detrimental to the public

16   interest." *Asarco*, 430 F.3d at 979. Contrary to X Corp.'s framing, *see* Def. Mem. 12 (suggesting "*[a]ny*

17   showing of a significant change . . . would justify a modification"), to warrant modification, the proffered

18   change must relate to the purposes underlying the decree, and to the feasibility of carrying out its

19   requirements, *see Asarco*, 430 F.3d at 979; *see also Moon v. GMAC Mortgage Corp.,* C08969Z, 2008 WL

20   4741492 (W.D. Wash. Oct. 24, 2008); *United States v. Swift & Co*., 189 F. Supp. 885, 905 (N.D. Ill. 1960)

21   ("Change is inevitable, but it is only change that reaches the underlying reasons for the decree that is

22   relevant."). Thus, even allegations of governmental harassment do not warrant modification of a decree

23   that remains feasible. *See Bldg. & Const. Trades Council of Philadelphia & Vicinity, AFL-CIO v. NLRB*,

24   64 F.3d 880, 890-91 (3d Cir. 1995) (holding alleged "harassing" agency adjudications are not "changed

25   circumstances [rendering] adherence to the [consent decree's] compliance procedure substantially more

26   onerous" or "unworkable").

27        Far from demonstrating that the 2022 Administrative Order's substantive requirements are now

28   more onerous or unworkable, X Corp.'s motion largely ignores them. And while X Corp. does claim the

1   FTC rendered the decree "unworkable" by allegedly "tamper[ing] with an independent assessment," Def.

2   Mem. at 19-21, this argument fails for multiple reasons. *First*, X Corp. has not shown that, by merely

3   communicating expectations and concerns, *supra* pp. 10-11, the FTC rendered EY incapable of providing

4   an independent assessment. In fact, it was *X Corp.'s* conduct that led to EY's resignation. *Supra* pp. 9-10.

5   *Second*, even if the FTC had "irremediably tainted" EY's assessment, Def. Mem. at 21, X Corp. has not

6   explained why this would have any prospective relevance, as X Corp. has since retained a new independent

7   assessor, *see supra* p. 9, and there is no suggestion that the new assessor's work has been compromised in

8   any way. *Third*, the 2022 Administrative Order imposes various requirements that have nothing to do with

9   the assessor's independence, including the prohibition against lying to consumers (§ I), the requirement

10   to maintain a comprehensive program that protects consumers' information (§ V), and the requirement to

11   offer enhanced account security features in a non-deceptive manner (§ III). X Corp. does not suggest that

12   these obligations have become "more onerous" or "unworkable." *Asarco*, 430 F.3d at 979.

13       X Corp. also contends that enforcing the parties' settlement would be "detrimental to the public

14   interest." Def. Mem. at 18. But "any argument that the continued enforcement of the decree would be

15   detrimental to the public interest would seem most unlikely given [X Corp.'s] purely private interest in

16   wanting to be free of the decree" to which it agreed. *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32,

17   36 (D.C. Cir. 2000); *see also SEC v. Coldicutt*, 258 F.3d 939, 944 (9th Cir. 2001) (citing *Harris Teeter*).

18   By contrast, the *public's* interest in maintaining the decree's safeguards is as strong as ever, particularly

19   given the alarming post-acquisition developments within X Corp. *See Musk*, 2023 WL 3451402, at *2.

### 3.   X Corp. Has Not Shown That Its Proposed Modification Is Suitably Tailored

21       Nor is X Corp.'s proposed relief "suitably tailored to resolve the problems created by the changed

22   factual . . . conditions" it cites. *Asarco Inc.*, 430 F.3d at 979. Indeed, the company offers no argument

23   whatsoever that its sole proposed modification—outright termination of the parties' agreement—is

24   suitably tailored to redress the company's complaints. This omission confers yet another independent basis

25   to deny X Corp.'s request for relief under Ruel 60(b)(5).

26       Nor could X Corp. show that its proposed modification is suitably tailored even if it tried. To

27   obtain complete dissolution of a judicial consent decree under Rule 60(b)(5), a movant must generally

28   show that the decree's "objective . . . has been achieved." *Horne v. Flores*, 557 U.S. 433, 450 (2009)*; see*

*Patterson v. Newspaper & Mail Deliverers' Union of New York & Vicinity*, 13 F.3d 33, 39 (2d Cir. 1993) (explaining that a court is entitled to "terminate the entire decree once [its dominant] objective has been reached" and it "has served its purpose"); *Stewart v. General Motors Corp.*, 756 F.2d 1285, 1291-93 (7th Cir. 1983) (granting dissolution because "the decree's provisions are now redundant"). X Corp. "makes no showing that the objective of the consent decree has been achieved"—nor could it, given the post-acquisition developments discussed above—so its request "to terminate the decree altogether" should be denied. *Musk*, 2023 WL 3451402, at *2, n.2. Indeed, even if the FTC had breached the parties' agreement as X Corp. suggests (it did not), *see* Def. Mem. at 21, then the proper relief, at most, would be to "simply order the [FTC] to follow" it. *W. Watersheds Project v. Bennett*, No. 04-cv-181, 2008 WL 2003114, at *6 (D. Idaho May 8, 2008) (declining to modify a consent decree where an agency deviated from it).

