QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
Daniel R. Koffmann (California Bar No. 344379)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
alexspiro@quinnemanuel.com
danielkoffmann@quinnemanuel.com

Christopher G. Michel (*pro hac vice*)
Casey J. Adams (*pro hac vice*)
Rachel G. Frank (California Bar No. 330040)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
christophermichel@quinnemanuel.com
caseyadams@quinnemanuel.com
rachelfrank@quinnemanuel.com

*Attorneys for X Corp.,*
*successor in interest to Defendant Twitter, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| United States of America, | Case No. 3:22-cv-3070-TSH |
| Plaintiff, | **X CORP.'S REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER & RELIEF FROM CONSENT ORDER** |
| vs. | |
| Twitter, Inc., | **Hearing Date**: November 16, 2023<br>**Hearing Time**: 11:00 AM |
| Defendant. | **Hearing Location**: Courtroom E, 15th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA |
| | The Hon. Thomas S. Hixson |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT .............................................................................................................................. 2

I.    The FTC's Extraordinary Misconduct Warrants Termination or Modification of the Consent Order. ................................................................................................................ 2

    A.    The Justice Department's Attempt to Minimize the Severity of the FTC's Misconduct is Unavailing. ............................................................................... 2

    B.    The FTC's Investigation is Tainted by Impermissible Bias. .................................. 6

    C.    Termination or Modification Are Appropriate Remedies. ..................................... 9

II.   The Court Has Jurisdiction Over the Consent Order ........................................................ 10

III.  The Court Should Grant a Protective Order Against Mr. Musk's Deposition ................. 12

IV.  The Court Should Compel the FTC to Respond to X Corp.'s Discovery Demands ......... 14

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Cnty. of Contra Costa*,
   No. 15-CV-01673-RS (MEJ), 2017 WL 930315 (N.D. Cal. Mar. 9, 2017) .......................... 13

*Apple Inc. v. Samsung Elecs. Co.*,
   282 F.R.D. 259 (N.D. Cal. 2012) ............................................................................... 12, 13

*Atl. Ref. Co. v. FTC*,
   381 U.S. 357 (1965) ...................................................................................................... 11

*Berger v. United States*,
   295 U.S. 78 (1935) .......................................................................................................... 5

*Bonnischen v. United States*,
   217 F. Supp. 2d 1116 (D. Or. 2002) ................................................................................ 7

*Brill v. Wing*,
   937 F. Supp. 170 (N.D.N.Y. 1996) ........................................................................... 10, 11

*Carma Devs. v. Marathon Dev.*,
   2 Cal. 4th 342 (1992) ...................................................................................................... 6

*Daly-Murphy v. Winston*,
   837 F.2d 348 (9th Cir. 1987) ......................................................................................... 11

*Drive-X Co. v. Dixon*,
   348 F.2d 342 (D.C. Cir. 1965) ....................................................................................... 11

*In re Facebook Consumer Privacy Litig.*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................................. 6

*Frew v. Hawkins*,
   540 U.S. 431 (2004) ...................................................................................................... 11

*Genuine Parts Co. v. FTC*,
   445 F.2d 1382 (5th Cir. 1971) ....................................................................................... 15

*In re Google Litig.*,
   No. C 08-03172 RMW (PSG), 2011 WL 4985279 (N.D. Cal. Oct. 19, 2011) ................... 13

*Keeling v. Sheet Metal Workers Int'l Ass'n*,
   937 F.2d 408 (9th Cir. 1991) ....................................................................................... 3, 9

*Lone Ranger Television v. Program Radio*,
   740 F.2d 718 (9th Cir. 1984) ........................................................................................... 5

*Mattingly v. United States*,
    939 F.2d 816 (9th Cir. 1991) .................................................................................................. 12

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992) ........................................................................................................... 6, 7

*U.S. ex rel. Schweizer v. Océ N.V.*,
    677 F.3d 1228 (D.C. Cir. 2012) ............................................................................................ 12

*Thompson v. U.S. Dep't of Housing & Urban Dev.*,
    404 F.3d 821 (4th Cir. 2005) ......................................................................................... 3, 7, 9

*Torres Advanced Enter. Sols. v. United States*,
    133 Fed. Cl. 496 (2017) ......................................................................................................... 7

*Travelers Ins. v. Budget Rent-A-Car*,
    901 F.2d 765 (9th Cir. 1990) .................................................................................................. 6

*U.S. ex rel. Turnkey Const. Servs., Inc. v. Alaskan Contracting, LLC*,
    No. 13-CV-01654 TLN-CMK, 2013 WL 6503307 (E.D. Cal. Dec. 11, 2013) ..................... 10

*United States v. Asarco Inc.*,
    430 F.3d 972 (9th Cir. 2005) .................................................................................................. 9

*United States v. Baus*,
    834 F.2d 1114 (1st Cir. 1987) ............................................................................................ 6, 9

*United States v. City of Albuquerque*,
    No. 1:14-cv-1025 RB-SMV, 2017 WL 5508519 (D.N.M. Nov. 16, 2017) ........................... 5

