# Exhibit C

## (Dkt. No. 42-3)
REDACTED

1                   UNITED STATES OF AMERICA

2                NORTHERN DISTRICT OF CALIFORNIA

3

4    In the Matter of:            )

5    UNITED STATES OF AMERICA,    )

6        V.                       ) Case No. 3:22-cv-3070TSH

7    TWITTER, INC.                )

8    _____)

9

10

11

12

13

14

15              VIDEOCONFERENCE DEPOSITION OF:

16                        SETH WILSON

17      Taken on behalf of the Federal Trade Commission

18                       May 5, 2023

19

20

21

22

23

24

25

2

Wilson

USA v. Twitter, Inc.                                              5/5/2023

```
 1    APPEARANCES (Via Zoom Videoconference):
 2    For the Federal Trade Commission:
 3              REENAH L. KIM, ESQ.
                ANNE COLLESANO, ESQ.
 4              ALEX GAYNOR, ESQ.
                ERIK JONES, ESQ.
 5              Federal Trade Commission
                600 Pennsylvania Avenue NW
 6              Washington, DC 20580
                202-326-2272
 7              rkim1@ftc.gov
 8    For the Witness:
 9              ELLEN LONDON, ESQ.
                London & Stout, PC
10              1999 Harrison Street
                Suite 2010
11              Oakland, California 94612
                415-862-8494
12              elondon@londonstoutlaw.com
13    For X Corp. (Formerly Twitter):
14              CASEY ADAMS, ESQ.
                DANIEL KOFFMANN, ESQ.
15              Quinn Emanuel Urquhart & Sullivan, LLP
                51 Madison Avenue
16              Floor 22
                New York, New York 10010
17              212-849-7000
                caseyadams@quinnemanuel.com
18              danielkoffmann@quinnemanuel.com
19    The Court Reporter:
20              PAMELA P. WILLIS, TLCR NO. 229
                For the Record, Inc.
21              10760 Demarr Road
22              White Plains, Maryland 20695
23              301-870-8333
24              nashvillecourtreporter@gmail.com
25
```

Wilson

USA v. Twitter, Inc.                                        5/5/2023

```
 1   Q.      Mr. Wilson, if I generally recall from the
 2   last time we met, I believe you've been working -- or
 3   you had been working at Twitter for roughly ten years.
 4   Does that sound about right?
 5   A.      Yes.  When I left, I was approximately --
 6   about four months short of being at Twitter for almost
 7   11 years.
 8   Q.      So you started around 2012; does that sound
 9   right?
10   A.      April of 2012.
11   Q.      Okay.  And when you started, who role did you
12   have?
13   A.      I don't -- I don't recall my official title.
14   Twitter was very much a small start-up at the time.
15   But I was hired by Bob Lord mostly to run their
16   ISO 27002 program related to the original FTC consent
17   decree, as well as do third-party security reviews,
18   on-call duties.  The security team was very small, so
19   you ended up having to wear a lot of different hats,
20   and I had a lot of different responsibilities.
21   Q.      And if you remember, at the time when you
22   first started, was there a particular team or division
23   that you were part of?
24   A.      The team was officially called the information
25   security team, or infosec for short.
```

11

Wilson

USA v. Twitter, Inc.                                              5/5/2023

1    Q.        And at some point, did you change roles?

2    A.        I did, yes.

3    Q.        And how did that change?

4    A.        So after -- after I'd had my first child --

5    and this was in 2017 -- I came back from paternity

6    leave, and I had an opportunity ███████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

9    ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

17              So that was really like the start, the start

18   of that change of moving from an individual

19   contributor engineer-type role to a more management

20   role.

21   Q.        ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████████████

Wilson

USA v. Twitter, Inc.                                                    5/5/2023

1    ██████

██████████████████████████████████████████████

██████████████████████████████████

4    Q.      So that was -- you said it was sometime in

5    2017, after you came back from paternity leave?

6    A.      Late 2017, after I came back.

7    Q.      And then at any point after that, did your

8    role at the company change?

9    A.      It did.  Y████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████

1  ████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████

██████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

████████████████████████████████████████

██████████

15              (Clarification by the reporter.)