X Corp. fails even to explain how its sole proposed modification (termination) would "resolve the problems created by the changed factual . . . conditions" of which it complains. *Asarco*, 430 F.3d at 979. Even if the 2022 Administrative Order's requirements were part of the Stipulated Order, and even if that order was terminated, the agency would retain authority to continue investigating X Corp.'s potential violations of the FTC Act, including the allegations underlying this litigation. *See, e.g.*, 15 U.S.C. § 49 (granting the FTC broad investigative authority); *see also United States v. Turner*, No. 3:13-cv-1827, 2022 WL 1570741, at *2 (S.D. Cal. May 17, 2022) (modification was not suitably tailored where it was "not clear" that such relief would alleviate the issues of which the movant complained).

In applying Rule 60(b)(5), courts "promote[] adherence to settlement agreements voluntarily entered into by parties to a litigation and ensure[] that consent decrees are not so easily modifiable as to discourage parties from reaching constructive settlements." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995). The Court should therefore hold X Corp. to the terms of the parties' agreement.

### 4. X Corp.'s Alternative Request For Discovery Is Meritless.

Because X Corp.'s allegations of bad faith are meritless, *see supra* pp. 14-18, its alternative request for discovery regarding a supposed "abuse of process," Def. Mem. at 20, should be denied.[9] X Corp.'s

---

[9] X Corp. recognizes that this Court's "authoriz[ation]" is required before it may "obtain discovery," Def. Mem. 20, but it has nonetheless forged ahead by issuing subpoenas to third parties, one of which it now seeks to enforce in another court, *see* Motion to Compel, *X Corp. v. Ernst & Young, LLP*,

request constitutes an attempt to disrupt the agency's active, pre-enforcement investigation—something courts do not permit. *See, e.g., Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1387-88 (5th Cir. 1971) (affirming denial of a motion for discovery concerning an FTC pre-enforcement investigation). Indeed, "grave policy considerations . . . militate against allowing" what X Corp. seeks. *Id.* at 1388.

The authorities X Corp. cites, *see* Def. Mem. at 20-21, do not suggest otherwise. Instead, they illustrate only that, in "extraordinary circumstances," courts have permitted limited discovery concerning credible allegations of bad faith in an agency's *subpoena enforcement* action. *SEC v. McGoff*, 647 F.2d 185, 193 (D.C. Cir. 1981) (Ginsburg, J.) (discussing the limited reach of *United States v. Fensterwald*, 553 F.2d 231 (D.C. Cir. 1977), on which X Corp. relies). X Corp. offers no basis to import that principle into this dispute, which stems from X Corp.'s preemptive effort to halt the FTC's compliance investigation pursuant to an administrative order to which X Corp. consented. The Court should refuse X Corp.'s request to intrude upon an ongoing investigation into the company's compliance with its administrative order.[10]

## B.      X Corp. Is Not Entitled To Relief Under Rule 60(b)(6)

X Corp.'s remaining argument—that the Court should grant relief under Rule 60(b)(6) because the FTC supposedly "repudiated" the parties' agreement, Def. Mem. at 21—also fails. Rule 60(b)(6) only applies in "extraordinary circumstances," and it is to be "used sparingly" by courts. *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). To justify setting aside a settlement under Rule 60(b)(6), a party's "repudiation must amount to a *complete* frustration of the settlement agreement." *Joe Hand Promotions, Inc. v. Rangee*, No. 2:13-cv-00939, 2013 WL 6859001, *3 (E.D. Cal. Dec. 24, 2013); *see Hermetic Order of Golden Dawn, Inc. v. Griffin*, No. 08-16904, 400 Fed. App'x. 166, 167 (9th Cir. 2010) (unpublished) (similar). For example, in *Keeling v. Sheet Metal Workers International*

No. 1:23-mc-82 (D.D.C. Aug. 25, 2023); ECF No. 35. Because the parties in this case have never "conferred as required by [Federal] Rule [of Civil Procedure] 26(f)" and no "court order" or "stipulation" has authorized X Corp. to obtain discovery, the company's third-party subpoenas were issued in patent violation of Rule 26(d)(1), which prohibits discovery "from any source" unless and until authorized. *See, e.g., Deuss v. Siso*, No. 14-cv-00710-YGR (JSC), 2014 WL 4275715, at *4 (N.D. Cal. Aug. 29, 2014).