*United States v. Fensterwald*,
    553 F.2d 231 (D.C. Cir. 1977) ....................................................................................... 14, 15

**<u>Rules</u>**

Fed. R. Civ. P. 29 .......................................................................................................................... 12

Fed. R. Civ. P. 30 .......................................................................................................................... 12

Fed. R. Civ. P. 60(b)(5) ................................................................................................................... 3

Fed. R. Civ. P. 60(b)(6) ................................................................................................................... 3

**<u>Statutes</u>**

15 U.S.C. § 45(b) .................................................................................................................... 11, 12

15 U.S.C. § 45(*l*) ..................................................................................................................... 10, 11

X Corp., successor in interest to Defendant Twitter, Inc. respectfully submits this reply in support of its motion to terminate, modify, or stay enforcement of the Consent Order that is subject to this Court's jurisdiction by virtue of the Stipulated Order and for a protective order staying the Notice of Deposition of Elon Musk issued by the Federal Trade Commission ("FTC").

**PRELIMINARY STATEMENT**

Although the government's Opposition largely tries to change the subject, the unrebutted evidence shows staggering misconduct that fundamentally undermines the parties' settlement. Lawyers at the FTC—a federal agency tasked with protecting consumers from unfair and deceptive trade practices and other unscrupulous conduct—"tr[ied] to influence the outcome of" a court-mandated independent assessment by (1) conveying "expectations … about what th[e] results should be before [the assessor, Ernst & Young LLP ("EY")] had even begun any procedures"; (2) providing "a list of specific[] … types of procedures they were expecting [EY] to execute"; and ultimately (3) communicating in "very adamant" terms "absolutely what [EY] will do"—including "produce a report" that "would conclude that there were deficiencies in Twitter's privacy and information security program."  Dkt. 18-14 at 121:20–122:2, 123:8-10, 201:2–12, 202:9–203:1. Contemporaneous written communications within EY memorialize the chilling effect this had. EY's senior partner and engagement lead, David Roque, described how, by "pressuring [EY] to reach a specific outcome," the FTC's conduct created an "[u]ndue influence threat" that interfered with EY's "ab[ility] to be objective." Dkt. 18-15. And he discussed his worry that, if EY responded to the pressure by resigning from its position, "[t]he FTC [will] take[] exception to our withdrawal and create[] 'other' challenges for EY over time[.]" Dkt. 18-17.

In its Opposition, the Justice Department hardly defends the FTC's conduct. It does not question Mr. Roque's credibility. It does not dispute the veracity of the documentary corroboration. It does not offer contrary evidence of the FTC's good faith. Its failure to do so is a concession that the FTC attempted to coerce EY into becoming an investigatory arm of the agency and generating evidence the FTC could use to charge the targets of its investigation.

Remarkably, the government's central response is that X Corp. should have *expected* the misconduct because the FTC and X Corp. are adversaries in this litigation. That is both alarming

and baseless. While it is true that the government sued X Corp. in 2022, the government agreed—as part of an order that it asked this Court to enter—that an "independent" and "objective" assessor would evaluate X Corp.'s compliance with the terms of the parties' settlement. The FTC's efforts to compromise the assessor's independence and objectivity can no more be justified by invoking adversarial litigation than could efforts to compromise the independence and objectivity of an arbitrator or judge overseeing compliance with a settlement. The FTC's egregious misconduct is a material change in circumstances and a flagrant violation of the parties' agreement—both of which are grounds for this Court to vacate or modify the Consent Order as outlined in X Corp.'s motion.

The FTC counters with a procedural argument, contending that X Corp. would remain subject to the Consent Order even if the Court were to vacate the Stipulated Order. But that argument misunderstands the relationship between the relevant orders. The Consent Order is a product of—and expressly integrated into—the Stipulated Order that this Court entered after *the FTC* brought the case in this forum, and over which this Court has continuing jurisdiction. Just as the Court had power to incorporate the Consent Order, it retains power to vacate or modify the Consent Order. The FTC cannot have it both ways, invoking the power of this Court to enforce the Consent Order when convenient, but then denying the power of the Court over the same Order when that approach suits its purposes.

This Court should reject the argument that it is powerless to sanction brazen government misconduct or remedy the resulting harm. The Court should terminate or modify the Consent Order, stay the deposition of Elon Musk, and compel the FTC to respond to X Corp.'s discovery demands.

**ARGUMENT**

**I.  THE FTC'S EXTRAORDINARY MISCONDUCT WARRANTS TERMINATION OR MODIFICATION OF THE CONSENT ORDER.**

    **A.  <u>The Justice Department's Attempt to Minimize the Severity of the FTC's Misconduct is Unavailing.</u>**

The FTC's attempts to manufacture evidence by influencing the independent assessment of X Corp.'s privacy, data protection, and information security program are egregious government misconduct justifying X Corp.'s requested relief. Mr. Roque's testimony was unambiguous: FTC staff "kept expressing their opinion more and more adamantly about the extent of procedures [EY]

would need to perform" and declaring their "expectations around the results they would expect [EY] to find[.]" Dkt. 18-14 at 121:11–19. FTC staff was "adamant about this is absolutely what you will do and this is going to occur, and you'll produce a report at the end of the day" that "would conclude that there were deficiencies in Twitter's privacy and information security program." *Id.* at 201:5–8, 20–23. Mr. Roque found this so unusual that it "raised a personal concern that … the FTC was trying to influence the outcome of the engagement before it had started[.]" *Id.* at 121:20–22.