16              THE WITNESS:  Summer of 2021.

17              COURT REPORTER:  Thank you.

18  BY MS. KIM:

19  Q.      So at that time -- let's say roughly the

20  summer of 2021 -- you were managing managers, and your

21  team had grown to about 30 to 35 employees; is that

22  correct?

23  A.      I would say 30 to 35 just pre-acquisition.

24  Q.      Okay.

25  A.      So you're looking at 2022 time frame, yeah.

33

Wilson

USA v. Twitter, Inc.                                              5/5/2023

```
 1    left.
 2    Q.        ████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████
 5              MS. LONDON:  Objection to form.
 6    Compound.
 7    BY MS. KIM:
 8    Q.      Do you understand the question, or do you want
 9    me to rephrase?
10    A.      Maybe rephrase it a bit.
11    Q.      Okay.
12    A.      I think I understand what you mean.
13    Q.      Okay.  Let me -- we'll start big and winnow
14    down.
15            S███████████████████████████████████
      ████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████████
```

Wilson

USA v. Twitter, Inc.                                              5/5/2023

1  ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

7       A significant number of people within my

8  organization decided to opt out on, like, the "fork in

9  the road" email that I believe came on November 16th,

10  if memory serves.

11      I can't speak to those individuals'

12  decision-making and rationale.  But it's worth noting

13  that a significant number of individuals -- a majority

14  of individuals within my organization were remote in

15  Boulder, Colorado; North Carolina; New York; Texas;

16  Florida.  A lot of them had concerns about being

17  forced, you know, to move, like, back to San Francisco

18  and were more risk-averse.  And so that was a safer

19  decision for them.

20  Q.     Can you just, so we have it on the record,

21  explain what you meant by the "fork in the road" email

22  that came in around mid-November?

23  A.      Yeah.  So my -- I was first aware of the email

24  -- I think it came in -- it came in midnight.  I

25  believe it was on the -- I believe it was on a

Wilson

USA v. Twitter, Inc.                                          5/5/2023

 1   Wednesday, the 16th.  But, again, I'm doing my best
 2   with dates.  And one of my colleagues -- one of my --
 3   one of the individuals in my org texted me and just
 4   said, "Well, it's been a great run."
 5            And then I read the email.  Again, because,
 6   like, a lot of us weren't sleeping, so I was up.  I
 7   saw the text and read the email.  And, essentially,
 8   like -- I'm paraphrasing it, but, you know, Elon had
 9   sent an email to everybody in the team that he wanted
10   -- it was an opt-in or opt-out -- or if you did not
11   reply, you opted out -- into being, like, hardcore.
12   And if you wanted to be a part of Twitter 2.0, that
13   means going all in on the vision and being hardcore.
14            So, essentially, he was giving employees that
15   weren't laid off an option to resign and get a -- and
16   get a severance package.
17   Q.       And do you recall that there were a number of
18   people who were laid off in early November of '22,
19   shortly after the acquisition took place?
20   A.       Yes, very much so.
21   Q.       Did any of those layoffs impact TMO?
22   A.       Only one.
23   Q.       One person?
24   A.       To the best of my knowledge.
25   Q.       Okay.

60

Wilson

USA v. Twitter, Inc.                                                5/5/2023

1    like, right away.

2            So Michael followed the onboarding process

3    that both Andy and I had come up with.  Part of that

4    process was that you had to sign an NDA and you had to

5    receive a copy of the consent decree and then sign

6    that you've read it and received it.

7            Bari refused to do either of that, so Michael

8    called Andy directly.  Then Andy contacted me, and we

9    got the right people involved from legal and

10   essentially put a pause on it until the following

11   week, where we would come up with a process to get her

12   the information that she needed without having her

13   having direct access.

14   Q.      And when I ask this next question, just I

15   don't need to hear about, sort of, discussions you may

16   have had with legal.  I want to focus on what your

17   direct involvement was.

18           On that Saturday when Michael Wilson was

19   called into the office and Bari Weiss was there, was

20   this San Francisco headquarters?

21   A.      San Francisco.

22   Q.      And you had said that Ms. Weiss was demanding

23   a certain type -- or she was demanding that she be

24   given access right away.  Was that your testimony?