[10] Even if the principle X Corp. cites applied here, discovery would still be improper. Such "discovery . . . is the exception rather than the rule," and it requires "more than alleg[ations of] an improper purpose . . . such as to harass." *United States v. Church of Scientology of California*, 520 F.2d 818, 824 (9th Cir. 1975). X Corp.'s "diffuse speculations concerning possible misuse of administrative authority do not establish . . . exceptional circumstances." *McGoff*, 647 F.3d at 194.

*Association, Local Union 162*, "complete frustration" justified setting aside a settlement where one party committed multiple acts of "bad faith noncompliance," including repeated, defiant refusals to comply with express obligations imposed by the parties' agreement. 937 F.2d 408, 411 (9th Cir. 1991).

Here, as evidence of repudiation, X Corp. cites only the FTC's alleged communications with EY. *See* Def. Mem. at 21-22. But as discussed above, *see supra* pp. 14-20, X Corp. has not shown that these communications violated the parties' agreement, that they prevented EY's performance of an independent assessment, or that they were improper. Nor has X Corp. alleged that the FTC interfered with the *current* independent assessor's work. *See supra* p. 20. Nor, for that matter, has X Corp. argued that its performance of the 2022 Administrative Order's substantive requirements—which include many obligations separate from retaining a third-party assessor—has been frustrated in any way. *Id.* X Corp.'s argument that the FTC's conduct "hind[ered]" the company's "performance" or otherwise "complete[ly] frustrat[ed]" the parties' agreement, Def. Mem. at 21, is therefore wholly conclusory.

Even if X Corp. had established a breach of the agreement by the FTC, wholesale termination would be unwarranted. "In the usual course upon repudiation of a settlement agreement, the frustrated party may" seek "specific performance," but it "may not . . . reopen the underlying litigation" by setting aside that agreement under Rule 60(b)(6). *Keeling*, 937 F.2d at 410; *see Sawka v. Healtheast, Inc.*, 989 F.2d 138, 140-41 (3d. Cir. 1993) (recognizing that mere breach of a settlement is insufficient to terminate agreement under Rule 60(b)(6)); *Joe Hand Promotions, Inc.*, 2013 WL 6859001, at *3 (similar). As explained, if the FTC had breached the parties' agreement, the Court could "simply order [the FTC] to follow" it. *W. Watersheds Project*, 2008 WL 2003114, at *6. The absence of a request for such relief from X Corp. suggests that the company's true aim is to avoid the 2022 Administrative Order's substantive requirements. The Court should "promote[] adherence to settlement agreements voluntarily entered into" by denying X Corp.'s efforts to undermine one. *Eastman Kodak Co.*, 63 F.3d at 102.

## III.   <u>X Corp. Is Not Entitled To A Protective Order To Prevent Musk From Testifying</u>

Finally, the Court should deny X Corp.'s alternative request for a protective order staying the deposition of Musk. *See* Def. Mem. at 23. As a threshold matter, this Court should deny X Corp.'s motion because discovery is occurring under the 2022 Administrative Order—the FTC has not invoked judicial "process." Def. Mem. 23; *see supra* pp. 11-13. Regardless, X Corp.'s two arguments in support of a

protective order are both meritless. *First*, X Corp. contends that "[t]he timeline of FTC action compels the conclusion that its quest to depose Musk is baseless, politically motivated, and made in bad faith." *Id.* The Court should reject this assertion for the reasons discussed above: there is no evidence to support X Corp.'s allegations that the FTC acted in bad faith or with an improper motive. *See supra* pp. 14-18.

*Second*, X Corp. also asserts that "deposing Mr. Musk at this time violates the so-called apex doctrine," *id.* at 24, which is a discretionary tool to protect "high-level executive[s]" from "harassment" during "discovery," *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012). But X Corp. fails to identify any instance where the apex doctrine was applied to an FTC investigation as opposed to an ongoing lawsuit. *See FTC v. Bisaro*, 757 F. Supp. 2d 1, 9 (D.D.C. 2010) (similarly recognizing that a party failed to identify instances where this "limited" doctrine was "applied in an administrative investigation"). Nor should the apex doctrine apply here, as the "standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992). "At the investigatory stage, the Commission does not seek information necessary to prove specific charges; it merely has a suspicion that the law is being violated in some way and wants to determine whether or not" it is necessary to respond. *Id.*; *see Civ. Investigative Demands Dated June 30, 2022, to Amazon.com, Inc. & Certain Current & Former Amazon Emps.*, No. 212-3050, 2022 WL 4483142, at *14 (FTC Sept. 21, 2022) (similar).