This testimony leaves no legitimate doubt that the FTC improperly attempted to influence the content and outcome of the independent assessment, which the FTC itself concedes is meant to be "truly objective—*i.e.*, unaffected by the interests (or litigation positions) of either the respondent or the FTC." Dkt. 18-1 at 3; *see also* Opp. 18–19 (recognizing that the parties negotiated for an "objective, independent, third-party assessment" because "neither party considered the other to be an objective, independent observer"). That extraordinary changed circumstance alone renders the Consent Order unworkable and is enough to warrant relief under Rule 60(b)(5), as other courts have recognized under analogous circumstances. *Thompson v. U.S. Dep't of Housing & Urban Dev.*, 404 F.3d 821, 825 (4th Cir. 2005) (affirming decision that "the magnitude of the [government defendants'] non-compliance amounted to a change of circumstance sufficient to warrant modification" of consent order).[1] The FTC's attempts to subvert a core part of the parties' agreement also amount to repudiation of the plain text of the Consent Order, which itself is an "extraordinary circumstance" justifying relief pursuant to Rule 60(b)(6). *Keeling v. Sheet Metal Workers Int'l Ass'n*, 937 F.2d 408, 410–11 (9th Cir. 1991) (affirming vacatur of judgment because party's conduct amounted to "repudiation or complete frustration of the settlement agreement.").

The Opposition does nothing to change that conclusion. Rather, it confirms it.

***First***, the government does not seriously dispute that the FTC sought to influence EY to reach an outcome that would be prejudicial to X Corp. Its half-hearted attempt to defend the FTC consists principally of arguing that X Corp. "cherry-picked" the worst quotations from Mr. Roque's

---

[1] Unless otherwise indicated, this brief omits internal quotation marks, citations, alterations, and omissions from legal citations.

testimony and applied a "hyperbolic" gloss to them.  Not so.  In any event, X Corp. provided the entire transcript of Mr. Roque's testimony with its motion, so the Court can judge for itself what Mr. Roque's testimony means.  At a minimum, his testimony, along with the accompanying internal EY discussions, easily rebut any suggestion that the FTC's conduct was "benign" and that the "FTC staff simply communicated an expectation that EY would issue an assessment" but did not convey "other expectations from a 'conclusion standpoint.'"  Opp. 16.  The government's Pollyanna reconstruction of the transcript is an exercise in whistling past the graveyard.

*Second*, lacking a basis to dispute what the FTC did, the government's only genuine point of contention is whether it is improper for a federal agency to engage in such conduct.  The answer to that question must be yes.  The Opposition shows why.

Contrary to the facts, the government appears to suggest that X Corp. might have engaged in the same type of misconduct if EY had failed to reach the company's favored conclusion: "[I]f EY had discovered problems in X Corp.'s data privacy and security program," the government's argument goes, then "X Corp. might have preferred for those problems to remain hidden."  *Id.* at 16.  But if the roles were reversed—and the FTC obtained testimony that X Corp. personnel had "pressur[ed] [EY] to reach a specific outcome" that would be positive to X Corp.—the FTC would have treated this as serious misconduct, potentially including a referral to the Justice Department's Consumer Protection Branch for criminal obstruction of an official proceeding.  Dkt. 18-15 at 1.  Those same Justice Department representatives cannot be heard to argue that such actions are the "unremarkable" or "fully expected" results of an "adversarial situation."  Opp. 16, 18.

More fundamentally, the government's suggestion that X Corp. should have "fully expected the perceived 'bias,' [] that it now alleges" because of the "adversarial situation" between the company and the FTC (Opp. 16, 18) is alarming and misguided.  The presence of an adversarial relationship in litigation is no excuse for attempting to influence an assessor the parties agreed must be independent and objective.  Virtually every settlement is the result of agreement by adversaries in litigation; if the underlying adversity justified attempts to gain an advantage by disregarding the agreement, then settlements would have little value.  The Court should decline the government's invitation to normalize the FTC's heavy-handed tactics as an unexceptional feature of our adversary

system.  "While zealous advocacy is laudable, it has its limits."  *Lone Ranger Television v. Program Radio*, 740 F.2d 718, 727 (9th Cir. 1984).  The government "may strike hard blows, [but it] is not at liberty to strike foul ones."  *Berger v. United States*, 295 U.S. 78, 88 (1935).