25   A.      Correct.  And this is -- this is -- Michael

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Wilson

USA v. Twitter, Inc.                                    5/5/2023

1   talked to me, like, directly about it.  And I got --
2   you know, because I wanted to understand it from an
3   incident standpoint.  So at that time -- I believe
4   this was on Monday, Monday morning -- I sat him down,
5   and I had him give me kind of an account of -- a
6   detailed account of what had happened on Saturday.
7           And that is -- that is what he -- that is what
8   he told me, that Bari was already waiting there; Elon
9   was not there; and that Bari was told by Elon that she
10  was to have access to Twitter systems to be able to
11  write a story.
12  Q.      Was Ms. Weis accompanied or -- accompanied by
13  anybody else while she was waiting at the Twitter
14  offices on Saturday?
15  A.      I was never -- I was not told.  It's possible.
16  I do not believe so, though.
17  Q.      What was Michael Wilson's sense of what type
18  of access she was supposed -- Mr. Musk wanted Bari
19  Weiss to be given?
20  A.      Michael wasn't sure, and Bari wasn't sure
21  either.
22  Q.      But the thought, at least at one point, was
23  that Bari Weiss was supposed to be given the same
24  laptop that any other Twitter employee would get?
25  A.      That is correct.

Wilson

USA v. Twitter, Inc.                                    5/5/2023

```
 1   Q.      With the same type of access that a regular
 2   Twitter employee would have?
 3   A.      That is correct.
 4   Q.      And she was asked to sign an NDA as a
 5   condition of getting that laptop, and she refused?
 6   A.      As a part of our onboarding process for Tesla
 7   and SpaceX engineers that were coming in to help, Andy
 8   and others, including myself, came up with a process
 9   to be able to support the need to, like, quickly
10   create accounts but also do it in a way that we felt
11   was in compliance.  And so part of that NDA process --
12   reading and then agreeing that you've read the consent
13   order -- was a part of that process.
14           And per my conversation with Michael is that
15   she refused to sign either.
16   Q.      Either the NDA or the FTC -- a copy --
17   something acknowledging she had reviewed a copy of the
18   FTC consent order?
19   A.      Yes.  She refused to sign either.
20   Q.      Do you recall there being some sort of
21   discussion about Bari Weiss being granted super admin
22   access on Slack?
23   A.      Yes.  I mean, super admin is not a thing, to
24   be clear.  But I think the -- I think what they wanted
25   was the ability to do keyword searching through
```

63

Wilson

USA v. Twitter, Inc.                                          5/5/2023

1   conversations in private Slack channels and one-to-one
2   direct messages, which would need elevated privileges
3   beyond just what a average employee might have.
4   Q.      Was Ms. Weiss ever given that type of -- those
5   type of privileges?
6   A.      To the best of my knowledge, she was not.
7   Q.      So it was reported that Mr. Musk had directed
8   somebody at Twitter to give Bari full access to
9   everything at Twitter, no limits at all.
10          Do you recall hearing anything along those
11  lines in your conversation with either Michael Wilson
12  or anybody else who was involved?
13  A.      I did hear that from both Andy and Michael,
14  but I do not have any direct account of hearing that
15  from either a written or verbal from Elon himself.
16  Q.      Do you know whether Mr. Musk ever used Signal
17  to communicate, give directions or instructions
18  concerning business at Twitter?
19  A.      I think deducting, based on conversations that
20  I'd had with Christopher Stanley and Josh from SpaceX,
21  who had very regular interaction with Elon, that
22  Signal was the preferred method of communication.
23  Q.      Is it your sense that Bari Weiss wasn't given
24  the broad access that had initially been contemplated
25  because you and others at the company had objected to

1     such an arrangement?

2     A.       Yes.  We put together a safer alternative,

3     which is what ended up occurring.

4     Q.       Were there any other incidents or events or

5     things you heard that caused you to have concerns

6     about Mr. Musk's leadership of Twitter?

7     A.       Related to the Twitter Files and executive

8     assistants, you know, for legal at the time came to me

9     and --

10             MS. LONDON:  Whoa.

11             THE WITNESS:  What's that?

12             MS. LONDON:  Be careful.  Is it someone

13    talking about legal issues?

14             THE WITNESS:  No.

15             MS. LONDON:  Okay.

16             THE WITNESS:  They were concerned that

17    they were -- they were being given a lot of access and

18    being, you know, asked to do searches in Slack and in

19    other tools on behalf of, like, the Twitter Files.