Even if the apex doctrine did apply to FTC investigations as a general matter (it does not), X Corp. has failed to carry its "heavy burden" of showing why the Court should take the "unusual" step of halting this particular deposition. *Apple Inc.*, 282 F.R.D. at 263. Contrary to X Corp.'s assertion that Musk occupies "merely a high-level supervisory role," Def. Mem. at 24, evidence the FTC uncovered during its investigation reveals that Musk has been deeply involved in the "fundamental transformation" of X Corp., which has created a serious concern that the company may not be adhering to the 2022 Administrative Order. Musk plainly has "unique first-hand, non-repetitive knowledge of the facts at issue" in the FTC's investigation, *Apple, Inc.*, 282 F.R.D. at 263.

As set forth above, several former employees testified about how Musk exercised granular control of X Corp., at times directing employees in a manner that may have jeopardized data privacy and security. Among other things, those individuals testified about Musk's personal involvement in: (1) massive

1    reductions in workforce, resulting in numerous gaps in ownership for privacy and security controls; (2) a

2    hasty transport of unencrypted company servers without adherence to X Corp. data security policies; (3) a

3    hurried release and retraction of a Twitter Blue product re-launch; and (4) individuals, including a third-

4    party journalist not employed by the company, receiving broad and apparently unjustified access to X

5    Corp. systems. *See supra* pp. 7-9. Moreover, Musk has apparently declared that he is the "single person

6    responsible" for ensuring compliance with the 2022 Administrative Order. Wilson Tr. at 75:20-76:7. The

7    evidence belies X Corp.'s characterization that Musk is merely a high-level supervisor without firsthand

8    knowledge of the privacy and security issues at hand.

9         X Corp. has also failed to carry its heavy burden of showing there are "less intrusive discovery

10   methods" than deposing Musk. *Apple, Inc.*, 282 F.R.D. at 263. While X Corp. asserts that Musk would be

11   the "very first *current* employee of X Corp. deposed by the FTC in this investigation," Def. Mem at 24,

12   that is because so many other employees with relevant information were fired or quit during X Corp.'s

13   "fundamental transformation." For example, X Corp. admitted that *all remaining members* of its Data

14   Governance Committee—which was charged with ensuring the company's data practices complied with

15   the 2022 Administrative Order—left the company in the two weeks after Musk formally acquired X Corp.

16   *See* Def. Ex. 5 at 25. Moreover, when Kieran was asked to identify the "most senior" employee with

17   "long-standing knowledge" about the information security team, he responded there was "nobody left."

18   Kieran Tr. at 39:7-40:17. The FTC has had to focus its prior depositions on former employees because

19   nearly every employee who has been identified as a point person for privacy or data security either

20   resigned or was terminated before the FTC could talk to them.

21        Neither X Corp.'s contrived allegations of bad faith nor the apex doctrine support granting a

22   protective order here. The Court should deny Defendants' request to stay the deposition of Musk.

23                                              **CONCLUSION**

24        For the foregoing reasons, the United States respectfully asks this Court to deny X Corp.'s Motion

25   for Protective Order & Relief from Consent Order, ECF No. 17.

26

27

28

1  Dated: September 11, 2023                    Respectfully submitted,

2                                               FOR THE UNITED STATES OF AMERICA:

3                                               BRIAN M. BOYNTON
4                                               Principal Deputy Assistant Attorney General
                                                Civil Division
5
                                                ARUN G. RAO
6                                               Deputy Assistant Attorney General

7                                               AMANDA N. LISKAMM
8                                               Director
                                                Consumer Protection Branch
9
                                                LISA K. HSIAO
10                                              HILARY K. PERKINS
                                                Assistant Directors
11
12                                                /s/ Scott P. Kennedy
                                                SCOTT P. KENNEDY
13                                              ZACHARY L. COWAN
                                                Trial Attorneys
14                                              Consumer Protection Branch
                                                U.S. Department of Justice
15                                              450 5th Street, N.W. Suite 6400-S
                                                Washington, D.C. 20530
16                                              Tel: (202) 305-1837 (Kennedy)
17                                              Tel: (202) 353-7728 (Cowan)
                                                Fax: (202) 514-8742
18                                              Scott.P.Kennedy@usdoj.gov
                                                Zachary.L.Cowan@usdoj.gov
19
                                                ISMAIL J. RAMSEY
20                                              United States Attorney

21                                              MICHELLE LO
22                                              Chief
                                                Civil Division
23
                                                SHARANYA MOHAN
24                                              EMMET P. ONG
                                                Assistant United States Attorney
25                                              Northern District of California
                                                450 Golden Gate Avenue
26                                              San Francisco, California 94102
27                                              Tel: (415) 436-7198
                                                sharanya.mohan@usdoj.gov
28                                              emmet.ong@usdoj.gov