***Third***, the government's suggestion that X Corp. is attempting to "preclud[e] FTC staff" from engaging in any kind of *ex parte* communications with the independent assessor is an unfounded attempt to distract from the real issue.  Opp. 17.  X Corp. never argued that the Consent Order barred all *ex parte* communications between the FTC and the independent assessor, which X Corp. made clear to EY were permitted.  *See, e.g.*, Dkt. 18-14 at 116:6–11 (Mr. Roque testifying that X Corp. informed EY it was "allowed to talk to the FTC if and when [EY] felt it was appropriate or [the FTC] reached out to [EY] with questions.").  Rather, X Corp. argues that the FTC was not free to use those *ex parte* communications to pressure the independent assessor to reach the FTC's predetermined outcome.  *See* Mot. 14–19.  The problem is not that the FTC spoke to the assessor; the problem is what the FTC said.

The Opposition's cited authorities thus miss the mark.  *T.Y. v. Board of County Commissioners*, for example, concerned whether one party could insist on a bar on *ex parte* communications with an independent monitor where the underlying consent order contained no such prohibition.  912 F. Supp. 1424, 1426–27 (D. Kan. 1996).  But here, X Corp. is not seeking a gag order.  It is seeking relief from a consent order that the FTC has abused to further its biased, predetermined investigation.  *United States v. City of Albuquerque*, No. 1:14-cv-1025 RB-SMV, 2017 WL 5508519 (D.N.M. Nov. 16, 2017), is equally inapposite.  The *Albuquerque* court rejected "vague allegations regarding 'the nature and frequency of communications between the Monitor and DOJ attorneys'" because "[t]he Parties [had] not prohibited the Monitor from engaging in ex parte communications."  *Id.* at *6.  By contrast here, X Corp. relies on specific, sworn testimony from EY's engagement partner about the content of the FTC's communications.

***Finally***, the government's suggestion that X Corp. should have negotiated different settlement terms is similarly misguided.  The Opposition acknowledges that the parties agreed that the assessment must be "objective [and] independent."  Opp. 18.  And the terms of the Consent Order leave no room for doubt, stating expressly that the assessment "must be obtained from one or

more qualified, *objective, independent* third-party professionals" who must (among other things) "conduct an *independent* review of" X Corp.'s program. Dkt. 11 at 15 (Section VI.A (emphases added)). It is not clear what other settlement terms X Corp. could have negotiated that would have more plainly required an objective and independent assessment. Where a "settlement agreement is made, as here, under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion." *United States v. Baus*, 834 F.2d 1114, 1124 (1st Cir. 1987). The Opposition cites no authority that blesses the FTC's attempt to subvert its acknowledged commitments because X Corp. failed to seek prophylactic "protection[s]" against the specific type of misconduct the FTC committed. Opp. 18.

Moreover, consent orders are contracts, and "[t]he idea that a party may not rely on a contract term because the other side can be expected to violate it cuts at the very heart of contract law." *Travelers Ins. v. Budget Rent-A-Car*, 901 F.2d 765, 768 (9th Cir. 1990). "[E]very contract includes an implicit promise not to take an action that would deprive the other contracting party of the benefits of their agreement." *In re Facebook Consumer Privacy Litig.*, 402 F. Supp. 3d 767, 802 (N.D. Cal. 2019). That implied promise proscribes conduct that "though not prohibited, is nevertheless contrary to the contract's purposes and the parties' legitimate expectations." *Carma Devs. v. Marathon Dev.*, 2 Cal. 4th 342, 373 (1992). The government's paragraph-long string cite defending witness tampering (Opp. 17–18) suggests it misunderstands this basic concept.

### B. The FTC's Investigation is Tainted by Impermissible Bias.

The FTC's conduct leads to the inescapable conclusion that its investigation is motivated by bias against X Corp. and its new owner rather than any lawful investigatory purpose. As noted, the Opposition does not seriously dispute this bias, arguing instead that X Corp. should have "fully expected the perceived 'bias'" when agreeing to the Stipulated Order. Opp. 18. But X Corp.—then Twitter, Inc.—could not have "actually [] anticipated" that the FTC would transform its compliance monitoring into a tool for targeting and harassing the company's subsequent acquirer, Elon Musk, and successor entity, X Corp. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 385 (1992). Nor could X Corp. have anticipated that the FTC would attempt to subvert the independent assessment in pursuit of those goals. X Corp. is "not required to anticipate every exigency that could

1  conceivably arise during the life of a consent decree," and *Rufo*'s "heavy burden" standard is not applicable. 502 U.S. at 385; *see also Thompson*, 404 F.3d at 828–29 (rejecting argument that party to consent order should have anticipated governmental non-compliance).

Alternatively, the Opposition argues that X Corp. cannot show bias because the FTC claims it was simply conducting routine investigations of X Corp.'s compliance with the Stipulated Order. Opp. 14–15. This response only begs the question. The FTC cannot rebut evidence of bias simply by pointing to a pretextual lawful purpose. *See, e.g.*, *Torres Advanced Enter. Sols. v. United States*, 133 Fed. Cl. 496, 522 (2017) ("[P]ersonal animus or bias on the part of agency officials…latent inconsistency in the existing record, or…some indication that the agency's explanation is pretextual" will suffice to place an issue before the court even when the "agency has provided for its decision a reasonable explanation."); *Bonnischen v. United States*, 217 F. Supp. 2d 1116, 1164–65 (D. Or. 2002) (remanding a "consistently biased" agency action even when the conduct was couched in a lawful pretext).