20             At one point in time, Alex Stillings, at

21    the direction of Elon, you know, had asked that this

22    individual -- you have to assist in being given Slack

23    admin access to perform searches.  And at the time,

24    you know, Alex Stillings attached a screenshot, a

25    photo from his phone that appeared to be, like, a text

65
Wilson

USA v. Twitter, Inc.                                      5/5/2023

1   message from Elon that -- I'm paraphrasing, but it
2   said something along the lines of, you know, I want to
3   be very clear that Teng is to get -- needs to get
4   Slack admin access immediately, and anybody standing
5   in the way is to be fired.
6              That raised some concerns to me that,
7   more holistically, that people are likely going to get
8   pressure from an access standpoint to do things that
9   -- and be given access that maybe weren't commensurate
10  with their job responsibility.
11  BY MS. KIM:
12  Q.    And this is Kang Taing, T-a-i-n-g?
13  A.    T-e-n-g.
14  Q.    And was this individual an executive assistant
15  for one of Musk's other companies --
16  A.    For Sean --
17  Q.    -- or has that -- pardon?
18  A.    Sean Edgett.
19  Q.    Okay.  The former general counsel at Twitter?
20  A.    Correct.
21  Q.    Okay.
22             MR. ADAMS:  And, obviously, I just want
23  to caution that to the extent we're talking about
24  Mr. Edgett's former assistant, it's already been
25  raised, but I just want to say again that we should be

66

Wilson

USA v. Twitter, Inc.                                            5/5/2023

1    careful that we're not talking about communications

2    that were sent at the direction of Mr. Edgett.

3                 MS. KIM:  Understood.

4    BY MS. KIM:

5    Q.       Were there any other instances or things you

6    heard or observed that led you to have concerns that

7    other people at Twitter would be pressured to provide

8    access in a way that may be not -- wouldn't be

9    appropriate?

10   A.       This is the only -- the Twitter Files was the

11   only instance where I -- where I observed, you know,

12   this, like, sense of urgency, you know, where

13   individuals needed to get access, broad access, that I

14   felt was, like, not commensurate with their job

15   responsibility.

16   Q.       And your sense was that Kang Teng, given that

17   person's job role, it wouldn't have been commensurate

18   for them to get the broad access that they were being

19   pressured to get.  Is that your sense?

20   A.       Correct.  And they came to me personally and

21   told me that they didn't want that access, and they

22   didn't know what they were doing.  They were scared.

23   Q.       You had mentioned that in connection with the

24   acquisition, a number -- Mr. Musk brought a number of

25   people from his other companies to Twitter and that

Wilson

USA v. Twitter, Inc.                                    5/5/2023

1    Q.      Any other incident or thing -- something you
2    observed or heard about that caused you to have
3    concerns regarding Mr. Musk's leadership of Twitter?
4    A.      I think I covered the most glaring -- the ones
5    that I can remember the most strongly.
6    Q.      Did you yourself ever meet with Mr. Musk,
7    whether in person or on videoconference?
8    A.      Not in a one-on-one-type setting, but there
9    were three meetings that I had with him.
10   Q.      I'm going to ask you some more about each of
11   those meetings.  Let's start with the first one.
12   Approximately when did it take place?
13   A.      I believe this was November 10th.  It was late
14   in the week, and this was shortly after Lea's
15   resignation, Damien's resignation, you-all's
16   resignation.
17           Andy, myself were concerned about the -- from
18   a personal liability standpoint from the consent
19   decree, given that we -- given that we no longer had a
20   CISO.  So we wanted some clarification around what he
21   felt about it, and so we had a meeting scheduled
22   between Elon, Alan, and I believe Alex Spiro was there
23   as well.
24   Q.      And Andy Sayler was there?
25   A.      Andy Sayler.