In any event, this justification crumbles under scrutiny. The Opposition's factual narrative tellingly skips from entry of the Stipulated Order in May 2022 straight to Mr. Musk's acquisition of the company at the end of October 2022. Opp. 4–5. In doing so, the government omits the explosive allegations by Peiter Zatko, Twitter, Inc.'s former Security Lead who reported directly to Twitter's CEO. Mr. Zatko alleged that pre-Musk Twitter deliberately misled the FTC about the company's compliance with the 2011 Consent Order and was endangering user data. *See* Mot. 5–6. Yet instead of focusing on those accusations, which relate to alleged misconduct occurring *before* Mr. Musk acquired Twitter, the FTC's depositions and rapid-fire demand letters have focused almost entirely on what happened *after* Mr. Musk acquired the company. *See, e.g.*, Dkt. 18-7, 18-8, 18-9, 18-10, 18-14, 42-3, 42-4, 42-5, 42-6. The government attempts to justify the FTC's focus by arguing that post-acquisition changes "gave [the FTC] every reason" to investigate, Opp. 14, but it offers no explanation for why the *possibility* that Mr. Musk's changes might affect user privacy and security merited so much more attention than Mr. Zatko's *direct allegations* that pre-Musk Twitter had misled the FTC and put users' privacy and security at risk. The FTC's inconsistency reinforces the

inference that its investigation is motivated by bias. The Opposition offers no alternative explanation for those facts.

In trying to justify the FTC's drastic shift in interest in X Corp., the Opposition inadvertently demonstrates that bias against Mr. Musk lies at the heart of the investigation. The government recounts at length deposition testimony about "several concerning incidents involving Musk." Opp, at 7. But that testimony resulted from the FTC's persistent focus on eliciting evidence about *Mr. Musk* during its ostensible investigation of X Corp.'s compliance with the Consent Order. *See, e.g.*, Dkt. 42-3 at 64:4–6 ("Were there any other incidents or events or things you heard that caused you to have concerns about Mr. Musk's leadership of Twitter?"); *id.* at 72:1–3 (similar); Dkt. 42-6 at 132:13–16 ("Was it your sense that the priorities coming from Elon Musk and his team were in effect having the security issues slide further down the list of priorities?"); Dkt. 42-4 at 264:22–265:2 ("[D]id anything else happen that changed your opinion of Mr. Musk's commitment to complying with the order?"). The FTC asked a former X Corp. security professional some variation of a question about "concerns" with Mr. Musk's "leadership" no fewer than seven times during his deposition. *See, e.g*, Dkt. 42-3 at 64:4–6, 72:1–3. In addition, the Opposition in some cases misleadingly quotes from the testimony. For example, the government cites testimony from the company's former Chief Privacy Officer, Damien Kieran, that the privacy and security reviews of Twitter Blue were not "conducted in accordance with the company's process for software development." Opp. 8–9. But the government conspicuously omits Mr. Kieran's *immediately preceding* testimony that he personally "ensured that the security and privacy reviews [of the Twitter Blue product] were appropriately conducted." Dkt. 42-5 at 146:1–7. Far from demonstrating a neutral, lawful purpose, this investigatory conduct provides yet more evidence that the FTC's investigation has been targeted at Mr. Musk personally all along.

In any event, objective evidence rebuts the FTC's justification for harassing X Corp. On August 5, 2023, FTI—who replaced EY as X Corp.'s independent assessor—completed its assessment of X Corp.'s privacy, data protection, and information security program for the period from May 26, 2022 to May 25, 2023. FTI's conclusions vindicated X Corp. According to FTI, "[X Corp.] has implemented and maintained a Program required by Provision V of the Order," and "the

Program established and implemented by [X Corp.] is appropriate." Ex. 21 at 7, 9.  To be sure, the assessment noted a number of exceptions and areas where X Corp. can improve.  These observations demonstrate the thoroughness of FTI's assessment and lend credibility to its overwhelmingly positive conclusions.

Finally, the government's suggestion that any misconduct is harmless because EY ultimately withdrew from the representation is a nonstarter.  By violating the plain terms of the parties' agreement, the FTC no longer has any basis to continue enforcing it.  That the FTC would resort to such conduct in the first place, moreover, is probative of its abuse of the Consent Order and its disqualifying bias against Elon Musk and X Corp.  It also demonstrates the risk that the FTC will engage in similar misconduct unless it loses access to the tools contained in the Consent Order.  This is far from a theoretical danger:  X Corp. must complete an independent assessment every two years, Dkt. 11 at 15, and the FTC no doubt will interpret a denial of X Corp.'s motion as an endorsement of its position that bullying an independent assessor is merely zealous advocacy that should "come as no surprise" to X Corp.  Opp. 19.  Absent relief from this Court, there is little reason to believe the FTC will not attempt the same approach again.