Wilson

USA v. Twitter, Inc.                                        5/5/2023

```
 1   Q.      Was this in the San Francisco headquarters
 2   office?
 3   A.      This was really late at night, so we were --
 4   Andy, Alan, and myself, we were virtual.  To be
 5   honest, I can't -- I don't recall -- I don't recall if
 6   Alex was there, like, in the room just because it was
 7   -- it was virtual.  And, like, we were, more or less,
 8   like, centered -- the conversation kind of centered
 9   around Elon himself, so...
10   Q.      And can you tell me more about what was
11   discussed in that meeting?
12           MS. LONDON:  If Alex was present, I don't
13   know -- I don't know if the --
14           MS. KIM:  Well, I can break it into
15   pieces.  Let me start.
16   BY MS. KIM:
17   Q.      Do you remember if Mr. Spiro did any of the
18   talking at this meeting?
19   A.      If he did, it was -- it was very little.  It
20   was -- it was mostly Elon.
21   Q.      Do you remember whether you or Mr. Sayler or
22   Mr. Rosa posed any particular questions to Mr. Musk
23   regarding the concerns you had about personal
24   liability under the FTC order?
25           MS. LONDON:  May we pause for a minute?
```

Wilson

USA v. Twitter, Inc.                                          5/5/2023

1    I just want to make sure that everyone's comfortable
2    with where we're going with this.  Even though the
3    lawyer was present -- I'm not expressing an opinion on
4    that, but I want to make sure that Quinn Emanuel is
5    comfortable.  I think we need a sidebar.
6               MS. KIM:  You want to take five minutes?
7               MR. ADAMS:  Yeah, we can take a few
8    minutes.
9               MS. KIM:  Okay.  Off the record.
10              MS. LONDON:  Thanks.
11              (Brief recess from 1:36 p.m. Central to
12                1:42 p.m. Central.)
13   BY MS. KIM:
14   Q.    So, Mr. Wilson, we were talking about a
15   meeting that happened on or about November 10th
16   involving you, Alan Rosa, Andy Sayler.  And you were
17   meeting with Elon Musk, and you think that Alex Spiro
18   may have also been in the room.  Do you recall?
19   A.    It was really late at night, and the
20   conference room was somewhat dark.  And both Andy,
21   Alan, and I were virtual.  So I want to say this was,
22   like, after 10:00 at night.  It was pretty late, and
23   the meeting was short.  It was approximately 15 minutes
24   -- 15 minutes long.
25   Q.    Do you remember what was discussed in that

75

Wilson

USA v. Twitter, Inc.                                         5/5/2023

1    meeting?

2    A.      Yeah.  I mean, the primary objective was -- of

3    it was that we had just lost, you know, our CISO and

4    our data protection officer.  And there were some

5    questions that Andy and I had had with regards to,

6    like, legal liability with regards to the consent

7    decree.

8    ██████████████████████████████████████

     ████████████████████████████████████████

     ███████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████

     ███████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████████████

     █████████████████████████████████████████

     ████████████████████

20   Q.      And how did Mr. Musk respond?

21   A.      Well, to the first question that Andy asked

22   around, like, liability, he was very clear that, you

23   know, he is the single person responsible, you know.

24   Like, it falls on him.

25           He mentioned that he'd just gotten off a call

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Wilson

USA v. Twitter, Inc.                                              5/5/2023

1    with the Federal Trade Commission and that everything

2    was good.  That relationship was good.  He wasn't

3    concerned.

4         And that's about all I can remember.  It was a

5    pretty short -- pretty short, quick answer.  But,

6    like, unequivocally, we, as in Andy and myself, are

7    not on the hook for it.  Like, it is him.

8    Q.  ███████████████████████████████████████

     ██████████████████████████████████████████████████

     ██████████████████

     ████████████████████████████████████████████

     ██████████████████████████████████████████████

     ████████████████████████████████████████████████

     ███████████████████████████████████████████

     █████████████

     █████████████████████████████████████████████████

     █████████████████████████

     ████████████████████████████████████████████

     ██████████████████████████████████████████████████

     █████████████████

21   Q.    Is there anything else you remember from that

22   meeting that Mr. Musk said regarding the FTC order and

23   whether the company was in shape to comply, anything

24   like that?