### C. <u>Termination or Modification Are Appropriate Remedies.</u>

The FTC's extraordinary misconduct represents a "repudiation or complete frustration" of the settlement agreement reached by the parties, which "justifies vacating the court's prior [] order." *Keeling*, 937 F.2d at 410–11 (vacating settlement between union and employer who repudiated the agreement by "fail[ing] to comply with the settlement terms"); *see also Baus*, 834 F.2d at 1127 (remanding for evidentiary hearing and noting that "[a] material breach of [the government's] obligation would, of course, constitute an independent ground for vacating the judgment entered pursuant to the settlement agreement").  If X Corp. had known that the FTC planned to violate the letter and spirit of the Consent Order, it "would never have been executed" in the first place. *Thompson*, 404 F.3d at 828.  At a minimum, the Court should impose modifications "suitably tailored to resolve the problems created" by the FTC's misconduct, by stripping the FTC of the tools it has abused.  *See United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005).  These include the independent assessor provisions (Parts VI–VII) and the discovery provisions (Parts XI and XIII).

## II. THE COURT HAS JURISDICTION OVER THE CONSENT ORDER

The government attempts to erect procedural roadblocks to granting X Corp.'s motion, but these arguments are meritless. The Opposition contends that the Consent Order "is not properly before the Court" (Opp. 11), but that is a remarkable assertion given that the government: (1) invoked this Court's jurisdiction by filing a civil complaint, Dkt. 1; (2) availed itself of that jurisdiction by obtaining relief that only this Court could award, 15 U.S.C. § 45(*l*); and (3) asked the Court to enter the Stipulated Order, which integrated the Consent Order, as a judgment over which the Court retained jurisdiction. Dkt. 11 at 3–4, 8–22. This Court then exercised its jurisdiction and entered the Stipulated Order (along with the Consent Order) in final judgment of the government's complaint, binding Twitter, its successors, and the government alike. *Id.* The FTC thereafter continued to invoke this Court's authority by taking discovery through subpoenas and deposition notices bearing the Court's name and case caption. *See, e.g.*, Dkt. 18-11, 18-12. But now that X Corp. seeks relief on the same grounds available to any civil litigant in a federal court, the government erroneously argues that this Court has no jurisdiction over the content of its own order. Given the government's repeated decisions to place this matter before the Court, it should be estopped from advancing this argument. *See, e.g.*, *U.S. ex rel. Turnkey Const. Servs., Inc. v. Alaskan Contracting, LLC*, No. 13-CV-01654 TLN-CMK, 2013 WL 6503307, at *3 (E.D. Cal. Dec. 11, 2013) (where "Plaintiff, not Defendant, invoked this court's jurisdiction … this court has jurisdiction to enforce the terms of the very agreement that forms the basis of the claims Plaintiff asserts").

In any event, the Stipulated Order's express incorporation of the Consent Order places the Consent Order squarely within this Court's jurisdiction. Attachments "are an intrinsic part of the decree and are to be given the same effect as the main document." *Brill v. Wing*, 937 F. Supp. 170, 175–76 (N.D.N.Y. 1996); 11 Williston on Contracts § 30:25 (4th ed.) (when "a writing refers to another document, that other document … becomes constructively a part of the writing, and in that respect the two form a single instrument"). The government filed the Stipulated Order and the Consent Order as a single, integrated document, and the Court entered them in a single document and docket entry. Dkt. 11. The Consent Order thus should "be given the same effect as the" Stipulated Order, over which the parties agreed "this Court shall retain jurisdiction … for purposes

1   of construction, modification, and enforcement." *Brill*, 937 F. Supp. at 176; Dkt. 11 at 4.

2   The government also suggests that even if the Court grants X Corp. relief, the FTC could assert that the Consent Order is still effective. Opp. 21. In doing so, the government asks the Court to endorse a heads-I-win-tails-you-lose construction under which the FTC can select the most favorable aspects of federal court jurisdiction and then retreat back to the safety of its administrative order when X Corp. asserts its rights. Having submitted this matter to the Court's continuing jurisdiction in order to invoke its penalty powers, the FTC should not be heard to argue that the Court's judgment has no force or effect on its investigation. The FTC cannot "unilaterally obliterate a part of the consideration—indeed an important part—by which it secured [X Corp.'s] assent to be bound." *Drive-X Co. v. Dixon*, 348 F.2d 342, 346 (D.C. Cir. 1965).

The FTC also argues that X Corp. is attempting to use its Motion as an end-run around administrative review. Opp. 12–13. But the FTC conflates 15 U.S.C. § 45(b), which concerns "cease and desist" "proceeding[s] by the Commission," with Section 45(*l*), which was the mechanism for the government to file this case in federal court and obtain monetary relief. None of the decisions on which the government relies concerned injunctions under Section 45(*l*). Nor does the government offer any other explanation for why a party to a judicially supervised consent order with a federal agency must seek the agency's permission before seeking relief or that such consent order should be subject to special procedures dictated by the agency. A consent order "embodies an agreement of the parties and is also an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004).