25   A.    No.  It was a pretty short meeting.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Wilson

USA v. Twitter, Inc.                                              5/5/2023

1    Q.      And you may have said this already, but is
2    there anything else Mr. Musk conveyed about the call
3    he had with the FTC earlier that day?
4    A.      Other than it was just kind of an amusing
5    response.  You know, it was just like, "I just got off
6    the call with them, and the relationship is really
7    good."  And he mentioned that, like, they're not
8    concerned.
9    Q.      Did he mention who at the FTC he had this call
10   with?
11   A.      No.
12   Q.      Okay.  What was your own personal impression
13   of that meeting?  Like, when you left that meeting,
14   did you feel reassured?  Did you feel that you have
15   nothing left to worry about?  What was your impression
16   of how that meeting went?
17   A.      I got the answer that I needed for the area of
18   my biggest concern, ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████
25   Q.      Did you yourself still have concerns from a

Wilson

USA v. Twitter, Inc.                                      5/5/2023

1    Ajimotokin, SGRC."

2          Let me know when you're ready for a question.

3    A.      Yeah.  I received it, but I don't -- I don't

4    really have any memory of it, so...

5    Q.      Do you have any understanding as to why you

6    were BCCed on it?

7    A.      No.

8    Q.      Would Sandra --

9    A.      Other than --

10   Q.      Go ahead.

11   A.      I was just saying, other than, like, me being

12   a stakeholder in a program.

13   Q.      Okay.  Was Sandra part of the TMO

14   organization?

15   A.      No.

16   Q.      Okay.  Do you know why these weekly -- and I'm

17   going to start going through a series of these weekly

18   update emails.  They all seem to be dated from

19   December.

20          Do you have any understanding as to what

21   prompted these weekly update emails in December?

22   A.      No.

23   Q.      Okay.  Do you know whether there was any

24   directive or instruction from someone in management

25   that people started to have -- had to start sending

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

121

Wilson

USA v. Twitter, Inc.                                    5/5/2023

1   weekly updates about what they were working on?

2   A.      I mean, I remember -- I remember the -- oh,

3   yeah.  Okay.  So Elon sent an email and instructed --

4   and it started out as engineers, but it was really

5   addressed to everybody to send a weekly update of

6   everything you were working on.

7          And there was somewhat, like, of a format.

8   And, like, in particular, like, he wanted, like,

9   examples of code; like, things you had done; like,

10  what projects, which initiatives; and, like, my

11  clearest -- there was, like, a clear set of

12  instructions that he wanted.

13         And the reason why I was BCCed, like, on this

14  -- and maybe Andy as well -- is that we -- Andy and I

15  were, like, the two remaining, like, Twitter leaders

16  left.  So some people on the team would, like, BCC us

17  just to keep us -- just to keep us in the loop of what

18  we were -- of what we were working on with the infosec

19  organization.

20         And then that distribution list was created --

21  was created in particular.  I think it was a couple

22  weeks after the weekly update email process went out

23  for not just engineering-related work.  It was all

24  infosec-related work.

25         So I think, you know, it may have come up in

122

Wilson

USA v. Twitter, Inc.                                                    5/5/2023

1    discovery.  But, like, I was also sending to that
2    distribution list right up until the end.  And so it
3    was meant to cover the work that you were doing, maybe
4    even if you weren't writing software code.
5    Q.       So it sounds like you may -- since
6    Ms. Ajimotokin didn't work directly with you or in
7    your organization, you may not be familiar.  I just
8    wanted to ask you a few questions in case you do --
9    A.       Yeah.
10   Q.       -- in case you are familiar.
11            So at the top, there's a section called, "What
12   projects are you working on?"
13            ██████████████████████████████████
     ████████████████████████████████
     ███████████████████████████████
     ████████████████████
     ██████████████████████████████████████
     ███████████████████████████
     █████████████████████████
     █████████████████████████████████████
     ███████████████████████████████████████
     █████████████████████████████████
     ████████████████████████████
     ██████████████████
     ██████████████████████████████████████

132

Wilson

USA v. Twitter, Inc.                                        5/5/2023

1    through and do this cleanup exercise with HR.  So

2    that's what that's referring to.

3    Q.      So this cleanup, or this sort of fast-track

4    process that you and Andy developed, that was due to

5    the volume of terminations that the company was

6    undergoing after the acquisition?

7    A.      Yeah.  I mean, you would never build your

8    processes with these cases in mind.  Like, that's --

9    it was kind of an extreme scenario, so...

10   Q.      Were you given -- there was a significant

11   number of layoffs that occurred on November -- around

12   November 4th.  Do you recall that?

13   A.      I recall most of them, and I don't think all

14   of them.  There was quite a few.

15   Q.      And if I tell you that the November 4th

16   layoffs approximated roughly almost half of the

17   workforce, roughly 50 percent of the workforce, does

18   that sound consistent with your recollection?