In any event, the FTC has it backwards—it threatens to use administrative proceedings to short circuit judicial authority to grant relief from court judgments. The rule of administrative exhaustion guards against "premature judicial intervention into the administrative process," before an agency has had a chance to pass on a matter "in the first instance." *Daly-Murphy v. Winston*, 837 F.2d 348, 354 (9th Cir. 1987); *Atl. Ref. Co. v. FTC*, 381 U.S. 357, 377 (1965). But here, the government submitted this matter to a federal court more than a year ago, and this Court reduced it to a judgment. Further "construction, modification, and enforcement" of that judgment—including

the integrated Consent Order—is explicitly a matter for the Court, not the FTC. Dkt. 11 at 4. This procedural posture results directly from the government's choices. If the FTC had sought a cease-and-desist order under Section 45(b) without involving the Court, then X Corp. might be required to exhaust administrative remedies before seeking judicial review. But by invoking the Court's authority to obtain relief it could not achieve on its own, the FTC "consented to judicial involvement" thereafter. *U.S. ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1236 (D.C. Cir. 2012).

### III.  THE COURT SHOULD GRANT A PROTECTIVE ORDER AGAINST MR. MUSK'S DEPOSITION

The Court should grant X Corp.'s request for a protective order against the FTC's attempt to depose Mr. Musk. Much of the government's argument rests on the false premise that the FTC's demand to depose Mr. Musk was administrative, not judicial, because the "the FTC has not invoked judicial process." Opp. 23. False. The FTC noticed Mr. Musk's deposition pursuant to Rule 30 of the Federal Rules of Civil Procedure and this court case. Dkt. 18-11, 18-12. Having invoked those authorities, the FTC must also respect the protections they afford to every litigant, including the protections of the apex doctrine. The Opposition fails to justify the FTC's attempt to go straight to the top of X Corp.'s leadership in contravention of that rule.

For the same reason, the Opposition's argument that the apex doctrine does not apply in administrative proceedings is a non-sequitur. The FTC's own deposition notices demonstrate that this investigation is unfolding under the auspices of the Court's authority pursuant to the Federal Rules of Civil Procedure, not in an FTC administrative proceeding governed by different procedural rules. The Stipulated Order provides that the FTC may obtain discovery "using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 [], 31, 33, 34, 36, 45, and 69." Dkt. 11 at 20. As the FTC has recognized, the apex doctrine "arises out of the Federal Rules of Civil Procedure." Ex. 22, Order on Pet. to Quash, *Amazon.com, Inc.*, No. 212 3050, at 16 (Sept. 21, 2022). Courts in this district apply the apex doctrine under the Federal Rules of Civil Procedure. *See Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012). The government cannot ask the Court to ignore that rule because it could have proceeded under a different paradigm in which it might not apply. *See Mattingly v. United States*, 939 F.2d 816, 818 (9th Cir. 1991)

("[W]hen the United States comes into court as a party in a civil suit, it is subject to the Federal Rules of Civil Procedure as any other litigant.").

The Opposition fails to demonstrate that the FTC's attempt to depose Mr. Musk as its very first currently employed witness is appropriate. "[T]he closer that a proposed witness is to the apex of some particular peak in the corporate mountain range, and the less directly relevant that person is to the evidence proffered in support of his deposition, the more appropriate the protections of the apex doctrine become." *Apple Inc.*, 282 F.R.D. at 263. As the majority shareholder and former CEO of X Corp., there can be little doubt Mr. Musk sits at the summit of X Corp.'s corporate structure. His deposition is only appropriate if he has "unique first-hand, non-repetitive knowledge of the facts at issue in the case," and the government "has exhausted other less intrusive discovery methods." *Id.* at 263. The FTC cannot satisfy either element.

The Opposition argues that Mr. Musk possesses unique knowledge because he was "deeply involved in the 'fundamental transformation' of X. Corp.," which allegedly created "a serious concern" about the company's adherence to the Stipulated Order. Opp. 24. If a generalized knowledge about large-scale changes at an organization were enough to justify an apex deposition, the apex doctrine would be a nullity. *See In re Google Litig.*, No. C 08-03172 RMW (PSG), 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011) (rejecting attempt to depose Google founder Sergey Brin because of lack of evidence of "unique and first-hand knowledge of the facts of this case" and opposing party's failure to "exhaust[] other less intrusive methods of discovery"). Nearly every high-level executive can be said to possess some such broad knowledge about an organization and its strategic decisions. *See Anderson v. Cnty. of Contra Costa*, No. 15-CV-01673-RS (MEJ), 2017 WL 930315, at *4 (N.D. Cal. Mar. 9, 2017) (denying request to depose under the apex doctrine where individual was "not an appropriate witness for general information regarding … policies and practices" which are "topics of general application"). The Court should reject the FTC's attempt to go straight to the top of the organization, which is precisely what the apex doctrine protects against.