19   A.      That is -- that is close to accurate, yes.

20   Q.      Were you or Andy or anyone from your teams

21   given a heads-up that there would be such a

22   significant number of Tweeps being offboarded all at

23   once?

24   A.      Yes.

25   Q.      Okay.  About how much advance notice were you

Wilson

USA v. Twitter, Inc.                                           5/5/2023

1   given?

2   A.      I was told -- I remember because I was at -- I

3   remember because I was at a Halloween play with my

4   daughters, and I had -- and I had to leave and not see

5   my daughter's first play.

6          The head of HR called me and mentioned that

7   Elon wanted to start the termination process that

8   weekend.  And that was -- that would have been

9   October, like, 29th, so that Saturday.  Again, dates

10  with me are, like, pretty bad, so that would have

11  been, like, that Saturday.

12         And Kathleen Pacini, who was the head of,

13  like, HR at the time, like, they were very nervous and

14  not confident that they could execute it.  Nor was I,

15  given that we were -- she was told, like, the numbers

16  were significantly higher than 50 percent.

17         So that was the first I learned of it.  And

18  then I already, more or less, had a plan and runbook

19  in place.  So I started executing upon that and kind

20  of putting a more detailed plan in place involving

21  Andy.  And, thankfully, cooler heads prevailed, and

22  the layoff got pushed to November 4th.

23  Q.      And by then, is that when you and Andy were

24  able to come up with a fast-track system that would

25  try to ensure that the access would be cut off for a

Wilson

USA v. Twitter, Inc.                                                        5/5/2023



153

Wilson

USA v. Twitter, Inc.                                              5/5/2023

1

22   Q.      Who made the decision to move out of the
23   Sacramento data center?
24   A.      I mean, I did not see a directive or order,
25   but I think it's fair to say that most of the

Wilson

USA v. Twitter, Inc.                                      5/5/2023

1    direction orders came directly from, like, Elon

2    himself.  So nothing was ever written down.  There was

3    no email that was sent out.  This is something that we

4    were told from Christopher Stanley and Josh during

5    that time.

6    Q.       And was Mr. Musk driving the decision on how

7    quickly that Sacramento data center had to be shut

8    down?

9    A.       I wasn't privy to that.  It's likely

10   Christopher Stanley or Josh that knew the actual,

11   like, dates of when we had to be out.

12   Q.       And is it your sense that they would have --

13   in a circumstance like this, they would have been

14   getting their instructions or directives from Mr. Musk

15   himself?

16   A.       Yes, that's correct.

17               MS. KIM:  I'm going to mark the next

18   exhibit Exhibit 8.

19               (Exhibit No. 8 was marked.)

20   BY MS. KIM:

21   Q.       This is a -- I'll give you time to page

22   through it.  I'm going to have questions for you about

23   the discussion that starts on Page 3.

24               While you're scrolling through in the

25   meantime, I'll note for the record, this is a thread

Wilson

USA v. Twitter, Inc.                                                    5/5/2023



1    Q.

Wilson

USA v. Twitter, Inc.                                     5/5/2023



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

194

Wilson

USA v. Twitter, Inc.                                                    5/5/2023

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I certify that the witness in the foregoing

 4    videoconference deposition, SETH WILSON, was by me

 5    duly sworn remotely to testify in the within entitled

 6    cause; that the said deposition was taken at the time

 7    and place therein named; that the testimony of said

 8    witness was reported by me, a Shorthand Reporter and

 9    Notary Public of the State of Tennessee authorized to

10    administer oaths and affirmations; that there was a

11    request that the witness read and sign this

12    deposition; and said testimony, Pages 1 through 193,

13    was thereafter transcribed into typewriting.

14            I further certify that I am not of counsel or

15    attorney for either or any of the parties to said

16    deposition, nor in any way interested in the outcome

17    of the cause named in said deposition.

18            IN WITNESS WHEREOF, I have hereunto set my

19    hand the 10th of May, 2023.

20

21

22

23                    s/Pamela P. Willis

24                    Pamela P. Willis, TLCR No. 229

25                    My Commission Expires:  11/3/2025
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary, I will attach on a separate sheet of paper to the original transcript.

_Seth R Wilson_

**WITNESS NAME**

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555