There is no legitimate question that the FTC could opt for "less intrusive discovery methods" than the deposition of Mr. Musk. *Apple, Inc.* 282 F.R.D. at 263. The Opposition argues that the agency had to focus on former employees because of departures during the transition period. Opp.

25. But X Corp. still has many employees working in roles that oversee or support its compliance with the Stipulated Order and who have direct, day-to-day, current knowledge about those efforts. For example, the independent assessor conducted "walkthroughs and working sessions with all Control Owners and relevant Program team members," and also interviewed 11 knowledgeable senior employees, including the company's Global Data Protection Officer, Privacy Leads, Security Engineering Leads, cybersecurity Detection and Response Team leads, and a Privacy Program Manager, in order to conduct its assessment. Ex. 21 at 5, 200. The FTC has not sought to depose any of those individuals and instead insists that it must interview Elon Musk himself before anyone else. At a minimum, the Court should require the FTC to exhaust less intrusive methods of discovery before seeking an apex deposition.

### IV. THE COURT SHOULD COMPEL THE FTC TO RESPOND TO X CORP.'S DISCOVERY DEMANDS

The limited record into which X Corp. has insight is sufficient to warrant termination or modification of the Consent Order for the reasons demonstrated above. The blatantly improper attempts to influence EY's assessment, the politically motivated timing of the FTC's investigation, its relative lack of interest in serious allegations about pre-Musk issues, and the unjustified demand to depose Mr. Musk all reinforce that conclusion. But further discovery is imperative. The Court should compel the FTC to respond to X Corp.'s discovery demands in order to illuminate the extent, intent, and effect of the agency's misconduct and bias.

Courts compel discovery from administrative agencies based on "substantial allegations" of inequitable conduct or abuse of judicial process. *See* Mot. 20–21. The government glosses over most of X Corp.'s authority and argues that *SEC v. McGoff* renders them all inapplicable to this matter. Opp. 22 (citing 647 F.2d 185, 193 (D.C. Cir. 1981)). Not so. *McGoff* did not cabin the principles of *United States v. Fensterwald*, 553 F.2d 231, 232–33 (D.C. Cir. 1977), or the many other decisions X Corp. cited, to actions involving an agency's "subpoena enforcement action." Opp. 22. Nor could it have, since *Fensterwald* itself involved a motion to quash an agency summons filed by the *recipient*, not an attempt by the agency to enforce its demands. 553 F.2d at 232 (noting that Fensterwald "initiated discovery by filing interrogatories directed to the IRS as the opposing

1  party in his action . . . to quash the IRS summons."). Rather, the *McGoff* court found the facts at
2  issue bore "scant resemblance" to *Fensterwald*, because McGoff could "point to nothing concrete"
3  to back up his allegations. 647 F.2d at 193. In contrast, X Corp.'s allegations are based on the
4  sworn testimony of the independent assessor that the FTC itself approved. That is a far cry from
5  the "diffuse speculations" in *McGoff*. *Id.* at 194. Like *Fensterwald*, X Corp. has based its discovery
6  demands on specific allegations of an "extraordinary harassing investigation." 553 F.2d at 232.

7        The government's attempt to characterize X Corp.'s discovery demands as an impermissible
8  disruption of a pre-enforcement investigation is also misplaced. Opp. 21–22 (citing *Genuine Parts*
9  *Co. v. FTC*, 445 F.2d 1382, 1387–88 (5th Cir. 1971)). The circumstances of this case differ
10 materially from *Genuine Parts*, where the subject of the FTC investigation alleged no agency
11 misconduct or bias. 445 F.2d at 1387. Here, however, X Corp. has established serious FTC
12 misconduct, bias, and harassment of X Corp. that must be developed further through discovery.

## CONCLUSION

14       For the foregoing reasons, the Court should (1) terminate, modify, or stay enforcement of
15 the Consent Order; (2) issue a protective order staying the notice of deposition issued to Elon Musk
16 by the FTC; and (3) order the FTC to respond to X Corp.'s discovery requests and stay all
17 enforcement of the Consent Order—including X Corp.'s obligations to respond to demand letters
18 and produce witnesses for deposition—until the FTC has done so.

DATED: October 11, 2023      Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Alex Spiro*
Alex Spiro (*pro hac vice*)
Daniel R. Koffmann (California Bar No. 344379)
51 Madison Ave, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
alexspiro@quinnemanuel.com
danielkoffmann@quinnemanuel.com

| | |
|---|---|
| 1 | Christopher G. Michel (*pro hac vice*) |
| 2 | Casey J. Adams (*pro hac vice*) |
|   | Rachel G. Frank (California Bar No. 330040) |
| 3 | 1300 I Street NW, Suite 900 |
|   | Washington, D.C. 20005 |
| 4 | Telephone: (202) 538-8000 |
|   | Facsimile: (202) 538-8100 |
| 5 | christophermichel@quinnemanuel.com |
|   | caseyadams@quinnemanuel.com |
| 6 | rachelfrank@quinnemanuel.com |
| 7 | *Attorneys for X Corp., successor in interest to* |
| 8 | *Defendant Twitter, Inc.* |